John Moseley   April 8, 2025

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTGRICT OF TEXAS
HOUSTON DIVISION

MMA LAW FIRM, PLLC,        )
                           )
        Debtor,            )
                           )
VS.                        )  Civil Action No.
                           ) 4:24-cv-4446
MORRIS BART, LLC,          )
                           )
        Appellant.         )
                           )
                           )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
JOHN MOSELEY
April 8, 2025
Volume 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JOHN MOSELEY,
produced as a witness at the instance of the DEFENDANT,
was taken in the above-styled and numbered cause on
April 8, 2025 from 9:11 a.m. to 3:37 p.m., before
Toyloria Lanay Hunter, CSR in and for the State of
Texas, reported by machine shorthand, at the law offices
of MMA Law Firm, 1235 North Loop West, Suite 810,
Houston, Texas 77008, pursuant to the Federal Rules of
Civil Procedure, and the provisions stated on the record
or attached hereto.

## Page 2

1        APPEARANCES:
2   FOR MMA LAW FIRM, PLLC:
    Miriam T. Goott
3   Johnie Patterson
    WALKER & PATTERSON, P.C.
4   P.O. Box 61301
    Houston, Texas 77208-1301
5   Tel: 713-956-5577
    E-mail: mgoott@walkerandpatterson.com
6         jjp@walkerand patterson.com
    FOR MORRIS BART LLC:
7   Rebekka C. Veith
    FISHMAN HAYGOOD, L.L.P.
8   201 St. Charles Avenue, Suite 4600
    New Orleans, Louisiana 70170
9   Tel: 504-586-5252
    Fax: 504-586-2520
10  E-mail: rveith@fishmanhaygood.com
11
    --and--
12
    FOR MORRIS BART LLC:
13  Matthew Probus
    THE PROBUS LAW FIRM
14  10497 Town & County Way, Suite 930
    Houston, Texas 77024
15  Tel: 713-258-2700
    E-mail: matthewprobus@theprobuslawfirm.com
16
    FOR THE UCC:
17  Natalie Galerne
    LAWSON & MOSHENBERG PLLC
18  2301 Commerce Street
    Houston, Texas 77002
19  Tel: 713-337-5580
    E-mail: natalie.galerne@lmbusinesslaw.com
20
    THE VIDEOGRAPHER:
21  Randall Barnett
22  ALSO PRESENT:
    Jonathan Hilton (via Zoom)
23  Eliza Bauler-O'Grady (via Zoom)
24
25

## Page 3

1              I N D E X
2                        PAGE
3   Appearances.............................    2
    Stipulations............................    1
4   Signature and Changes...................  232
    Reporter's Certification................  234
5
6   JOHN MOSELEY
7       E X A M I N A T I O N
8   By Ms. Veith                     10
9       E X H I B I T S
10  Exhibit   Description        Page
11  Exhibit 1   AMENDED NOTICE OF RULE 30(b)(6)   10
              DEPOSITION OF MMA LAW FIRM, PLLC
12
13  Exhibit 2   LIST OF NAMES;              16
              MMA-MB000001-000017
14  Exhibit 3   E-MAIL DATED JUNE 25, 2021 FROM   18
              PHIL VOTTIERO TO MARY KATHERINE
15            SMITH; PATE SMITH, ET AL RE:
              QUESTIONNAIRE STORM.DOCX;
16            MMA-B001026-001032 (WITH
              ATTACHMENTS)
17
    Exhibit 4   E-MAIL DATED JUNE 29, 2021 FROM   28
18            PHIL VOTTIERO TO MARY KATHERINE
              SMITH, SHANE RADFORD, ET AL, RE:
19            FIRST PARTY INTAKE CALL CENTER;
              MMA-MB001016-001018
20
    Exhibit 5   E-MAIL DATED AUGUST 10, 2021 FROM   31
21            PHIL VOTTIERO TO PATE SMITH, ZACH
              MOSELEY RE: STORM DAMAGE CALL
22            CENTER; MMA-MB001014-001015
23  Exhibit 6   E-MAIL DATED AUGUST 20, 2021 FROM   32
              SHANE RADFORD TO PATE SMITH, ET
24            AL RE: STORM DAMAGE CALL CENTER;
              MMA-MB000464-000469
25

## Page 4

1       E X H I B I T S (Continued)
2   NO.       Description        Page
3   Exhibit 7   E-MAIL DATED DECEMBER 15, 2021   36
              FROM PHIL VOTTIERO TO ZACH
4             MOSELEY, JOHN SCALLAN RE: INTAKE
              INTRO; MMA-MB000886-000887
5
    Exhibit 8   E-MAIL DATED AUGUST 31, 2021 FROM   40
6             SHANE RADFORD PHIL VOTTIERO ET
              AL RE: LAST TWO QUESTIONS/FIELDS;
7             MMA-MB000474
8   Exhibit 9   E-MAIL DATED AUGUST 31, 2021 FROM   41
              PHIL VOTTIERO TO ZACH MOSELEY RE:
9             IDA POA; MMA-MB001002-001003
              (WITH ATTACHMENTS)
10
    Exhibit 10   E-MAIL DATED AUGUST 31, 2021 FROM   42
11            PHIL VOTTIERO TO ZACH MOSELEY RE:
              HURRICANE FORM MAPPING;
12            MMA-MB000988 (WITH ATTACHMENT)
13  Exhibit 11   E-MAIL DATED AUGUST 31, 2021 MARY   46
              KATHERINE SMITH, ET AL RE;
14            HURRICANE IDA;
              MMA-MB000099-000110 (WITH
15            ATTACHMENT)
16  Exhibit 12   E-MAIL DATED SEPTEMBER 6, 2021   49
              FROM PHIL VOTTIERO TO ZACH
17            MOSELEY RE:
              MAPS/SCHEDULING/ROUTES/SCHEDULING
18            API; MMA-MB000982
19  Exhibit 13   E-MAIL DATED SEPTEMBER 7, 2021   50
              FROM PHIL VOTTIERO TO PATE SMITH,
20            ET AL RE: CONTRACTOR REFERENCE
              CODE.XLSX; MMA-MB000980-000981
21            (WITH ATTACHMENT)
22  Exhibit 14   E-MAIL DATED SEPTEMBER 7, 2021   52
              FROM ROBERT KINSMAN TO ZACH
23            MOSELEY ET AL RE: HURRICANE IDA;
              MMA-MB000043-000056
24
25

1 (Pages 1 to 4)

John Moseley   April 8, 2025

## Page 5

E X H I B I T S (Continued)

NO.      Description      Page

Exhibit 15  E-MAIL DATED SEPTEMBER 14, 2021   53
FROM ROBERT KINSMAN TO ZACH
MOSELEY ET AL RE: HURRICANE IDA;
MMA-MB000042

Exhibit 16  E-MAIL DATED SEPTEMBER 16, 2021   59
FROM PHIL VOTTIERO TO WILLIAM
HUYE, ZACH MOSELEY RE: STORM
DAMAGE RETAINER; MMA-MB000975
(WITH ATTACHMENT)

Exhibit 17  E-MAIL DATED SEPTEMBER 21, 2021   61
FROM SHANE RADFORD TO ADAM
KRAUSE, ET AL RE: STORM DAMAGE
EMAIL; MMA-MB000479

Exhibit 18  E-MAIL DATED SEPTEMBER 22, 2021   62
FROM SHANE RADFORD TO KORI
WESTBROOK ET AL RE: STORM DAMAGE
INTEGRATION; MMA-MB000480-000481

Exhibit 19  E-MAIL DATED OCTOBER 6, 2021 FROM   64
SHANE RADFORD TO ADAM KRAUSE ET
AL RE: STEPS; MMA-MB000482-000483

Exhibit 20  E-MAIL DATED OCTOBER 7, 2021 FROM   66
PHIL VOTTIERO TO PATE SMITH, ET
AL RE: CLAIMANTS THAT COME IN TO
MMA; MMA-MB000963

Exhibit 21  E-MAIL DATED OCTOBER 9, 2021 FROM   69
PHIL VOTTIERO TO ZACH MOSELEY ET
AL RE: ONBOARDING; MMA-MB000962

Exhibit 22  E-MAIL DATED OCTOBER 13, 2021   71
FROM PHIL VOTTIERO TO COLETTE
JONES, ET AL RE;
HURRICANE-RELIEF.COM;
MMA-MB000945-000948

Exhibit 23  E-MAIL DATED OCTOBER 18, 2021   74
FROM SHANE RADFORD TO MARY
KATHERINE SMITH, ET AL RE:
HURRICANE-RELIEF.COM;
MMA-MB000500-000505

## Page 6

E X H I B I T S (Continued)

NO.      Description      Page

Exhibit 24  E-MAIL DATED OCTOBER 21, 2021   76
FROM SHANE RADFORD TO MARY
KATHERINE SMITH, ET AL RE: MMA
AND KK PROCESS;
MMA-MB000506-000507

Exhibit 25  E-MAIL DATED DECEMBER 7, 2021   80
FROM ZACH MOSELEY TO ACCOUNTING
RE: MMAC INVOICE 1572;
MMA-MB000040-000041 (WITH
ATTACHMENT)

Exhibit 26  E-MAIL DATED DECEMBER 8, 2021   82
FROM SHANE RADFORD TO ZACH
MOSELEY ET AL RE: MMAC KRAUSE
KINSMAN STORM DAMAGE INVOICE;
MMA-MB000519-000520
(W/ATTACHMENT)

Exhibit 27  MARKETING SERVICE AGREEMENT;   84
MMA-MB001039-001044

Exhibit 28  E-MAIL DATED DECEMBER 9, 2021   97
FROM SHANE RADFORD TO COLETTE
JONES RE: EMAIL FORWARDING;
MMA-MB000525-000527

Exhibit 29  E-MAIL DATED DECEMBER 15, 2021   101
FROM PHIL VOTTIERO TO ZACH
MOSELEY ET AL RE: INTAKE INTRO;
MMA-MB000886-000887

Exhibit 30  E-MAIL DATED DECEMBER 17, 2021   102
FROM PHIL VOTTIERO TO ZACH
MOSELEY RE: ETHICS APPROVAL;
MMA-MB00082 (W/ATTACHMENT)

Exhibit 31  E-MAIL DATED JANUARY 6, 2022 FROM   105
PHIL VOTTIERO TO ZACH MOSELEY ET
AL RE: DRIVERS; MMA-MB000867

Exhibit 32  E-MAIL DATED JANUARY 13, 2022   107
FROM PHIL VOTTIERO TO SEAN KELLY,
ZACH MOSELEY RE: AGENCY OF
RECORD; MMA-MB000865

## Page 7

E X H I B I T S (Continued)

NO.      Description      Page

Exhibit 33  E-MAIL DATED JANUARY 24, 2022   109
FROM SHANE RADFORD TO PHIL
VOTTIERO ET AL RE: WHAT A LAW
ALLOWS US TO COLLECT ATTORNEYS
FEES; MMA-MB000533-000537
(W/ATTACHMENTS)

Exhibit 34  MARKETING SERVICE AGREEMENT;   112
MMA-MB001045-001050

Exhibit 35  E-MAIL DATED FEBRUARY 8, 2022   118
FROM ZACH MOSELEY TO PHIL
VOTTIERO RE: MMA LOUISIANA
RADIO ADS; MMA-MB000417

Exhibit 36  E-MAIL DATED FEBRUARY 8, 2022   119
FROM SHANE RADFORD TO ZACH
MOSELEY ET AL RE: STORM PHYSICAL
CONTRACT COVER LETTERS;
MMA-MB000540 (W/ATTACHMENTS)

Exhibit 37  E-MAIL DATED FEBRUARY 21, 2022   123
FROM SHANE RADFORD TO WILLIAM
HUYE ET AL RE: DRAFT UPDATED POA;
MMA-MB000549-000552
(W/ATTACHMENTS)

Exhibit 38  E-MAIL DATED FEBRUARY 28, 2022   125
FROM PHIL VOTTIERO TO JAMES
MCCLENNY ET AL RE: SA INTEGRATION
FOR MMA NEEDED RE: SMART ADVOCATE
FIRST DAY; MMA-MB000827-000833

Exhibit 39  E-MAIL DATED MARCH 16, 2022 FROM   129
PHIL VOTTIERO TO SCHERY RAMADAN
ET AL RE: DATA TRANSFER;
MMA-MB000806-000811

Exhibit 40  E-MAIL DATED MARCH 18, 2022 FROM   132
SHANE RADFORD TO SCHERY RAMADAN
ET AL RE: DATA TRANSFER;
MMA-MB000607

## Page 8

E X H I B I T S (Continued)

NO.      Description      Page

Exhibit 41  E-MAIL DATED APRIL 8, 2022 FROM   135
SHANE RADFORD GTO WILLIAM HUYE ET
AL RE:  CUSTOMER SERVICE
QUESTION; MMA-MB000715-000716

Exhibit 42  E-MAIL DATED APRIL 8, 2022 FROM   138
SHANE RADFORD TO WILLIAM HUYE ET
AL RE: MMA CS CALL RECAP WORKBOOK
REQUIREMENTS; MMA-MB000717

Exhibit 43  E-MAIL DATED APRIL 7, 2025 FROM   141
ZACH MOSELEY TO KATY OHLSSON RE:
FW: MMA CS CALL RECAP WORKBOOK
REQUIREMENTS (W/ATTACHMENT)

Exhibit 44  E-MAIL DATED APRIL 18, 2022 FROM   148
SHANE RADFORD TO CRAIG ANDREAS ET
AL RE: MMA MESSAGE MEDIA API KEY
FOR MCCLENNY MOSELEY ASSOCIATES;
MMA-MB000757-000770

Exhibit 45  E-MAIL DATED APRIL 22, 2022 FROM   153
ADAM KRAUSE TO ZACH MOSELEY ET AL
RE: DUAL REPS; MMA-MB000032
(W/VOLUMINOUS ATTACHMENT)

Exhibit 46  MARKETING SERVICE AGREEMENT;   157
MMA-MB001051-001057

Exhibit 47  MARKETING SERVICE AGREEMENT;   159
MMA-MB001058-001064

Exhibit 48  E-MAIL DATED JUNE 16, 2022 FROM   161
SHANE RADFORD TO ZACH MOSELEY ET
AL RE: USE THIS CONTRACT;
MMA-MB000787-000790

Exhibit 49  E-MAIL DATED JULY 16, 2022 FROM   164
SHANE RADFORD TO WILLIAM HUYE ET
AL RE: UPDATED STORM RETAINERS;
MMA-MB000339-000340

2  (Pages 5 to 8)

John Moseley    April 8, 2025

**Page 9**

E X H I B I T S (Continued)
NO.     Description     Page

Exhibit 50  E-MAIL DATED JULY 13, 2022 FROM    167
ZACH MOSELEY TO SEAN KELLY ET AL
RE: ZACH MOSELEY SIGNATURE;
MMA-MB000343

Exhibit 51  E-MAIL DATED AUGUST 11, 2022 FROM    167
PHIL VOTTIERO TO WILLIAM HUYE RE:
UPDATED STORM RETAINERS;
MMA-MB000333-000335

Exhibit 52  E-MAIL DATED AUGUST 16, 2022 FROM    169
TIGHE WILHELMY TO ZACH MOSELEY ET
AL RE: LOOK AT COMMENTS ERIN
BELK; MMA-MB000020-000021
(W/ATTACHMENT)

Exhibit 53  E-MAIL DATED OCTOBER 27, 2022    172
FROM CARLOS CEPEDA TO WILLIAM
HUYE ET AL RE:; KKTL RETAINERS
NEED SIGNATURE PAGES RESCANNED;
MMA-MB000269-000271
(W/ATTACHMENTS)

Exhibit 54  MARKETING SERVICE AGREEMENT;    174
MMA-MB001066-001074

Exhibit 55  E-MAIL DATED SEPTEMBER 6, 2022    177
FROM ZACH MOSELEY TO PHIL
VOTTIERO ET AL RE: LAURA/DELTA
CLAIMS; MMA-MB000324-000325

Exhibit 56  E-MAIL DATED JANUARY 31, 2023    180
FROM PHIL VOTTIERO TO ZACH
MOSELEY RE: NEW CAMPAIGN FOR MMA;
MMA-MB000289-000290
(W/ATTACHMENTS)

Exhibit 57  ADVERTISEMENT REGARDING HURRICANE    195
LAURA AND DELTA CLAIMS;
MMA-MB001075-001090

Exhibit 58  INVOICE #1572;    207
MMA-MBB001091-001099

Exhibit 59  TRANSACTION REPORT MMA LAW FIRM    221

Exhibit 60  E-MAIL DATED FEBRUARY 5, 2023    229
FROM TIGHE WILHELMY TO WILLIAM
HUYE ET AL RE: CEASE AND DESIST;
MMA-MB000234

**Page 10**

THE VIDEOGRAPHER:  Today is Tuesday, April 8, 2025.  The time is 9:10 a.m., and we're on the record.

JOHN MOSELEY, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. VEITH:

Q.  Good morning, Mr. Moseley.

Can you state your full name for the record, please?

A.  John Zachary Mosley.

Q.  And, Mr. Moseley, you are here as a 30(b)(6) representative for MMA Law firm PLLC, right?

A.  Yes, ma'am.

Q.  And we are at 1235 North Loop West, Suite 810 in Houston.  And that's that MMA's business offices?

A.  Yes, ma'am.

Q.  I'm going to hand you what will be marked as Deposition Exhibit 1.

(Exhibit 1 marked.)

BY MS. VEITH:

Q.  Take a look at that and let me know when you're ready.

A.  (Reading.)

Q.  Have you seen this document before?

**Page 11**

A.  Yes, ma'am.

Q.  And this is the notice of the deposition that we're sitting here in today, right?

A.  Yes.

Q.  And the last page, page 6, has a list of topics, correct?

A.  Yes, ma'am.

Q.  And you are the person on behalf of MMA who's designated to speak on all of those topics, correct?

A.  Yes, ma'am.

Q.  And there's no one else who would know more about any of those topics?

A.  No, ma'am.

Q.  I forgot to start with the rules of depositions.  But I know you know them 'cause you're a lawyer.  So I'm just going to say a couple that are ones important for me.  The first is, as you know, you're under oath just like you would be in a courtroom, right?

A.  Yes.

Q.  The second is that you have to answer verbally because we have a court reporter?

A.  Yes, ma'am.

Q.  And then the last -- and this is hard for me -- is that we can't talk over each other because she's trying to make a record.  And you're good at this;

**Page 12**

I'm not.  We should talk kind of slowly so that it's easy for the court reporter to take a record; you understand?

A.  Yes, ma'am.

Q.  Okay.  All right.  So I don't obviously want to know about conversations that you had with your lawyers.  But what did you do to prepare for today's deposition?

A.  I read the deposition notice.

Q.  Did you talk to anyone who's currently or formerly employed by MMA?

A.  Not outside of conversations with counsel.

Q.  And did -- well, and I don't want to know the substance.  But who were those people?

A.  Katy Olson.

Q.  Anyone else?

A.  No, ma'am.

Q.  And then did you review any documents?

A.  Yes, ma'am.

Q.  What kind of documents did you look at?

A.  The discovery that was produced.

Q.  Okay.  Those documents that came to us with MMA Bates numbers?

A.  Yes, ma'am.

Q.  Anything else?

3 (Pages 9 to 12)

John Moseley    April  8, 2025

| Page 13 | Page 15 |
|---|---|
| 1    A.  I'm not sure that it had Bates numbers when I | 1    object. |
| 2  looked at them.  But I assume those are the ones you're | 2            MS. GOOTT:  And would you clarify to me |
| 3  talking about. | 3  what you think is a speaking objection?  Because I said |
| 4        Q.  And for the most part, those are your e-mails, | 4  compound question, which is not a speaking objection. |
| 5  right? | 5            MS. VEITH:  Anything after "objection." |
| 6    A.  There's a lot of documents that I viewed. | 6            MS. GOOTT:  No, that's not how the |
| 7        Q.  All right.  So -- and you also understand that | 7  Federal rules work.  I get to make my -- this isn't |
| 8  this deposition today is limited to Velawcity or Tort | 8  state court.  So I get to make my full legal objection. |
| 9  Network LLC? | 9  But you can carry on. |
| 10    A.  Yes. | 10            MS. VEITH:  Okay.  Sure. |
| 11        Q.  So we're just going to be talk about MMA's | 11  BY MS. VEITH: |
| 12  relationships and interactions with Velawcity? | 12        Q.  So, I'm sorry.  I missed that. |
| 13    A.  Yes. | 13            Can you repeat it? |
| 14        Q.  So why don't you tell me when MMA first became | 14    A.  What was your question? |
| 15  acquainted with or connected with Velawcity? | 15        Q.  Was it video advertising?  Magazine |
| 16    A.  I believe it was the Lanier Trial Academy | 16  advertising?  Internet advertising? |
| 17  either 2020 or 2021. | 17            MS. GOOTT:  Objection; compound question. |
| 18        Q.  What's the Lanier Trial Academy? | 18    A.  We didn't discuss that. |
| 19    A.  It's a legal conference here in Houston. | 19  BY MS. VEITH: |
| 20        Q.  Okay.  And who at Velawcity did MMA connect | 20        Q.  So what did you discuss about their |
| 21  with? | 21  advertising? |
| 22    A.  I met a salesman.  His first name is Brian.  I | 22    A.  Just that they advertised. |
| 23  don't know his last name. | 23        Q.  Okay.  At some point in time, did MMA decide |
| 24        Q.  So in the discovery that I saw, the first | 24  to utilize Velawcity for advertising? |
| 25  correspondences are around June of 2021. | 25    A.  Yes. |

| Page 14 | Page 16 |
|---|---|
| 1            Was it sometime before June of 2021 that | 1        Q.  When was that? |
| 2  MMA first became connected with Velawcity? | 2    A.  I don't know. |
| 3            MS. GOOTT:  Objection; assumes facts not | 3        Q.  Do you know when Velawcity first placed ads |
| 4  in evidence. | 4  for MMA? |
| 5    A.  I assume I met them before I e-mailed them. | 5    A.  I assume it was in the summer of 2021. |
| 6  BY MS. VEITH: | 6        Q.  And this information isn't something that you |
| 7        Q.  Okay.  And so when you became connected with | 7  endeavored to learn when you were preparing for this |
| 8  Velawcity, what happened next? | 8  deposition? |
| 9            What did you utilize them for? | 9            MS. GOOTT:  Objection; vague. |
| 10            MS. GOOTT:  Objection; vague. | 10    A.  No. |
| 11    A.  We went to dinner. | 11  BY MS. VEITH: |
| 12  BY MS. VEITH: | 12        Q.  Okay.  Well, let's look at some documents. |
| 13        Q.  Okay.  And what'd you talk about at dinner? | 13  Maybe these will help you remember. |
| 14    A.  Advertising. | 14            MS. GOOTT:  Sorry, Rebekka.  We would -- |
| 15        Q.  And what kind of advertising did Velawcity | 15  we would have focused on dates if that was in your |
| 16  indicate that they did? | 16  topics.  But -- yeah.  If you give him the documents, |
| 17    A.  Plaintiff's work. | 17  I'm sure that will help him. |
| 18        Q.  And was it video advertising?  Magazine | 18            MS. VEITH:  Sure. |
| 19  advertising?  Internet advertising? | 19            (Exhibit 2 marked.) |
| 20    A.  They didn't discuss -- | 20  BY MS. VEITH: |
| 21            MS. GOOTT:  Objection -- hold on.  I just | 21        Q.  The first document I want to look at actually |
| 22  need you to please give me a second so I can get my | 22  doesn't have anything to do with dates.  So we'll mark |
| 23  objection on the record.  Objection; compound question. | 23  this as Exhibit 2; and it's a document that has some |
| 24            MS. VEITH:  Thanks.  And, you know, you | 24  Bates numbers at the bottom that begin with MMA-MB, five |
| 25  don't need to do speaking objections.  You can just | 25  0s 1. |

4  (Pages 13 to 16)

John Moseley    April 8, 2025

Page 17

1    A. (Reading.)
2    Q. And just let me know when you're ready.
3    A. Okay.
4    Q. So I understand from MMA's discovery responses
5    that this is a list of all MMA clients who are now
6    represented by Morris Bart, who came to MMA through
7    Velawcity. And I just want to confirm that is that your
8    understanding as well?
9    A. If this was produced in response to that yes,
10   then yes.
11   Q. Okay. Thank you.
12         How did you determine who -- which of
13   those MMA Morris Bart clients came through Velawcity?
14   A. I believe this list is clients that MMA
15   contracted with Velawcity to help with marketing and
16   intake.
17   Q. Okay. Can you explain to me what that means?
18        Clients that MMA contracted with through
19   Velawcity to help with marketing and intake?
20   A. MMA employed Velawcity to help with intake and
21   marketing.
22   Q. Uh-huh. And I guess I'm asking a slightly
23   different question. When you determined that this list
24   of clients were -- came to MMA through Velawcity, how
25   did -- how were you able to make that determination?

Page 18

1    A. Internal processes.
2    Q. And what are those processes?
3    A. Our database.
4    Q. Okay. And what's that database?
5    A. Smart Advocate.
6         THE REPORTER: I'm sorry. I didn't hear
7    that.
8         THE WITNESS: Smart Advocate.
9    BY MS. VEITH:
10   Q. And somewhere in Smart Advocate it indicates
11   if a client came in through Velocity's intake?
12   A. It tracks the marketing and intake of the
13   entire firm.
14        THE REPORTER: Of the entire?
15        THE WITNESS: Firm.
16        THE REPORTER: Keep your voice up at the
17   end, please, sir.
18        (Exhibit 3 marked.)
19   BY MS. VEITH:
20   Q. All right. So now getting into some dates.
21   I'll show you what we'll mark as Exhibit 3. And this is
22   a document that begins with Bates number MMA-MB two 0s
23   1026. And just let me know when you're ready -- oh, and
24   actually, sometimes we're going to have to do something
25   with some of these exhibits because initially e-mails

Page 19

1    were not provided with attachments. When the e-mails
2    were provided with attachments, they didn't have Bates
3    numbers. So I'm going to also hand you, which will be
4    just a part of Exhibit 3, the native version of the
5    e-mail that has the attachment.
6    A. (Reading.)
7    Q. Same e-mail, just one extra page at the end
8    for the attachment.
9    A. Okay.
10   Q. All right. So from what I could see in the
11   documents that were produced, this is the earliest
12   correspondence that was produced with Velawcity.
13        So if you go to the -- you know, back of
14   the e-mail 'cause that's the first e-mail in the chain,
15   there's an e-mail from you on Wednesday, June 23rd, 2021
16   to Phil at Velawcity.
17        Do you want to look at it? I'm going to
18   ask you a couple of questions about it.
19   A. (Reading.) Okay.
20   Q. So do you recall was this like your first
21   interaction with Velawcity after that Lanier Trial
22   Academy?
23   A. I don't think so.
24   Q. Okay. So there would have been earlier
25   correspondences perhaps?

Page 20

1    A. Phone calls. Meetings.
2    Q. Would there have been earlier e-mails?
3    A. Not to my knowledge.
4    Q. Okay. So in this e-mail, you thank Mr. -- I
5    forget, Vottiero for his time today. And you cc Pate
6    Smith and Mary Katherine Smith on the e-mail.
7         Who are Pate and Mary Katherine?
8    A. Former employees of MMA.
9    Q. And were they attorneys or administrative
10   employees?
11   A. I'm not sure if Pate Smith was an attorney at
12   this time, but he ended up being an attorney. And Mary
13   Katherine Smith was his wife.
14   Q. But she was also employed by MMA?
15   A. I think so.
16   Q. You don't know in what capacity, though?
17   A. I'm not sure if she was employed by Pate or
18   she was employed by MMA.
19   Q. Got it. Okay. And you say that Pate and Mary
20   Katherine are the leads for these voluminous referrals.
21        Can you tell me what referrals you're
22   talking about?
23   A. They're normal like contractor public adjuster
24   referrals.
25   Q. Okay. And what's a normal contractor public

5 (Pages 17 to 20)

## Page 21

1    adjuster referral?  How did that work?
2        A.  If a contractor comes across an insurance
3    claim, it gets denied or grossly underpaid, they give
4    the homeowner our contact information.  Then the
5    property owner for the commercial or residential reaches
6    out --
7            THE REPORTER:  Slow -- slow down, please,
8    sir.
9        A.  Reaches out to us to represent them.
10   BY MS. VEITH:
11       Q.  Okay.  All right.  And going up forward in the
12   chain, Mary Katherine responds.  It looks like she's an
13   administrative assistant, based on her signature.
14           And she notes, "Our referral source that
15   has about 200 clients"; do you see that?
16           MS. GOOTT:  Objection to the sidebar.
17   You're just making comments about who she is, not asking
18   questions.  Go ahead.
19           MS. VEITH:  I asked a question.
20       A.  I didn't hear you ask your question.
21   BY MS. VEITH:
22       Q.  Mary Katherine mentions a referral source that
23   has about 200 clients; do you see that?
24       A.  Yes.
25       Q.  Okay.  I want to flip back then to the

## Page 22

1    previous page.  And Mr. Vottiero responds.  And he's
2    talking about a script that I think Mary Katherine or
3    you had sent him, although I don't know, so correct me
4    if I'm wrong.
5            And he says, "After reviewing how many of
6    the questionnaire questions can we auto populate based
7    off referral source?  How many of the questions need to
8    be answered in order to send contract?"
9            Can you tell me what questions you guys
10   were discussing?
11           MS. GOOTT:  Hold on.  What is the pending
12   question?  'Cause you asked two questions before that
13   one.  So are you withdrawing the first two?  It's
14   confusing.
15           MS. VEITH:  What are the first two that
16   you think I asked?
17           MS. GOOTT:  Well, not what I think you
18   asked.  First you said what you thought it was.  Then
19   you asked if -- if that was his understanding.  And then
20   you read from the content of it and asked the question.
21           So if you could just clarify the
22   question.
23           MS. VEITH:  So I think he answered the
24   question about my understanding --
25           MS. GOOTT:  No --

## Page 23

1            MS. VEITH:  -- that was about the prior
2    e-mail.  But my question that I'm asking --
3            MS. GOOTT:  He didn't answer.  You just
4    kept talking.  So if you could -- it's just so we're
5    clear and I -- we can have a -- I don't want to
6    interrupt you.  But you make comments about it and your
7    understanding.  And if you want to ask him the question,
8    that's fine.  But then if you could just keep it one at
9    a time so that he knows what he's answering.
10           MS. VEITH:  Sure.
11   BY MS. VEITH:
12       Q.  What are the questions that you guys are
13   discussing in this e-mail?
14       A.  I would assume it would be PNC name, address,
15   date of loss, claim number, policy number, insurance
16   company.
17       Q.  And why was Mr. Vottiero going to autopopulate
18   questions?
19           MS. GOOTT:  Objection; calls for
20   speculation.  Foundation.
21   BY MS. VEITH:
22       Q.  If you have an understanding.
23       A.  I guess I don't understand your question.
24       Q.  Mr. Vottiero asks here, "After reviewing, how
25   many of the questionnaire questions can we autopopulate

## Page 24

1    based off referral source?"
2            Do you see that?
3        A.  Uh-huh.
4        Q.  What -- why was Mrs. Vottiero going to
5    autopopulate questions, if you know?
6        A.  To keep data clean.
7        Q.  And that was questions that these potential
8    clients would answer?
9        A.  It's usually claim number/policy number.
10   Because those can be 10, 12-digit numbers, they
11   oftentimes get messed up when people enter them.  So if
12   they're autopopulated by auto extraction, it keeps the
13   data clean so mistakes aren't made in the future.
14       Q.  Understood.  Information, though, the claim
15   number and the policy number, that's; coming from the
16   client, right?
17       A.  It can come from the client.
18       Q.  Where else would it come from?
19       A.  Insurance docs, referrals, the -- the client
20   could mail us the documents or e-mail us the documents,
21   and then we would extract it from the document and put
22   it into the system.
23       Q.  Got it.
24           Next e-mail up, you respond, "I thought
25   there were multiple referrals sources, thousands of

6 (Pages 21 to 24)

John Moseley    April 8, 2025

Page 25

1  PNCs"; do you see that?
2     A.  (Nods head affirmatively.)
3     Q.  Why did you think there were thou-- PNC, does
4  that mean potential new clients?
5     A.  Yes, ma'am.
6     Q.  Why did you think that there were thousands of
7  potential new compliance?
8     A.  Four hurricanes hit the coast of in a 12-month
9  period.  There were hundreds of thousands of PNCs.  We
10  were talking to hundreds of referral sources, which
11  would have gathered us thousands of clients.
12     Q.  And just to be clear, you said four
13  hurricanes.  This is June 2021.  So this is before a
14  hurricane hit, right?
15     A.  Yeah, so hurricane Laura and delta would have
16  hit at this time.
17     Q.  Got it.  All right.  I'm going to go up to the
18  first page in the e-mail, so the last e-mail in the
19  chain essentially.  And this e-mail is from Mr. Vottiero
20  with Velawcity, right?
21     A.  Yes.
22     Q.  Okay.  And he's attaching a document called
23  "Questionnaire Storm"; do you see that?
24     A.  (Reading.)  Yes.
25     Q.  Up in attachments?

Page 26

1         And if you look at that attachment which
2  is attached to the native file, it's a chart with
3  certain information about a client that would be filled
4  in; is that right?
5     A.  Yes.
6     Q.  Okay.  And so Mr. Vottiero says that he had a
7  chance to speak with Pate and get the final questions
8  wrapped up, and he's recapping below; is that fair to
9  say?
10     A.  (Reading.)  I mean, he's giving instructions.
11  He's setting expectations.  It's a lengthy e-mail.
12     Q.  Got it.  And if you look to the fourth
13  paragraph, if you found that first little sentence of
14  the paragraph, it starts with, "In the short term."
15         He says, "In the short term, we will
16  deliver signed contract and completed end date to a list
17  of e-mails that you designate"; do you see that?
18     A.  Yes.
19     Q.  And that's one of those expectations that you
20  said Mr. Vottiero was discussing?
21     A.  Yeah.
22     Q.  And so Velawcity was going to deliver to MMA
23  contracts signed by these PNCs?
24     A.  This is not part of the MSA.  This is a
25  different deal.  That's why I was -- I think we sent you

Page 27

1  an e-mail saying that these e-mails weren't necessarily
2  responsive to your discovery.  This has nothing to do
3  with the MSA.
4     Q.  It does have to do with storms, though, right?
5  'Cause you just -- it's questionnaire storm, correct?
6     A.  Yes, these are organic leads.  These are
7  nonmarketed MMA -- or nonmarketed Velawcity cases.
8         MS. VEITH:  And I'm going to object to
9  this answer as nonresponsive.
10  BY MS. VEITH:
11     Q.  'Cause the question I'm asking is just, was
12  Velawcity going to deliver a signed contract from a PNC
13  to MMA?
14         MS. GOOTT:  Objection; vague.  You're
15  talking about intake.  You're here -- your notice, your
16  depo and the issue that was scheduled for today was
17  whether or not how these clients were obtained.
18         This issue -- and I think maybe what
19  you're missing is that Velawcity had a different work
20  that they did with MMA.  Completely unrelated.  So
21  you're confusing two things.
22         THE WITNESS:  These people are not from
23  this (pointing).
24         MS. VEITH:  Okay.
25         THE WITNESS:  These are two separate

Page 28

1  lists.
2         MS. VEITH:  Thank you for that answer.
3         Can you just answer my question?
4  BY MS. VEITH:
5     Q.  In the context of this e-mail --
6     A.  I'm trying to answer your questions as best as
7  possible to give the whole picture.
8     Q.  Sure.  And so in the context of this e-mail
9  which you have just provided to me, was Velawcity going
10  to deliver signed contracts to MMA?
11         MS. GOOTT:  Objection; vague.  For whom?
12  'Cause it has nothing to do with what we're here on
13  today or your previous question.  You can answer.
14     A.  I don't know if they would or not.
15         (Exhibit 4 marked.)
16  BY MS. VEITH:
17     Q.  Okay.  Thank you.  All right.  Let me show you
18  a document I'll mark as Exhibit 4.  Okay.
19         Take a look at this, and let me know when
20  you're ready.
21     A.  (Reading.)
22     Q.  Okay.  This is an e-mail -- or the last one in
23  the chain on the first page is dated Thursday,
24  June 29th, 2021; do you see that?
25     A.  (Reading.)

7 (Pages 25 to 28)

John Moseley   April 8, 2025

Page 29

1    Q.  The first page.  So I'm asking about the last
2  e-mail.
3    A.  Oh, Tuesday, June 29th?  Yes.
4    Q.  Okay.  And the subject is, "First Party Intake
5  Call Center"; you see that?
6    A.  Yes.
7    Q.  Did that -- is that call center something that
8  relates to that list of clients that we're sitting here
9  today talking about?
10    A.  No.
11    Q.  Okay.  What clients came through the call
12  center if not the hurricane clients?
13    A.  The hurricane claimants didn't come through
14  the call center.
15        THE REPORTER:  Hurricane clients?
16        THE WITNESS:  Didn't come through the
17  call center.
18  BY MS. VEITH:
19    Q.  So then how do you know that they aren't the
20  Morris Bart MMA clients?
21    A.  Because they were coded differently.
22    Q.  How were they coded?
23    A.  From the referral source.
24    Q.  Okay.  And how do I know which is which?
25  'Cause that's not something that was provided to us in

Page 30

1  any of the discovery responses.
2        MS. GOOTT:  Objection; assumes facts not
3  in evidence.  Calls for speculation as to what you would
4  know.
5    A.  I have no idea of what you know or don't know.
6  BY MS. VEITH:
7    Q.  Okay.  How can I determine from the documents
8  that you produced?
9        What have you produced that would indicate
10  to me which clients came through the call center and
11  which came through somewhere else?
12    A.  I provided responses that answered your
13  questions.  That's up for you to determine.
14    Q.  Okay.  Well, looking at this first party
15  intake call center, go down to e-mail that begins on
16  page 616.  And it's just the top.  And then the actual
17  substance is on the next page?
18    A.  Yes.
19    Q.  Okay.  Mr. Radford, in this e-mail, is asking
20  if there is a script that is utilized when someone calls
21  in; do you see that?
22    A.  Yes, ma'am.
23    Q.  And then if you go back to the prior page --
24    A.  Yes.
25    Q.  -- Ms. Smith says she doesn't have script; do

Page 31

1  you see that?
2    A.  Correct.
3    Q.  So did Velawcity ultimately come up with a
4  script that they used for hurricane claimants who called
5  into this call center?
6    A.  I think our team deferred to counsel to come
7  up with a script.
8    Q.  All right.  You can set that aside.  All
9  right.  I show you a document that we'll mark as
10  Exhibit 5.
11        (Exhibit 5 marked.)
12    A.  (Reading.)
13  BY MS. VEITH:
14    Q.  This is a document that's Bates numbered
15  MMA-MB 00464 on the first page.
16        And do you see that it's an e-mail where
17  the last e-mail in the chain, the first one is dated
18  August 20th, 2021?
19    A.  (Reading.)
20    Q.  The last e-mail in the chain, first e-mail on
21  the first page?
22    A.  August 10th.
23    Q.  20th.
24        MS. GOOTT:  We have August 10th.  And
25  it's not the same Bates that you mentioned.

Page 32

1        MS. VEITH:  You're right.  August 10th.
2  BY MS. VEITH:
3    Q.  And so let me correct myself.  Exhibit 5,
4  Bates numbers are MMA-MB 001014.
5        It's an e-mail dated August 10th, 2021,
6  correct?
7    A.  Yes, ma'am.
8    Q.  And the subject is "Storm Damage Call Center,"
9  right?
10    A.  Yes, ma'am.
11    Q.  And in this e-mail, Mr. Vottiero from
12  Velawcity, top e-mail of the chain on August 10th asks
13  you or Pate Smith -- 'cause you're the recipients,
14  correct?
15    A.  I am a recipient on this e-mail.
16    Q.  To "-- send the agreement that you will need
17  us to send to the plaintiff to get signed on your
18  behalf," correct?
19    A.  Correct.
20    Q.  So out of this storm damage call center,
21  Velawcity was getting agreements signed by plaintiffs on
22  your behalf, correct?
23    A.  Yes.
24    Q.  All right.  Exhibit 6.
25        (Exhibit 6 marked.)

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

| Page 33 | Page 35 |
|---|---|

**Page 33**

1  BY MS. VEITH:
2      Q.  Exhibit 6 now is that document with MMA-MB
3  three 0s 464 as the first Bates number.
4      A.  (Reading.)  Okay.
5      Q.  Okay.  And if you -- this is a continuation of
6  that e-mail that we just looked at.  And so I really
7  just want to look at the sort of first page over into
8  the top of the second page, the e-mail's from
9  August 19th and 20th.
10          So if you go to the e-mail that starts on
11  the bottom of the first page, it's from Mr. Radford with
12  Velawcity; do you see that?
13      A.  Yes.
14      Q.  And he's asking a few questions about what
15  looks like portions of an attorney fee contract.
16          Is that what these -- this text is in this
17  e-mail?
18      A.  Yes.
19      Q.  Why was the contract with Shunnarah Injury
20  Lawyers?
21      A.  I think Velawcity was doing work for them as
22  well.
23      Q.  Okay.  But a contract with Shunnarah Injury
24  Lawyers would not have been one pursuant to which MMA
25  was representing a client, correct?

**Page 34**

1      A.  We with might have co-counsel relationships
2  with them.  I'm not sure.
3      Q.  Okay.  I just don't see MMA listed in here
4  defined in the word that's defined as attorneys.  So I
5  was curious about that.
6          MS. GOOTT:  Objection; sidebar.
7  BY MS. VEITH:
8      Q.  But one of the things that Mr. Radford is
9  asking is -- and this is on the second page -- for
10  values for the attorney's fee portion; do you see that?
11      A.  Where exactly?
12      Q.  If you go to the -- so on the first page,
13  there's an attorney's fees and cost paragraph; do you
14  see that?
15      A.  Yes, ma'am.
16      Q.  And then on the second page, there's some text
17  that says, "I assume these values will be set in the
18  retainer before we go live?  It will be difficult to get
19  potential claimants to sign on a blank fee portion"; do
20  you see that?
21      A.  Yes.
22      Q.  Okay.  So my question was, is Mr. Radford
23  asking about the attorney's fees portion of this
24  contract?
25          MS. GOOTT:  Objection; calls for

**Page 35**

1  speculation.
2  BY MS. VEITH:
3      Q.  If you know.
4          Or did you understand Mr. Radford to be
5  asking about the attorney's fees percentages on this
6  contract?
7          MS. GOOTT:  Objection; foundation.
8      A.  I think he's asking what our attorney's fees
9  will be or if we can have an attorney fee established
10  before a consultation.
11  BY MS. VEITH:
12      Q.  Got it.  And Mr. Smith responds, "The percents
13  will be 33 percent Pres hit and 40 percent in suit."
14          Do you think the "Pres hit" means presuit?
15          MS. GOOTT:  Objection; calls for
16  spacious.  Foundation.
17      A.  I do.
18  BY MS. VEITH:
19      Q.  Okay.  So the attorney's fee percentages for
20  these contracts were 33 percent of anything recovered
21  pre-suit and 40 percent of anything recovered post-suit?
22          MS. GOOTT:  Objection; foundation.
23  Assumes facts not in evidence.
24      A.  There were numerous different contracts, yeah.
25

**Page 36**

1  BY MS. VEITH:
2      Q.  Was that one of the different fee splits that
3  you utilized?
4          MS. GOOTT:  Objection; vague.
5      A.  33/40s?  Yes.
6          (Exhibit 7 marked.)
7  BY MS. VEITH:
8      Q.  Okay.  Exhibit 7, an e-mail chain.  Let me
9  know when you're ready.
10      A.  (Reading.)  Got it.
11      Q.  Okay.  So this e-mail, the -- I can't remember
12  if I read the Bates number.  But it's MMA-MB four 0s 82
13  is the first page.  I want you to flip to -- on the
14  second page.
15          The first e-mail in the chain begins --
16  and it's from you on August 29th, 2021 at 4:30 p.m.; do
17  you see that?
18      A.  Yes, ma'am.
19      Q.  And you write, "Glad we've all decided to
20  partner and work together.  I wanted to introduce
21  everyone"; do you see that?
22      A.  Yes.
23      Q.  So you introduced a list of MMA employees,
24  correct?
25      A.  Yes.

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

1    Q.  And then you note two Velawcity employees,
2    Mr. Vottiero and Mr. Radford, correct?
3    A.  Correct.
4    Q.  And then you note two attorneys from Krause
5    Kinsman, correct?
6    A.  Correct.
7    Q.  And you say, "MMA guys we're all working on
8    the same team," correct?
9    A.  Correct.
10   Q.  What was that team?
11            What were you guys all working on
12   together?
13   A.  Storm damage cases.
14   Q.  And the subject of this e-mail I think
15   specifically is Hurricane Ida and future hurricanes,
16   right?
17   A.  Correct.
18   Q.  And August 29th, 2021, that's the day that
19   Hurricane Ida hit, right?
20   A.  That sounds right.
21   Q.  Okay.  How -- what did MMA and Krause &
22   Kinsman, how did they work together?
23            What was that partnership like?
24   A.  Co-counsel.
25   Q.  Okay.  And what kind of work did Krause &

1    Kinsman do on the cases?
2    A.  They set up the foundation architecture to
3    take our niche firm and make it into a mass-action firm.
4    Q.  And what sort of foundation architecture was
5    that?
6    A.  Data processing, data collection, automation,
7    client communications, database building, software
8    training for employees.
9    Q.  And how was Velawcity involved in all of this?
10   A.  Krause & Kinsman, Galindo and MMA had decided
11   to use Velawcity as our marketing and intake specialist.
12   Q.  And in terms of intake specialist, what --
13   what did Velawcity do as an intake specialist in your
14   understanding?
15   A.  Weed out clients that didn't pass our
16   criterion.
17   Q.  Did they accept clients who did pass your
18   criterion?
19   A.  No.
20   Q.  Who did the accepting of those clients?
21   A.  MMA and KKTL.
22       THE REPORTER:  KK?
23       THE WITNESS:  TL.
24   BY MS. VEITH:
25   Q.  So what -- what was MMA's process for

1    accepting; a client that Velawcity did not weed out?
2        MS. GOOTT:  Objection; assumes facts not
3    in evidence.  Mischaracterizes testimony.
4    A.  Yeah, it really was claims acknowledgment.
5    BY MS. VEITH:
6    Q.  What does claims acknowledgment mean?
7    A.  Like we needed to verify that there was an
8    actual claim.  The majority of the calls from marketing
9    are people that don't have insurance policies or don't
10   have insurance claims.
11            And so it's getting -- they might even
12   tell you they have one, but they really don't.  So it's
13   getting to the point of okay, yes, they have an
14   insurance claim.  Yes, it's prosecutable.  And that
15   process could be extensive.
16            So I mean, honestly, we actually used
17   Velawcity.  We used KKTL --
18        THE REPORTER:  I'm sorry, honestly, we
19   actually?
20        THE WITNESS:  We honestly used KKTL.  We
21   used Velawcity, Galindo.  We used MMA.  I mean, it was a
22   team effort.
23   BY MS. VEITH:
24   Q.  And Velawcity was a part of that team?
25   A.  They were the intake marketing specialist.

1    Q.  Was part of the determination of whether a
2    client had a prosecutable claim, a conversation between
3    MMA and the client?
4    A.  Oftentimes.
5    Q.  Okay.  And how did MMA communicate with those
6    clients?  Was it via telephone?  Via e-mail?  Via text
7    message?
8    A.  All the above.
9    Q.  Did you have some sort of tracking system
10   within the Smart Advocates or some other file that would
11   indicate when you communicated with a client?
12   A.  Yes.
13   Q.  Okay.  Exhibit 8 is going to be a document
14   with the Bates number MMA three 0s 474.
15            (Exhibit 8 marked.)
16   BY MS. VEITH:
17   Q.  In the first e-mail in this one-page chain,
18   Mr. Vottiero writes, "We realize that especially on this
19   lien page, we will need to track who the
20   contractor/roofer is and/or who the public adjuster is";
21   do you see that?
22   A.  Yes.
23   Q.  Why was that something that Velawcity needed
24   to track, if you know?
25   A.  These, again, were claimants outside the MSA.

John Moseley    April 8, 2025

---

**Page 41**

1  So these were organic leads from MSA. We just needed to
2  track it for lien resolution, if there were expenses, if
3  work had been performed. There's all sorts of reasons.
4  And so we're clear, when I say outside of MSA, I mean
5  those are clients not on the list.
6      Q.  I understand that. Thank you. All right.
7  Exhibit 9. This is another one where I'm going to
8  review the Bates number document and the native. The
9  Bates number document is MMA-MB two 0s 1002.
10             (Exhibit 9 marked.)
11     A.  (Reading.)
12  BY MS. VEITH:
13     Q.  In this e-mail -- in the top e-mail that
14  actually contains the attachment, Mr. Vottiero sends you
15  an e-mail that says, "See revisions attached," correct?
16     A.  Correct.
17     Q.  And the document that's attached is a property
18  damage claims attorney employment contract; do you see
19  that?
20     A.  Correct.
21     Q.  And based on the date blank filled in, was
22  this an agreement -- and that date is 8/29/21; do you
23  see that?
24     A.  (No response.)
25     Q.  In the -- in the attachment? There's a blank

---

**Page 42**

1  for a date that's filled in?
2      A.  Yes.
3      Q.  Was this an agreement that was going to be
4  used for potential Ida claims?
5      A.  I think this was a Ida specialty contract.
6      Q.  What does Ida specialty mean?
7      A.  So depending on the type of roofing system,
8  where the client originated from, if coverage is open,
9  if coverage is denied, they'll get different contracts.
10  This is a 1030 contract, which means that it was
11  probably a high-priced roofing system that they already
12  had had coverage open.
13     Q.  Okay. And Mr. Vottiero at Velawcity made some
14  edits to this document, correct?
15     A.  That's what this e-mail says.
16     Q.  Mr. Vottiero, is he a lawyer?
17     A.  No.
18     Q.  The next document, Exhibit 10. Again, I'm
19  going to hand you the Bates numbered document as well as
20  the native document.
21             (Exhibit 10 marked.)
22     A.  (Reading.)
23  BY MS. VEITH:
24     Q.  Are you ready?
25     A.  Yes, ma'am.

---

**Page 43**

1      Q.  All right. Okay. So this document came from
2  Mr. Vottiero to you on August 31st, 2021.
3             Do you see that?
4      A.  Yes.
5      Q.  And he says, "See all the attached fields as
6  well as all the accepted answers to those fields"; do
7  you see that?
8      A.  Yes.
9      Q.  And then the attachment has a list of
10  questions. And in some cases, there's a column with
11  yes/no or other answers to those questions; is that fair
12  to say?
13     A.  Yes.
14     Q.  So these were questions that Velawcity would
15  ask when they were in-taking a potential hurricane
16  client?
17             MS. GOOTT: Objection; calls for
18  speculation.
19     A.  These are the criterion to qualify a potential
20  new client.
21  BY MS. VEITH:
22     Q.  And what would they -- how would they qualify
23  a potential new client?
24     A.  Verifying insurance is the key. Making sure
25  -- well, that's a loaded question. We thought we know

---

**Page 44**

1  how to do it by just relying on the clients answers --
2  you know, insurance company, claim number, policy
3  number, date of loss. You know, do you own the address?
4  Will you sign an affidavit saying yes, you have a policy
5  on this address, that State Farm is your insurance
6  company on this address.
7             But come to find out that people just --
8  you know. Either they were mistaken or intentionally
9  gave us wrong answers even with a signed affidavit. But
10  there was just a lot of falloff. But we -- we tried our
11  best to screen them. Like a lot of people said no, I
12  don't have insurance. Well, they would have been --
13  they would have been excluded.
14             MS. VEITH: Okay. I'm going to object to
15  that as nonresponsive.
16  BY MS. VEITH:
17     Q.  My question just was, how was Velawcity
18  obtaining these answers?
19     A.  I don't understand the question. But go
20  ahead.
21             MS. GOOTT: I'm going to object -- she's
22  already objected. Objection; calls for speculation.
23  BY MS. VEITH:
24     Q.  If you know.
25     A.  Landing pages and phone conversations, I would

---

11 (Pages 41 to 44)

11 (Pages 41 to 44)

John Moseley   April 8, 2025

---

**Page 45**

1  guess.
2        MS. GOOTT: I need to make a quick --
3        MS. VEITH: That's fine.
4        MS. GOOTT: -- call at 10:00 o'clock,
5  which is two minutes.
6        MS. VEITH: Let's take a break.
7        MS. GOOTT: Can I go do that? It will be
8  really fast.
9        MS. VEITH: That's fine.
10       THE VIDEOGRAPHER: The time is 9:58 a.m.,
11  and we're off the record.
12       (A break was taken from 9:58 a.m. to
13       10:08 a.m.)
14       THE VIDEOGRAPHER: The time is
15  10:08 a.m., and we're back on the record.
16       MS. GOOTT: So I don't forget at the
17  end -- 'cause it has happened before -- he's going to
18  want to read and review. Thank you.
19       MS. VEITH: I would have assumed that.
20       MS. GOOTT: Yeah, but if it's not on the
21  record, he doesn't get to do it. So I learned that the
22  hard way once.
23       MS. VEITH: That's the best way to learn
24  things, though, 'cause you never make the same mistake
25  twice.

---

**Page 46**

1        MS. GOOTT: That's for sure. Hopefully
2  not.
3        (Exhibit 11 marked.)
4  BY MS. VEITH:
5        Q. Okay. Mr. Moseley, I will hand you what I've
6  marked as Deposition Exhibit 11. This document has the
7  beginning Bates number MMA-MB four 0s 99.
8        A. (Reading.)
9        Q. You know what? It's another one with a
10  native. Here's the native. That will also be a part of
11  Exhibit 11.
12       A. (Reading.) Got it.
13       Q. Okay. I'm really only interested in the --
14  the top e-mail, last one in the chain. But if you need
15  to tell me about others for context, that's fine.
16       So this is a list of questions and
17  answers. Is that fair to say in this top e-mail?
18       A. (Reading.) Yes.
19       Q. Okay. And so the first question is, "What
20  type of catastrophic events per case type"; do you see
21  that?
22       A. Yes.
23       Q. And it says, "We will want to map these from
24  the very beginning. These are going to be mapped with
25  the questions asked by Velawcity as well"; do you see

---

**Page 47**

1  that?
2        A. Correct.
3        Q. And the answers A through F are, flooding,
4  wind/hurricane, wind/hurricane and flood, hail, pipe
5  burst and fire, correct?
6        A. Yes.
7        Q. And then the next one asks what natural
8  disasters events are going to be coming into our system;
9  do you see that?
10       A. Yes.
11       Q. What was the system that these events were
12  coming into, if you know?
13       A. Smart Advocate.
14       Q. Okay. And that's the system that MMA utilized
15  for client management essentially?
16       A. MMA and Krause & Kinsman.
17       THE REPORTER: Krause and?
18       THE WITNESS: Kinsman.
19  BY MS. VEITH:
20       Q. Did Velawcity use Smart Advocate as well?
21       MS. GOOTT: Objection; calls for
22  speculation.
23       A. I don't believe so.
24  BY MS. VEITH:
25       Q. So when Velawcity asked the questions that are

---

**Page 48**

1  referenced in this e-mail, where was that preserved, if
2  you know?
3        MS. GOOTT: Objection. These questions
4  are from Mr. Mosley not from --
5        MS. VEITH: That's why I said if you
6  know.
7        MS. GOOTT: No, no, no. But you said
8  when Velawcity asked these questions. Mr. Moseley is
9  asking these questions.
10       MS. VEITH: So, ma'am, what I meant was,
11  you see how there's a sentence that says these are going
12  to be mapped with questions asked by Velawcity? And we
13  had discussed that? That's the questions I'm referring
14  to.
15       MS. GOOTT: Thank you for making that
16  less vague for me. I appreciate it.
17       A. Sorry, what's the question?
18  BY MS. VEITH:
19       Q. Okay. The questions that were going to be
20  asked by Velawcity that you and I have previously
21  discussed in this e-mail, when those questions were
22  asked, where were the answers preserved, if you know?
23       A. MMA preserved them in Smart Advocate.
24       Q. Did Velawcity send the answers to MMA? How
25  did MMA get those answers?

John Moseley   April 8, 2025

---

Page 49

1    A.  I assume there was some sort of API plug-in.
2  I don't know what system Velawcity used to house it.
3    Q.  What's an API plug-in?
4    A.  It's an acronym the tech guys used to say data
5  gets pushed from one system to another.
6    Q.  So you assumed that data would get pushed from
7  Velawcity system to your system?
8    A.  Data was pushed -- data that originated in
9  Velawcity system ultimately ended up in MMA system.  I
10  don't know if there were intermediaries in between.
11    Q.  Got it.  Okay.  Exhibit 12 will be a one-page
12  document Bates numbered MMA-MB three 0s 982.
13        (Exhibit 12 marked.)
14    A.  (Reading.)
15  BY MS. VEITH:
16    Q.  In this e-mail, you write to Mr. Vottiero,
17  "Any luck on finding software for expert scheduling?"
18        You see that?
19    A.  Yes.
20    Q.  Why were having Velawcity look for software
21  for expert scheduling?
22    A.  We were looking for a (indiscernible)-like
23  solution for scheduling experts.
24    Q.  And Velawcity, would they have assisted with
25  that scheduling?

---

Page 50

1    A.  They never would have assisted with the actual
2  scheduling, no.
3    Q.  Just procuring of software if they could have
4  found it?
5    A.  Yes.  They -- yes.
6    Q.  All right.  Exhibit 13.
7        (Exhibit 13 marked.)
8  BY MS. VEITH:
9    Q.  Another one with a native that will also be a
10  part of the exhibit.  It is a document Bates labeled
11  MMA-MB three 0s 980.
12    A.  (Reading.)
13    Q.  Okay.  This is an e-mail where Mr. Vottiero is
14  sending you an Excel spreadsheet titled "Contractor
15  Reference Code"; do you see that?
16    A.  Yes.
17    Q.  And in the e-mail, he says, "Please see the
18  attachment.  Contractors, roofers, MPAs have reference
19  codes below.  If your client is not a 1030 split, don't
20  send them their reference code or a link yet"; do you
21  see that?
22    A.  Yes.
23    Q.  And then it says, "Landing page for roofers,
24  contractors, MPA hurricane/relief.com"; do you see that?
25    A.  Yes.

---

Page 51

1    Q.  So the attachment lists various contractors;
2  fair to say?
3    A.  Yes.
4    Q.  And those contractors, were they directed to
5  hurricane-relief.com?
6    A.  Were they directed towards?  What do you mean
7  by directed towards?
8    Q.  So Mr. Vottiero says there's a landing page,
9  hurricane-relief.com for roofers, contractors, MPAs.  I
10  guess more simply, what does that mean that that landing
11  page was for roofers, contractors, MPAs, if you know?
12    A.  Organic MMA referrals that we had -- that we
13  had established over the past half decade, we had a
14  landing page where their clients could access it and
15  choose -- I think it was a drop down to -- you know,
16  drop down and then the name would pop up.
17        And they could say -- it would be like a
18  normal landing page with all the claim information --
19  name, address, date of loss, claim number, policy
20  number.  But then it had an additional field where they
21  could select who referred them.  And then that way we
22  could just track who referred them.
23    Q.  And Mr. Vottiero wrote, "If your client is not
24  a 1030 split, don't send them their reference code or a
25  link yet."

---

Page 52

1        Does the 1030 split refer to a split with
2  the referring contractor?
3    A.  It's the fee split percentage.  It was a 10/30
4  contract.
5    Q.  Okay.
6    A.  10 percent pre-lit, 30 percent lit.
7    Q.  Did the contractors get any percentage of the
8  fee?
9    A.  Never.  Not once.
10    Q.  Okay.  And this -- there are several
11  contractors listed on this attachment.  The first one is
12  Apex, correct?
13    A.  Correct.
14    Q.  All right.  You can put that aside.  Exhibit
15  14 is MMA-MB four 0s 43 is the first page.
16        (Exhibit 14 marked.)
17  BY MS. VEITH:
18    Q.  This is a continuation of a thread we recently
19  looked at with these questions and answers.  But some of
20  the answers are redacted.
21        Do you know why those were redacted?
22    A.  You'd have to discuss with counsel.
23    Q.  Okay.  And then the top e-mail is from
24  Mr. Kinsman on September 7th, 2021.  Do you see that?
25    A.  Yes.

---

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

<table>
<tr><td>

Page 53

```
1        Q.  And he's asking will your guys internal
2   distribution e-mail be claims@mma-pllc.com; do you see
3   that?
4        A.  Yes.
5        Q.  Was that the -- an internal distribution
6   e-mail that MMA used?
7        A.  I don't know what internal distribution e-mail
8   means.  But claims@mma-pllc.com, we asked insurance
9   companies to respond with -- or cc that e-mail address
10  on every correspondence.
11       Q.  Okay.  And who was monitoring that e-mail?
12       A.  30, 40, 50 employees.
13       Q.  Attorneys?
14       A.  Some attorneys.
15       Q.  Which attorneys?
16       A.  It would have been primarily the Louisiana
17  team.  So William, Claude, Grant.  Natalie might have
18  been on that team.  Katy Aromi.  Cameron Sanders-- or
19  Saunders.  I think that's --
20       Q.  Cameron Sanders or Cameron Snowden?
21       A.  Snowden.  I apologize.  It's been a couple of
22  years.
23       Q.  Okay.  Next Exhibit will be 15.
24           (Exhibit 15 marked.)
25
```

</td><td>

Page 55

```
1        A.  Yes.
2        Q.  What was the workflow process that Mr. Kinsman
3   was referring to, if you know?
4        A.  Hurricane Ida.
5        Q.  And when you say Hurricane Ida, do you mean
6   claims arising out of Hurricane Ida?
7        A.  Yes.
8        Q.  So this is the workflow for processing
9   clients' claims?
10       A.  Yes.
11       Q.  Okay.  One of the questions is, "Where will
12  the information --" it's No. 3.  It says, "Where will
13  the information provided in the position
14  papers/mediation formulas coming -- come from?"
15           Do you see that?
16       A.  Yes.
17       Q.  Do you know where information provided in the
18  position papers and mediation formulas originated?
19           MS. GOOTT:  I'm going to object.  This is
20  beyond the scope of your deposition.
21           MS. VEITH:  The next question will
22  clarify.
23       A.  Sorry.  Can you ask the question again?
24  BY MS. VEITH:
25       Q.  Yeah, do you know where the information
```

</td></tr>
<tr><td>

Page 54

```
1   BY MS. VEITH:
2        Q.  Oh, actually, let me ask you one more question
3   about 14.  So Mr. -- after Mr. Kinsman asked about what
4   the internal distribution e-mail would be, he said, "Is
5   the e-mail address you want all insurance companies to
6   cc on all correspondence.  We will note this in bolded
7   red font on all outgoing correspondence"; do you see
8   that?
9        A.  Yes, ma'am.
10       Q.  Do you understand what outgoing correspondence
11  Mr. Kinsman was referring to?
12       A.  All e-mails sent to the carrier letters.  We
13  -- I think at the bottom or the top of it, it would just
14  say "Please make sure to cc claims@mma-pllc" on all of
15  the response correspondence.
16       Q.  And those e-mails to insurance companies were
17  coming sometimes from Mr. Kinsman's firm; is that right?
18       A.  I think Mr. Kinsman's firm sent e-mails on
19  behalf of MMA.  Mostly claim acknowledgment letters and
20  letters of representation.
21       Q.  All right.  Exhibit 15.  MMA 40 -- or MMA-MB
22  four 0s 42.  Another e-mail from Mr. Kinsman in which he
23  asks several questions.  He prefaces with "Couple
24  follow-up questions so we can solidify the workflow
25  process"; you see that?
```

</td><td>

Page 56

```
1   provided in the position paper/mediation formulas
2   originated?
3            MS. GOOTT:  Object again.  This is beyond
4   the scope.  This is about Velawcity and how the clients
5   were acquired, not what happened.
6        A.  Partly from the claims filed the carrier would
7   produce.  And then partly from our expert's opinion
8   reports.
9   BY MS. VEITH:
10       Q.  And so Ms. Goott raised a good point.  There
11  are Velawcity employees copied on this e-mail, correct?
12  Mr. Vottiero, Mr. Radford?
13       A.  Yes.
14       Q.  So what was their involvement in this
15  workflow?
16       A.  To assist with it.
17       Q.  And how did they assist?
18       A.  By making recommendations.
19       Q.  Recommendations about what?
20       A.  Efficiencies.
21       Q.  So can you give me an example of a
22  recommendation about efficiency that Velawcity made
23  relating to this workflow?
24           MS. GOOTT:  I'm going to again object.
25  It doesn't clarify anything.  He told you from the
```

</td></tr>
</table>

14 (Pages 53 to 56)

John Moseley   April 8, 2025

---

Page 57

1  beginning they had two separate agreements.  You're here
2  to talk about how clients were acquired.  This is a
3  separate issue.  This is beyond what you asked Judge
4  Hanen for a deposition and discovery.  So if you know.
5  This is not on the topics.
6      A.  Yes.
7  BY MS. VEITH:
8      Q.  My question was asking for an example of one.
9      A.  You asked if I could give you an example.
10  Yes, I can.
11     Q.  What -- please give me an example.
12     A.  Instead of asking a hundred questions on the
13  intake questionnaire, you should ask ten questions.
14     Q.  And that was an intake questionnaire that
15  Velawcity asked, correct?
16     A.  I just made up an example.  I wasn't
17  referencing a specific questionnaire.
18     Q.  There was an intake questionnaire that was a
19  part of this workflow, though, correct?
20     A.  This workflow is different.  I think this
21  workflow is after a client signed up.
22     Q.  Do you have a real example of a question that
23  Velawcity -- or an efficiency that Velawcity recommended
24  as a part of this workflow?
25         MS. GOOTT:  What workflow?  You're

---

Page 58

1  talking about two separate contracts, two separate
2  issues.  And you're conflating them.  So if you want to
3  just clarify that we're focused on what the deposition
4  is for today, he can answer your question.
5  BY MS. VEITH:
6      Q.  You can answer.
7      A.  What's your question?
8      Q.  Do you have a real example of a question that
9  Velawcity -- or an efficiency Velawcity recommended as a
10  part of this workflow?
11     A.  Which workflow --
12         MS. GOOTT:  Which work -- sorry.
13  BY MS. VEITH:
14     Q.  Both.
15     A.  No.
16         MS. GOOTT:  I'm not trying to frustrate
17  you.  I appreciate you rolling your eyes at me.  It's
18  just we're talking about two totally different issues.
19  And if you could just clarify so he can answer your
20  questions, it would be helpful.
21         MS. VEITH:  Thank you, Miriam.  I don't
22  need your testimony; I need Mr. Moseley's.
23         MS. GOOTT:  I appreciate that.  But
24  you're rolling your eyes at me.  So I'm trying to make
25  this process less frustrating for you.  And if you could

---

Page 59

1  just clarify the question, it'll be smoother for
2  everybody.
3         MS. VEITH:  I'll ask my questions, and
4  you can make your objections.
5         MS. GOOTT:  That's what I'm doing.
6         (Exhibit 16 marked.)
7  BY MS. VEITH:
8      Q.  Okay.  Next Exhibit will be 16.  And it is
9  another one where there is a native with an attachment,
10  the Bates numbered e-mail is MMA-MB three 0s 975.
11         Do you see that?
12     A.  (Reading.)  Yes.
13     Q.  And this is an e-mail, subject "Forward Storm
14  Damage Retainer" to you and Mr. William Huye, correct?
15     A.  Yes.
16     Q.  And it is from Phil Vottiero at Velawcity,
17  correct?
18     A.  Yes.
19     Q.  And the native e-mail, the document that is
20  attached, is a property damage claims attorney
21  employment contract; you see that?
22     A.  (Reading.)  Yes.
23     Q.  And it's for Hurricane Ida property damage
24  based on the blank that is filled in on Item 2; do you
25  see that?

---

Page 60

1      A.  Yes.
2      Q.  And so this is a form that Velawcity was
3  using; is that right?
4         MS. GOOTT:  Objection; assumes facts not
5  in evidence.  Calls for speculation.
6      A.  I don't know the context of this e-mail.
7  BY MS. VEITH:
8      Q.  Okay.  But you do know that Mr. Vottiero wrote
9  "retainer being used," and then attached this document,
10  correct?
11     A.  Yes.
12     Q.  I want to ask you a couple of questions about
13  the retainer that was attached.
14         In No. 3, there is a bold sentence, starts
15  middle of the third line down in item three that says,
16  "Attorneys are required to obtain client's consent and
17  authorization before filing a lawsuit"; do you see that?
18     A.  Yes.
19     Q.  There's also a reference to a lawsuit -- "If a
20  lawsuit is filed after a client's consent or a recovery
21  from a TWIA mediation is obtained if applicable"; do you
22  see that?
23     A.  Yes.
24     Q.  TWIA, that's the Texas Windstorm Arbitration
25  Act, right?

15 (Pages 57 to 60)

John Moseley    April 8, 2025

Page 61

1    A. Texas Windstorm Insurance Association.
2    Q. Okay. Would there have been TWIA mediations
3  for Hurricane Ida claims?
4    A. We got calls in Texas from Hurricane Ida, yes.
5    Q. Okay. And then also in Item 1, there's a
6  footnote next to the word "co-counsel"; you see that?
7    A. Yes.
8    Q. And in the footnote at the bottom of the page
9  it, defined co-counsel to include Krause & Kinsman Trial
10  Lawyers LLP; do you see that?
11    A. Yes.
12    Q. Okay. Thank you. All right. Exhibit 17.
13        (Exhibit 17 marked.)
14  BY MS. VEITH:
15    Q. This document is MMA-MB three 0s 479. And it
16  is an e-mail dated September 21st, 2021, from Shane
17  Radford at Velawcity; do you see that?
18    A. Yes.
19    Q. Okay. And Mr. Radford writes, "We're sending
20  cases directly to Smart Advocate but would like to have
21  an e-mail as well for packet delivery in the event there
22  is an issue. Would someone please provide?"
23        Do you see that?
24    A. Yes.
25    Q. Okay. What packet delivery?

Page 62

1        Do you know what a packet is referring to?
2    A. I assume he means any documents that they
3  gathered during the screening process.
4    Q. And then it says that "We're sending cases
5  directly to Smart Advocate."
6        Does that refresh your recollection in any
7  way about how information obtained by Velawcity would be
8  sent to MMA?
9    A. It does not refresh my memory any more than it
10  already was.
11    Q. Okay. And Mr. Radford recommends setting up a
12  dummy e-mail or something in quotes, Velawcity-storm
13  damage -- storm-damage@e-mail.com; do you see that?
14    A. Yes.
15    Q. Was any sort of dummy e-mail set up for
16  Velawcity to deliver packets to by MMA?
17    A. Not to my knowledge.
18    Q. Exhibit 18.
19        (Exhibit 18 marked.)
20  BY MS. VEITH:
21    Q. MMA-MB three 0S 480. Let me know when you're
22  ready.
23    A. I'm ready.
24    Q. If you look at the first e-mail in this chain,
25  it is from Mr. Vottiero to a Cory Westbrook; do you see

Page 63

1  that on September 20th, 2021?
2    A. (Reading.) Yes.
3    Q. And her e-mail is @galindolaw.com?
4    A. Yes.
5    Q. And Mr. Vottiero writes, "I believe you-all
6  have everything you need currently in order to get
7  started on signing of storm damage claims"; do you see
8  that?
9    A. Yes.
10    Q. And so my question about this e-mail is just
11  how -- what was Galindo Law's role in the -- I'll use
12  the word "workflow" 'cause it was used in a prior
13  e-mail -- that Velawcity was a part of with MMA, if they
14  had a role?
15    A. I'm not aware of Galindo having a role in MMA
16  Velocity's workflow.
17    Q. So why -- do you know why you, Mr. Moseley,
18  were copied on these e-mails between Velawcity and
19  Galindo?
20    A. The Galindo Law Firm sent MMA roughly 5,000
21  cases for Louisiana, Mississippi, Alabama and Texas
22  storm damage.
23    Q. And so Velawcity -- were they utilized in the
24  transfer of these cases from Galindo to MMA or the
25  receipt of these cases by MMA?

Page 64

1    A. I don't know of any role of them transferring
2  them.
3    Q. So do you know why they were e-mailing Galindo
4  about getting set up on Smart Advocate?
5        MS. GOOTT: Objection; asked and
6  answered.
7    A. I think a lot of law firms use Velawcity as
8  like a technology hub. And so if they had questions,
9  they went to Velawcity for solutions about how to
10  transfer data, especially very large datasets.
11        (Exhibit 19 marked.)
12  BY MS. VEITH:
13    Q. Okay. I'll show you Exhibit 19. This is
14  MMA-MB three 0s 428 is the first page.
15        And the first e-mail in this chain -- it's
16  the second e-mail on the first page is from Adam Krause
17  on October 6, 2021; do you see that?
18    A. Yes.
19    Q. And Mr. Krause, the second line in this e-mail
20  writes, "Shane needs to send all surveys and retainers
21  for the following clients to K&K." And then he lists
22  some numbers where he needs either a retainer or survey
23  and retainer; do you see that?
24    A. Yes.
25    Q. What were -- if you know, the -- Shane is --

16 (Pages 61 to 64)

John Moseley    April 8, 2025

1    sorry. Let me back up.
2            Shane refers to Shane Radford, correct?
3    A. I assume that's who Adam was referring to.
4    Q. And Mr. Radford was employed by Velawcity,
5    correct?
6    A. Correct.
7    Q. And so do you know what surveys and retainers
8    are that Mr. Krause is referring to that Shane was going
9    to send?
10   A. No.
11   Q. Would Velawcity, if you know, have sent signed
12   claim retainers to Krause & Kinsman?
13   A. No.
14   Q. What would they -- what kind of retainers
15   would they have sent if not signed claim retainers, if
16   you know?
17   A. I don't know.
18   Q. And if you look up, Mr. Radford says, "My data
19   team's pulling all of the below retainer/intake survey.
20   Will send over shortly in pdfs; do you see that? Back
21   at the top.
22   A. I'm sorry. (Reading.) Okay.
23   Q. Do you know what intake survey refers to?
24   A. I don't know what he meant.
25   Q. Do you know if Velawcity did intake surveys at

1    all that you're aware of?
2    A. If you want me to guess, I'd guess that it's
3    that criteria questionnaire that we looked at earlier.
4    Q. I actually don't want you to guess, but thank
5    you. Okay. So Exhibit 20 is going to be MMA-MB three
6    0s 963 -- or 962.
7            (Exhibit 20 marked.)
8    BY MS. VEITH:
9    Q. All right. It is 963.
10           Do you have 963 or 962?
11   A. I have 963.
12   Q. Okay. Good. That is what Exhibit 20 is and
13   what I want to ask you about.
14           So this is from Mr. Vottiero on October 7,
15   2021, correct?
16   A. Yes.
17   Q. And it's titled "Claimants That Come in to
18   MMA," correct?
19   A. Correct.
20   Q. And Mr. Vottiero writes, "Can we jump on a
21   call this week to discuss how we will handle intakes and
22   sign contract that MMA signs"; do you see that?
23   A. Yes.
24   Q. And he says, "In the future, we want to have
25   all claimants push through hurricane-relief.com or call

1    in"; do you see that?
2    A. Yes.
3    Q. And he said, "It's understandable that you
4    still have people that call into the office or you-all
5    personally and need to sign up"; do you see that?
6    A. Yes.
7    Q. And those people, those would be outside of
8    the MMA that we're talking about, right?
9            If someone called you personally?
10   A. To this day, the MSA has not happened yet
11   because advertising launches on Monday. So everything
12   prior that we discussed is not about the MSA.
13   Q. Sure. Okay. But my question is that --
14           MS. VEITH: Your answer is nonresponsive,
15   so I'll move to strike that.
16   BY MS. VEITH:
17   Q. My question is, the people that call into the
18   office or you-all personally and you just sign up, those
19   would be outside of the MSA, right? Yes or no?
20   A. When?
21   Q. Well, that's a good question.
22           If someone called your office after the
23   MSA was signed, they might still be governed by the MSA
24   with Velawcity?
25           MS. GOOTT: Objection; calls for a legal

1    conclusion.
2    A. I'd have to speculate on it. It's a
3    hypothetical.
4            THE REPORTER: What was the last?
5            THE WITNESS: It's a hypothetical.
6    BY MS. VEITH:
7    Q. Well, you said -- you asked when.
8            And so I guess, why were you asking me
9    when? Is there some temporal relationship to when a
10   client signed up and the MSA being applicable, in your
11   understanding?
12   A. Well, if they signed up before the MSA
13   existed, I assume it wouldn't apply to it.
14   Q. Sure. But after the MSA existed, if a client
15   called into your office, would they be governed in your
16   understanding, by the MSA?
17           MS. GOOTT: Objection; calls for a legal
18   conclusion.
19   A. Maybe.
20   BY MS. VEITH:
21   Q. And -- maybe.
22           So in what case would they be governed by
23   the MSA?
24           MS. GOOTT: Objection; calls for a legal
25   conclusion.

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley   April 8, 2025

Page 69

1    A. I don't know. I have to look at it on a
2    case-by-case basis.
3    BY MS. VEITH:
4        Q. Can you give me an example?
5        A. No.
6        Q. Okay. So you say advertising -- or
7    Mr. Vottiero says, "Advertising launches on Monday."
8        So I believe you just testified, but tell
9    me yes or no, after advertising launched on the coming
10   Monday, clients who came in through that advertising
11   might have been governed by the Velawcity and MMA MSA?
12       MS. GOOTT: Objection. Mischaracterizes
13   his testimony. They did not send clients.
14       A. Yeah, Velawcity never sent us clients.
15   BY MS. VEITH:
16       Q. What did they send you?
17       A. Screened potential clients.
18       Q. So potential clients may have been governed by
19   the MSA?
20       A. When?
21       Q. After advertising launched on Monday.
22       A. Yes. Potential clients could be governed by
23   an MSA after advertising launched.
24       Q. All right. Exhibit 21.
25           (Exhibit 21 marked.)

Page 70

1    BY MS. VEITH:
2        Q. MMA-MB 000962.
3        A. (Reading.)
4        Q. This is an October 3rd, 2021 e-mail from
5    Mr. Vottiero to your list?
6        A. I'm on the recipient list, yes.
7        Q. And Mr. Vottiero writes that "Shane and I need
8    to be sent any new signup intake and retainer in an
9    e-mail with the subject line (new claimant-last name,
10   first name)" do you see that?
11       A. Yes.
12       Q. And then next paragraph, Mr. Vottiero writes,
13   "Velawcity will be building on a website where you-all
14   can submit all of the intake questions and upload the
15   signed contract"; do you see that?
16       A. Yes.
17       Q. And he says, "Once that is done, we will no
18   longer accept contracts and intakes in an e-mail form";
19   do you see that?
20       A. Yes.
21       Q. What format did Velawcity accept contracts and
22   intakes in?
23       MS. GOOTT: Objection; assumes facts not
24   in evidence.
25       A. I don't know.

Page 71

1        (Exhibit 22 marked.)
2    BY MS. VEITH:
3        Q. Okay. Exhibit 22. MMA-MB three 0s 945.
4        A. (Reading.) All right.
5        Q. All right. If you go back to the
6    second-to-the-last page of this document that ends in
7    947, that is where the first e-mail in the chain on
8    October 11th, 2021 from Mary Katherine Smith starts; do
9    you see that?
10       A. Yes.
11       Q. And Ms. Smith is e-mailing about a 404 error
12   message; do you see that?
13       A. Yes.
14       Q. And she says that "Phil is going to have a
15   phone number show up when the client submits contract
16   within the next 24 hours"; do you see that?
17       A. Yes.
18       Q. And then she says some other things. But she
19   also says, "Phil is going to send me a spreadsheet of
20   clients that have tried to sign via the site to ensure
21   we capture them. Tyeisha has already sent two
22   contracts." Do you see that?
23       A. Yes.
24       Q. So were some clients signing up via a
25   Velawcity website?

Page 72

1        MS. GOOTT: Objection; vague.
2        A. No.
3    BY MS. VEITH:
4        Q. And then Mary Katherine writes, "Phil, I do
5    believe we will need to figure out some solution for
6    contract completion on the actual website"; do you see
7    that?
8        A. (Reading.) Yes.
9        Q. Do you know what contract completion meant in
10   this context?
11       A. Yeah, these are organic claims from our
12   internal business development team. We were having
13   trouble capturing a high percentage of the retainers
14   that we sent out.
15       Q. Okay.
16       MS. VEITH: So objection; nonresponsive.
17   BY MS. VEITH:
18       Q. What does contract completion mean in this
19   context?
20       A. I just told you.
21       Q. Contract completion means you were having
22   trouble with organic clients?
23       A. Yes.
24       Q. All right. So moving forward in time,
25   backward and then -- you know, back toward page 1 of the

18 (Pages 69 to 72)

John Moseley    April 8, 2025

| Page 73 | |
|---|---|

1  e-mail, on October 13th, 2021. So it's in the middle of
2  the page that ends in 946.
3       Mary Katherine writes, "Phil, can you send
4  over the list of clients that have tried to sign up
5  online. We need to make sure they are taken care of";
6  do you see that?
7  A. Yes.
8  Q. So there were clients who were trying to sign
9  up online, correct?
10      MS. GOOTT: Objection; assumes facts not
11 in evidence.
12 A. No.
13 BY MS. VEITH:
14 Q. So Ms. Smith is just referring to something
15 that didn't actually happen?
16      MS. GOOTT: Objection; argumentative.
17 You know you're mischaracterizing the word "client."
18 A. No.
19 BY MS. VEITH:
20 Q. Okay. All right. Flipping to the bottom of
21 the first page, an e-mail from Colette Jones. She also
22 worked at MMA, correct?
23 A. Correct.
24 Q. And she says, "Thank you, MK, I couldn't agree
25 more. We really need this information. When clients

| Page 74 | |
|---|---|

1  are calling, we sound really ignorant because we know
2  nothing about what paperwork they have signed, who the
3  attorney is assigned to them and such --" flip to the
4  following page. She writes, "Automation is great
5  theoretically, but these residential clients want to
6  hear a voice and need to know we are here to help.
7  Thoughts?" Do you see that?
8  A. Yes.
9  Q. What was being automated that Ms. Jones is
10 referring to, if you know?
11 A. The workflow.
12 Q. And what was that workflow?
13 A. The claims prosecution.
14 Q. The entire prosecution of the claims was being
15 automated?
16 A. That was our goal, yes.
17 Q. All right. Exhibit 23.
18      (Exhibit 23 marked.)
19 BY MS. VEITH:
20 Q. Will be MMA-MB three 0s 500.
21      THE REPORTER: And you'll read just a
22 little slower, please.
23      MS. VEITH: Sure.
24 BY MS. VEITH:
25 Q. It's an e-mail chain where the top e-mail, the

| Page 75 | |
|---|---|

1  last one in the chain is from Shane Radford on Monday,
2  October 18th, 2021; do you see that?
3  A. Yes.
4  Q. All right. Go to the middle -- so go to the
5  page that ends in 503.
6       Do you see that in the middle of this page
7  is that e-mail from Mary Katherine Smith that you and I
8  have already discussed where Ms. Smith asks for the list
9  of clients that have tried to sign up online; do you see
10 that?
11 A. Yes.
12 Q. Okay. So then flip back to the page that ends
13 in 502 where Mr. Radford, on October 14th, sends an
14 e-mail that says, "Hey, all. Please see the attached
15 Excel book of all the storm damage leads who went
16 through the online signup process but failed to complete
17 the retainer signing portion"; do you see that?
18 A. Correct.
19 Q. So do you have an understanding that there was
20 a retainer signing portion of Velawcity's online signup
21 process?
22 A. This is not part of the MSA. Velawcity didn't
23 -- wasn't involved in this process.
24 Q. Okay.
25      MS. VEITH: Objection; nonresponsive.

| Page 76 | |
|---|---|

1  BY MS. VEITH:
2  Q. Was there a retainer signing portion of the
3  Velawcity online signup process?
4  A. No.
5  Q. Exhibit 24.
6       (Exhibit 24 marked.)
7  BY MS. VEITH:
8  Q. MMA-MB three 0s 506.
9  A. (Reading.)
10 Q. Okay. In the first e-mail in this chain,
11 which begins at the bottom of the first page from
12 Ms. Smith on October 21st, 2021; do you see that?
13 A. Yes.
14 Q. And Ms. Smith writes, "Thanks, William and
15 Phil for talking with me this morning. I'm sending a
16 followup e-mail to reiterate what was discussed and
17 agreed upon"; do you see that?
18 A. Yes.
19 Q. She writes a list of immediate action items;
20 do you see that?
21 A. Yes.
22 Q. No. 3 in that list is, "MK is following up
23 with the smallest of clients that did not complete
24 signature of online contract form and will be sending
25 Adobe contract if needed." Do you see that?

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 77

```
 1     A.  Yes.
 2     Q.  And then flip to the second page where there's
 3  a header that says, "Agreed Upon Process Until Portal is
 4  Live"; do you see that?
 5     A.  Yes.
 6     Q.  Do you know what the portal was that was going
 7  live?
 8     A.  Yes.
 9     Q.  And what was that portal?
10     A.  That was the contractor PA referral portal.
11     Q.  All right.  So if you go up to the first page,
12  the first page --
13     A.  Sorry.
14     Q.  -- the e-mail from Mr. Radford, he says, "I
15  have some very exciting news.  The MMA claimant upload
16  portal is live and functioning as intended"; do you see
17  that?
18     A.  Yes.
19     Q.  So the claimant upload portal was only for
20  contractor referrals?
21     A.  No.
22     Q.  Okay.  So were there two different portals?
23     A.  To clarify, I answered your question no
24  because contractors, public adjusters, property
25  managers, individuals could use the portal.  There might
```

Page 78

```
 1  have been more than one portal, though I don't know how
 2  narrowly or broadly defined the portal is.
 3     Q.  Okay.  So when I previously asked you -- and
 4  by the way, as you know, I think, from the rules of
 5  depositions, if you need to correct an answer that
 6  you've earlier given, that's fine.
 7         When you -- when I asked you what the
 8  portal was and you said contractor referral --
 9     A.  And PA.
10     Q.  Excuse me?
11     A.  I said contractor and PA.
12     Q.  Okay.  So --
13     A.  You limited it to contractor.  That's why I
14  corrected you.
15     Q.  But your answer that you just gave now, you
16  also referred to individuals?
17     A.  Correct.
18     Q.  Okay.  So there may have been others besides
19  contractors and PAs who used the upload portal?
20     A.  Yes.  I believe our staff used it for walk-ins
21  as well.
22     Q.  Okay.  Did you have access to the portal?
23     A.  I think it was a landing page.
24     Q.  So yes or no?  Did you have access to it?
25     A.  I had access to Internet.  So I had access to
```

Page 79

```
 1  the landing page.
 2     Q.  And did you have access to the information
 3  that was uploaded through the portal?
 4     A.  I could get access if I didn't have it.  I
 5  don't think I had logins or anything.
 6     Q.  Okay.  Do you know people who did have logins
 7  to that portal?
 8     A.  Not specifically, no.
 9     Q.  Okay.  What about, for example, did Mr. Huye
10  have access to what was uploaded to that portal?
11     A.  I assume any person cc'd on these e-mails had
12  access to it.  I don't know if they had access to it or
13  not.
14     Q.  And the upload portal, this e-mail comes from
15  Mr. Radford.  Was it Velawcity who launched the portal?
16     A.  Did they create the landing page?  Is that
17  what you're asking?
18     Q.  Yes.  Although, let me say, I understand it
19  might be like a technology person who created the
20  landing page.
21         Was it Velawcity who got the landing page
22  to come into existence?
23         MS. GOOTT:  Objection; calls for
24  speculation.
25     A.  Yeah, I would say MMA caused it to come into
```

Page 80

```
 1  existence.
 2  BY MS. VEITH:
 3     Q.  And how was Velawcity involved in that
 4  process?
 5     A.  Velawcity was an agent for KKTL and MMA.
 6     Q.  Okay.  And so specifically with respect to the
 7  portal, what was Velawcity's role?
 8     A.  I think they created the landing page.
 9     Q.  All right.  Exhibit No. 25 --
10         (Exhibit 25 marked.)
11  BY MS. VEITH:
12     Q.  -- is MMA-MB four 0s 40 along with a native
13  version of that e-mail and its attachments.  Okay.  This
14  is a December 7th, 2021 e-mail from -- well, the top
15  e-mail, it's from you to accounting.
16         Is that your internal accounting e-mail
17  address?
18     A.  Yes.
19     Q.  Okay.  And then the earlier e-mail is from
20  Mr. Radford to you.  And it says, "Hey, Zach.  Sent you
21  the MSA to sign via Everlog -- Eversign.  Invoice
22  attached for payment"; do you see that?
23     A.  Yes.
24     Q.  And the attachment, Invoice No. 1572, is for
25  $2,001,000; do you see that?
```

John Moseley    April 8, 2025

Page 81

1    A. Yes.
2    Q. And there is a line item for advertising; you
3  see that?
4    A. Yes.
5    Q. And rate and amount for advertising are zero,
6  correct?
7    A. Correct.
8    Q. There's a line item for intake; do you see
9  that?
10    A. Correct.
11    Q. And the rate and amount for intake are zero,
12  correct?
13    A. Correct.
14    Q. Then there's a line item for storm damage
15  retainers; do you see that?
16    A. Yes.
17    Q. The quantity is 667; do you see that?
18    A. Yes.
19    Q. The rate is 3,000; do you see that?
20    A. Yes.
21    Q. And the amount is $2,001,000; do you see that?
22    A. Yes.
23    Q. Okay. Did you pay this invoice?
24    A. MMA, I believe, paid this invoice.
25    Q. Sure. And when I'm saying "you" -- and I know

Page 82

1  it's confusing. But generally I'm referring to MMA
2  since that's who I'm deposing, right?
3    A. Yes.
4    Q. Okay. So did MMA pay this invoice?
5    A. Either I did, KKTL, Galindo. Someone paid it.
6    Q. Why would KKTL or Galindo have paid it?
7    A. 'Cause they invested in storm cases as well.
8    Q. Next, Exhibit 26.
9      (Exhibit 26 marked.)
10  BY MS. VEITH:
11    Q. Is MMA-MB three 0s 519 along with the native
12  version of that e-mail and its attachment.
13    A. (Reading.)
14    Q. So this e-mail is from Mr. Radford on
15  December 8th, 2021 to you and Mr. Vottiero; do you see
16  that?
17    A. Yes.
18    Q. And Mr. Radford writes, "Zach provides invoice
19  to account for 1,000 packets instead of 667. I also
20  sent a revised MMA to sign if you wouldn't mind
21  completing that as well. Thank you." Do you see that?
22    A. Yes.
23    Q. Do you know what packets referred to in this
24  e-mail from Mr. Radford?
25    A. The marketing and screening.

Page 83

1    Q. And what marketing and screening was in the
2  packets?
3    A. I don't know for this particular invoice.
4    Q. And if you look to the attachment, which is
5  also invoice 1572 --
6    A. I don't have an attachment.
7      MS. GOOTT: I don't either.
8      MS. VEITH: Oh, did I not give you the --
9  can you hand me the native with the attachment, please.
10  Natalie, I think you should at least have the native
11  with the attachment. No?
12  BY MS. VEITH:
13    Q. Well, I'll give you mine. This is the native
14  with the attachment. And if you look to the attachment,
15  again, it's Invoice 1572, correct?
16    A. Yes.
17    Q. And the difference between this one and the
18  last one is that it is for the $3 million rather than 2
19  million and $1,000?
20    A. Yes.
21    Q. And what's stated on the invoice is storm
22  damage retainers, correct?
23    A. Those are the three words on the invoice, yes.
24    Q. All right. Let's look at Exhibit 28 -- no,
25  27. My Tab 28.

Page 84

1      (Exhibit 27 marked.)
2  BY MS. VEITH:
3    Q. And this document begins MMA-MB two 0s 1039;
4  do you see that?
5    A. Yes, ma'am.
6    Q. Okay. So this is a marketing service
7  agreement or MSA, which is the shorthand you've been
8  using to refer to this type of document, correct?
9    A. Yeah, I've referred to this document as an
10  MSA.
11    Q. Okay. So this MSA says that Velawcity was
12  providing -- it is an agreement for marketing and
13  administrative services, correct?
14    A. Correct.
15    Q. Okay. And it further says that "Velawcity
16  will perform prescreening intake administrative services
17  for the law firm as law firm's agent, based on law
18  firm's written criteria and under law firm supervision."
19      Do you see that?
20    A. Yes.
21    Q. What sort of the supervision did MMA provide
22  to Velawcity?
23    A. Specific instructions on what questions they
24  could or could not answer when hurricane victims called
25  or any storm victims called.

21 (Pages 81 to 84)

John Moseley    April 8, 2025

Page 85

1    Q.  Was any MMA employee present supervising a
2  Velawcity employee when they actually asked those
3  questions?
4    A.  When that question was ever asked?  Or when a
5  question was ever asked?
6    Q.  Well, let me ask it this way.
7       Was the general practice for an MMA
8  employee to supervise a Velawcity employee as it [sic]
9  asked the questions?
10    A.  We did not have 24 surveillance on what I
11  presume to be the hundreds of Velawcity employees, no.
12    Q.  Did you have any surveillance at all?
13    A.  We did like management and training.
14    Q.  On the front end, but not while the calls were
15  taking place; is that fair to say?
16    A.  No.  It was -- it happened regularly.
17    Q.  Throughout the course of Velawcity doing this
18  intake?  Is that what you mean?
19    A.  Through them running advertising and screening
20  hurricane victims, yes.
21    Q.  Sure.  And so I'm still asking a slightly
22  different question.  When a potential client would be
23  screened by Velawcity, was an MMA employee present
24  listening to the screening?
25    A.  For the hundred thousand clients that

Page 86

1  Velawcity screened, MMA did not listen to every single
2  call.
3    Q.  Okay.  And then fourth paragraph under general
4  services, "Law Firm understands and agrees that
5  Velawcity cannot -- ethically cannot enter into
6  attorney/client fee arrangements for law firm.
7       "But Velawcity will, as an independent
8  contractor and agent for a law firm, provide potential
9  clients who meet law firm's pre-screening eligibility
10  with law firm's proposed fee agreement HIPAA
11  authorization for release of medical records and
12  high-tech letter"; do you see that?
13    A.  Yes.
14    Q.  So is that what would happen, that Velawcity
15  would provide a potential client with a proposed fee
16  agreement with MMA?
17    A.  No.
18    Q.  What happened instead?
19    A.  What do you mean?
20    Q.  Well, you said that Velawcity would not
21  provide potential clients with MMA's proposed fee
22  agreement.  So what did Velawcity provide potential
23  clients with?
24    A.  That's not what I said.
25    Q.  So maybe explain to me what I'm getting wrong

Page 87

1  here.  What did you say?
2    A.  Can you rephrase your question?
3    Q.  Okay.  This statement says, "Velawcity will,
4  as an independent contractor and agent for law firm,
5  provide potential claimants who meet law firm's
6  prescreening eligibility criteria with law firm's
7  proposed fee agreement"; do you see that?
8    A.  Yes.
9    Q.  Did Velawcity provide potential claimants with
10  a proposed fee agreement with MMA?
11    A.  They provided forms sometimes.
12    Q.  And sometimes those forms were proposed
13  retainer agreements; is that right?
14    A.  It could be.
15    Q.  Okay.  So go down under Marketing Service.
16  The second paragraph, last full paragraph says:
17       "All marketing for the designated legal
18  claims and the DMAs should include a direct and/or
19  dialling numbers and/or online form submission to direct
20  inquires to Velawcity"; do you see that?
21    A.  Yes.
22    Q.  So is that what happened?
23       Were inquires from potential claimants
24  directed to Velawcity?
25    A.  Velawcity ran marketing services that included

Page 88

1  contact information that had numbers or contact avenues
2  that were routed to MMA agents that some were Velawcity
3  run systems, yes.
4    Q.  Okay.  So in an advertisement that Velawcity
5  placed that had a number that said call this number or
6  go to this website, if a potential claimant called that
7  number or went to that website, they would speak to an
8  MMA agent who might be an employee of Velawcity?
9    A.  Possibly, yes.
10    Q.  Would they possibly speak to attorneys at MMA?
11    A.  Yes.
12    Q.  Which attorneys spoke to clients as a result
13  of the website or the phone numbers?
14    A.  So we had a tiered system where, depending on
15  what number they called, what jurisdiction they were in,
16  we tried to get them with an attorney that was licensed
17  in their jurisdiction.  So it would just depend on a lot
18  of different things.
19    Q.  All right.  In Louisiana, who did they speak
20  to?
21    A.  I believe the first person would be Katie
22  Aromi.
23       THE REPORTER:  Katie what?
24       THE WITNESS:  Aromi, A-R-O-M-I.
25

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley   April 8, 2025

Page 89

1    BY MS. VEITH:
2        Q.  Okay.  Let's look at the next page.  The next
3    page.  Okay.  Under Intake Services --
4        A.  Uh-huh -- or yes, ma'am.
5        Q.  -- it says -- you really don't need to call me
6    ma'am.  I do think I'm younger than you.  "Velawcity --"
7            MS. GOOTT:  We're in Texas.  He's got
8    manners.
9    BY MS. VEITH:
10       Q.  " -- in consultation with law firm, will use
11   specific intake scripts and survey questions for each
12   legal claim based on the intake criteria required by law
13   firm"; you see that?
14       A.  Yes.
15       Q.  For hurricane claimants, did Velawcity use
16   specific intake scripts and survey questions for
17   potential claimants?
18       A.  I believe they used the -- the questionnaire
19   you had or you presented earlier.
20       Q.  Let me ask a clarifying question because I do
21   believe you told me that the questionnaire I showed you
22   earlier did not have to do with the MSA.
23            Was it later used in connection with the
24   MSA?
25       A.  They were similar, yes.

Page 90

1        Q.  All right.  And then second paragraph under
2    Intake Services says, "Upon Velawcity's prescreening
3    intake review of a potential client's eligibility,
4    Velawcity will transmit to law firm, with potential
5    client's consent, the potential client's contact
6    information, fee agreement and HIPAA release either by
7    direct posting through established secure connection
8    with law firm system or e-mail"; do you see that?
9        A.  Yes.
10       Q.  So did Velawcity transmit to MMA, potential
11   clients for hurricane claims, contact information and
12   fee agreements?
13       A.  Information that they gathered from the
14   marketing they were in and screening they did was
15   provided to MMA, yes.
16       Q.  Did that include fee agreements?
17       A.  There were no fee agreements transmitted, no.
18       Q.  So why does it provide for that in this
19   contract?
20       A.  Don't know.
21       Q.  Did you review this contract before you signed
22   it?
23       A.  Yes.
24       Q.  Why didn't you do anything to strike
25   references to Velawcity providing fee agreements within

Page 91

1    it?
2        A.  I think later in the contract, it addresses
3    that issue and why they couldn't do it.
4        Q.  Show me where in the contract it provides for
5    that.
6        A.  (Reading.)  It says, "Velawcity may, at law
7    firm's request, provide prescreened potential clients
8    with law firm's fee agreement.  But no attorney/client
9    relationship is formed until the law firm agrees to
10   represent the potential client."
11           So after Velawcity does their screening,
12   KKTL would do their screening, then MMA would do their
13   screening.  So -- you know.  There is -- there's a lot
14   of work that goes in before a client could be -- reach
15   an agreement with the law firm.
16       Q.  Sure.  And so you and I may be talking about
17   different things.  I understand that Velawcity may not
18   have been entering into the fee agreements on your
19   behalf, right?  That's what this provides for, that no
20   attorney/client relationship is formed until the law
21   firm agrees to represent, right?
22       A.  Yes.
23       Q.  But my question is different because this --
24   this didn't -- still says, "Velawcity may, at law firm's
25   request, provide prescreened potential clients with law

Page 92

1    firm's fee agreement"; you see that?
2            MS. GOOTT:  What's the question?
3            THE WITNESS:  Yeah, I don't --
4            MS. GOOTT:  If he sees it?
5            MS. VEITH:  Yes.
6        A.  Yes.
7    BY MS. VEITH:
8        Q.  So my question is, was Velawcity obtaining and
9    then providing to MMA, fee agreements that were signed
10   by the clients?
11           MS. GOOTT:  Objection; asked and
12   answered.
13       A.  Yeah, no.
14   BY MS. VEITH:
15       Q.  How did the fee agreements get executed by the
16   clients then?
17       A.  It depends on how they signed it.
18       Q.  If a client came in through the Velawcity
19   system --
20           MS. GOOTT:  Objection; assumes facts not
21   in evidence that any clients came in.
22   BY MS. VEITH:
23       Q.  -- what would be the process for a fee
24   agreement getting executed by both the client and the
25   law firm?

23 (Pages 89 to 92)

John Moseley    April 8, 2025

Page 93

1    A. I mean, there's a thousand different
2    variables.
3    Q. Okay. Give me one example.
4    A. MMA could hard mail a client a contract.
5    Q. And did that often happen?
6    A. Yes.
7    Q. Okay. Who at MMA was sending out those hard
8    mail contracts?
9    A. We used a third-party company.
10   Q. And who was that?
11   A. Legal Wings.
12   Q. Okay. Did MMA meet with the client before
13   that contract was signed?
14   A. If the client requested.
15   Q. And if they didn't?
16   A. No.
17   Q. Okay. All right. So moving down under Fees.
18      "Law firm agrees to prepay Velawcity a
19   fixed rate of $3,000 for each prescreened potential
20   client reviewed for law firm and delivered to law firm";
21   do you see that?
22   A. Yes, sir.
23   Q. And is that what MMA agreed to do?
24   A. Yeah. I signed this agreement.
25   Q. Okay. And then if you will go to the last

Page 94

1    page, the order summary.
2    A. Yes.
3    Q. The order summary says total prescreened
4    clients, 1,000?
5    A. Yes.
6    Q. And then prescreened client cost, 3,000?
7    A. Yes.
8    Q. And then total balance due, 3 million?
9    A. Yes.
10   Q. So the payment was for those 1,000 prescreened
11   clients?
12   A. No.
13   Q. What was the payment for?
14   A. It was for running marketing and scrubbing
15   services.
16      THE REPORTER: And what services?
17      THE WITNESS: Scrubbing.
18   BY MS. VEITH:
19   Q. So why is it characterized in this way?
20   A. I don't know. I didn't draft this document.
21   Q. You did sign it, though?
22   A. I did.
23   Q. And you agreed to pay $3,000 per prescreened
24   client, correct?
25   A. I agreed to pay $3 million for advertising and

Page 95

1    intake services.
2    Q. You saw the words, "prescreened client cost
3    3,000" before you signed this, right?
4    A. Yes.
5    Q. And if you weren't agreeing to pay per client,
6    why didn't you correct that?
7       MS. GOOTT: Objection; argumentative.
8    A. Yeah, I didn't pay per client. Velawcity
9    never got us clients.
10   BY MS. VEITH:
11   Q. So my question is, if you weren't agreeing to
12   pay per prescreened client, why didn't you make an edit
13   to this document?
14      MS. GOOTT: Objection; assumes facts not
15   in evidence.
16   A. Yeah, I paid for the prescreening and the
17   marketing. $3 million lump sum upfront.
18   BY MS. VEITH:
19   Q. $3 million lump sum achieved by $3,000 per
20   client, correct?
21   A. No, achieved by an Amex card.
22      THE REPORTER: By a what?
23      THE WITNESS: An Amex card.
24   BY MS. VEITH:
25   Q. Okay. The way that $3,000 number is arrived

Page 96

1    at is by multiplying a thousand by 3,000, correct?
2    A. I don't know how they came up with that
3    number.
4    Q. Total prescreen clients 1,000, right?
5    A. I know how to do math. I just don't -- I'm
6    not going to make assumptions 'cause I didn't draft this
7    document.
8       MS. GOOTT: Hold on. I'm going to object
9    to argumentative. He has answered your question. He
10   has told you what he paid for. There's no reason to
11   continue arguing with him and to have him multiply 3,000
12   times a thousand. He's told you what he paid for, which
13   completely matches what's in this contract. So...
14      MS. VEITH: Thank you, Ms. Goott.
15      MS. GOOTT: You're welcome.
16      MS. VEITH: You do not need to continue
17   to argue on the record. My question --
18      MS. GOOTT: Well, you don't need to
19   continue to argue with my client either. He's answered
20   your question multiple times.
21      MS. VEITH: Miriam, I'll notice your
22   deposition when I want it.
23   BY MS. VEITH:
24   Q. Mr. Moseley, this order summary provides --
25      MS. GOOTT: That's funny.

John Moseley    April 8, 2025

| Page 97 |
|---|

1  BY MS. VEITH:
2      Q.  -- 1,000 documents per total prescreened -- or
3  1,000 as a number for total prescreened clients,
4  correct?
5          MS. GOOTT:  Objection; mischaracterizes.
6  Best evidence rule.
7      A.  Sorry, what's the question?
8  BY MS. VEITH:
9      Q.  This document says, "Total prescreened
10  clients: 1,000," correct?
11     A.  Those words are on this page.
12     Q.  And it says, "Prescreened client cost: 3,000,"
13  correct?
14     A.  Those words are on this page.
15     Q.  And you signed this document?
16     A.  I did.
17     Q.  Okay.  Exhibit No. 28.
18          (Exhibit 28 marked.)
19  BY MS. VEITH:
20     Q.  Oh, let me ask you one -- one more question
21  about that MSA.  We were talking about the phone calls
22  that you provided some training for at the beginning of
23  the questions.
24          Did MMA ever or any employees from MMA
25  ever listen, whether in real time or later to a

| Page 98 |
|---|

1  recording, to the calls that Velawcity had with
2  potential clients?
3      A.  Yes.
4      Q.  Okay.  And how did MMA do that?
5      A.  I think it was gloCOM, if I'm not mistaken.
6  It's a software.
7      Q.  So was that in real time or after the fact?
8      A.  Both.
9      Q.  Okay.  And did MMA attorneys or employees
10  actually participate in these phone calls, speak with
11  the potential clients?
12     A.  I don't know.
13     Q.  And then do you know where the employees at
14  Velawcity who were taking these phone calls, do you know
15  where they were located?
16     A.  I think I know locations.  But I think it was
17  several.
18     Q.  Okay.  What locations do you think you know
19  of?
20     A.  Scottsdale, Houston, New Orleans, New Jersey,
21  Florida, Tennessee, Ohio, Illinois.
22     Q.  Okay.  Do you know which Velawcity employees
23  were located in New Orleans?
24     A.  Oh, man.  They would be offended that I can't
25  remember their names.  It was a John, I think.

| Page 99 |
|---|

1      Q.  Okay.  And if you don't know, you don't know.
2      A.  Yeah, I'm so sorry.
3      Q.  Don't speculate.  Okay.
4      A.  I think there was a John.
5      Q.  Pretty common name, as you might know.
6  Exhibit 28.
7          (Exhibit 28 marked.)
8  BY MS. VEITH:
9      Q.  This is MMA-MB three 0s 525.  And this
10  document, the last e-mail, top one, is from Shane
11  Radford on December 9th, 2021 to Colette Jones; do you
12  see that?
13     A.  Yes.
14     Q.  And Ms. Jones was the Director of HR at MMA;
15  is that correct?
16     A.  She held a bunch of different roles through
17  her course of employment.
18     Q.  So if you go to the first e-mail, so last
19  page, the very top of the first e-mail starts on the
20  second page, but the substance is on the last page.
21     A.  Sorry.  I'm on -- start at 137, go to 138?
22     Q.  Correct.  But all that's on 137 is -- you
23  know, the sender and the date.
24     A.  Okay.
25     Q.  And the sender is Mr. Vottiero, and the date

| Page 100 |
|---|

1  is December 8th, 2021, correct?
2      A.  Correct.
3      Q.  The subject of this e-mail is "E-Mail
4  Forwarding"; do you see that?
5      A.  Yes, sir.
6      Q.  And Mr. Vottiero writes, "Hey, Colette, please
7  have the e-mail account forwarded to Carlos, Shane and
8  Hector, all copied on this e-mail"; do you see that?
9      A.  Yes.
10     Q.  And those are all Velawcity employees, based
11  on their e-mail address at least, correct?
12     A.  Yep.
13     Q.  Do you -- do you know why or what this e-mail
14  account was that was forwarding to Carlos, Shane and
15  Hector?
16     A.  I believe it was another project they were
17  working on for us.
18     Q.  And what was that project?
19     A.  Post-retention customer service.
20     Q.  Okay.  What was post-retention customer
21  service?
22     A.  That's after MMA agreed to represent an
23  insured, we -- we needed help with capacity on the
24  phones.
25     Q.  Got it.  So Velawcity would provide customer

John Moseley   April 8, 2025

Page 101

1  service to clients who had been retained?
2  A. I don't know if it was Velawcity specifically,
3  but they were -- I don't know if they -- I think they
4  might have managed another call center that wasn't
5  Velawcity's. And they helped us onboard their customer
6  service agents.
7  Q. The John that you were referring to in New
8  Orleans with Velawcity, was that John Scallan, by any
9  chance?
10 A. Maybe. I don't remember his last name.
11 Q. Do you remember interacting with John Scallan
12 at all?
13 A. If it's my John, it might be. Yeah.
14 Q. All right. Well, I'll show you this document.
15 And the only question I have about it is who was John
16 Scallan and what was he doing. Exhibit 29.
17 (Exhibit 29 marked.)
18 BY MS. VEITH:
19 Q. MMA-MB three 0s 886.
20 A. Yeah, this might be John. I think he was in
21 charge of the call center.
22 Q. Got it.
23 A. And I think he was -- I think he was located
24 in New Orleans, if I'm not mistaken.
25 Q. Okay. And so Mr. -- this e-mail with

Page 102

1  Mr. Scallan, which is -- the subject is "Intake Intro."
2  Would that have related to the call center
3  in New Orleans?
4  A. Presumably.
5  Q. And Mr. -- if you look at in the middle of the
6  page, December 15th, 2021, more like toward the bottom,
7  Mr. Scallan writes that he just has a quick script he
8  wanted you to bless; do you see that?
9  A. I do.
10 Q. Do you recall what that script was?
11 A. I do not.
12 Q. Okay. Exhibit 30.
13 (Exhibit 30 marked.)
14 BY MS. VEITH:
15 Q. This is MMA-MB three 0s 882 as well as the
16 native e-mail and its attachment. Okay.
17 This e-mail is from December 17th, 2021;
18 do you see that?
19 A. Yes, ma'am.
20 Q. And Mr. Vottiero e-mails you, subject Ethics
21 Approval. It says, "Hey, Zach. We need to get this
22 copy approved by ethics"; do you see that?
23 A. Yes, ma'am.
24 Q. And what's attached is an advertisement. And
25 Mr. -- is it correct that Mr. Vottiero is asking you to

Page 103

1  have the advertisement approved by ethics?
2  A. Yes.
3  Q. Who was that that was providing that approval
4  for you?
5  A. Claire Rubion.
6  Q. Okay. And this advertisement, this relates to
7  Hurricane Ida claims; is that right?
8  A. (Reading.) It says Hurricane Ida in the top
9  right-hand corner. But I don't know if it was
10 geographically located to only go out to Ida victims.
11 It could have been Lower Delta, Zeda, Ida.
12 Q. So within this e-mail there's like little box
13 that says, "Let the experts go to work for you and
14 collect the funds you deserve to get your property back
15 to normal." Do you see that?
16 A. Yes, ma'am.
17 Q. And then it provides a number to call, a
18 number to text, and a website. Although those are just
19 like dummy numbers and websites in this particular
20 version of the advertisement, right?
21 A. Yes, ma'am. I assume so.
22 Q. In an advertisement like this that actually
23 went out where there were real phone numbers and
24 websites provided, would those phone numbers and
25 websites have sent the potential clients to Velawcity

Page 104

1  intake?
2  MS. GOOTT: Objection; calls for hearsay.
3  A. I think we can presume that, that it would go
4  to an agent of MMA that was presumably -- you know,
5  Velawcity-related.
6  BY MS. VEITH:
7  Q. Okay. And you said something about how the
8  advertisement says Ida, but you don't know
9  geographically if it may also have been sent out to
10 Laura and Delta addresses.
11 How did -- how did MMA determine addresses
12 to send these letters to?
13 A. We sent direct mailers to every single
14 individual south of 10 in Louisiana.
15 Q. And what about text messages?
16 How did MMA determine what numbers to send
17 text messages to?
18 A. We did zero text message advertising.
19 Q. Did Velawcity do text message advertising for
20 MMA?
21 A. Not to my knowledge. They were not allowed
22 to.
23 Q. Okay. And same thing, was there e-mail
24 advertising?
25 A. No. All advertising was approved by ethics

26 (Pages 101 to 104)

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 105

1  counsel before it was put into print.
2      Q.  And that would be like the text of the
3  advertising that was approved, right?
4      A.  And the means for dispersement.
5          THE WITNESS:  Can I take a five-second
6  break to grab a diet Coke 'cause I have an addiction?
7          MS. VEITH:  Yes.
8          THE VIDEOGRAPHER:  The time is 11:29
9  a.m., and we are off the record.
10         (A break was taken from 11:29 a.m. to
11         11:42 a.m.)
12         THE VIDEOGRAPHER:  The time is
13  11:42 a.m., and we are back on the record.
14         (Exhibit 31 marked.)
15  BY MS. VEITH:
16     Q.  All right.  Exhibit 31 will be MMA-MB three 0s
17  867.
18         MS. GOOTT:  And whenever you want to stop
19  for lunch, you just tell us.
20         MS. VEITH:  I'm good right now.
21  Ordinarily, I would try to just push through.
22         MS. GOOTT:  No, no, no.  Not necessary.
23  When's your flight?
24         MS. VEITH:  Late like 6:00.
25         MS. GOOTT:  Okay.  We're good.

Page 106

1  BY MS. VEITH:
2      Q.  This e-mail, this is from Mr. Vottiero to you
3  and James McClenny on January 6, 2022, correct?
4      A.  Yes.
5      Q.  And the subject is "Drivers," right?
6      A.  Yes.
7      Q.  And Mr. Vottiero writes, "After reviewing
8  listing on a deed, this looks to be an 18- to $25 per
9  hour position, 720 to 1,000 per week.  We are averaging
10  10 to 20 in-person contracts that need to go out to
11  their homes and get signed per week"; do you see that?
12     A.  Yes, sir.
13     Q.  I think you mentioned Legal Wings as a courier
14  that would deliver hard copies of contracts when we were
15  talking earlier, right?
16     A.  Yes.
17     Q.  And those contracts, at least according to
18  this e-mail, were -- or some contracts that Legal Wings
19  were delivering were contracts that Mr. Vottiero at
20  Velawcity determined needed to be delivered, correct?
21     A.  The e-mail says contracts, but I think he is
22  referring to forms.
23     Q.  Okay.  How do you know that?
24     A.  Because Mr. Vottiero doesn't have authority to
25  enter into a contract on behalf of MMA.

Page 107

1      Q.  And understanding that he doesn't have
2  authority to enter into a contract, did he ever provide
3  contracts to potential clients?
4      A.  No.
5      Q.  And how do you know that?
6      A.  Because he didn't have authority to do so.
7      Q.  But you personally know that Mr. Vottiero
8  never provided a contract to a potential client?
9      A.  Yes.
10     Q.  Okay.  And you know that because you know he
11  didn't have authority to?
12     A.  Well, if he doesn't have authority to enter
13  into a contract, then he couldn't provide one.
14     Q.  But you weren't personally supervising what
15  Mr. Vottiero was and wasn't sending out, were you?
16     A.  No.
17     Q.  Okay.  Exhibit 32.
18         (Exhibit 32 marked.)
19  BY MS. VEITH:
20     Q.  This is MMA-MB three 0s 865.  And it's an
21  e-mail from Mr. Vottiero on January 13th, 2022 where
22  Mr. Vottiero says, "Hey, Sean, please send Zach, copy
23  here the Agency of Record form.  I tried forwarding it,
24  and it didn't work."
25         And my only question to you is, what is

Page 108

1  the Agency of Record form?
2      A.  I'm not sure.
3      Q.  You don't know?
4      A.  I don't remember.
5      Q.  Okay.  I have a question going back to
6  Exhibit 31, the Legal Wings document.  You said you
7  think Mr. Vottiero was referring to forms rather than
8  contracts?
9      A.  Yes.
10     Q.  Did you respond to that e-mail and clarify to
11  Mr. Vottiero that he did not have authority to deliver
12  contracts to clients?
13     A.  I don't know.
14     Q.  Why not?
15         MS. GOOTT:  Objection; assumes facts not
16  in evidence.  Foundation.
17     A.  Why not what?
18  BY MS. VEITH:
19     Q.  You said "I did not," right?
20     A.  I said I don't know.
21     Q.  You don't know?  Okay.
22         At any point in time, did you communicate
23  to Mr. Vottiero, hey, don't send out contracts.  You
24  don't have that authority?
25     A.  Everything was done through ethics counsel.

27 (Pages 105 to 108)

John Moseley   April 8, 2025

Page 109

1  So yes. I assume.
2      Q. So your lawyer would have told him that?
3      A. Yeah, my lawyer did communicate with him.
4      Q. Okay. And was Ms. Rubion the lawyer for
5  Velawcity?
6      A. No.
7      Q. Okay. So the next exhibit, 33, is another one
8  where there's a native that will be attached to it. And
9  it is a document titled [sic] MMA-MB three 0s 533.
10         (Exhibit 33 marked.)
11     A. (Reading.)
12         MS. GOOTT: I feel bad. Just toss it. I
13  don't want you leaning over every document.
14         MS. VEITH: It's really no trouble.
15         MS. GOOTT: Okay.
16  BY MS. VEITH:
17     Q. Okay. So this e-mail, the top one is dated
18  Monday, January 24th, '22 -- 2022, correct?
19     A. Sorry. I was reading the e-mail. Can you ask
20  your question again?
21     Q. Oh, are you done? Take your time.
22     A. If you don't mind.
23     Q. Just let me know when you're done.
24     A. (Reading.) Okay.
25     Q. Okay. So the top e-mail from Mr. Radford to

Page 110

1  several people, including you, on Monday, January 24th,
2  2022; do you see that?
3      A. Yes, ma'am.
4      Q. And the subject of this e-mail is, "What LA
5  Law Allows Us to Collect Attorney's Fees," correct?
6      A. Correct.
7      Q. And the top indicates that there's an
8  attachment entitled, "Last Name, First Name-Retainer
9  (MMAC.Pdf)" do you see that?
10     A. Yes.
11     Q. So going back to the first e-mail in the chain
12  is actually from you, also on the 24th. And it just
13  says, "Need asap."
14         And were you referring to the LA law that
15  allows us to collect attorney's fees?
16     A. Yes, the subject line.
17     Q. And Mr. Michael Barcus responds with a revised
18  statute on the bottom of the page that has a -- page 4?
19     A. Yes.
20     Q. And then you respond to that where you ask,
21  "Fair statement, Louisiana RF 221892 makes insurance
22  companies responsible for insured's (property owners)
23  attorney's fees if they fail to pay a claim properly.
24  Y'all okay with this statement? Any revisions if this
25  statement goes public?" You see that?

Page 111

1      A. Correct.
2      Q. And then there's some back and forth on pages
3  2 and 3 between Mr. Snowden, Mr. Barcus and Mr. Huye
4  about the particular language to use; is that fair to
5  say?
6      A. Yes.
7      Q. And then ultimately, you, at the top of page
8  2, agree with language that Mr. Huye proposed. And you
9  write, "Shane/Phil y'all good," correct?
10     A. Yes.
11     Q. And Shane and Phil, those are Shane Radford
12  and Phil Vottiero of Velawcity, correct?
13     A. Correct.
14     Q. Okay. And so, Mr. Vottiero, on the first page
15  responds, "Shane, let's add that to the contract in
16  Paragraph 3. Let it ride"; do you see that?
17     A. Yes.
18     Q. And then Mr. Radford, in the top e-mail,
19  writes, "Hey all. Can someone give their blessing on
20  this edit and I'll make sure it gets updated asap"; do
21  you see that?
22     A. Yes, ma'am.
23     Q. And then the document to which Mr. Radford is
24  referring is that attachment, which is a property damage
25  claims attorney employment contract; is that correct?

Page 112

1      A. It's the form, yes, ma'am.
2      Q. And that's -- that form is what you-all were
3  discussing editing in this e-mail exchange, correct?
4      A. That makes sense logically.
5      Q. Okay. In fact, if you see under No. 3, the
6  first sentence says, "Louisiana RS221892 requires
7  insurance companies to pay for attorney's fees over and
8  above the amount of property damage if the claim is paid
9  untimely in violation of state statutes"; do you see
10  that?
11     A. Yes, ma'am.
12     Q. So again, just to be clear, this property
13  damage claims attorney employment contract is what you,
14  Mr. Huye, Mr. Barcus, Mr. Snowden as well as Shane and
15  Phil at Velawcity were discussing editing, correct?
16     A. I believe the attorneys which language
17  language to use to make it not misleading and as
18  accurately as possible.
19     Q. And then Mr. Radford and Mr. Vottiero
20  ultimately actually made the edits, correct?
21     A. I think they adopted the edits the attorneys
22  made in the form.
23     Q. Okay. All right. Exhibit 34.
24         (Exhibit 34 marked.)
25

28 (Pages 109 to 112)

John Moseley   April 8, 2025

| Page 113 | Page 115 |
|---|---|

**Page 113**

1  BY MS. VEITH:
2      Q.  Is a document Bates numbered -- first Bates
3  MMA-MB two 0s 1045.  This is another marketing service
4  agreement, correct?
5      A.  (Reading.)  Yes, ma'am.
6      Q.  And if you flip to the last page, you signed
7  this on February 5th, 2022, correct?
8      A.  That's what it says, yes.
9      Q.  Why do you have "Daddy" as your title?
10     A.  It's a running joke in the office.  I was a
11  new father, as we discussed just minutes ago.
12     Q.  Got it.  This marketing service agreement, it
13  once again, on the first page, indicates that Velawcity
14  will perform prescreening intake administrative services
15  for law firm, correct?
16     A.  Where are you at?
17     Q.  First paragraph begins toward the end of the
18  third line from the bottom, "Velawcity also will"?
19     A.  (Reading.)  Yes.
20     Q.  Okay.  And it also indicates -- that last
21  paragraph under general services, beginning in the
22  second line, "Velawcity will, as an independent
23  contractor and agent for law firm, provide potential
24  clients who meet law firm's prescreening eligibility
25  criteria with law firm's proposed fee agreement,"

**Page 114**

1  correct?
2          MS. GOOTT:  I'm going to object.
3  Mischaracterizes.  Left out the first part of the
4  sentence too.
5      A.  The words you read are on the page.
6  BY MS. VEITH:
7      Q.  Okay.  And then flipping to the second page
8  under Intake Services, second paragraph, "This contract
9  states upon Velawcity's prescreening intake review of a
10  potential client's eligibility, Velawcity will transmit
11  to law firm, with potential client's consent, the
12  potential client's contact information, fee agreement
13  and HIPAA release either by direct posting through
14  established secure connection with law firm system or
15  e-mail," correct?
16     A.  Yes.  This contract says that Velawcity will
17  send the forms and the client's contact information to
18  us.
19     Q.  Okay.  And one such form that's listed in this
20  document at least is fee agreement, correct?
21     A.  It says fee agreement.  But -- you know, as we
22  talked about before, they cannot enter into a fee
23  agreement on MMA's behalf.  They can send a form, but
24  not an agreement.
25     Q.  Okay.  So they can send the -- the contract

**Page 115**

1  form.  It just cannot constitute an agreement; is that
2  what you're saying?
3      A.  I'm saying they send forms.  They don't send
4  agreements.  It's impossible for someone to send an
5  agreement.
6      Q.  The property damage agreement form that you
7  and I were just looking at where you were adding the
8  language about LA RS221982; do you remember that?
9      A.  That's one of the forms, yes.
10     Q.  That is a form that Velawcity would send?
11     A.  They may.
12     Q.  Okay.  And then under Fees, this contract
13  says, "Law firm agrees to prepay Velawcity a fixed rate
14  of $3,000 for each prescreened potential client reviewed
15  for law firm and delivered to law firm," correct?
16     A.  That -- those words that you read are on this
17  page.
18     Q.  Okay.  And then going back to the order
19  summary.  This contract also contains the words "total
20  prescreened clients: 1,000," correct?
21     A.  It does.
22     Q.  "Prescreened client cost: $3,000," correct?
23         MS. GOOTT:  Correct to what?  That it's
24  written here?  Or --
25         MS. VEITH:  Yeah, the contract says that,

**Page 116**

1  correct?
2          MS. GOOTT:  Best evidence rule on the
3  paper.  You just want him to confirm that that's what it
4  says?
5          MS. VEITH:  I do.
6      A.  I don't know if this is part of the contract.
7  It's like a -- it says Order Summary.  Looks like a
8  different doc.
9  BY MS. VEITH:
10     Q.  Well, it --
11     A.  I know it's page 6 out of the -- it's labeled
12  as one document.  But there's -- it's obviously two
13  docs, given the titles and the headings.  We entered
14  into the market services agreement as a doc.  To me,
15  this is like an invoice.
16     Q.  Where is the signature on the market service
17  agreement then?
18     A.  I don't think it's a very well written
19  document.
20     Q.  Okay.  Well --
21         THE REPORTER:  You don't think it's a
22  what?
23         THE WITNESS:  Very well written document.
24  BY MS. VEITH:
25     Q.  As you indicated, the agreement goes from page

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

| Page 117 |
| --- |

1    5, right? At the bottom, little black box?
2        A. There are numbers on this page.
3        Q. To page 6, little black bottom, correct?
4        A. There's numbers on both pages, yes.
5        Q. And in that order summary, it also says -- I'm
6    not sure you answered this question, so I'm going to ask
7    it again. The words on the page indicate, "Prescreen
8    client cost: $3,000," correct?
9        A. Yeah, in this order summary document, that
10   number's on there.
11       Q. And the words on the page indicate, "Total
12   balance due: $3 million," correct?
13       A. That number is on this order summary page.
14       Q. And you signed right underneath that, correct?
15       A. I did.
16       Q. And you didn't make any changes to the
17   document before you signed it?
18       A. I think I changed my title.
19       Q. But no change to the other words that we just
20   went through?
21       A. I did not draft this document.
22       Q. And you didn't request any changes be made?
23       A. I don't know. No. Maybe I did. Maybe I
24   didn't. I don't know.
25       Q. But one way or another, you reviewed and then

| Page 118 |
| --- |

1    signed the document?
2        A. I reviewed the MSA agreement, yes.
3        Q. And then you signed the order summary page?
4        A. Yeah, this additional document, I signed.
5        Q. Okay. Exhibit 35.
6            (Exhibit 35 marked.)
7    BY MS. VEITH:
8        Q. This document is Bates labeled MMA-MB three 0s
9    417 --
10       A. Yes.
11       Q. -- do you see that?
12           And the title is, "MMA Louisiana Radio
13   Ads," correct?
14       A. Yes.
15       Q. And were those radio ads part of the marketing
16   services Velawcity was providing?
17       A. Yes.
18       Q. Okay. If you look at the bottom of the e-mail
19   or bottom of the page, e-mail from Mr. Vottiero to Sean
20   Kelly and you on February 8th, 2022.
21           And he writes, "Hey, Zach, I think Sean
22   just launches the bus ads and shit ASAP. Don't want to
23   waste days waiting on LSBA"; do you see that?
24       A. Yes.
25       Q. And you replied to that e-mail, "Sure,"

| Page 119 |
| --- |

1    correct?
2        A. Yes.
3        Q. All right. Exhibit 36.
4            (Exhibit 36 marked.)
5    BY MS. VEITH:
6        Q. Another one with a native. So this is Bates
7    numbered MMA-MB three 0s 540. And it also includes the
8    native version of that document and its attachment.
9            This e-mail is from Mr. Radford to you and
10   Mr. Huye with a copy to Carlos Cepeda on Tuesday,
11   February 8th, 2022, correct?
12       A. Yes.
13       Q. And the subject is, "Storm Physical Contract
14   Cover Letters," correct?
15       A. Yes.
16       Q. And Mr. Radford writes, "Zach and William, we
17   would like to start including a three-page cover letter
18   for the physical contract retainers requested. Can you
19   please review the attached three-page cover letter and
20   make any edits you see fit," correct?
21       A. Yes.
22       Q. All right. Then flip to the attachments. And
23   it is a document, first page on McClenny Mosley and
24   Associates letterhead, correct?
25       A. That is the McClenny Mosley and Associates

| Page 120 |
| --- |

1    logo. But that's not our letterhead.
2        Q. The logos -- okay. So good correction. This
3    is a document that has McClenny Mosley and Associates
4    logo atop it?
5        A. Yes.
6        Q. Okay. And then the next page -- I'll come
7    back to the text of that -- but is a document completion
8    example; do you see that?
9        A. Yes.
10       Q. And then the last page is "FAQs, Protect
11   Yourself From the Carrier"; do you see that?
12       A. Correct.
13       Q. Okay. So flipping back -- and these were the
14   documents attached to the e-mail from Mr. Radford that
15   he's asking you to review, right?
16       A. I believe that is true.
17       Q. Okay. So in the -- the first page, that
18   letter that has your logo affixed at the top, this --
19   the letter says, "Thank you for taking the first steps
20   in your property damage claim. In order to continue the
21   process with McClenny Mosley and Associates PLLC, we
22   will need you to complete and sign the attached
23   document"; do you see that?
24       A. Yes.
25       Q. Do you know what "attached document" was

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 121

1    referring to?
2        A.  I do not.
3        Q.  Okay.  Going down to the middle of the page,
4    it says, "Please reference the example document for
5    completion requirements"; do you see that?
6            MS. GOOTT:  Where are you now?
7            MS. VEITH:  Middle of the page.
8        A.  Yes.
9            MS. VEITH:  It's right above Page No. 1.
10    So -- and we're in the attachment.
11            THE WITNESS:  It's the first page.
12    Should be the one before that.
13            MS. VEITH:  You skipped it again, Miriam.
14    There you go.
15            MS. GOOTT:  Thank you.
16    BY MS. VEITH:
17        Q.  So then flipping over to the document
18    completion example --
19        A.  Yes.
20        Q.  -- there's like a clip-out of the top of a
21    property damage claims attorney employment contract,
22    right?
23        A.  Yeah, it has a copy of the form.
24        Q.  And it -- the blanks provides instructions.
25    The first blank, it says, "Do not fill in," right?

Page 122

1        A.  It does say that.
2        Q.  Okay.  And then the next box, which has page
3    number 3 on top, that is the signature page of those
4    attorney employment contracts, correct?
5        A.  It has the signature pages for the form, yes.
6        Q.  Okay.  And it has instructions as well.  It
7    says, "Your signature goes here" above the blank for
8    client signature, correct?
9        A.  It says that.
10        Q.  And then last page FAQs, the first one is,
11    "How do I know if I have a case?"  Right?
12        A.  Yes.
13        Q.  And it explains, "Now, more than ever, claims
14    are delayed, underpaid and denied by insurance companies
15    in efforts to impress their stockholders and board
16    members," correct?
17        A.  That's what it says.
18        Q.  And then it explains that you can contact
19    McClenny Moseley and Associates for a free,
20    no-obligation consultation, correct?
21        A.  Correct.
22        Q.  And then the second FAQ, "What is bad faith
23    and how does it affect my claim?"  Explains, "If your
24    claim was delayed, underpaid or denied without proper
25    justification, you may have a bad faith claim against

Page 123

1    your insurance company," correct?
2        A.  Correct.
3        Q.  And then toward the end in bold it says, "You
4    could be entitled to up to three times your claim damage
5    amount," correct?
6        A.  Correct.
7        Q.  Exhibit 37 --
8            (Exhibit 37 marked.)
9    BY MS. VEITH:
10        Q.  -- is MMA-MB three 0s 549 as well as its
11    native version.  And the top e-mail in the chain is from
12    Shane Radford on February 21st, 2022, correct?
13        A.  Yes.
14        Q.  Okay.  And if you go to the end of the chain,
15    last page, the first e-mail's from Mr. Huye who had
16    e-mailed Mr. McClenny an attached draft updated POA he
17    suggests on February 8th, 2022; do you see that?
18        A.  Yes.
19        Q.  Okay.  I don't really have a lot of questions
20    about the back and forth except that to summarize, tell
21    me if you agree with this, Mr. Huye's asking for a new
22    contract form to be put into the system, correct?
23        A.  (Reading.)
24        Q.  And you can look at the bottom of page 3.
25            MS. GOOTT:  Objection; calls for

Page 124

1    speculation.
2    BY MS. VEITH:
3        Q.  Sure.  So I'll try to be clear.
4            On the bottom of page 3, Mr. Huye writes,
5    "Phil, can we get this new contract form in the system
6    ASAP"?
7        A.  Correct.
8        Q.  Okay.  And then Mr. Vottiero replies.  And he
9    says, "Hey, William, I think we will need to have the
10    footer added back in for fee splits."
11            Do you see that?
12        A.  Yes.
13        Q.  And then he also says at Shane, "Also, please
14    put in the Louisiana statute regarding bad faith that
15    was agreed upon"; do you see that?
16        A.  Correct.
17        Q.  Okay.  And then ultimately there's some
18    further back and forth.  But in the top e-mail that
19    actually contained the attachment from Mr. Radford, so
20    the first e-mail in the first page, he says, "Pdf
21    version.  Getting this updated.  Should be in place
22    tomorrow"; you see that?
23        A.  Yes.
24        Q.  And the attachment to this e-mail is the
25    property damage claims attorney employment contract,

31 (Pages 121 to 124)

John Moseley   April 8, 2025

1   correct?  The form?
2       A.  It's the form.
3       Q.  What did you understand -- what does it mean,
4   if you know, that the form would be in place tomorrow?
5       A.  I don't know.
6       Q.  You said you don't know?
7       A.  I don't know.
8           MS. VEITH:  I think this might be a good
9   point at which to take a lunch break.
10          MS. GOOTT:  Okay.  How long would you
11  like?
12          MS. VEITH:  How close is food?
13          THE REPORTER:  Should we go off the
14  record?
15          MS. VEITH:  Yes, please.
16          THE VIDEOGRAPHER:  The time is 12:09
17  p.m., and we're off the record.
18          (A break was taken from 12:09 p.m. to
19          1:04 p.m.)
20          THE VIDEOGRAPHER:  The time is
21  12:04 p.m., and we are back on the record.
22          (Exhibit 38 marked.)
23  BY MS. VEITH:
24      Q.  All right.  Exhibit 38.  First, let me ask you
25  this, Mr. Moseley.

1           Did you talk about the testimony you're
2   going to give this afternoon with anyone during the
3   break?
4       A.  No.
5       Q.  Exhibit 38 is MMA-MB three 0s 827.
6           THE REPORTER:  82?
7           MS. VEITH:  827, yeah.
8   BY MS. VEITH:
9       Q.  Take a look and let me know when you're ready.
10      A.  (Reading.)
11      Q.  Okay.  So this e-mail's subject is
12  "Velawcity-SA Integration For MMA Needed-Re: Smart
13  Advocate First Day."  Do you see that?
14      A.  Yes.
15      Q.  What sort of integration did MMA need for
16  Smart Advocate?
17      A.  Data.
18      Q.  What sort of data?
19      A.  Claims data.
20      Q.  Okay.  And where was that data being
21  integrated from?
22      A.  An old case management software and third
23  parties.
24      Q.  Okay.  So if you go to the first e-mail in
25  this chain, meaning the last page, which is the page

1   that's 64 and 65 or 832 and 833 --
2       A.  Yes.
3       Q.  -- it's from someone named Luis Nieto?
4       A.  Yes.
5       Q.  And he appears to be with a company called
6   Nieto Technology Partners; do you see that?
7       A.  Yes.
8       Q.  Who is Nieto Technology Partners?
9       A.  I believe they assisted with the data
10  conversion.
11      Q.  Okay.  And flipping back.  Now, I'm on the
12  page that is MMA-MB three 0's 831 or page 63?
13      A.  Yes, ma'am.
14      Q.  There's an e-mail from Mr. Kinsman at Krause &
15  Kinsman on the bottom?
16      A.  Yes.
17      Q.  And he says, "We will need a dual integration
18  with Velawcity.  Go get cases pushed through"; do you
19  see that?
20      A.  Yes.
21      Q.  What sort of integration was Velawcity doing
22  with Krause & Kinsman?
23          MS. GOOTT:  Objection; calls for
24  speculation.
25      A.  Krause & Kinsman, as part of their duties in

1   the co-counsel relationship, was additionally scrubbing
2   files.  So I'm not sure what duties they delegated
3   towards -- or to each other.  But, you know, we were --
4   MMA needed clean data sets to determine whether or not,
5   you know, they wanted to proceed or prosecute these
6   claims.  And so it's my understanding Velawcity did the
7   first round of scrubbing.  And then Krause & Kinsman did
8   the second.
9   BY MS. VEITH:
10      Q.  Okay.  So what Krause & Kinsman-- this data
11  that Krause & Kinsman was talking about, it's fair to
12  say it was for clients that were jointly represented by
13  Krause & Kinsman and MMA?
14          MS. GOOTT:  Objection; mischaracterizes
15  his testimony.
16      A.  No, not -- no.  It would be prior to that.
17  BY MS. VEITH:
18      Q.  Explain what you mean by prior to that?
19      A.  Like, we didn't represent them yet.
20      Q.  For clients who would potentially be
21  represented by Krause & Kinsman Krause and MMA?
22          MS. GOOTT:  Objection; mischaracterizes
23  his testimony.
24      A.  Yeah, it was for hurricane victims that were
25  seeking representation.

32 (Pages 125 to 128)

John Moseley    April 8, 2025

Page 129

```
 1    BY MS. VEITH:
 2        Q.  Okay.  And for hurricane victims that were
 3    seeking representation, do I understand what you just
 4    explained to be that Velawcity scrubbed some files,
 5    right?
 6        A.  I hope they scrubbed every file to some
 7    degree.
 8        Q.  And then the next step was Krause & Kinsman
 9    would scrub those files?
10        A.  Yes.
11        Q.  And then MMA would?
12        A.  Yes.  I guess you could call it that.
13        Q.  Okay.
14        A.  But we needed to make a determination on
15    whether or not representation was proper for that
16    client.
17        Q.  And I guess what I'm trying to figure out is,
18    that process, is that what this integration that's being
19    e-mailed about is related to?
20        A.  From my recollection.
21        Q.  Okay.  Exhibit 39.
22            (Exhibit 39 marked.)
23    BY MS. VEITH:
24        Q.  It will be MMA-MB three 0s 806.
25        A.  (Reading.)
```

Page 130

```
 1        Q.  Let me know when you're ready.
 2        A.  Okay.
 3        Q.  Okay.  So this is an e-mail where the top one,
 4    the last e-mail in the chain is from Phil Vottiero on
 5    March 16th, 2022, correct?
 6        A.  Correct.
 7        Q.  And the subject is "Data Transfer"; is that
 8    right?
 9        A.  Yes.
10        Q.  Okay.  If you go to the last page, so the
11    first e-mail in the chain, do you see the e-mail from
12    Mr. Vottiero on March 15th?
13        A.  Yes, ma'am.
14        Q.  And he writes, "We need to transfer K&K data
15    to the MMA system"; do you see that?
16        A.  Yes.
17        Q.  Was that part of the integration process that
18    we spoke about relating to the last document?
19        A.  Yes.
20        Q.  Okay.
21        A.  I think -- well, I'm sorry.  Ask your next
22    question?
23        Q.  Are you -- are you mistaken?
24            Is it related to a different process?
25        A.  Reading these e-mails, I think the integration
```

Page 131

```
 1    maybe wasn't so much to do with data as it was to do
 2    with architecture of the Smart Advocate system.
 3        Q.  Okay.  What do you mean by architecture?
 4        A.  So prior to MMA's involvement with Krause &
 5    Kinsman, we were in a very boutique firm.  You know, we
 6    had 500 to 700 clients at any given time.  We laid out
 7    the perfect workflow for a case.
 8            And then Krause & Kinsman built the
 9    automated process in Smart Advocate.  These e-mails are
10    talking about transferring that architecture of
11    automation to our Smart Advocate.
12        Q.  Understood.  Okay.  Flipping back to the first
13    page and at the --
14        A.  March 16th?
15        Q.  Correct.  The very first page of the document.
16    The bottom of that page, someone named Schery Ramadan
17    writes that "Our team is pulling the K&K system now and
18    performing their requested removal"; do you see that?
19        A.  Yes.
20        Q.  And up at the top, Mr. Vottiero's response is:
21    "My fear is if you pull all the data now and I haven't
22    stopped the delivery of new cases, that between the time
23    of when you pulled the data and when it actually hits
24    MMA system, we would have some cases not accounted for.
25            "I'm attempting to make sure no cases fall
```

Page 132

```
 1    through the cracks.  We are delivering roughly a hundred
 2    new cases per day."  Do you see that?
 3        A.  Yes.
 4        Q.  Were those hurricane cases that Mr. Vottiero
 5    was talking about, if you know?
 6        A.  I do not know.  We did other types of cases
 7    with Krause & Kinsman as well.  So it could be other
 8    types of cases.
 9        Q.  Do you think at least some would be hurricane
10    cases?
11        A.  It's possible.
12            MS. GOOTT:  Objection; foundation.
13    BY MS. VEITH:
14        Q.  What other types of cases did you do with
15    Krause & Kinsman that Velawcity would have delivered?
16            MS. GOOTT:  Objection; assumes facts not
17    in evidence.
18        A.  Hail, fire, wind, hail -- or I said hail.
19    Zantac.  Those were the -- the main ones.
20            (Exhibit 40 marked.)
21    BY MS. VEITH:
22        Q.  Okay.  Exhibit 40 is MMA-MB three 0s 607.
23            And this is an e-mail from Shane Radford
24    with Velawcity to you and others on March 18th, 2022,
25    correct?
```

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley   April 8, 2025

---

Page 133

1    A. Yes.
2       Q. And the bottom e-mail is another one from
3  Mr. Ramadan also on March 18th, 2022, correct?
4    A. Yes.
5       Q. And subject line is the same as the last
6  e-mail we saw, "Data Transfer," right?
7    A. Correct.
8       Q. And Mr. Ramadan [sic] writes, "Please find
9  login credentials to review storm cases and
10  configuration"; do you see that?
11   A. Ms. Ramadan.
12      Q. Thank you for that correction.
13         So does that change your testimony at all
14  about this data transfer and the cases Velawcity was
15  delivering being storm hurricane-related cases?
16         MS. GOOTT: Objection. It
17  mischaracterizes his testimony. He never got cases from
18  Velawcity.
19         MS. VEITH: Sure. I'm just reading from
20  the page that says storm cases.
21  BY MS. VEITH:
22      Q. But you can continue, Mr. Moseley.
23         MS. GOOTT: No, I object. Your question
24  was his understanding of it -- of cases. And from what
25  his -- from the prior testimony. And so let's just get

---

Page 134

1  that clear.
2         MS. VEITH: Okay. Miriam, I'm going to
3  object to you testifying on behalf of Mr. Moseley, so...
4         MS. GOOTT: No, I'm just simply asking
5  you to not mischaracterize his testimony.
6         MS. VEITH: You're making speaking
7  objections.
8         MS. GOOTT: So are you. And you're being
9  argumentative.
10  BY MS. VEITH:
11      Q. Mr. Moseley, does that change your
12  recollection about what kinds of cases or potential
13  clients Velawcity was delivering to MMA relating to this
14  data transfer?
15   A. Sorry. Can you start over? What -- what am I
16  looking at?
17      Q. Okay. The e-mail from Ms. Ramadan says,
18  "Please find login credentials to review storm cases and
19  configuration, correct?
20   A. Yes.
21      Q. Okay. Earlier, last e-mail where we were
22  discussing the data transfer, there was a statement from
23  Mr. Vottiero at Velawcity that said, "We are delivering
24  roughly a hundred new cases a day," correct?
25   A. If that's what the e-mail said.

---

Page 135

1       Q. Okay. And I asked you if those were hurricane
2  cases. But I'll ask you, hurricane-potential clients.
3         Does this change your recollection as to
4  whether the hundreds of new potential clients would have
5  been hurricane clients?
6    A. No.
7       Q. Okay. So even though it's -- Ms. Ramadan is
8  writing about a storm -- login credentials for storm,
9  they may have related to other cases?
10   A. They may have related to other cases than
11  hurricanes, yes. There are other types of storms
12  besides hurricanes.
13      Q. You said Zantac, though.
14         Is Zantac not a storm, right?
15   A. Zantac is not a storm case, no.
16      Q. All right. Exhibit 41.
17         (Exhibit 41 marked.)
18  BY MS. VEITH:
19      Q. Let me know when you're ready.
20   A. (Reading.) Okay.
21      Q. Okay. This string of e-mails, the top one,
22  last e-mail is from Shane Radford on April 8th --
23  exactly three years ago -- 2022 to Mr. Huye and to you,
24  with a copy to Chad -- Chaz Van De Motter, Jordan
25  Scallan and Frances Morison; do you see that?

---

Page 136

1    A. Yes.
2       Q. And the subject is, "Customer Service
3  Question"; do you see that?
4    A. Yes.
5       Q. Okay. Flip to the last page, the second page,
6  last e-mail in the chain. It's an e-mail from
7  Mr. Radford; do you see that?
8    A. Yes.
9       Q. And so Mr. Radford writes, "Zach/William,
10  would you like our team members to state to the client
11  calling in that they're working on behalf of your law
12  firm or that they work, quote, for your law firm"; do
13  you see that?
14   A. Yes.
15      Q. And Mr. Huye replies, "I think saying, I,
16  William Huye, with McClenny Moseley and Associates,
17  makes the most sense. Does that work?"
18         Do you see that?
19   A. Yes.
20      Q. And so Mr. Radford thanks Mr. Huye and says,
21  "We'll script as we're working for MMA," correct?
22   A. Correct.
23      Q. And this is something that you approved of?
24   A. I didn't approve this.
25      Q. Did you ever reply to this e-mail and say

---

34 (Pages 133 to 136)

John Moseley   April 8, 2025

<table>
<tr><td>

Page 137

```
 1   please don't do that?
 2       A.  I don't know if I replied via e-mail or any
 3   other way.
 4       Q.  So at the -- whether you may not have approved
 5   of it in this e-mail, is that a practice that you
 6   believed was appropriate for an agent of MMA like
 7   Velawcity?
 8       A.  What do you mean?
 9       Q.  Did you, when you saw that Velawcity was
10   suggesting that they were going to script as though they
11   were working for MMA, did you believe that that was
12   appropriate method for Velawcity to speak to clients or
13   potential clients?
14           MS. GOOTT:  Objection; calls for a legal
15   conclusion.
16       A.  I know it's permissible for law firms to hire
17   agents.
18   BY MS. VEITH:
19       Q.  And you thought it was permissible for the
20   agent to state that they are working for the law firm
21   that they are an agent for?
22           MS. GOOTT:  Objection; calls for
23   speculation.
24       A.  I don't know my train of thought at the time.
25   But now, yeah.  Agents work for law firms all the time.
```

</td><td>

Page 139

```
 1   from Velawcity.  This has nothing to do with that, and
 2   it's not part of your topics.
 3           MS. VEITH:  Then why'd you produce the
 4   document?
 5           THE WITNESS:  An abundance of caution.
 6           MS. GOOTT:  We were producing documents
 7   because you asked for information from Velawcity.  And
 8   we told you in an e-mail that this has nothing to do
 9   with this, but we sent it anyway because we have nothing
10   to hide.  But this isn't on the topic.  This isn't what
11   he was prepared for.  And this is specifically not what
12   you asked Judge Hanen for.
13           MS. VEITH:  Judge Hanen's order says that
14   discovery will be taken related to Velawcity and the
15   acquisition of clients --
16           MR. PATTERSON:  It's in the scope of the
17   30(b)(6) or it's not.  If it's not, he doesn't have to
18   be prepared.  Ask him and he may not be prepared.
19           MS. VEITH:  Great.
20           MR. PATTERSON:  I don't need to hear from
21   you, Matt.
22           MR. PROBUS:  I don't need to hear from
23   you either.
24           MR. PATTERSON:  Well, you already did.
25           MR. PROBUS:  Well, you already did too.
```

</td></tr>
<tr><td>

Page 138

```
 1           (Exhibit 42 marked.)
 2   BY MS. VEITH:
 3       Q.  Exhibit 42.  This is MMA-MB three 0s 717.  Let
 4   me know when you're ready.
 5       A.  (Reading.)  Can you show me in your depo
 6   notice where I'd need to be prepared to answer questions
 7   about this?
 8       Q.  Sure.  It's Exhibit 1, right?
 9       A.  Yeah.
10       Q.  No. 4, the methods you approved of Velawcity
11   using to obtain hurricane claim clients.
12       A.  I think I'm -- most of this is post retention.
13       Q.  No. 5, your knowledge of Velawcity's call
14   center to which potential hurricane claim clients were
15   directed.
16       A.  Yeah, so this would be post retention.
17       Q.  Okay.  But it's a call center, correct?
18       A.  But yeah, you've limited --
19           MS. GOOTT:  But not for that definition.
20   Not for why we're here.
21           MS. VEITH:  We're here to talk about
22   Velawcity.  That's what the order from Hanen says.
23           MS. GOOTT:  No, you specifically told
24   Judge Hanen that you did not believe that MMA was
25   entitled to any fees, based on how MMA obtained clients
```

</td><td>

Page 140

```
 1   And His notice says regarding the --
 2           MR. PATTERSON:  The notice is the scope.
 3   The notice is the scope.
 4           MR. PROBUS:  -- the notice is as clear as
 5   a bell that it's within the scope.  And it's not --
 6           MS. GOOTT:  No, it's not.  Come on --
 7           MR. PROBUS:  Yeah, it is.
 8   (Indiscernible) I just read it --
 9           MR. PATTERSON:  You're dreaming.
10           MS. VEITH:  Okay.  Well, to
11   Mr. Patterson's point, he may not be prepared.  I will
12   still ask you.
13   BY MS. VEITH:
14       Q.  'Cause you have seen this document before,
15   right?  It's an e-mail that you've received, correct?
16       A.  I assume I've seen it.
17           MS. GOOTT:  Three years ago to the day.
18           MS. VEITH:  Ms. Goott, you are not
19   testifying.
20           MS. GOOTT:  Neither are you and neither
21   is Mr. Probus.
22   BY MS. VEITH:
23       Q.  Mr. Moseley, if you would look at the last
24   page in the e-mail -- or the second-to-the-last page
25   from Mr. Radford.
```

</td></tr>
</table>

35 (Pages 137 to 140)

John Moseley    April 8, 2025

Page 141

1      And to the point that your counsel has
2  been making, this e-mail says, "Thank you again for
3  taking the time this morning to go over the customer
4  service workflow with our team," correct?
5      A.  That's what the e-mail says.
6      Q.  And one of the bullets underneath that is case
7  status scripting details, correct?
8      A.  It says those words.
9      Q.  And Mr. Radford is saying, "We will also need
10 to make sure that all possible case statuses are
11 covered.  If multiple statuses can be covered in a
12 single scripting text, please include/group the case
13 status in Column A"; you see that?
14     A.  Yes.
15     Q.  And then there's also a bullet that says, "FAQ
16 Scripting Details," correct?
17     A.  There's a bullet that says that.
18     Q.  Great.  Thank you.
19         And just for completeness, Exhibit 43 is a
20 document that does not have Bates labels because it was
21 only produced natively.  But it is an e-mail dated
22 April 7th, 2022.
23         (Exhibit 43 marked.)
24 BY MS. VEITH:
25     Q.  From Mr. Huye with an Excel spreadsheet

Page 142

1  attached.
2      A.  (Reading.)
3      Q.  And you received this e-mail from Mr. Huye,
4  correct?
5      A.  I'm not prepared to talk on these topics.  I
6  didn't prep for this 'cause it's outside the scope of
7  the deposition notice.
8      Q.  So you can't tell me that Zach Moseley is you
9  in that e-mail?
10         MS. GOOTT:  Objection; argumentative.
11 That's not the question you asked him.
12 BY MS. VEITH:
13     Q.  Is this e-mail directed to Shane Radford, Zach
14 Mosley and James McClenny?
15     A.  The cover e-mail?
16     Q.  Yes.  From Mr. Huye.
17     A.  It's directed toward Shane.
18     Q.  Shane, semicolon.  The next name listed is
19 Zach Mosley, correct?
20     A.  I was cc'd on the e-mail, but it's addressed
21 to Shane in the body of the e-mail.
22     Q.  Yeah, sure.  I'm just asking if your name is
23 listed as one of the e-mails that received this e-mail.
24     A.  Oh, I didn't hear you ask that question.  You
25 asked if it was addressed to me.

Page 143

1      Q.  Well, first I asked you if you received it,
2  and you said you didn't know.  So I was trying to figure
3  out how to prove that you received it.
4          MS. GOOTT:  Objection; argumentative.
5  You asked him if it was addressed to him, and he said
6  no.  It's addressed to Shane.  It says Shane comma.
7  BY MS. VEITH:
8      Q.  Did you receive this e-mail, Mr. Moseley?
9      A.  I believe this -- I have no reason not to
10 believe this e-mail wasn't sent to me.  But I did not
11 prep for this deposition because it's outside the scope of
12 the 30(b)(6) witness.
13     Q.  And, in fact, up at the top, you forwarded
14 this e-mail to Ms. Ohlsson yesterday, correct?
15     A.  No.
16     Q.  The from Zach Mosley is not you?
17     A.  No.
18     Q.  Who is it?
19     A.  It's Katie Ohlsson.
20     Q.  So Ms. Ohlsson has access to your e-mail
21 address?
22     A.  I gave her access to my e-mail address to
23 forward this e-mail and all e-mails responsive to the
24 discovery request.
25     Q.  So this e-mail was then located in your e-mail

Page 144

1  inbox, correct?
2      A.  Yes.
3      Q.  Okay.  Mr. Huye, when he was sending these
4  e-mails, that was in the course and scope of his
5  employment for MMA, correct?
6      A.  I believe so.
7      Q.  Okay.  And there is an Excel spreadsheet
8  attached to Mr. Huye's e-mail, correct?
9      A.  I don't know.  I -- I assume you're telling
10 the truth.
11     Q.  Well, in the document that your e-mail address
12 forwarded to Ms. Ohlsson, there are attachments listed,
13 correct?
14     A.  I assume you're telling the truth.  I just
15 haven't prepped for this 'cause it was outside the scope
16 of the 30(b)(6) witness deposition notice.
17     Q.  Sure.  But you actually provided this e-mail
18 to us yesterday, correct?  Because as you just said, you
19 were pulling documents responsive to the discovery
20 request, correct?
21     A.  I think my counsel provided them to you.
22         MS. GOOTT:  I'm going to object -- hold
23 on.  No need to argue with him.  Ask him a question.  Go
24 ahead.
25         MS. VEITH:  I asked the question.

36 (Pages 141 to 144)

John Moseley   April 8, 2025

Page 145

1    MS. GOOTT:  You did.  And you don't need
2  to argue with him or raise your voice.  Just ask him the
3  question, and he will answer.
4  BY MS. VEITH:
5    Q.  The question was asked.
6      Can you please answer?
7    A.  I believe my counsel provided these documents
8  to you.  Not me.
9    Q.  How did your counsel get the documents?
10    A.  I assume via e-mail.
11    Q.  From your e-mail inbox, correct?
12    A.  I assume Katie Ohlsson sent them to my
13  counsel.
14    Q.  Okay.  Yes, from your e-mail inbox because it
15  indicates from Zach Moseley at the top of this e-mail,
16  correct?
17    MS. GOOTT:  Objection; foundation.  Calls
18  for speculation.
19    A.  I think I know what you're asking.  You're
20  asking if this e-mail originated from my inbox to get to
21  you.
22  BY MS. VEITH:
23    Q.  Yes.
24    A.  I believe that is truthful.  But I did not
25  prep for this because it's outside the scope of your

Page 146

1  30(b)(6) witness deposition notice.
2    Q.  You've made that very clear.  I'm just asking
3  you to look at the document, and tell me if certain
4  things appear on the face of the document.
5    MS. GOOTT:  Objection; best evidence
6  rule.
7  BY MS. VEITH:
8    Q.  Okay.  There's a list of attachments.  One of
9  them is, MMA Customer Service Outline (WH Updates
10  4.6.22.xlss), correct?
11    A.  I see what -- what line you're reading from.
12    Q.  Okay.  So in the separate document that I have
13  handed you, which I understand you may not have prepared
14  to answer questions about, but I'm going to ask you to
15  turn to the third page from the back.
16      Is this a chart on this page?
17    A.  I'm on a different page than you.
18    Q.  Third page -- oh, fourth page from the back.
19    A.  Is this document a chart?
20    Q.  Yes.
21    A.  Sure.  I don't know.  Some could call it a
22  chart.
23    THE REPORTER:  What -- okay.
24    THE WITNESS:  Some could call it a chart.
25

Page 147

1  BY MS. VEITH:
2    Q.  At the top, is there a line that says, "Case
3  Status"?
4    MS. GOOTT:  Objection; best evidence
5  rule.
6    A.  I don't see a line.
7  BY MS. VEITH:
8    Q.  Is there something that says case status at
9  the top?
10    A.  There are letters that articulate case status.
11    Q.  And then going over on the same line, are
12  there letters that articulate scripting text?
13    A.  Going to the next cell, yes.
14    Q.  Okay.  And then the next cell after that, are
15  there letters that articulate text messages (not being
16  scripted)?
17    A.  I think that's what it says.  It's very small.
18    Q.  That's the trouble with printing out Excel
19  spreadsheets.  All right.  Last page.
20      Does this depict a flowchart?
21    MS. GOOTT:  Objection; foundation.  Best
22  evidence rule.
23    A.  Flowchart, workflow.  There's arrows and
24  boxes.  I haven't prepped for these questions 'cause
25  it's outside of the scope of the deposition notice for

Page 148

1  the deposition --
2  BY MS. VEITH:
3    Q.  Sure.  Just in your general memory --
4    A.  I wasn't finished yet.
5    MS. GOOTT:  Try not to talk over him so
6  the court reporter doesn't struggle.
7  BY MS. VEITH:
8    Q.  Go ahead.
9    A.  Can you repeat your question?
10    Q.  Just in your general memory, was there a
11  workflow for Velawcity's customer service for MMA?
12    A.  I'm sure there would have to be.
13    Q.  Do you recall if this chart depicts what that
14  workflow looks like?
15    A.  I don't know.
16    MS. GOOTT:  Objection; beyond the scope
17  of this deposition.
18    A.  I do not.
19    (Exhibit 44 marked.)
20  BY MS. VEITH:
21    Q.  Okay.  Exhibit 44.  This is MMA-MB three 0s
22  757.
23    A.  (Reading.)  Are these different e-mail chains?
24    Q.  I think the last page is incorrectly included.
25  But other than -- so you can rip that off.  But other

37 (Pages 145 to 148)

John Moseley   April 8, 2025

Page 149

1    than that, it's all the same.  I'm not interested in the
2    last page, so...
3              A.  I'm not prepared to talk about this 'cause it
4    looks like it's post retention --
5              Q.  Well --
6              A.  -- which wasn't included on the scope of the
7    30(b)(6) depo notice that I appeared for.
8              Q.  Let me see if maybe that some things in this
9    could change your mind.  I'm -- I'm of the belief that
10   it relates to retention.
11             MS. GOOTT:  Object to sidebar.
12   BY MS. VEITH:
13             Q.  Maybe I'm right.  Maybe you're right.  Let's
14   just see.
15             MS. GOOTT:  Objection; sidebar.
16   BY MS. VEITH:
17             Q.  So if you'll go to the page that ends in 763.
18             Do you see someone at Message Media is
19   asking for an API key; do you see that?
20             A.  Yes.
21             Q.  You mentioned an API key to me earlier today.
22   And I didn't know what it was then; I don't now.
23             Do you know what that means in this
24   context?
25             MS. GOOTT:  Object to the sidebar.

Page 150

1              A.  API is a common acronym.  You can -- I can
2    have an API in to Miriam.  I can have an API in to you.
3    There's no one API key.  It just means the two different
4    systems plug into each other.  Message Media is a form
5    of communications that we have with clients once they're
6    retained.  So that's why I believe that this is post
7    retention, which I was not prepared to testify to 'cause
8    it was not included in your notice of deposition.
9    BY MS. VEITH:
10             Q.  Okay.  Understood.  Let me just ask you my
11   next question 'cause this is why I think it relates to
12   retention.  So if you'll go up to the e-mail from
13   Mr. Krause on April 14th, 2022?
14             A.  Yes.
15             Q.  He's asking to "Please prioritize this over
16   anything -- almost anything else.  Tomorrow our
17   automated campaigns won't work until that's activated."
18             What -- what campaigns is he referring to?
19             A.  Customer service campaigns, not marketing
20   campaigns, which you -- I assume you're thinking it is.
21             Q.  So this was not advertising campaigns.  This
22   was a campaign for clients who had already been
23   retained?
24             A.  Client updates.
25             Q.  Got it.

Page 151

1              A.  I presume.  'Cause I wasn't prepared to
2    testify to 'cause it's not in the scope of the
3    deposition.
4              Q.  Okay.  Well, then let me ask you this.  So go
5    to the page 760.
6              A.  Yes.
7              Q.  And this is a list of -- so Adam Krause
8    writes -- on April 15th, 2022 he writes, "I don't know
9    the issue, but I do know that these posted correctly
10   into MMA"; do you see that?
11             A.  Yes.
12             Q.  And it's a list of clients?
13             A.  Yes.
14             Q.  The posting isn't referring to the posting of
15   the actual clients?
16             A.  I don't know what you're asking.
17             Q.  So if you'll flip back up --
18             MS. GOOTT:  What page are you on?
19             MS. VEITH:  Preceding page, 759.
20   BY MS. VEITH:
21             Q.  And on April 15th, Mr. Radford writes, "Adam,
22   here's an example of one that failed to hit MMA, but
23   looks like it hit your system.  Can you confirm?"
24             MS. GOOTT:  I don't see where -- 759
25   doesn't have an April 15th.

Page 152

1              MS. VEITH:  So yeah.  You're looking at
2    the wrong number.  I'm speaking about the Bates number.
3    You're probably looking at the number in the middle of
4    the page.  The Bates number that ends in 759 --
5              MS. GOOTT:  Oh, you're not referring to
6    the page number.
7              MS. VEITH:  756.
8              MS. GOOTT:  That's confusing since those
9    are the same numbers.  Okay.  So Bates 759.
10             MS. VEITH:  Correct.
11   BY MS. VEITH:
12             Q.  Do you see that?
13             A.  Yes.
14             Q.  Is that not a client that hit Krause & Kinsman
15   system but did not hit MMA?
16             A.  I interpret this as Shane Radford, on behalf
17   of Krause & Kinsman, is finding an error in data
18   transfer.
19             Q.  Something that's hitting Velawcity's -- or
20   Krause & Kinsman's system but not MMA system, correct?
21             A.  Correct.
22             Q.  Okay.  And then if you go to Bates 758, the
23   next preceding page --
24             A.  Yes.
25             Q.  -- someone, Rahul Doshi at Smart Advocate, is

38 (Pages 149 to 152)

John Moseley   April 8, 2025

1  asking Mr. Radford for a response or "Provide us a
2  response you are getting because it seems we are
3  creating cases for the lead being posted to Smart
4  Advocate."
5         That wasn't cases like client cases that
6  Mr. Doshi was talking about?
7     A.  Sorry.  I'm not following where you're at.
8     Q.  The middle of the page that's Bates numbered
9  758.  E-mail from Rahul Doshi.
10    A.  Oh, the previous page.  Sorry.  I don't know
11 how to interpret that statement.  It's kind of
12 ambiguous.
13    Q.  So this to you is all about post-retention
14 information, not retention of clients?
15    A.  Yes.
16    Q.  Exhibit 45, MMA-MB four 0s as well as the
17 native attachment to that document.
18         (Exhibit 45 marked.)
19 BY MS. VEITH:
20    Q.  It's an e-mail from Adam Krause to you and
21 others, including -- how do you say T-I-G-H-E?
22    A.  "Tie" (phonetic.)
23    Q.  Tighe Wilhelmy, Phil Vottiero and Shane
24 Radford at Velawcity, correct?
25    A.  Yes.

1     Q.  And Mr. Krause is attaching a list of dual
2  reps; do you see that?
3     A.  Yeah, I was not prepared to answer questions
4  about this because this is a post-retention e-mail and
5  falls outside the notice of your depo.
6     Q.  Well, let me ask you a question because the
7  reps were obtained through Velawcity's intake services,
8  correct?
9     A.  No.
10    Q.  How were they obtained?
11    A.  I don't know.  You'd have to go case-by-case
12 basis.  Dual reps are all the cases in the firm.  It
13 could be a case that my mother referred to me that was
14 also being represented by Galindo.
15    Q.  Okay.  There were only 315 cases that you
16 repped with Krause & Kinsman?
17    A.  No, that's not what a dual rep is.
18    Q.  So what is a dual rep?  'Cause I thought you
19 just said it was a case where you represented your
20 mother that was also being represented by Galindo?
21    A.  It's where a client signs up with two law
22 firms with two different fee arrangements.  So for
23 instance, the Morris Bart cases are dual represented.
24 They are repped by MMA, and they're repped by Morris
25 Bart.  That's a dual rep.

1     Q.  So is that, there was a case in which the
2  representation of one law firm had terminated and
3  another had commenced?
4     A.  No.
5     Q.  What was this then?  'Cause that's what you
6  just described is a representation where one law firm's
7  representation ended and another's began.
8         MS. GOOTT:  Objection; argumentative.
9  You don't need to tell him what his testimony.  Just
10 please ask him questions.  And if he knows the answer,
11 he will answer.
12    A.  Yeah, it's when a client signs up with two law
13 firms.
14 BY MS. VEITH:
15    Q.  And why was Velawcity being included on this
16 conversation regarding dual representation?
17    A.  'Cause as we told you, they helped with
18 scrubbing clients, scrubbing data, our administrative
19 side, our technology side.  It had nothing to do with a
20 campaign they were in -- you know, or anything like
21 that.  'Cause they're just dual rep clients.
22         We got to figure out what to do with them
23 because the insurance company usually won't talk to us
24 'cause they're like, "Oh, we got two LORs on file.  How
25 are we going to handle these claims?"

1     Q.  And those dual reps, could they have possibly
2  come in through Velawcity's intake where, as you've
3  testified, Velawcity did some prescreening intake for
4  potential clients?
5         MS. GOOTT:  Objection; mischaracterizes
6  his testimony.
7     A.  Yeah.  A hurricane victim that classifies as a
8  dual rep could have originated from a Velawcity campaign
9  for sure.
10 BY MS. VEITH:
11    Q.  And that victim would have somehow ended up
12 with representations both from MMA and from Krause &
13 Kinsman?
14    A.  No -- well, I guess it could have.
15    Q.  Because what I'm trying to figure out, most of
16 your -- your clients that had these property damage
17 employment agreements, Krause & Kinsman is defined as a
18 co-counsel in those, right?
19         MS. GOOTT:  Objection; vague.
20    A.  Krause & Kinsman was a co-counsel with MMA.
21 BY MS. VEITH:
22    Q.  So for those clients, Krause & Kinsman and MMA
23 were both representing the client, there wasn't a dual
24 rep 'cause it wasn't a representation that had been
25 created twice; is that right?

39 (Pages 153 to 156)

John Moseley    April 8, 2025

| Page 157 | Page 159 |
|---|---|

**Page 157**

1  A. Not necessarily.
2  Q. What do you mean by not necessarily?
3  A. MMA could have ran its own marketing campaign.
4  Krause & Kinsman could have ran its own marketing
5  campaign. And two different arrangements were entered
6  into by the client.
7  Q. And what's what I'm trying to figure out.
8  That's what dual rep means as opposed to just a client
9  who was represented by both law firms?
10  A. It means that they have multiple arrangements
11  entered into on behalf of representing them with their
12  insurance company. Those multiple arrangements could be
13  with the same firm or same law firms, just different
14  arrangements.
15  Q. Got it. So it's a client that had two
16  agreements?
17  A. Yes.
18  Q. Okay. Exhibit 46.
19  (Exhibit 46 marked.)
20  BY MS. VEITH:
21  Q. This is -- this is a marketing services
22  agreement, Bates number MMA-MB 1051.
23  If you turn to Bates number MMA-MB 001057,
24  is this your signature on this document?
25  A. (Reading.) It appears to be an automated

**Page 158**

1  signature.
2  Q. Did you authorize that signature to be placed
3  on this document?
4  A. Probably.
5  Q. And that was as owner of McClenny Moseley and
6  Associates?
7  A. That was the title that day, yes.
8  Q. And the date that this signature was imposed
9  is May 2nd, 2022?
10  A. That's what the document says.
11  Q. Okay. And if you flip to the preceding page,
12  Order Summary, you see that?
13  A. Yeah, I'm in the order summary document.
14  Q. There is a cell that says "Total Prescreened
15  Clients"; do you see that?
16  A. I do.
17  Q. The cell next to it says 268; do you see that?
18  A. I do.
19  Q. Prescreened Client Cost, the cell next to that
20  $3,500; do you see that?
21  A. Those are the words on to page.
22  Q. And then total balance due is $938,000; do you
23  see that?
24  A. I do.
25  Q. All right. And this master services

**Page 159**

1  agreement, did you review it before you signed it?
2  A. I read this document.
3  Q. Did you ask that any changes be made?
4  A. No. I don't think the MSA -- let me go back.
5  I think I read the MSA originally. I don't know if I
6  read this one specifically as this post dated the
7  others. But I assume it was the same as the ones
8  before.
9  Q. Exhibit 47.
10  (Exhibit 47 marked.)
11  BY MS. VEITH:
12  Q. It's a document Bates labeled MMA-MB three 0s
13  -- two 0s 1058. Do you see that?
14  A. Yes.
15  Q. And if you go to the last page, MMA-MB two 0s
16  1064, it's titled "Authorization"; do you see that?
17  A. I do see an authorization page.
18  Q. And it is signed by you, Zach Mosley, on
19  May 23rd, 2022?
20  A. My name is there, yes.
21  Q. As owner of McClenny Moseley and Associates?
22  A. Yes.
23  Q. And did you authorize your name being signed
24  to this document?
25  A. I believe so.

**Page 160**

1  Q. Okay. Preceding page, order summary cell says
2  prescreened client -- total prescreened clients. And
3  the cell next to it says 1,000, correct?
4  A. That's what it says.
5  Q. Next cell, prescreened client cost. And the
6  cell next to that says 3,500, correct?
7  A. Yes.
8  Q. And then finally, total balance due is
9  3.5 million, correct?
10  A. Yes.
11  Q. This is less than a month after that last MSA
12  we looked at, correct?
13  A. Maybe. I didn't check the date.
14  Q. So this is May 23rd, 2022. And that last one
15  was May 2nd, 2022. And you're free to look at it if you
16  want to confirm.
17  A. So it was one day.
18  Q. No, I think it was three weeks. May 2nd.
19  A. Okay.
20  Q. And I just want to know why -- why were two
21  MSAs so close in time required? If you recall.
22  A. I think we were -- I don't know if they were
23  required.
24  Q. Well, why'd you sign two MSAs so close in
25  time?

40 (Pages 157 to 160)

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 161

1    A.  Just practice of the business.
2    Q.  And what is that practice?
3    A.  Helping hurricane victims.
4    Q.  Sure.  So previously, the last MSA we saw was
5  from February.  And then the one before that was from
6  December.  So those were spaced about two, three months
7  apart prior to these two, right?
8    A.  If you say so.
9    Q.  And so I'm just curious as to why you did two
10 within the same months?
11   A.  Don't know.
12   Q.  And you were paying them for their intake and
13 marketing services twice that month?
14   A.  That's what it appears.
15   Q.  Exhibit 48.
16      (Exhibit 48 marked.)
17 BY MS. VEITH:
18   Q.  MMA-MB three 0s 787.
19   A.  (Reading.)  Got it.
20   Q.  So the first e-mail, which is the last page,
21 MMA-MB three 0s 790, it's from you on June 14th, 2022,
22 correct?
23   A.  Yes.
24   Q.  And the subject is, "Just Use This Contract."
25      No text in the e-mail, correct?

Page 162

1    A.  Correct.
2    Q.  And Mr. Radford, on June 16th, replies to you.
3        And he's wanting to confirm what the
4  changes were; is that fair to say?
5    A.  Yes.
6        MS. GOOTT:  Objection; calls for
7  speculation of what he wants.
8  BY MS. VEITH:
9    Q.  And so what Mr. -- the changes that
10 Mr. Radford shows are the deletion of that language
11 regarding Louisiana Revised Statute 221892?
12   A.  Yes.
13   Q.  And then you reply.  And you say, "A little
14 more taking out TWIA and taking out the need for the
15 attorney to gain consent to file suit"; you see that?
16   A.  Yes.
17   Q.  So we had looked at that language earlier in
18 one of the contracts where there was the bold attorney
19 must get client authorization to file suit as of
20 June 2022.  You were revising the contract to take that
21 language out, correct?
22      MS. GOOTT:  Objection; mischaracterizes.
23 What you said that you're looking at before was a
24 contract.
25      MS. VEITH:  The document.

Page 163

1        MS. GOOTT:  I think he said form, but...
2    A.  I'm sorry.  What was your question?
3  BY MS. VEITH:
4    Q.  Okay.  So we looked previously at the form or
5  the document where the form that would one day become a
6  contract.
7        MS. GOOTT:  Objection; assumes facts not
8  in evidence.
9  BY MS. VEITH:
10   Q.  Did you ever have any contracts with clients
11 to pursue hurricane claims?
12   A.  Ever?
13   Q.  Yeah.
14   A.  Yes.
15   Q.  Okay.  Thanks.
16      So in any event, that document that we
17 looked at, there was bold language that said client must
18 obtain consent from attorney before filing suit,
19 correct?
20   A.  Correct.
21   Q.  And in this e-mail, you're talking about
22 making certain changes to that document, one of which is
23 to remove that language, correct?
24   A.  Correct.
25   Q.  And this was in June of 2022?  This e-mail?

Page 164

1    A.  Correct.
2        (Exhibit 49 marked.)
3  BY MS. VEITH:
4    Q.  So Exhibit 49 will be MMA-MB three 0s 339 as
5  well as the native version of that document with its
6  attachment.  Okay.  The subject of this e-mail is,
7  "Updated Storm Retainers," correct?
8    A.  Yes.
9    Q.  And if we look at the first page of the
10 document, on July 14th, Mr. Huye e-mailed to
11 Mr. Vottiero an updated contract which specifically
12 gives us the right to file suit without our client's
13 authority; you see that?
14   A.  Yes.
15   Q.  And then Mr. Radford responds and says, "Hey,
16 all.  This is good to go.  I'll get updated on Monday
17 morning."  Do you see that?
18   A.  (No response.)
19   Q.  And then the document that Mr. Radford
20 attached is that same form, the property damage claims
21 attorney employment contract form.  And what it now says
22 in Item 3 -- and it's in the text that's a little --
23 slightly different-sized font than the rest of that
24 paragraph.  It says, "Attorneys are authorized to file
25 suit if and when necessary"; do you see that?

41 (Pages 161 to 164)

John Moseley    April  8, 2025

| Page 165 | Page 167 |
|---|---|

**Page 165**

1    A.  Yes.
2    Q.  So that was the change from the prior bolded
3  language, right?
4    A.  Correct.
5    Q.  Okay.  And now there's no longer any reference
6  to TWIA arbitrations, right?
7    A.  Correct.
8    Q.  Okay.  So what was Mr. Radford getting this
9  form updated for?
10    A.  What do you mean?
11    Q.  He says, "I'll get -- this is good to go.
12  I'll get updated on Monday morning."
13        What was he updating it for?
14    A.  The scrubbing.
15    Q.  Okay.  And that was scrubbing of forms that
16  were provided to potential clients?
17    A.  They might have provided it to potential
18  clients.
19    Q.  Okay.  And then at -- so prior to this time in
20  July when this contract was updated, earlier contracts
21  required client consent to file suit, correct?
22        MS. GOOTT:  Objection; mischaracterizes
23  testimony.  Assumes facts not in evidence that these are
24  contracts.
25

**Page 166**

1  BY MS. VEITH:
2    Q.  Prior forms had that requirement, correct?
3    A.  I believe so.
4    Q.  Okay.  At any time, did MMA or Velawcity ever
5  send updated contracts to those clients who had signed
6  the forms requiring explicit authorization to file suit?
7    A.  That might have happened.
8    Q.  Did you keep track in any way of which clients
9  were required to authorize filing suit versus which had
10  given you the authorization to file?
11        MS. GOOTT:  I'm going to object.  This is
12  beyond the scope of this deposition.  It has nothing to
13  do with Velawcity and authorizing clients.
14    A.  Every client that we had, received an
15  independent letter giving us the authority to file suit.
16  BY MS. VEITH:
17    Q.  They received the letter giving you the
18  authority to file suit?
19    A.  It was an additional.
20    Q.  How did the letter that they received give you
21  the authority to file suit?
22        MS. GOOTT:  Objection; calls for hearsay.
23  Beyond the scope of this deposition.
24    A.  I forgot what it's called.  But there's some
25  -- I believe Louisiana refers to it as an opt-in letter.

**Page 167**

1  So they had to opt in to give us the right to file suit.
2  BY MS. VEITH:
3    Q.  So they would have to give some response to
4  that letter?
5        MS. GOOTT:  Objection; calls for legal
6  conclusion.
7        (Exhibit 50 marked.)
8  BY MS. VEITH:
9    Q.  Exhibit 50.  This document had an attachment
10  that was never produced, but I think we can get by
11  without it.  It's MMA-MB three 0s 343.  And it's just an
12  e-mail from you to Sean Kelly and Phil Vottiero
13  entitled, "Zach Moseley Signature"; do you see that?
14    A.  Yes.
15    Q.  And you wrote, "Please get to team," right?
16        THE REPORTER:  Please get?
17        MS. VEITH:  To team.
18    A.  Yes.
19  BY MS. VEITH:
20    Q.  Why were you sending out your signature to
21  Velawcity?
22    A.  I have no idea.
23    Q.  Exhibit 51, MMA-MB three 0s 33.
24        (Exhibit 51 marked.)
25

**Page 168**

1  BY MS. VEITH:
2    Q.  Okay.  This is an August 11th, 2022 e-mail at
3  the top from Phil Vottiero to William Huye.  And you are
4  one of the cc's, correct?
5    A.  Yes.
6    Q.  Okay.  And it's that same subject line,
7  "Updated Storm Retainers," as the previous e-mail,
8  correct?
9    A.  Correct.
10    Q.  And, in fact, if you look down the bottom of
11  this first page, there's an e-mail from Mr. Huye that
12  was part of the last e-mail chain where he's attaching
13  the updated contract which specifically gives us the
14  right to file suit without our client authority, right?
15    A.  Correct.
16    Q.  And that's in July.  And then Mr. Huye's next
17  e-mail is on August 11th, 2022, correct?
18    A.  Correct.
19    Q.  And he says, "Phil, can we get this new
20  contract in use both by both Velawcity and Galindo
21  ASAP"; do you see that?
22    A.  Correct.
23    Q.  'Cause he says, "I just checked the two most
24  recent files, and neither are using the updated contract
25  form"; you see that?

42 (Pages 165 to 168)

John Moseley   April 8, 2025

<table>
<tr><td>

Page 169

1    A.  Correct.
2    Q.  And he lists two files.  One is Smith and one
3  is Vernado; you see that?
4    A.  Yes.
5    Q.  And he indicates them both as signed on
6  8/5/2022, correct?
7    A.  Correct.
8    Q.  Exhibit 52.
9        (Exhibit 52 marked.)
10  BY MS. VEITH:
11    Q.  So Exhibit 52 is an e-mail as well as a
12  LinkedIn post that is linked in the e-mail.  The e-mail
13  is Bates numbered MMA-MB four 0s 20.
14    A.  Okay.
15    Q.  On August 16th, in this document, you sent a
16  link to a LinkedIn post at 1:16 p.m., correct?
17    A.  I believe that's correct.
18    Q.  And Mr. Wilhelmy -- Tighe at Velawcity replied
19  on it; do you see that?
20    A.  Yep.
21    Q.  Do you know what Mr. Wilhelmy was on?
22    A.  Yes.
23    Q.  And what's that?
24    A.  He was trying to see -- to get validation if
25  this was correct.  But -- well, yeah.

</td><td>

Page 171

1    A.  We did not find any, no.
2    Q.  So this one Russian text message just happened
3  to go to Mr. Modsen's wife.  But otherwise, you never
4  heard from any clients who were contacted by the
5  Russians?
6        MS. GOOTT:  Objection to your sidebar --
7  or assumes facts not in evidence.
8    A.  No, we never found the client that complained
9  about it or not.  Again, you had to opt in to receive a
10  text.  So you have to put your information in to receive
11  a text.  So it didn't even meet the definition of direct
12  solicitation because he was asking for a text message.
13        Mr. Modsen, in the Fernadovich (phonetic)
14  case, raised the issue that his main concerns that
15  landing page was a white label.  So it didn't have
16  McClenny Moseley and Associates' name on the label.  And
17  that was the ethical violation.  Not, in fact, the fact
18  that he received a text message 'cause he opted in for
19  the text message.
20  BY MS. VEITH:
21    Q.  But that landing page, that was created by the
22  Russians; is that what you're saying?
23    A.  Yes.
24    Q.  So it's not even an issue 'cause you or
25  Velawcity didn't create it.

</td></tr>
<tr><td>

Page 170

1    Q.  Okay.  And if you look to the LinkedIn post --
2  I'm not interested in all of Mr. Modsen's
3  editorializing.  But there is a photograph of a text
4  message on the second page; do you see that?
5    A.  Yes.
6    Q.  Is that a text message that Velawcity sent
7  out?
8    A.  No.
9    Q.  Did you ever figure out what there was?
10    A.  Yes.
11    Q.  What was that?
12    A.  It was a Russian texter.  He created MMA
13  landing pages.  Mr. Modsen opted in to receive a text
14  message from this rogue MMA landing page.  And once you
15  opt in to receive a contract from this rogue landing
16  page, it would also text you 'cause you had to put your
17  information in first.
18        And then as I'm sure you're aware,
19  Mr. Modsen ran to the federal benches and claimed that
20  we were directly soliciting him.
21    Q.  Did you -- forgetting Mr. Modsen, if this
22  Russian website was soliciting text messages in this
23  way, did you ever have clients who came to you believing
24  that they were represented by you because of this text
25  message that they received?

</td><td>

Page 172

1        Is that what your testimony is?
2    A.  Yeah, it wasn't, as we responded in the bar
3  complaint that Mr. Modsen also filed against us.  The
4  Louisiana did their investigation.  Found it wasn't our
5  web page.  We derived no clients from it.  It wasn't an
6  issue with us.
7    Q.  Exhibit 52 --
8        THE REPORTER:  Exhibit 53.
9        (Discussion off the record.)
10        (Exhibit 53 marked.)
11  BY MS. VEITH:
12    Q.  Exhibit 53 is MMA-MB three 0s 269, as well as
13  the native and its attachment.  However, I seem to only
14  have one copy of the native and its attachment.  So that
15  will just go with you.
16        MS. VEITH:  Here's the Bates one, Miriam.
17  I just don't have the attachment, sorry.
18  BY MS. VEITH:
19    Q.  Okay.  So go to the last e-mail, which is from
20  Mr. Huye on October 27th, 2022.
21    A.  Sorry.  Say that one more time?
22    Q.  Last e-mail.  It's on page 296 or MMA-MB three
23  0s 271.  It's from Mr. Huye on October 27th, 2022.  You
24  see that?
25    A.  Yes.

</td></tr>
</table>

43 (Pages 169 to 172)

John Moseley    April 8, 2025

Page 173

1    Q. And Mr. Huye writes, "Velawcity, we discovered
2    the following three contracts that don't have signatures
3    on the copies' NSA." You see that?
4    A. Yes.
5    Q. He lists three clients, correct?
6    A. Yes.
7    Q. And he asks Velawcity to please re-push these
8    contracts with the fully-signed retainers, correct?
9    A. Correct.
10    Q. And Mr. Huye then responds to himself, it
11    seems. And he asks some -- Carlos at Velawcity to
12    please provide him with the digital pdf-- "-- the pdf
13    digital packet or Phil asked me to tell you guys these
14    could be Legal Wings scanning ones. And if so, we need
15    to have Legal Wings provided for the following three
16    matters"; do you see that?
17    A. Yes.
18    Q. So MMA is missing three signed contracts,
19    correct?
20    A. We do not have copies of three engagement
21    letters in our system.
22    Q. And it's looking to Velawcity or Legal Wings
23    to provide those signatures, correct?
24    A. Not to provide the signatures. We're looking
25    to see that they gathered the information. And during

Page 174

1    the course of the data being pushed through through the
2    API, was it not transferred correctly. And so do they
3    happen to have a of copy of the specific form.
4    Q. Okay. And then ultimately, in this particular
5    part of the chain, Mr. Zepeda responds with the retainer
6    for Mary Delanay, correct?
7    A. He responds with a filled-out form from
8    Delanay. So if that's how you pronounce it.
9    Q. Yes. And that document is signed by her,
10    correct?
11    A. I believe that is a filled-out form, yes.
12    Appears to have a coffee or something on it. Not you,
13    but...
14    Q. Scanned.
15    A. Delanay's coffee, maybe.
16    Q. Okay. Exhibit 54.
17        (Exhibit 54 marked.)
18    BY MS. VEITH:
19    Q. MMA-MB two 0s 1066.
20        MR. PROBUS: 1050 what?
21        MS. VEITH: 1066.
22    A. (Reading.)
23    BY MS. VEITH:
24    Q. Okay. This is another marketing services
25    agreement, correct?

Page 175

1    A. Yes, ma'am.
2    Q. And if you flip to the page Bates labeled
3    MMA-MB two 0s 1074, there's an order summary, correct?
4    A. The last document in this bundle says order
5    summary.
6    Q. Okay. And it says total prescreened clients,
7    220, correct?
8    A. Those words appear on this page.
9    Q. And it says base rate client cost, 3500,
10    correct?
11    A. Yeah, those words are on this order summary.
12    Q. And then total balance due is $770,000,
13    correct?
14    A. It looks like it.
15    Q. And now there's criteria added as well, right?
16    A. There is a criteria section on this page.
17    Q. And criteria number one is, "Claimant has
18    property damage due to Hurricane Ida"?
19    A. Yes. That's what that document says.
20    Q. Criteria number two is, "Claimant has
21    property/home insurance"?
22    A. Yes.
23    Q. Number three, "Claimant's residence/damaged
24    home is in LA." I'm assuming that means Louisiana?
25        MS. GOOTT: I'm going to object to vague.

Page 176

1    You're just reading it. Are you asking him if that's
2    what this document says?
3        MS. VEITH: Yeah.
4        MS. GOOTT: Okay. If you could just
5    clarify that.
6        MS. VEITH: I said -- before each number,
7    I say "criteria number one is."
8        MS. GOOTT: Right. But you don't say --
9    it's vague because it could be that you're asking him to
10    agree or if you're asking him that this is what it says
11    on this piece of paper.
12        MS. VEITH: Thanks, Miriam.
13        MS. GOOTT: You're welcome. Just wanted
14    to be clear.
15    BY MS. VEITH:
16    Q. Number three, "Client -- Claimant's residence
17    home/damaged home is in LA," correct?
18        MS. GOOTT: I'm going to object to the
19    form of the question as just being correct. You're
20    asking it's correct that this is an agreement? Or this
21    is what it says? Or whatever it is that you mean. It's
22    just unclear.
23    A. Number three on this document says that.
24    BY MS. VEITH:
25    Q. Okay. And then No. 4 says, "Claimant does not

44 (Pages 173 to 176)

John Moseley    April 8, 2025

| Page 177 | Page 179 |
|---|---|

**Page 177**

1  currently have legal representation for this legal
2  matter," correct?
3      A.  That is what the document says.
4      Q.  Exhibit 55.
5          (Exhibit 55 marked.)
6  BY MS. VEITH:
7      Q.  This is a document Bates numbered MMA-MB three
8  0s 324.
9      A.  (Reading.)  Yes.
10     Q.  Okay.  The subject line for this is
11 "Laura/Delta Claims," correct?
12     A.  Yes.
13     Q.  And if you look at the last e-mail, this is
14 actually from Ms. Westbrook with Galindo.
15         She writes, "Hey, Zach, we confirmed two
16 weeks ago that MMA will continue to accept Laura/Delta
17 claims, but with a waiver.  Will you please send the
18 waivers so that Decibel can incorporate in the signup
19 packets"; do you see that?
20     A.  Yes.
21     Q.  What's Decibel?
22     A.  I think that's their internal marketing team.
23     Q.  Okay.  And this is forwarded by Mr. Radford to
24 Mr. Vottiero and Mr. Kelly at Velawcity; do you see
25 that?

**Page 178**

1      A.  Yes.
2      Q.  And then Mr. Vottiero at the bottom of the
3  first page, reaches out to Mr. Huye, Mr. Krause and
4  yourself and asks for some clarity, correct?
5      A.  Yes.
6      Q.  And you respond, "We were discussing to add
7  language to the contract and/or an additional waiver
8  that included languages as if law firm discovers that
9  you have missed your SOL to file suit, law firm is not
10 responsible"; do you see that?
11     A.  (No response.)
12     Q.  Do you ever actually end up adding waivers
13 like that to contracts?
14     A.  I believe so.
15     Q.  And this is an e-mail chain from September 6
16 2022, which is shortly before the prescriptive period
17 for Laura and Delta claims, right?
18     A.  Yes.  And I'd like to change my answer.  I
19 believe Galindo engaged clients and then sent the
20 clients to us.  But we asked him to include that
21 language in his retainer.
22         THE REPORTER:  Include that language?
23         THE WITNESS:  In his retainer.
24 BY MS. VEITH:
25     Q.  So the clients were retained by Galindo, but

**Page 179**

1  then sent to MMA?
2      A.  Correct.
3      Q.  So did you take on Laura and Delta claims past
4  the statute of limitation for those claims?
5      A.  In Louisiana, they call it the prescriptive
6  period.  And it's two years after the date of loss is
7  what most lawyers thought.  We had a very aggressive
8  strategy that we didn't think it was limited to the two
9  years.  So we were actively taking clients past the
10 two-year anniversary of the storm.
11     Q.  And were you letting them know that the
12 prescriptive period was two years from the date of loss?
13         MS. GOOTT:  I object.  Asking you for
14 communications that you had with your clients.  And I'm
15 going to instruct you not to answer.
16         MS. VEITH:  If they weren't your clients
17 yet, it's not a communication with the client.
18         MS. GOOTT:  Well, then why did you ask if
19 you told your clients?
20         MS. VEITH:  I said "them."
21         MS. GOOTT:  And who were you referring
22 to?
23         MS. VEITH:  The potential clients, which
24 is who we've been referring to all day.
25         MS. GOOTT:  All right.  So ask that

**Page 180**

1  question again so I can hear it?
2  BY MS. VEITH:
3      Q.  Did you tell the potential clients that the
4  prescriptive period was two years from the date of loss?
5          MS. GOOTT:  If they're potential clients,
6  then I also instruct him not to answer.
7      A.  As I previously told you, we did not engage
8  these clients.  The Galindo Law Firm was engaging them.
9  BY MS. VEITH:
10     Q.  But then you represented them 'cause Galindo
11 sent them to you; is that right?
12     A.  Yes.
13     Q.  Okay.  Exhibit No. 56.
14         (Exhibit 56 marked.)
15 BY MS. VEITH:
16     Q.  Is MMA-MB three 0s 289 along with the native
17 attachments to that e-mail.  Can you hand me your
18 exhibits back?  I may have given you two of the same
19 attachments.  Make sure it's correct.
20     A.  (Complies.)
21         MS. VEITH:  Natalie, can I have back what
22 I handed you?
23         MS. GALERNE:  (Complies.)
24 BY MS. VEITH:
25     Q.  Here you go.

45 (Pages 177 to 180)

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 181

1    A. (Reading.) Sorry. I have to do this again.
2  I'm blaming Matt 'cause he printed out these attachments
3  for me, and they're all wrong. So I want to give you
4  the right documents.
5    (A brief discussion was held off record.)
6  BY MS. VEITH:
7    **Q. Okay. This contains the actual native e-mail**
8  **plus attachments as a part of the Exhibit 56. Okay.**
9    A. (Reading.)
10   **Q. So this is an e-mail from Phil Vottiero to you**
11 **on January 31st, 2023, correct?**
12   A. This has nothing to do with -- well, is this
13 the same e-mail chain?
14   **Q. Uh-huh. It should be.**
15   A. This is a -- well...
16   **Q. I understand hurricane Ian is not related,**
17 **right?**
18   A. No, it's not that. This is a -- I know it
19 says new campaign for MMA, but this isn't our campaign.
20 This wasn't a contract I think for MMA.
21   **Q. What was it then? Just so I understand.**
22   A. Looks like it was a campaign for Aspey Watkins
23 & Diesel.
24   **Q. Okay. And you get that from this first**
25 **e-mail?**

Page 182

1    A. Bates number 290?
2  **Q. Correct.**
3    A. Yeah.
4  **Q. So it says, "there will be a new campaign that**
5  **will be delivering to MMA." But it wasn't for you?**
6    A. It wasn't MMA's campaign. Someone else ran a
7  campaign, and we were the handling firm.
8  **Q. Explain to me what that means.**
9    A. So some firms advertise and scrub, and then
10 some firms prosecute. In this instance, we were a
11 prosecuting firm. We didn't do the in-- we weren't
12 responsible for intake or scrubbing.
13 **Q. Okay. So Velawcity was doing intake for Aspey**
14 **Watkins & Diesel; do I understand that correctly?**
15   MS. GOOTT: Objection; assumes facts not
16 in evidence. Foundation. Calls for speculation.
17   A. Maybe. I just know that we were not involved
18 in the intake of these clients.
19 BY MS. VEITH:
20 **Q. But they were clients that you ultimately**
21 **represented?**
22   A. Possibly --
23   MS. GOOTT: Hold on. Your question was
24 "But these were clients that you represented"?
25   MS. VEITH: Ultimately represented, yes.

Page 183

1    MS. GOOTT: Objection; foundation.
2    A. I don't know if any clients derived from this
3  campaign or not.
4  BY MS. VEITH:
5  **Q. But the plan was for you to be the prosecuting**
6  **firm representing these clients, right?**
7    MS. GOOTT: Objection; calls for
8  speculation. Foundation of who these clients were.
9    A. I mean, we accepted clients from everywhere.
10 I think we even accepted some claims from Morris Bart.
11 BY MS. VEITH:
12   **Q. But you had nothing to do with intake?**
13   A. Not of this campaign. No, ma'am.
14   **Q. Okay. So the attachments then, if you'll just**
15 **take a look. Because two of the sample agreements are**
16 **agreements with -- where in the form it states that the**
17 **client hires McClenny Moseley and Associates?**
18   A. Correct.
19   **Q. So the campaign would have been done for Aspey**
20 **Watkins & Diesel. But they would have, through that**
21 **campaign, received a form that if filled out would have**
22 **hired McClenny Moseley & Associates as counsel?**
23   MS. GOOTT: Objection; foundation. Calls
24 for speculation.
25   A. As the prosecuting firm.

Page 184

1  BY MS. VEITH:
2  **Q. Understood. But I'm just -- yes or no? So**
3  **it's yes. They -- through the campaign for Aspey**
4  **Watkins & Diesel, this form that they were sent,**
5  **contemplated the client hiring McClenny Moseley and**
6  **Associates --**
7    MS. GOOTT: Objection --
8  BY MS. VEITH:
9  **Q. -- correct?**
10   MS. GOOTT: Objection; assumes facts not
11 in evidence. And you're referring to this as a sample
12 agreement across it?
13   MS. VEITH: Yes.
14   MS. GOOTT: Okay.
15   A. According to this, they hired three firms
16 simultaneously, one of which being McClenny Moseley and
17 Associates as a prosecuting firm. But they're not
18 contracting with us. It still has to be scrubbed. We
19 have to view the file, see if we want to even represent
20 this client.
21   MMA doesn't represent anyone until we've
22 accepted the fact that we want to and that the client
23 wants to. Like, there's -- you know. It takes two
24 parties to enter into a contract.
25

46 (Pages 181 to 184)

John Moseley   April 8, 2025

| Page 185 |
|---|

1  BY MS. VEITH:
2      **Q. You made that point very clear.**
3      **The question that I have is that the**
4  **document that the clients would have been -- potential,**
5  **possible client would have been sent -- and if you'll**
6  **just look at the attachment. I mean, I can read it to**
7  **you. It says, "The undersigned client hires McClenny**
8  **Moseley and Associates PLLC and co-counsel."**
9      **Do you see that?**
10      A. Yeah, I didn't have anything to do with the
11  creation of this campaign. So they might have sent this
12  document out. I don't know.
13      **Q. You didn't have anything to do with the**
14  **creation of the campaign even though Mr. Vottiero said**
15  **you would be signing for it?**
16      MS. GOOTT: Objection; asked and
17  answered.
18      A. I did not create the campaign, no.
19  BY MS. VEITH:
20      **Q. Did you sign for the campaign?**
21      A. I don't know what you mean by sign for the
22  campaign.
23      **Q. Mr. Vottiero, "Zach will be signing for it."**
24      **Did you sign for the campaign as**
25  **Mr. Vottiero indicated?**

| Page 186 |
|---|

1      A. I don't know what that means, is what I'm
2  getting at. I don't know the context.
3      **Q. Did you --**
4      A. This wasn't an MMA campaign. So I did not
5  prep for this 'cause it's outside the scope of this
6  deposition notice. So I can't answer this question.
7  I'm not prepared to.
8      **Q. Well, this is about clients Velawcity procured**
9  **for MMA.**
10      A. It's not true.
11      **Q. The potential clients would not have become**
12  **clients of MMA?**
13      MS. GOOTT: Hold on. I'm going to
14  object. You don't need to argue with him. He's told
15  you multiple times that he doesn't know about this
16  campaign.
17  BY MS. VEITH:
18      **Q. The potential clients, they would not have**
19  **become clients of MMA; is that what you're telling me?**
20      MS. GOOTT: Objection. What client?
21      MS. VEITH: Who would have been derived
22  from this campaign.
23      MS. GOOTT: He just told you he doesn't
24  know about this campaign. Ask him a fifth time.
25      MS. VEITH: Okay.

| Page 187 |
|---|

1  BY MS. VEITH:
2      **Q. You know something about the campaign because**
3  **you're telling me -- you told me that --**
4      MS. GOOTT: Object to the sidebar. Don't
5  argue with him. Just ask him the question again.
6  BY MS. VEITH:
7      **Q. You did testify earlier that this was a**
8  **campaign where Aspey & Watkins would get clients and**
9  **give them to MMA as prosecuting attorney, correct?**
10      A. No.
11      MS. GOOTT: Objection; mischaracterizes
12  his testimony.
13  BY MS. VEITH:
14      **Q. So what was to happen with that -- clients**
15  **that Aspey & Watkins engaged?**
16      MS. GOOTT: Objection; foundation. Calls
17  for speculation. Assumes facts not in evidence.
18      A. I believe -- but I haven't prepped because
19  this is outside the scope of the deposition notice --
20  that this is a campaign by AKW to market and scrub
21  clients.
22  BY MS. VEITH:
23      **Q. And then those scrubbed clients, MMA would be**
24  **the prosecuting attorney for, correct?**
25      A. They could be.

| Page 188 |
|---|

1      **Q. And so those would be clients of MMA, correct?**
2      MS. GOOTT: Objection; calls for
3  speculation.
4      A. If a potential client and MMA want to engage
5  in a relationship, then that could result in an
6  attorney/client relationship.
7  BY MS. VEITH:
8      **Q. Yes. So in the case where MMA agreed to**
9  **become the prosecuting attorney for a client, that --**
10  **for a potential client, that potential client would then**
11  **become a client of MMA upon MMA's agreement, correct?**
12      MS. GOOTT: Objection; calls for
13  speculation. Or it's a hypothetical. I don't quite
14  understand.
15      A. What client are you talking about?
16      THE REPORTER: I didn't yet your answer
17  at all.
18      THE WITNESS: What client are you talking
19  about?
20  BY MS. VEITH:
21      **Q. The prescreened clients who were scrubbed by**
22  **Aspey & Watkins that you have been referring to.**
23      MS. GOOTT: Objection; assumes facts not
24  in evidence.
25      A. I don't know if they ever sent us any client

47 (Pages 185 to 188)

John Moseley    April 8, 2025

Page 189

1 to -- or potential client to scrub.
2 BY MS. VEITH:
3    Q. Who would know the answer to that?
4    A. If you send me a depo request, I could get you
5 the information.
6    Q. So again, the deposition notice asks about
7 clients who were procured for MMA by Velawcity. If
8 these clients eventually became your client, it is my
9 position that those were clients procured by Velawcity
10 who was the author of this e-mail for MMA. So this is
11 within the scope of the notice. So I am asking you
12 again --
13    MS. GOOTT: I'm going to object to the
14 sidebar --
15 BY MS. VEITH:
16    Q. -- who would know --
17    MS. GOOTT: -- I'm going to the argue--
18 BY MS. VEITH:
19    Q. -- the answer to the question --
20    MS. GOOTT: I'm going to object --
21    MR. PROBUS: Let her finish her question.
22    MS. GOOTT: -- no, I'm going to object --
23 hold on. She can respond for herself. She doesn't need
24 you -- she doesn't need you to answer for her --
25    MR. PROBUS: What she needs is you to

Page 190

1 stop talking on top of her --
2    MS. GOOTT: No, you're talking over me,
3 and -- and --
4    MR. PROBUS: Yeah, because you're talking
5 over her. So somebody's got to stop you.
6    MS. GOOTT: Well, she -- oh, really?
7    MR. PROBUS: Yeah.
8    MS. GOOTT: And she can't do that
9 herself? Because we've been going all day, and you were
10 sleeping about 60 seconds ago.
11    MR. PROBUS: I wasn't sleeping at all.
12 My --
13    MS. GOOTT: Your eyes were closed --
14    MR. PROBUS: Yeah, my eyes were closed
15 'cause I was listening to every word --
16    MS. GOOTT: Yes. And you're sleeping.
17 And now --
18    MR. PROBUS: So now you want to control
19 the (inaudible) --
20    MS. GOOTT: No --
21    MR. PATTERSON: Stop Matt. Stop Matt --
22    MR. PROBUS: -- and stop her from asking
23 the question.
24    MR. PATTERSON: -- Matt, stop --
25    MR. PROBUS: Let her finish her question.

Page 191

1    MR. PATTERSON: You're not even here as a
2 lawyer, Matt. Quiet.
3    MS. GOOTT: No. Listen --
4    MR. PATTERSON: Good Lord.
5    MS. GOOTT: -- you don't need to give him
6 a whole explanation about what you think. Ask him the
7 question. Your opinion of what is in the topics isn't
8 relevant. Ask him the question. And if he knows it,
9 he'll answer it.
10    MS. VEITH: If my opinion of the topics
11 is not relevant --
12    MS. GOOTT: Correct.
13    MS. VEITH: -- then neither is his and
14 neither is yours.
15    MS. GOOTT: Yeah, mine is because I'm
16 making objections. Your statement of what you believe,
17 isn't important to share with him. If you want to have
18 a discussion with me about the notice, we can do that.
19 But you talking to the witness and explaining to him
20 your position, isn't appropriate.
21    Your job is to ask questions, and his job
22 is to answer them. You and I can have those discussions
23 or matt can speak for you. But I think you and I are
24 capable.
25    MS. VEITH: Miriam, while I deeply

Page 192

1 appreciate the CLE, I'm going to ask you to stop making
2 speaking objections.
3    MS. GOOTT: I'm not -- I'm not doing a
4 CLE. You're too smart. I don't need to --
5    MS. VEITH: Ms. Goott, stop making --
6    MS. GOOTT: No, no no --
7    MS. VEITH: -- speaking objections.
8 BY MS. VEITH:
9    Q. Mr. Moseley --
10    MS. GOOTT: I'm going to tell you,
11 Ms. Veith, that I simply asking you not to give him
12 lectures and your opinions. Just ask him questions, and
13 he will answer. Go ahead.
14    MS. VEITH: Your request is noted.
15 BY MS. VEITH:
16    Q. Mr. Moseley --
17    MS. GOOTT: Thank you. That's all I ask.
18 BY MS. VEITH:
19    Q. -- if a client was procured by Velawcity for
20 Aspey Watkins & Diesel and then became a client of MMA's
21 as prosecuting attorney, you've testified you don't know
22 if that ever happened. Who would know that?
23    MS. GOOTT: Objection; calls for
24 speculation. Foundation.
25    A. It's my understanding that Velawcity never

48 (Pages 189 to 192)

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

1  procured clients for Aspey Watkins. So I don't think
2  that is a hypothetical that could exist.
3  BY MS. VEITH:
4      Q.  So the simple answer is that there were no
5  clients who MMA came to represent who were procured
6  through the campaign discussed in this e-mail; is that
7  correct?
8      A.  Velawcity did not procure clients for law
9  firms.
10     Q.  Were there any clients for whom Velawcity
11 performed -- potential clients, for whom Velawcity
12 performed intake for Aspey Watkins & Diesel who became--
13 let me rephrase.
14         If Velawcity had performed intake
15 prescrubbing services for potential clients of Aspey
16 Watkins & Diesel, who at MMA would know if those
17 potential clients ever became actual clients of MMA?
18         MS. GOOTT:  Objection; calls for
19 speculation.
20     A.  Velawcity didn't work for clients. They
21 didn't do work for clients.
22 BY MS. VEITH:
23     Q.  And I didn't say that they did. My question
24 was --
25     A.  Yes, you did. We can read it back --

1      Q.  -- if Velawcity performed --
2      A.  -- That's exactly what your question was. You
3  said, if a client -- or if Velawcity did intake for a
4  client, they didn't do any work for a client. Velawcity
5  didn't work for clients.
6          MS. GOOTT:  Both of you don't need to
7  argue with each other.
8          MS. VEITH:  All right.
9          MS. GOOTT:  Zach, just listen to her
10 question.
11         THE WITNESS:  Okay.
12         MS. GOOTT:  And I will object when she's
13 arguing with you. You don't need to argue back. Just
14 if you don't know, don't know. If you do know, answer.
15 BY MS. VEITH:
16     Q.  If Velawcity performed prescreening intake of
17 a potential client for Aspey Watkins & Diesel, who at
18 MMA would know if any of those potential clients became
19 actual clients of MMA?
20         MS. GOOTT:  Objection; calls for
21 speculation. Foundation.
22     A.  No one.
23 BY MS. VEITH:
24     Q.  There's no way to tell within MMA's Smart
25 Advocate system? Is that what you're telling me?

1      A.  No.
2          THE WITNESS:  Just so the record's clear
3  --
4          MS. VEITH:  There's no question pending,
5  Mr. Moseley.
6          THE WITNESS:  Okay. Well...
7          MS. GOOTT:  You need to clarify
8  something?
9          THE WITNESS:  Yeah. No, that's not what
10 I'm telling you. Not "no" to your question. You asked
11 two questions. I answered no to your second question.
12 BY MS. VEITH:
13     Q.  What would you like to clarify for me,
14 Mr. Moseley?
15     A.  I don't need to clarify anything for you.
16         MS. VEITH:  All right. Then I'll move to
17 strike all of that commentary by Mr. Moseley as
18 nonresponsive to a question.
19         (Exhibit 57 marked.)
20 BY MS. VEITH:
21     Q.  All right. Exhibit 57 is a compilation of
22 various documents, the first one being MMA-MB two 0s
23 1075.
24     A.  (Reading.) Okay.
25     Q.  These are all documents that were produced by

1  MMA, correct? They have MMA-MB Bates numbers on the
2  bottom?
3      A.  Yes.
4      Q.  And are these advertisements that Velawcity
5  prepared and sent out for MMA?
6      A.  No.
7      Q.  What are they?
8      A.  They're advertisements.
9      Q.  So who prepared them if not Velawcity?
10     A.  Counsel.
11     Q.  Counsel as in your ethics counsel, Ms. Rubion?
12 Or lawyers within MMA?
13     A.  Ethics counsel. Ms. Rubion.
14     Q.  Okay. So Velawcity didn't prepare them.
15         Did Velawcity send them out?
16     A.  Maybe.
17     Q.  What marketing was Velawcity doing if it
18 wasn't sending these out?
19     A.  What do you mean?
20     Q.  Well, so you've told me that they may have
21 sent them out, but they didn't prepare them.
22         But you testified earlier today that one
23 of the things that Velawcity was paid for by you was
24 marketing, correct?
25     A.  Correct.

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 197

1    Q. So I'm curious, if they weren't preparing
2    advertisements, what kind of markets were they doing?
3         MS. GOOTT: Objection; that
4    mischaracterizes his testimony. You asked if this one.
5    A. Yeah, they distributed marketing. They
6    assisted counsel in creating it. They chose the
7    channels. Negotiated the rates for the channels.
8    BY MS. VEITH:
9    Q. Channels? What sorts of channels?
10   A. Like hard copy, digital, TV, radio.
11   Q. There was an objection by your counsel that I
12   asked if these advertisements were prepared by
13   Velawcity, and you said they weren't.
14        Were there other advertisements that have
15   not been produced to me that were prepared by Velawcity?
16   A. All advertisements have been approved. All
17   advertisements are ran through counsel for Louisiana Bar
18   approval. So I don't want to like -- I'm not trying to
19   be tricky here about who created it.
20        But in my head, the final rubber stamp was
21   put on by counsel. So in my eyes, they created it.
22        MS. VEITH: Okay. So I'm going to move
23   to strike that as nonresponsive.
24   BY MS. VEITH:
25   Q. But my question is -- and it's just a yes or

Page 198

1    no. And I understand that you have testified that all
2    -- the final product of an advertisement was approved by
3    counsel.
4         Were there advertisements that Velawcity
5    created that have not been produced to me? That's my
6    first question. Yes or no?
7    A. Can you rephrase it?
8    Q. Were there advertisements created by Velawcity
9    that are -- you have not produced?
10   A. That's the same question. Can you rephrase
11   it?
12   Q. What's confusing about it?
13   A. What do you mean by created?
14   Q. The word "create" means to produce. That
15   Velawcity prepared, drafted, wrote.
16   A. I don't know of any advertisements that they
17   created, sold to -- I guess my question to your answer
18   is no (verbatim.)
19   Q. Okay. So there are no advertisements that
20   Velawcity created that exist?
21   A. Not solo, no.
22   Q. Okay. These documents that you're looking at
23   that are Exhibit 60 --
24        MR. PROBUS: 57.
25        MS. VEITH: 57?

Page 199

1    BY MS. VEITH:
2    Q. Oh, yeah, that are Exhibit 57, did Velawcity
3    participate in the creation of them?
4    A. Potentially.
5    Q. Who would know the answer to that question, if
6    not you?
7    A. I don't know if anyone knows that.
8    Q. It's certainly one of the topics of this
9    deposition. So just to be clear, you were -- you did
10   not prepare by learning what role Velawcity had, if any,
11   in the creation of these advertisements; is that right?
12   A. I just told you.
13   Q. I don't believe you did.
14        So if you have an answer to the question
15   of what role Velawcity played, please tell me again
16   'cause I did not catch it.
17   A. They worked with counsel to create
18   bar-approved advertisements. To the granular level of
19   what words they chose to go on the advertisements, I
20   don't know.
21   Q. That's not what I asked you. I'm asking --
22        MS. GOOTT: Objection; argumentative.
23   BY MS. VEITH:
24   Q. -- if they participated at all --
25   A. You've never asked that.

Page 200

1         MS. GOOTT: That's a different question.
2    BY MS. VEITH:
3    Q. -- in the creation of these documents?
4         MS. GOOTT: You can answer that question.
5    It's a new question.
6    A. I believe they participated. To what extent,
7    I don't know.
8    BY MS. VEITH:
9    Q. All right. So for the ones that -- like for
10   example, turn to the second page, MMA-MB two 0s 1076.
11        It says, "by e-mail"; do you see that?
12   A. Where?
13   Q. At the top?
14   A. Where am I looking?
15   Q. Top left, "by e-mail" above John Doe?
16   A. Yes, I see that.
17   Q. Okay. I thought you testified earlier that
18   there were no ads sent out by e-mail.
19        Was -- were you mistaken?
20   A. No. There were no direct solicitation e-mails
21   sent.
22   Q. So to whom were e-mails sent in that case?
23   A. People that requested information.
24   Q. And how -- how was that information requested?
25   A. Manually.

50 (Pages 197 to 200)

John Moseley   April 8, 2025

1   Q.  And through what?  How manually?
2   A.  Do you have a specific example?
3   Q.  No, I'm asking you.
4   A.  I don't have a specific example.
5   Q.  So you don't know how they would have been
6   requested.  You just know they were requested?
7   A.  I mean, I know ways that you can request
8   e-mails.
9   Q.  Do you personally know of any way in which a
10  potential client requested an e-mail that was sent to
11  them?
12  A.  I have no personal knowledge of a personal
13  request for an e-mail.
14  Q.  And so on behalf of MMA, there's no knowledge
15  of potential clients requesting e-mails?
16      MS. GOOTT:  Objection; vague.
17  A.  I don't -- I don't believe we have that data,
18  no.
19  BY MS. VEITH:
20  Q.  So in -- flip to the page that ends in 1080.
21  A.  Okay.
22  Q.  This is another one where up at the top left
23  it says "by e-mail"; do you see that?
24  A.  Yes.
25  Q.  Following the text of the ad, there's the

1   bold, "Let the experts go to work for you and collect
2   the funds you deserve to get your property back to
3   normal"; do you see that?
4   A.  Yes.
5   Q.  And then it says, "To get started, simply
6   click here"; do you see that?
7   A.  Yes.
8   Q.  Was click here a hyperlink that sent a
9   potential client to a particular website?
10  A.  I would guess.
11  Q.  Do you know of a website that clients --
12  potential clients were sent to access through
13  advertisements?
14  A.  Mma-pllc.com.
15  Q.  It was your firm's website that --
16  A.  My firm.
17  Q.  -- they were directed to?  Mma pllc.com?
18  A.  I don't know if the specific ad sent them to
19  that.  But I know that you could sign up on our website.
20  Q.  Sure.  So that's not my question.  My question
21  was if you know where --
22      MR. PATTERSON:  Yes, it was.
23      MS. VEITH:  It was not, Mr. Patterson.
24  And I do believe you're not participating in this
25  deposition.

1   BY MS. VEITH:
2   Q.  If you know what the website was that this
3   hyperlink would send you to.
4       Was it your firm's website?
5   A.  I testified that I don't know if that's a
6   hyperlink.  But I believe it is.
7   Q.  Okay.  Do you believe that you know the
8   website that the hyperlink would send a potential client
9   to?
10  A.  This particular one?
11  Q.  Yes.
12  A.  No.
13  Q.  Do you know the website that a hyperlink would
14  send a potential client to in any ad that was sent out
15  on MMA's behalf?
16  A.  Are you asking me if I know a particular ad,
17  if it has a particular hyperlink and what that
18  particular hyperlink is?
19  Q.  I'm asking if there exists an ad that you
20  would know where the hyperlink within the ad sent the
21  potential client to?
22  A.  That's what I meant.
23  Q.  Yes.
24  A.  Like so do I know of a specific ad with a
25  specific hyperlink that sent to a specific landing page?

1   Q.  Correct.
2   A.  No.
3   Q.  Okay.  So then let's just kind of flip through
4   the next page, 1081.  There looks like it's a click here
5   learn more.  It's possibly a button that someone could
6   click on; do you see that?
7   A.  Yes.
8   Q.  And you don't know where that button would
9   have directed a potential client if clicked, correct?
10  A.  No.  But it looks like you can call the
11  Louisiana State Bar and ask 'cause it has bar number, a
12  bar advertisement number for all of these.  Every single
13  one has a Bar advertisement number, which would have the
14  hyperlink.
15  Q.  So you think a client could call the state bar
16  and ask?
17  A.  Yes.
18  Q.  Okay.  That wasn't my question, but thank you
19  for that information.  Next page --
20  A.  You just asked me that question.
21  Q.  -- 1082.
22      MS. GOOTT:  Object argumentative.
23  BY MS. VEITH:
24  Q.  1082.
25  A.  Yes.

51 (Pages 201 to 204)

John Moseley    April 8, 2025

Page 205

1      Q.  Same button, "Click here learn more"?
2      A.  Yes.
3      Q.  You don't personally know what website that
4  button might have linked you to?
5      A.  Sitting here, I don't know.  But it looks like
6  I could call the Louisiana State Bar and put this
7  advertisement number and get more information.
8      Q.  Okay.  Flip to 1085.  Same thing.  There's a
9  click here hyperlink at the bottom of this page.
10         You don't know what website this click
11  here would link you to?
12     A.  Sitting here, I do not know.  But it looks
13  like I could call the Louisiana State Bar and give them
14  LA-22-13014A and they would tell me.
15     Q.  1086.  There's a click here button.  Same
16  thing.  You don't know what website that hyperlinked to?
17     A.  I do not know where this went, no.
18     Q.  1087.  "Click here to learn more."
19         You don't know where that -- clicking that
20  button would direct you to?
21     A.  As I sit here today, I do not know.
22     Q.  Did you look at any point in time?  Just since
23  you qualified by "As I sit here today"?
24     A.  Yeah.  I mean, I remember a conversation with
25  ethics counsel for sure.

Page 206

1      Q.  Specifically about what website the potential
2  client would be directed to?
3      A.  I approved mockups for landing pages, yes.
4         THE REPORTER:  Mockups?
5         THE WITNESS:  Mockups, yes.
6  BY MS. VEITH:
7      Q.  Do you remember what -- what those landing
8  pages were?  What were they?  Mma-pllc.com?
9      A.  That was one of them.  I think one might have
10  been -- did we buy Lake Charles Strong maybe?  I don't
11  know.  We had some -- we had different landing pages.
12  Hurricanehelp.com maybe.  It's been three or four years.
13     Q.  What's the next page?  Was it 1087 or 1088?
14     A.  I'm on 1089.
15     Q.  I think it's 1088.  Just confirming that click
16  here, you didn't know -- sitting here today, you don't
17  know where that click here would lead you to, correct?
18     A.  Sitting here today, I don't know if that's a
19  hyperlink or where -- if it is, where it would lead to.
20     Q.  Where would -- do you know if it would be
21  something different than a hyperlink that you would
22  click on?
23     A.  What do you mean?
24     Q.  Well, you said you don't know if it's a
25  hyperlink.  Do you have an idea of something it would be

Page 207

1  other than a hyperlink?
2      A.  Could be a picture.  I don't know.
3      Q.  Did you send out advertisements where people
4  clicked on things and pictures popped up?
5      A.  We definitely had pictures in advertisements.
6      Q.  And those that you clicked on and the picture
7  popped up?
8      A.  I bet when you click on a link, pictures pop
9  up, yeah.
10     Q.  Pictures on a webpage, correct?
11     A.  Yeah.  It could be.
12     Q.  All right.  Exhibit No. 61.  So I'm curious
13  about this -- or sorry, 58.  It's my Tab 61.  Exhibit
14  No. 58.
15         (Exhibit 58 marked.)
16  BY MS. VEITH:
17     Q.  This document has an MMA-MB Bates number on
18  the bottom, but it also has a Velawcity Bates number on
19  the bottom.  And every page of the document has that.
20         Do you know why that is?
21     A.  I think we were overly diligent in producing
22  as much material as possible, including documents that
23  we reviewed from Velawcity's production.
24     Q.  So these documents, these invoices, they
25  didn't -- you didn't pull them from your own files; is

Page 208

1  that right?
2      A.  I don't know.
3      Q.  Do you have the invoices from Velawcity in
4  your own files?
5      A.  I would assume so.
6      Q.  Okay.  And would they have Velawcity Bates
7  stamped at the bottom of them?
8      A.  I'm sure we have copies of Velawcity Bates
9  stamped documents in our files.
10     Q.  Sure.  I'm asking two different questions.
11         The original invoices, which would have
12  been prior to any litigation, do you have those in your
13  files?
14     A.  I assume.
15     Q.  Okay.  And did -- those wouldn't have a
16  Velawcity Bates number on the bottom, correct?
17     A.  Would invoices that existed before the
18  Velawcity litigation or the MMA Morris Bart litigation
19  exist?  Yes.
20     Q.  Okay.  Can you produce those to me?
21         MS. GOOTT:  And if they're duplicates, do
22  you want the same thing?
23         MS. VEITH:  Well, they're -- I mean, this
24  is from Velawcity, which is quite obvious --
25         MR. PATTERSON:  Yes or no?

52 (Pages 205 to 208)

John Moseley    April 8, 2025

<table>
<tr><td colspan="2">

Page 209

1    MS. VEITH: -- because it has the page
2  stamped across the top. So I'd like to see the
3  documents in MMA's files --
4    MS. GOOTT: No, I'm just -- I
5  understand--
6    MS. VEITH: -- that evidence MMA's
7  payment of the invoices.
8    MS. GOOTT: I understand. But I'm asking
9  you if these documents are identical except for the
10  Velawcity Bates stamp, you want us to go through that
11  effort of producing identical documents to you?
12    MS. VEITH: I don't necessarily need
13  identical documents. I don't believe they will be
14  identical because I don't believe they will have the
15  "paid" stamp that Velawcity put on the documents.
16    MS. GOOTT: Okay. So it's the identical
17  document -- if it is the identical document minus the
18  "paid," you still want us to go through that?
19    MS. VEITH: Well, I would like just MMA
20  to search its actual files and produce documents that it
21  maintains in its records --
22    MR. PATTERSON: Make work. Make work.
23    MS. VEITH: -- so that's -- that's the
24  request that I have.
25    MR. PATTERSON: Make work.

</td><td>

Page 211

1  (inaudible.)
2    MS. GOOTT: -- I'm asking you --
3    MR. PROBUS: -- and you want to hide
4  documents.
5    MS. GOOTT: We want to hide when we
6  handed it to you?
7    MR. PROBUS: Shame on you.
8    MS. GOOTT: We gave it to you.
9    MR. PROBUS: Shame on you.
10    MS. GOOTT: Shame on me for what? For
11  giving you exactly --
12    MR. PROBUS: (Inaudible.)
13    MS. GOOTT: And, Matt, if this
14  document --
15    MR. PROBUS: (Inaudible) you get
16  Velawcity's file and now MMA --
17    MS. GOOTT: -- hold on -- hold on. Matt,
18  if this document is identical --
19    MR. PROBUS: You won't know until you get
20  them. If you get them --
21    MS. GOOTT: -- Matt, Matt, just listen.
22  Listen to me --
23    MR. PROBUS: (Inaudible.)
24    MS. GOOTT: Listen, I know you're the big
25  man in the room. And you want to talk over me.

</td></tr>
<tr><td>

Page 210

1    MR. PROBUS: It's not make work. You're
2  assuming --
3    MS. GOOTT: Hold on --
4    MR. PROBUS: -- you're assuming it's make
5  work --
6    MS. GOOTT: -- hold on. Hold on. If --
7    MR. PROBUS: -- but before you even get
8  the paperwork.
9    MS. GOOTT: Rebekka -- Rebekka --
10    MR. PROBUS: It's hide work --
11    MS. GOOTT: -- Rebekka --
12    MR. PROBUS: -- you're hiding it. I know
13  that. You're hiding the documents. I love that.
14    MS. GOOTT: Rebekka -- Matt, go back to
15  your nap.
16    MR. PROBUS: Yeah, there ain't no nap
17  involved.
18    MS. GOOTT: Well, go --
19    MR. PROBUS: What's involved is you guys
20  hiding documents --
21    MS. GOOTT: You woke up --
22    MR. PROBUS: -- and not producing them --
23    MS. GOOTT: You woke up, and now you want
24  to make stuff up. I'm asking you --
25    MR. PROBUS: -- (inaudible) the request

</td><td>

Page 212

1    MR. PROBUS: I'm not.
2    MS. GOOTT: I'm asking you a question. I
3  want to be responsive and give you documents. It is my
4  understanding that everything that we produced to you is
5  the same thing that we have, except this was already in
6  a file from Velawcity. And the only difference is that
7  it has a "paid" stamp and a Velawcity Bates stamp.
8    My question to you, Rebekka, is, is your
9  request that you want us to go through and produce the
10  exact same document because you want to see it without
11  the paid stamp?
12    MS. VEITH: My request is that I'd like
13  you to confirm in writing --
14    MS. GOOTT: Happily.
15    MS. VEITH: -- that you have the
16  identical documents --
17    MS. GOOTT: Yes.
18    MS. VEITH: -- but I do believe there
19  were also requests made for documents evidencing the
20  actual payment, none of which have been received. So
21  that is something that I was asking Mr. Moseley if it
22  exists. And if it does, if we could see it.
23    MS. GOOTT: This evidences that it was
24  paid, correct? You asked for documents evidencing that
25  it was paid.

</td></tr>
</table>

53 (Pages 209 to 212)

Page 213

1    MS. VEITH:  Let me -- you know what?
2  Let's see if we clear up all of this --
3    MS. GOOTT:  But you're asking me if
4  there's anything different.
5    MS. VEITH:  I'm not asking you any
6  questions, Miriam.  And I'm happy to discuss after
7  the --
8    MS. GOOTT:  No, you just --
9    MS. VEITH:  -- deposition --
10   MS. GOOTT:  -- you've just --
11   MS. VEITH:  -- what documents I'm looking
12 for.  But right now, I'm asking Mr. Moseley questions --
13   MS. GOOTT:  Correct.
14   MS. VEITH:  -- and we'll finish the
15 deposition.  And then you and I can talk about what
16 might be lacking in the discovery responses.
17   MS. GOOTT:  All right.  Well, you asked
18 him if he would produce something to you.
19   MS. VEITH:  I asked him if it's possible
20 for him to do it.
21   MS. GOOTT:  Correct.  And that is
22 something that he's going to work through with
23 me.  And I would like to be responsive and get you what
24 you need.  If you don't want to talk about it now, we
25 can do it later.

Page 214

1    MS. VEITH:  Well, we'll talk about it at
2  the end of the deposition.  I'm happy to --
3    MS. GOOTT:  Great.
4    MS. VEITH:  -- almost done.  And I'd like
5  to just get through it.
6    MS. GOOTT:  No problem.
7    MS. VEITH:  -- the answers that
8  Mr. Moseley provides to the questions might (inaudible)
9  all of this.
10 BY MS. VEITH:
11   Q.  So if you could look at that document,
12 Mr. Moseley.  It's Exhibit 58.  Okay.
13      So this first page, MMA-MB two 0s 1091,
14 it's that Invoice 1572 which we've already looked at,
15 correct?
16   A.  Correct.
17   Q.  And that's for the $3 million, correct?
18   A.  (No response.)
19   Q.  There's a credit card surcharge, I understand.
20 And I was going to ask that next.  But --
21   MS. GOOTT:  Where are you looking that
22 says 3 million?
23   MS. VEITH:  Amount, 3 million.
24   MS. GOOTT:  Okay.  I was looking at the
25 payment, which is not.  But go ahead.  Just want to make

Page 215

1  sure I'm looking at the right thing.
2  BY MS. VEITH:
3    Q.  It's $3 million plus a 3 percent -- or
4  1.9 percent credit card surcharge, correct?
5    A.  Correct.
6    Q.  Okay.  And was this invoice paid?
7    A.  Yes.
8    Q.  And it was paid by MMA?
9    A.  I believe so.
10   Q.  Okay.  How -- how can we know so?
11   A.  I could ask my team to verify.  My accounting
12 team.
13   Q.  And that isn't something that you've done
14 hereto for?
15   A.  I have a total in my head of payments that
16 were issued to Velawcity.
17   Q.  Okay.  What's the total?
18   A.  $33.5 million.
19   Q.  Okay.  But if we went through this -- these
20 invoices one by one, you sitting here today could not
21 tell me with certainty that the particular invoice was
22 paid by MMA?
23   A.  Today, I could probably do that.  As we sit
24 here right now, I cannot.
25   Q.  Okay.  Well, let's go through.  And I'll ask

Page 216

1  you a slightly different question.  Next page, which
2  ends in 1092, Invoice 1634.
3      Is this an invoice that was received by
4  MMA from Velawcity?
5    A.  I believe so.
6    Q.  How would you know so?
7    A.  I would just need to get with our accounting
8  department.
9    Q.  Next page, MMA-MB 1093.  And I do just -- so
10 Topic No. 2 in your deposition notice is payments by you
11 to Velawcity pursuant to any agreements between you and
12 Velawcity relating to hurricane claims.
13      So I do just want to make clear, in
14 preparing for this deposition, you didn't determine with
15 certainty whether any of these payments and the invoices
16 that you produced were actually made by about MMA.
17      Is that your testimony?
18   A.  I think we're -- I'm not trying to be
19 difficult here.  But a majority, if not all of these
20 payments MMA is responsible for.  But the money could
21 have come from other places.
22   Q.  So --
23   A.  In almost all cases, it came from EAJF.
24   Q.  And were those payments made on behalf of MMA?
25   A.  If this is the MMA campaigns, yes.

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

Page 217

1    Q. Okay. So the page number ending in 1093,
2 Invoice No. 1709, sitting here today, you cannot tell me
3 with certainty if MMA received this invoice?
4    A. I mean, it looks like --
5       MS. GOOTT: Objection; that
6 mischaracterizes his testimony.
7    A. I mean, it says it was mailed to us. So I
8 assume we received it.
9 BY MS. VEITH:
10    Q. Okay. Do you assume that you -- MMA or
11 someone on MMA's behalf paid it?
12    A. I assume all of these invoices were paid.
13    Q. And to know that with certainty, you will need
14 to speak with your accounting department?
15    A. Yeah, I mean, I just haven't gone up and added
16 these up individually. I haven't memorized the numbers.
17 What if you snuck one in here that's MMA's?
18    Q. Well, so that's why I want to go through them.
19 Because I certainly am not intending to do that. So
20 next document --
21    A. But I still haven't memorized them one by one.
22    Q. Sure. But you're looking at them now. So you
23 can -- I think you would be able to tell me if there's
24 one I snuck in; is that right?
25       MS. GOOTT: I'm going to -- objection.

Page 218

1 There's no reason to argue with him.
2       MS. VEITH: I'm asking a question.
3       MS. GOOTT: No, you're not asking him.
4 You're saying, "I assume that you would go through that
5 I didn't sneak one in." He told you he prepared. He
6 told you he knew the number. He knows how much he paid.
7 He doesn't have these memorized. And we don't have to
8 argue with him.
9       MS. VEITH: We're going to go through
10 them one by one.
11 BY MS. VEITH:
12    Q. So next page, MMA-MB two 0s 1094, Invoice
13 1747. Is this an invoice that was sent to MMA?
14    A. It says it was.
15    Q. Is it an invoice that was received by MMA?
16    A. I believe so.
17    Q. Is it an invoice that was paid by or on MMA's
18 behalf?
19    A. I believe so.
20    Q. Next page, MMA-MB two 0s 1095. This is also
21 Invoice 1752. But it has a different -- no. The first
22 one was 1572. This is 1752.
23       Was this invoice sent to MMA?
24    A. It says it was.
25    Q. Was it received by MMA?

Page 219

1    A. I believe -- I have no reason to believe it
2 wasn't.
3    Q. Was it paid by MMA or on MMA's behalf?
4    A. I believe so.
5    Q. MMA-MB 1096, the next page. Invoice 1781 --
6    A. Yes.
7    Q. -- was this invoice sent to MMA?
8    A. I believe so.
9    Q. Was it received by MMA?
10    A. I have no reason not to believe so.
11    Q. Was it paid by MMA or on MMA's behalf?
12    A. I don't know -- I don't believe that
13 Invoice 1781 was paid on MMA's behalf.
14    Q. Okay. And why is that?
15    A. 'Cause I think it was paid on Krause &
16 Kinsman's behalf.
17    Q. So although it was billed to McClenny Moseley
18 and Associates, it was paid by Krause & Kinsman?
19    A. Maybe. Same thing with -- the names are
20 different. And other firms use Velawcity. So I don't
21 know if -- you know. I don't know. The names --
22 because the naming of the invoices aren't clear, I don't
23 know if -- you know...
24    Q. And if it was an invoice that was intended for
25 and sent to Krause & Kinsman, would it be in MMA's

Page 220

1 files?
2    A. It could be if they sent it.
3    Q. All right. Next one, MMA-MB two 0s 1097.
4 Invoice 1806. Is this an invoice that was sent to MMA?
5    A. It says it was.
6    Q. Was this an invoice that was received by MMA?
7    A. I have no reason to believe it wasn't.
8    Q. Was it paid by or on behalf of MMA?
9    A. I don't know.
10    Q. Okay. Next page, MMA-MB two 0s 1098,
11 Invoice 1830. Is this an invoice that was sent to MMA?
12    A. It says it was.
13    Q. Was it received by MMA?
14    A. I have no reason to believe it wasn't.
15    Q. Was it paid by MMA or on MMA's behalf?
16    A. I have no reason to believe it wasn't.
17    Q. And, finally, MMA-MB two 0s 1099, Invoice
18 1831. Is this an exhibit that -- or excuse me, an
19 invoice that was sent to MMA?
20    A. It says it was.
21    Q. Was it received by MMA?
22    A. I have no reason to believe it wasn't.
23    Q. And was it paid by MMA or on MMA's behalf?
24    A. I have no reason to believe it wasn't.
25       MS. VEITH: We'll request on the record

55 (Pages 217 to 220)

John Moseley    April 8, 2025

Page 221

1  that MMA produce invoices actually in its files and
2  documents evidencing MMA's payment of those invoices,
3  particularly in light of Mr. Moseley's testimony that
4  some of these invoices may not have been paid by MMA or
5  on MMA's behalf.
6        MS. GOOTT:  Do you want to -- do you want
7  to take a quick little break so we can get to the answer
8  of that so I can get it for you?
9        MS. VEITH:  Sure.
10       MS. GOOTT:  Okay.
11       MS. VEITH:  Let's go off the record.
12       THE VIDEOGRAPHER:  The time is 3:07 p.m.,
13  and we're off the record.
14       (A break was taken from 3:07 p.m. to
15       3:23 p.m.)
16       (Exhibit 59 marked.)
17       THE VIDEOGRAPHER:  The time is 3:23 p.m.,
18  and we are back on the record.
19  BY MS. VEITH:
20    Q.  Okay.  Mr. Moseley, I'm marking a document as
21  Exhibit 59 that's titled "Transaction Report MMA Law
22  Firm."  So let's switch.
23       Tell me what this document is?
24    A.  This is a document we just created at your
25  request to summarize payments in our internal system

Page 222

1  going to Velawcity.
2    Q.  Okay.  And the total amount is about
3  28.95 million, correct?
4    A.  Yes, ma'am.
5    Q.  So that's slightly off from the number that
6  you previously told me.
7       Is this document's number the number that
8  I should be relying on?
9    A.  I still believe that MMA paid around 33 and a
10  half million dollars to Velawcity.  Just with a quick
11  gathering of information, this is what we were able to
12  capture.
13   Q.  Okay.  This is a list of -- it has several
14  columns.  The first is transaction date.  Then there's
15  transaction type.  Then there's NUM.
16       Does that stand for number?
17   A.  (Reading.) I don't know what that stands for.
18   Q.  Okay.  And then there's name and then
19  category/product/service amount.
20       Does that fairly represent the columns in
21  this document?
22   A.  Yes.
23   Q.  Is there a way for me -- other than just
24  matching the amounts, is there a way for me to tell if a
25  particular payment on this transaction report

Page 223

1  corresponds to a particular invoice?
2    A.  I think matching it with the invoice would
3  probably be the most efficient way.
4    Q.  And when you say the invoice, you mean the
5  invoice amount?
6    A.  Yes.
7    Q.  Okay.
8    A.  Or date.
9    Q.  Okay.  Do you -- so at the very bottom, the
10  last row is a payment on April 25th, 2022.  It says,
11  "Bill."  And then there's an 1824 in the NUM column.
12       Would that be an invoice number, or is it
13  a check number?
14   A.  I'm not sure.
15   Q.  Okay.  Is there any way within MMA system to
16  match up payments to invoices?
17   A.  Is there any way in MMA system to match up
18  payments with invoices?
19   Q.  Correct.
20   A.  Yes.
21   Q.  What is that way?
22   A.  Manual.
23   Q.  Okay.  And that, as of today, has not been
24  done.  Is that fair to say?  For these Velawcity
25  payments?

Page 224

1    A.  We just created this document.  So we have not
2  done more work with this document we just created.
3    Q.  Okay.  So I think you answered my question
4  yes, but just to be clear.  And I'm just -- I want to
5  understand the universe I'm working with.
6       Sitting here at this very moment, there is
7  no manually-created document that matches payments to
8  invoices?
9    A.  Not specifically for Velawcity.
10       MS. GOOTT:  I asked.  We would have given
11  --
12       MS. VEITH:  I understand.  I understand.
13  BY MS. VEITH:
14   Q.  Take a look at -- so keep Exhibit 59 in front
15  of you, and then put Exhibit 58 in front of you as well.
16       So the first invoice in Exhibit 58 is for
17  a total of $3,058,103.98; do you see that?
18   A.  Yes, ma'am.
19   Q.  And on Exhibit 59, five lines down, there
20  is --
21   A.  Oh, sorry.  I was --
22   Q.  -- there is a payment in that amount to
23  Velawcity, correct?
24   A.  Yeah.  I marked on this exhibit.  Can I just
25  exchange it?

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

| Page 225 | Page 227 |
|---|---|

**Page 225**

1    MS. VEITH: Sure.
2    MS. GOOTT: Do you want to switch?
3    THE WITNESS: Yeah.
4    (A brief discussion was held off record.)
5    MS. VEITH: Yeah, we'll -- I got it.
6    We'll put a new 59 on the clean one. And you just keep
7    marking up the one --
8    THE WITNESS: Yeah, I was just trying to
9    identify the --
10    MS. VEITH: I got it.
11    THE WITNESS: -- invoices.
12    MS. VEITH: Totally fine. Miriam, you'll
13    just put that on the pile and we're done. So he can
14    keep marking up --
15    (A brief discussion was held off record.)
16    BY MS. VEITH:
17    Q. So next page, MMA-MB two 0s 1092 is an invoice
18    for a total of $2,036,698, correct?
19    A. Yes.
20    Q. And if you go three more lines down from the
21    last payment we looked at, there is a payment in that
22    amount to Velawcity on Exhibit 59, correct?
23    A. Correct.
24    Q. The next invoice, MMA-MB two 0s 1093, it's for
25    a payment of $39,756; do you see that?

**Page 226**

1    A. Yes.
2    Q. And there is no similar payment reflected on
3    Exhibit 59, right?
4    A. No.
5    Q. There are, however, references to payments
6    made to a Light Snap account that are debited on this
7    invoice. Do you see that?
8    A. I do.
9    Q. And one is for $500,000, 2/25/2022?
10    A. Yep.
11    Q. And then if you look at Exhibit 59, underneath
12    the last payment on 2/23/22, there's a $500,000 payment
13    to Velawcity?
14    A. I see it.
15    Q. Okay. And then the next debit on Exhibit 58,
16    page MMA-MB 1093, is payment made to Light Snap on March
17    18, 2022 for $1.5 million; do you see that?
18    A. I do.
19    Q. And then over on Exhibit 59, the next payment,
20    which is dated March 16, 2022 to Velawcity is for
21    $1.5 million, correct?
22    A. Yes, ma'am.
23    Q. Okay. All right. Next invoice, MMA-MB two 0s
24    1094 is for $998,059; do you see that?
25    A. Yes.

**Page 227**

1    Q. And then over on Exhibit 59, the next payment,
2    which is dated May 2nd, 2022 is for $998,059; do you see
3    that?
4    A. Yes, ma'am.
5    Q. Okay. The next page of Exhibit 58, MMA-MB
6    1095 is for a total of $3,591,954.02; do you see that?
7    A. Yep.
8    Q. And there is no identical payment on
9    Exhibit 59, correct?
10    A. There is not.
11    Q. However, there is a payment -- there are two
12    payments both made on June 16th; do you see that?
13    A. I do.
14    Q. And; first one is for $3,395,000; do you
15    see that?
16    A. Yes.
17    Q. And the next is for $196,954.02; you see that?
18    A. Yep.
19    Q. Okay. All right. The next page of
20    Exhibit 59, MMA-MB two 0s 1096, is for a total payment
21    of $3,114,224.14; do you see that?
22    A. Yes.
23    Q. And there is no identical payment reflected on
24    Exhibit 59, correct?
25    A. Correct.

**Page 228**

1    Q. There is a payment on August 2nd for just a
2    flat 3 million, correct?
3    A. Yes.
4    Q. Is it possible that that's related to this
5    invoice which was sent on July 18th?
6    A. Like Kevin Garnett said, anything's possible.
7    Q. But you -- you don't know?
8    A. Yeah.
9    Q. Okay. Next page, MMA-MB two 0s 1097 for
10    $848,212.77?
11    A. Yep.
12    Q. You see that?
13    And there's not a corresponding payment on
14    the Exhibit 59, correct?
15    A. Correct.
16    Q. Okay. MMA-MB two 0s 1098 is an invoice for a
17    flat $1 million, correct?
18    A. Correct.
19    Q. There is no flat one-million-dollar payment on
20    Exhibit 59, correct?
21    A. There is not.
22    Q. However, if you look to MMA-MB two 0s 1099,
23    it's also an invoice for a flat $1 million on
24    November 18th, 2022?
25    A. (No response.)

57 (Pages 225 to 228)

John Moseley    April 8, 2025

Page 229

1    Q.  You see that?
2    A.  Yes.
3    Q.  And the previous invoice was dated
4  November 14th, 2022, correct?
5    A.  Yes.
6    Q.  And there is a two-million-dollar payment, but
7  -- that is on the invoice.  Although that was made in
8  August of 2022, correct?
9    A.  Correct.
10    Q.  And that is the sum total of Exhibit -- or of
11  invoices that make up Exhibit 58.
12    MS. VEITH:  So I would just ask on the
13  record for the production of any additional invoices
14  from Velawcity that MMA has in its possession that may
15  relate to the payments detailed on the transaction
16  report that is Exhibit 59.
17  BY MS. VEITH:
18    Q.  Okay.  Exhibit 60 is MMA-MB three 0s 234.
19    THE REPORTER:  2 what?
20    MS. VEITH:  34.
21    (Exhibit 60 marked.)
22    A.  (Reading.)
23  BY MS. VEITH:
24    Q.  And this document is an e-mail with the
25  subject line "Cease and Desist," correct?

Page 230

1    A.  Correct.
2    Q.  And the e-mail is dated February 5th, 2023,
3  correct?
4    A.  Correct.
5    Q.  And in the e-mail on February 5th, 2022,
6  Mr. Huye e-mails Tighe Wilhelmy and says, "This e-mail
7  will confirm that MMA directs you to cease and desist
8  all advertising on its behalf per our consulting
9  agreement"; you see that?
10    A.  Yes.
11    Q.  After February 5th, 2023, were -- did MMA sign
12  -- eventually reach agreements to represent any clients
13  who were screened as potential clients by Velawcity
14  following February 5th, 2023?
15    Or is this the last day that Velawcity
16  would have screened potential clients for MMA?
17    A.  This would have been the last day.  I guess
18  the universe exists where they could have screened a
19  client and then we did not get the client or -- you
20  know.  We did not -- the client could have reached us in
21  different avenues, I guess, is what I'm saying.
22    Q.  Why was MMA directing Velawcity to cease and
23  desist all advertising?
24    A.  This was the day of or day after the
25  Fernadovich (phonetic) hearing where --

Page 231

1    THE REPORTER:  The what hearing?
2    THE WITNESS:  Fernadovich (phonetic.)
3  It's a case.
4    A.  Where Mr. Matthew Modsin made some pretty
5  egregious allegations.  And on advice of counsel and out
6  of abundance of clearance -- or clearance of abundance,
7  we decided to send a cease and desist to Velawcity
8  (verbatim.)
9    MS. VEITH:  Give me one second to confer
10  with Mr. Probus.  I think I might be done.  Okay.
11    Thank you, Mr. Moseley, for your time.  I
12  tender the witness.  No questions?
13    MS. GOOTT:  No.
14    MS. VEITH:  All right.  Thank you so
15  much, Mr. Moseley.
16    THE VIDEOGRAPHER:  Before we go off the
17  record, did y'all need a copy of the video or
18  transcript?
19    MS. GOOTT:  We just need a read and
20  review.  That's all.
21    THE VIDEOGRAPHER:  All right.  The time
22  is 3:36 p.m., and we're off the record.
23    (Whereupon, the deposition was concluded
24    at 3:37 p.m., and further the deponent
25    saith not.)

Page 232

1    CHANGES AND SIGNATURE
2  PAGE LINE    CHANGE    REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

58 (Pages 229 to 232)

John Moseley   April 8, 2025

## Page 233

1      I, JOHN MOSELEY, have read the
foregoing deposition and hereby affix my signature that
2    same is true and correct, except as noted above.
3
4
    _____
5         JOHN MOSELEY
6
7    THE STATE OF _____)
     COUNTY OF _____)
8
        Before me, _____, on
9    this day personally appeared JOHN MOSELEY, known to me
     (or proved to me under oath or through
10   _____) (description of identity
     card or other document)) to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
     to me that they executed the same for the purposes and
12   consideration therein expressed.
        Given under my hand and seal of office this
13   _____ day of _____, 2025
14
15
    _____
16       NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
         COMMISSION EXPIRES: _____
17
18
19
20
21
22
23
24
25

## Page 234

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRGICT OF TEXAS
2                  HOUSTON DIVISION
     MMA LAW FIRM, PLLC,      )
3                             )
          PLAINTIFF,          )
4                             )
     VS.                      ) Civil Action No.
5                             ) 4:24-cv-4446
     MORRIS BART, LLC,,       )
6                             )
          DEFENDANT.          )
7                             )
                              )
8    *********************************************************
          REPORTER'S CERTIFICATION
9         DEPOSITION OF JOHN MOSELEY
              April 8, 2025
10
11      I, Toyloria Lanay Hunter, Certified Shorthand
12   Reporter in and for the State of Texas, hereby certify
13   to the following:
14      That the witness, JOHN MOSELEY, was duly sworn
15   remotely by the officer and that the transcript of the
16   oral deposition is a true record of the testimony given
17   by the witness;
18      That the deposition transcript was submitted on
19   _____to the witness or to the
20   attorney for the witness for examination, signature and
21   return to me by _____;
22      That the amount of time used by each party at the
23   deposition is as follows:
24   MS. VEITH.....04:50:24
25

## Page 235

1       That pursuant to information given to the deposition
2    officer at the time said testimony was taken, the
3    following includes counsel for all parties of record:
4    Miriam T. Goott, Attorney for MMA LAW FIRM, PLLC
5    Rebekka C. Veith, Attorney for MORRIS BART LLC
6    Matthew Probus, Attorney for MORRIS BART LLC
7    Natalie Galerne, Attorney for THE UCC
8       I further certify that I am neither counsel for,
9    related to, nor employed by any of the parties or
10   attorneys in the action in which this proceeding was
11   taken, and further that I am not financially or
12   otherwise interested in the outcome of the action.
13
14      Certified to by me this 14th day of April, 2025.
15
16
17   _____
     Toyloria Lanay Hunter
18   Texas CSR No. 7978
     Expiration Date:  09/30/2026
19   WORLDWIDE COURT REPORTERS, INC.
     FIRM REGISTRATION NO.223
20   3000 Weslayan
     Suite 235
21   Houston, Texas 77027
     Tel: 800.745.1101
22   Fax: 713.572.2009
23
24
25

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

**A**
**A-R-O-M-I**
  88:24
**a.m** 1:17 10:2
  45:10,12,13,15
  105:9,10,11,13
**able** 17:25
  217:23 222:11
**above-styled**
  1:16
**abundance**
  139:5 231:6,6
**Academy** 13:16
  13:18 19:22
**accept** 38:17
  70:18,21
  177:16
**accepted** 43:6
  183:9,10
  184:22
**accepting** 38:20
  39:1
**access** 51:14
  78:22,24,25,25
  79:2,4,10,12
  79:12 143:9
  143:22 202:12
**account** 82:19
  100:7,14 226:6
**accounted**
  131:24
**accounting** 6:6
  80:15,16
  215:11 216:7
  217:14
**accurately**
  112:18
**achieved** 95:19
  95:21
**acknowledged**
  233:11
**acknowledgm...**
  39:4,6 54:19
**acquainted**
  13:15

**acquired** 56:5
  57:2
**acquiring**
  166:13
**acquisition**
  139:15
**acronym** 49:4
  150:1
**Act** 60:25
**action** 1:4 76:19
  234:4 235:10
  235:12
**activated** 150:17
**actively** 179:9
**actual** 30:16
  39:8 50:1 72:6
  151:15 181:7
  193:17 194:19
  209:20 212:20
**ad** 201:25
  202:18 203:14
  203:16,19,20
  203:24
**Adam** 5:9,14
  8:14 64:16
  65:3 151:7,21
  153:20
**add** 111:15
  178:6
**added** 124:10
  175:15 217:15
**addiction** 105:6
**adding** 115:7
  178:12
**additional** 51:20
  118:4 166:19
  178:7 229:13
**additionally**
  128:1
**address** 23:14
  44:3,5,6 51:19
  53:9 54:5
  80:17 100:11
  143:21,22
  144:11

**addressed**
  142:20,25
  143:5,6
**addresses** 91:2
  104:10,11
**adjuster** 20:23
  21:1 40:20
**adjusters** 77:24
**administrative**
  20:9 21:13
  84:13,16
  113:14 155:18
**Adobe** 76:25
**adopted** 112:21
**ads** 7:9 16:3
  118:13,15,22
  200:18
**advertise** 182:9
**advertised** 15:22
**advertisement**
  9:20 88:4
  102:24 103:1,6
  103:20,22
  104:8 198:2
  204:12,13
  205:7
**advertisements**
  196:4,8 197:2
  197:12,14,16
  197:17 198:4,8
  198:16,19
  199:11,18,19
  202:13 207:3,5
**advertising**
  14:14,15,18,19
  14:19 15:15,16
  15:16,21,24
  67:11 69:6,7,9
  69:10,21,23
  81:2,5 85:19
  94:25 104:18
  104:19,24,25
  105:3 150:21
  230:8,23
**advice** 231:5

**Advocate** 7:18
  18:5,8,10
  47:13,20 48:23
  61:20 62:5
  64:4 126:13,16
  131:2,9,11
  152:25 153:4
  194:25
**Advocates** 40:10
**affect** 122:23
**affidavit** 44:4,9
**affirmatively**
  25:2
**affix** 233:1
**affixed** 120:18
**afternoon** 126:2
**Agency** 6:24
  107:23 108:1
**agent** 80:5 84:17
  86:8 87:4 88:8
  104:4 113:23
  137:6,20,21
**agents** 88:2
  101:6 137:17
  137:25
**aggressive** 179:7
**ago** 113:11
  135:23 140:17
  177:16 190:10
**agree** 73:24
  111:8 123:21
  176:10
**agreed** 76:17
  77:3 93:23
  94:23,25
  100:22 124:15
  188:8
**agreeing** 95:5,11
**agreement** 6:12
  7:6 8:16,17
  9:14 32:16
  41:22 42:3
  84:7,12 86:10
  86:16,22 87:7
  87:10 90:6

**91:8,15 92:1**
  92:24 93:24
  113:4,12,25
  114:12,20,21
  114:23,24
  115:1,5,6
  116:14,17,25
  118:2 157:22
  159:1 174:25
  176:20 184:12
  188:11 230:9
**agreements**
  32:21 57:1
  87:13 90:12,16
  90:17,25 91:18
  92:9,15 115:4
  156:17 157:16
  183:15,16
  216:11 230:12
**agrees** 86:4 91:9
  91:21 93:18
  115:13
**ahead** 21:18
  44:20 144:24
  148:8 192:13
  214:25
**ain't** 210:16
**AKW** 187:20
**AL** 3:15,18,24
  4:6,13,20,23
  5:4,9,12,14,16
  5:19,21,24 6:4
  6:10,17,22 7:4
  7:9,11,14,17
  7:20,23 8:4,6
  8:11,14,20,22
  9:3,9,12,17,24
**ALA** 7:4
**Alabama** 63:21
**allegations**
  231:5
**allowed** 104:21
**allows** 7:4 110:5
  110:15
**ambiguous**

John Moseley    April 8, 2025

Page 237

153:12
**AMENDED**
3:11
**Amex** 95:21,23
**amount** 81:5,11
81:21 112:8
123:5 214:23
222:2,19 223:5
224:22 225:22
234:22
**amounts** 222:24
**and--** 2:11
**and/or** 40:20
87:18,19 178:7
**ANDREAS** 8:11
**anniversary**
179:10
**another's** 155:7
**answer** 11:20
23:3 24:8 27:9
28:2,3,6,13
58:4,6,19
67:14 78:5,15
84:24 138:6
145:3,6 146:14
154:3 155:10
155:11 178:18
179:15 180:6
186:6 188:16
189:3,19,24
191:9,22
192:13 193:4
194:14 198:17
199:5,14 200:4
221:7
**answered** 22:8
22:23 30:12
64:6 77:23
92:12 96:9,19
117:6 185:17
195:11 224:3
**answering** 23:9
**answers** 43:6,11
44:1,9,18
46:17 47:3

48:22,24,25
52:19,20 214:7
**anything's**
228:6
**anyway** 139:9
**apart** 161:7
**Apex** 52:12
**API** 4:18 8:11
49:1,3 149:19
149:21 150:1,2
150:2,3 174:2
**apologize** 53:21
**appear** 146:4
175:8
**Appearances**
2:1 3:3
**appeared** 149:7
233:9
**appears** 127:5
157:25 161:14
174:12
**Appellant** 1:6
**applicable** 60:21
68:10
**apply** 68:13
**appreciate**
48:16 58:17,23
192:1
**appropriate**
137:6,12
191:20
**approval** 6:20
102:21 103:3
197:18
**approve** 136:24
**approved**
102:22 103:1
104:25 105:3
136:23 137:4
138:10 197:16
198:2 206:3
**April** 1:11,17
8:3,5,8,10,13
10:2 135:22
141:22 150:13

151:8,21,25
223:10 234:9
235:14
**Arbitration**
60:24
**arbitrations**
165:6
**architecture**
38:2,4 131:2,3
131:10
**argue** 96:17,19
144:23 145:2
186:14 187:5
194:7,13 218:1
218:8
**argue--** 189:17
**arguing** 96:11
194:13
**argumentative**
73:16 96:9
134:9 142:10
143:4 155:8
199:22 204:22
**argumentive**
95:7
**arising** 55:6
**Aromi** 53:18
88:22,24
**arrangements**
86:6 154:22
157:5,10,12,14
**arrived** 95:25
**arrows** 147:23
**articulate**
147:10,12,15
**asap** 110:13
111:20 118:22
124:6 168:21
**aside** 31:8 52:14
**asked** 21:19
22:12,16,18,19
22:20 46:25
47:25 48:8,12
48:20,22 53:8
54:3 57:3,9,15

64:5 68:7 78:3
78:7 85:2,4,5,9
92:11 135:1
139:7,12
142:11,25
143:1,5 144:25
145:5 173:13
178:20 185:16
195:10 197:4
197:12 199:21
199:25 204:20
212:24 213:17
213:19 224:10
**asking** 17:22
21:17 23:2
27:11 29:1
30:19 33:14
34:9,23 35:5,8
48:9 53:1 57:8
57:12 68:8
79:17 85:21
102:25 120:15
123:21 134:4
142:22 145:19
145:20 146:2
149:19 150:15
151:16 153:1
171:12 176:1,9
176:10,20
179:13 189:11
190:22 192:11
199:21 201:3
203:16,19
208:10 209:8
210:24 211:2
212:2,21 213:3
213:5,12 218:2
218:3
**asks** 23:24 32:12
47:7 54:23
75:8 173:7,11
178:4 189:6
**Aspey** 181:22
182:13 183:19
184:3 187:8,15

188:22 192:20
193:1,12,15
194:17
**assigned** 74:3
**assist** 56:16,17
**assistant** 21:13
**assisted** 49:24
50:1 127:9
197:6
**Associates** 8:12
119:24,25
120:3,21
122:19 136:16
158:6 159:21
183:17,22
184:6,17 185:8
219:18
**Associates'**
171:16
**Association** 61:1
**assume** 13:2
14:5 16:5
23:14 34:17
49:1 62:2 65:3
68:13 79:11
103:21 109:1
140:16 144:9
144:14 145:10
145:12 150:20
159:7 208:5,14
217:8,10,12
218:4
**assumed** 45:19
49:6
**assumes** 14:3
30:2 35:23
39:2 60:4
70:23 73:10
92:20 95:14
108:15 132:16
163:7 165:23
171:7 182:15
184:10 187:17
188:23
**assuming**

John Moseley   April 8, 2025

**assumptions**
   96:6
**atop** 120:4
**attached** 1:23
   26:2 41:15,17
   43:5 59:20
   60:9,13 75:14
   80:22 102:24
   109:8 119:19
   120:14,22,25
   123:16 142:1
   144:8 164:20
**attaching** 25:22
   154:1 168:12
**attachment** 4:12
   4:15,21 5:7 6:8
   8:15 19:5,8
   26:1 41:14,25
   43:9 50:18
   51:1 52:11
   59:9 80:24
   82:12 83:4,6,9
   83:11,14,14
   102:16 110:8
   111:24 119:8
   121:10 124:19
   124:24 153:17
   164:6 167:9
   172:13,14,17
   185:6
**attachments**
   3:16 4:9 19:1,2
   25:25 80:13
   119:22 144:12
   146:8 180:17
   180:19 181:2,8
   183:14
**attempting**
   131:25
**attorney** 20:11
   20:12 33:15
   35:9 41:18
   59:20 74:3
   88:16 111:25
   112:13 121:21

122:4 124:25
   162:15,18
   163:18 164:21
   187:9,24 188:9
   192:21 234:20
   235:4,5,6,7
**attorney's** 34:10
   34:13,23 35:5
   35:8,19 110:5
   110:15,23
   112:7
**attorney/client**
   86:6 91:8,20
   188:6
**attorneys** 7:4
   20:9 34:4 37:4
   53:13,14,15
   60:16 88:10,12
   98:9 112:16,21
   164:24 235:10
**August** 3:20,23
   4:5,8,10,13 9:5
   9:8 31:18,22
   31:24 32:1,5
   32:12 33:9
   36:16 37:18
   43:2 168:2,17
   169:15 228:1
   229:8
**author** 189:10
**authority**
   106:24 107:2,6
   107:11,12
   108:11,24
   164:13 166:15
   166:18,21
   168:14
**authorization**
   60:17 86:11
   159:16,17
   162:19 166:6
   166:10
**authorize** 158:2
   159:23 166:9
**authorized**

164:24
**auto** 22:6 24:12
**automated** 74:9
   74:15 131:9
   150:17 157:25
**automation** 38:6
   74:4 131:11
**autopopulate**
   23:17,25 24:5
**autopopulated**
   24:12
**Avenue** 2:8
**avenues** 88:1
   230:21
**averaging** 106:9
**aware** 63:15
   66:1 170:18

---

**B**

**B** 3:9 4:1 5:1 6:1
   7:1 8:1 9:1
**back** 19:13
   21:25 30:23
   45:15 65:1,20
   71:5 72:25
   75:12 103:14
   105:13 108:5
   110:11 111:2
   115:18 120:7
   120:13 123:20
   124:10,18
   125:21 127:11
   131:12 146:15
   146:18 151:17
   159:4 180:18
   180:21 193:25
   194:13 202:2
   210:14 221:18
**backward** 72:25
**bad** 109:12
   122:22,25
   124:14
**balance** 94:8
   117:12 158:22
   160:8 175:12

**bar** 172:2
   197:17 204:11
   204:11,12,13
   204:15 205:6
   205:13
**bar-approved**
   199:18
**Barcus** 110:17
   111:3 112:14
**Barnett** 2:21
**Bart** 1:5 2:7,12
   17:6,13 29:20
   154:23,25
   183:10 208:18
   234:5 235:5,6
**base** 175:9
**based** 21:13
   22:6 24:1
   41:21 59:24
   84:17 89:12
   100:10 138:25
**basis** 69:2
   154:12
**Bates** 12:23 13:1
   16:24 18:22
   19:2 31:14,25
   32:4 33:3
   36:12 40:14
   41:8,9 42:19
   46:7 49:12
   50:10 59:10
   113:2,2 118:8
   119:6 141:20
   152:2,4,9,22
   153:8 157:22
   157:23 159:12
   169:13 172:16
   175:2 177:7
   182:1 196:1
   207:17,18
   208:6,8,16
   209:10 212:7
**Bauler-O'Gra...**
   2:23
**became--** 193:12

**began** 155:7
**beginning** 46:7
   46:24 57:1
   97:22 113:21
**begins** 18:22
   30:15 36:15
   76:11 84:3
   113:17
**behalf** 11:8
   32:18,22 54:19
   91:19 106:25
   114:23 134:3
   136:11 152:16
   157:11 201:14
   203:15 216:24
   217:11 218:18
   219:3,11,13,16
   220:8,15,23
   221:5 230:8
**belief** 149:9
**believe** 13:16
   17:14 47:23
   63:5 69:8 72:5
   78:20 81:24
   88:21 89:18,21
   100:16 112:16
   120:16 127:9
   137:11 138:24
   143:9,10 144:6
   145:7,24 150:6
   159:25 166:3
   166:25 169:17
   174:11 178:14
   178:19 187:18
   191:16 199:13
   200:6 201:17
   202:24 203:6,7
   209:13,14
   212:18 215:9
   216:5 218:16
   218:19 219:1,1
   219:4,8,10,12
   220:7,14,16,22
   220:24 222:9
**believed** 137:6

John Moseley    April 8, 2025

| | | | | |
|---|---|---|---|---|
| believing 170:23 | boutique 131:5 | 31:4 67:9,22 | capture 71:21 | 19:14 22:12 |
| BELK 9:9 | box 2:4 103:12 | 68:15 84:24,25 | 222:12 | 27:5,11 28:12 |
| bell 140:5 | 117:1 122:2 | 88:6,15 127:5 | capturing 72:13 | 29:25 32:13 |
| benches 170:19 | boxes 147:24 | 166:24 | card 95:21,23 | 45:17,24 63:12 |
| best 28:6 44:11 | break 45:6,12 | calling 74:1 | 214:19 215:4 | 82:7 96:6 |
| 45:23 97:6 | 105:6,10 125:9 | 136:11 | 233:10 | 105:6 140:14 |
| 116:2 146:5 | 125:18 126:3 | calls 20:1 23:19 | care 73:5 | 142:6 144:15 |
| 147:4,21 | 221:7,14 | 30:3,20 34:25 | Carlos 9:11 | 147:24 149:3 |
| bet 207:8 | Brian 13:22 | 35:15 39:8 | 100:7,14 | 150:7,11 151:1 |
| beyond 55:20 | brief 181:5 | 43:17 44:22 | 119:10 173:11 | 151:2 154:18 |
| 56:3 57:3 | 225:4,15 | 47:21 60:5 | carrier 54:12 | 155:5,17,21,24 |
| 148:16 166:12 | broadly 78:2 | 61:4 67:25 | 56:6 120:11 | 156:24 168:23 |
| 166:23 | building 38:7 | 68:17,24 79:23 | carry 15:9 | 170:16 171:18 |
| big 211:24 | 70:13 | 85:14 97:21 | case 46:20 68:22 | 171:24 180:10 |
| Bill 223:11 | built 131:8 | 98:1,10,14 | 122:11 126:22 | 181:2 186:5 |
| billed 219:17 | bullet 141:15,17 | 104:2 123:25 | 131:7 135:15 | 190:15 199:16 |
| black 117:1,3 | bullets 141:6 | 127:23 137:14 | 141:6,10,12 | 204:11 219:15 |
| blaming 181:2 | bunch 99:16 | 137:22 145:17 | 147:2,8,10 | caused 79:25 |
| blank 34:19 | bundle 175:4 | 162:6 166:22 | 154:13,19 | caution 139:5 |
| 41:21,25 59:24 | burst 47:5 | 167:5 182:16 | 155:1 171:14 | cc 20:5 53:9 54:6 |
| 121:25 122:7 | bus 118:22 | 183:7,23 | 188:8 200:22 | 54:14 |
| blanks 121:24 | business 10:16 | 187:16 188:2 | 231:3 | cc'd 79:11 |
| bless 102:8 | 72:12 161:1 | 188:12 192:23 | case-by-case | 142:20 |
| blessing 111:19 | button 204:5,8 | 193:18 194:20 | 69:2 154:11 | cc's 168:4 |
| board 122:15 | 205:1,4,15,20 | Cameron 53:18 | cases 27:7 37:13 | cease 9:24 |
| body 142:21 | buy 206:10 | 53:20,20 | 38:1 43:10 | 229:25 230:7 |
| bold 60:14 123:3 | | campaign 9:19 | 61:20 62:4 | 230:22 231:7 |
| 162:18 163:17 | **C** | 150:22 155:20 | 63:21,24,25 | cell 147:13,14 |
| 202:1 | C 2:7 235:5 | 156:8 157:3,5 | 82:7 127:18 | 158:14,17,19 |
| bolded 54:6 | call 3:19,21,24 | 181:19,19,22 | 131:22,24,25 | 160:1,3,5,6 |
| 165:2 | 8:6,9 29:5,7,11 | 182:4,6,7 | 132:2,4,6,8,10 | center 3:19,22 |
| book 75:15 | 29:14,17 30:10 | 183:3,13,19,21 | 132:14 133:9 | 3:24 29:5,7,12 |
| bottom 16:24 | 30:15 31:5 | 184:3 185:11 | 133:14,15,17 | 29:14,17 30:10 |
| 33:11 54:13 | 32:8,20 45:4 | 185:14,18,20 | 133:20,24 | 30:15 31:5 |
| 61:8 73:20 | 66:21,25 67:4 | 185:22,24 | 134:12,18,24 | 32:8,20 101:4 |
| 76:11 102:6 | 67:17 86:2 | 186:4,16,22,24 | 135:2,9,10 | 101:21 102:2 |
| 110:18 113:18 | 88:5 89:5 | 187:2,8,20 | 153:3,5,5 | 138:14,17 |
| 117:1,3 118:18 | 101:4,21 102:2 | 193:6 | 154:12,15,23 | Cepeda 9:11 |
| 118:19 123:24 | 103:17 129:12 | campaigns | 216:23 | 119:10 |
| 124:4 127:15 | 138:13,17 | 150:17,18,19 | catastrophic | certain 26:3 |
| 131:16 133:2 | 146:21,24 | 150:20,21 | 46:20 | 146:3 163:22 |
| 168:10 178:2 | 179:5 204:10 | 216:25 | catch 199:16 | certainly 199:8 |
| 196:2 205:9 | 204:15 205:6 | capable 191:24 | category/prod... | 217:19 |
| 207:18,19 | 205:13 | capacity 20:16 | 222:19 | certainty 215:21 |
| 208:7,16 223:9 | called 25:22 | 100:23 | cause 1:16 11:15 | 216:15 217:3 |

John Moseley    April 8, 2025

217:13
**Certification** 3:4
  234:8
**Certified** 234:11
  235:14
certify 234:12
  235:8
**Chad** 135:24
**chain** 19:14
  21:12 25:19
  28:23 31:17,20
  32:12 36:8,15
  40:17 46:14
  62:24 64:15
  71:7 74:25
  75:1 76:10
  110:11 123:11
  123:14 126:25
  130:4,11 136:6
  168:12 174:5
  178:15 181:13
**chains** 148:23
**chance** 26:7
  101:9
**change** 117:19
  133:13 134:11
  135:3 149:9
  165:2 178:18
  232:2
**changed** 117:18
**changes** 3:4
  117:16,22
  159:3 162:4,9
  163:22 232:1
**channels** 197:7
  197:7,9,9
**characterized**
  94:19
**charge** 101:21
**Charles** 2:8
  206:10
**chart** 26:2
  146:16,19,22
  146:24 148:13
**Chaz** 135:24

**check** 160:13
  223:13
**checked** 168:23
**choose** 51:15
**chose** 197:6
  199:19
**Civil** 1:4,22
  234:4
**claim** 21:3 23:15
  24:9,14 39:8
  39:14 40:2
  44:2 51:18,19
  54:19 65:12,15
  89:12 110:23
  112:8 120:20
  122:23,24,25
  123:4 138:11
  138:14
**claimant** 77:15
  77:19 88:6
  175:17,20
  176:25
**Claimant's**
  175:23 176:16
**claimant-last**
  70:9
**claimants** 5:16
  29:13 31:4
  34:19 40:25
  66:17,25 87:5
  87:9,23 89:15
  89:17
**claimed** 170:19
**claims** 9:17,21
  39:4,6,10
  41:18 42:4
  55:6,9 56:6
  59:20 61:3
  63:7 72:11
  74:13,14 87:18
  90:11 103:7
  111:25 112:13
  121:21 122:13
  124:25 126:19
  128:6 155:25

163:11 164:20
  177:11,17
  178:17 179:3,4
  183:10 216:12
**claims@mma-...**
  54:14
**claims@mma-...**
  53:2,8
**Claire** 103:5
**clarify** 15:2
  22:21 55:22
  56:25 58:3,19
  59:1 77:23
  108:10 176:5
  195:7,13,15
**clarifying** 89:20
**clarity** 178:4
**classifies** 156:7
**Claude** 53:17
**CLE** 192:1,4
**clean** 24:6,13
  128:4 225:6
**clear** 23:5 25:12
  41:4 112:12
  124:3 134:1
  140:4 146:2
  176:14 185:2
  195:2 199:9
  213:2 216:13
  219:22 224:4
**clearance** 231:6
  231:6
**click** 202:6,8
  204:4,6 205:1
  205:9,10,15,18
  206:15,17,22
  207:8
**clicked** 204:9
  207:4,6
**clicking** 205:19
**client** 18:11
  24:16,17,19
  26:3 33:25
  38:7 39:1 40:2
  40:3,11 42:8

43:16,20,23
  47:15 50:19
  51:23 57:21
  68:10,14 71:15
  73:17 85:22
  86:15 91:10,14
  92:18,24 93:4
  93:12,14,20
  94:6,24 95:2,5
  95:8,12,20
  96:19 97:12
  107:8 115:14
  115:22 117:8
  122:8 129:16
  136:10 150:24
  152:14 153:5
  154:21 155:12
  156:23 157:6,8
  157:15 158:19
  160:2,5 162:19
  163:17 165:21
  166:14 168:14
  171:8 175:9
  176:16 179:17
  183:17 184:5
  184:20,22
  185:5,7 186:20
  188:4,9,10,10
  188:11,15,18
  188:25 189:1,8
  192:19,20
  194:3,4,4,17
  201:10 202:9
  203:8,14,21
  204:9,15 206:2
  230:19,19,20
**client's** 60:16,20
  90:3,5,5
  114:10,11,12
  114:17 164:12
**clients** 17:5,13
  17:14,18,24
  21:15,23 24:8
  25:4,11 27:17
  29:8,11,12,15

29:20 30:10
  38:15,17,20
  40:6 41:5 44:1
  51:14 56:4
  57:2 64:21
  69:10,13,14,17
  69:18,22 71:20
  71:24 72:22
  73:4,8,25 74:5
  75:9 76:23
  85:25 86:9,21
  86:23 88:12
  90:11 91:7,25
  92:10,16,21
  94:4,11 95:9
  96:4 97:3,10
  98:2,11 101:1
  103:25 107:3
  108:12 113:24
  115:20 128:12
  128:20 131:6
  134:13 135:2,4
  135:5 137:12
  137:13 138:11
  138:14,25
  139:15 150:5
  150:22 151:12
  151:15 153:14
  155:18,21
  156:4,16,22
  158:15 160:2
  163:10 165:16
  165:18 166:5,8
  166:13 170:23
  171:4 172:5
  173:5 175:6
  178:19,20,25
  179:9,14,16,19
  179:23 180:3,5
  180:8 182:18
  182:20,24
  183:2,6,8,9
  185:4 186:8,11
  186:12,18,19
  187:8,14,21,23

John Moseley    April 8, 2025

Page 241

188:1,21 189:7
189:8,9 193:1
193:5,8,10,11
193:15,17,17
193:20,21
194:5,18,19
201:15 202:11
202:12 230:12
230:13,16
**clients'** 55:9
**clip-out** 121:20
**close** 125:12
160:21,24
**closed** 190:13,14
**co-counsel** 34:1
37:24 61:6,9
128:1 156:18
156:20 185:8
**coast** 25:8
**code** 50:15,20
51:24
**CODE.XLSX**
4:20
**coded** 29:21,22
**codes** 50:19
**coffee** 174:12,15
**Coke** 105:6
**Colette** 5:20
6:14 73:21
99:11 100:6
**collect** 7:4
103:14 110:5
110:15 202:1
**collection** 38:6
**column** 43:10
141:13 223:11
**columns** 222:14
222:20
**come** 5:16 24:17
24:18 29:13,16
31:3,6 44:7
55:14 66:17
79:22,25 120:6
140:6 156:2
216:21

**comes** 21:2
79:14
**coming** 24:15
47:8,12 54:17
55:14 69:9
**comma** 143:6
**commenced**
155:3
**commentary**
195:17
**comments** 9:9
21:17 23:6
**Commerce** 2:18
**commercial**
21:5
**COMMISSION**
233:16
**common** 99:5
150:1
**communicate**
40:5 108:22
109:3
**communicated**
40:11
**communication**
179:17
**communicatio...**
38:7 150:5
179:14
**companies** 53:9
54:5,16 110:22
112:7 122:14
**company** 23:16
44:2,6 93:9
123:1 127:5
155:23 157:12
**compilation**
195:21
**complained**
171:8
**complaint** 172:3
**complete** 75:16
76:23 120:22
**completed** 26:16
**completely**

27:20 96:13
**completeness**
141:19
**completing**
82:21
**completion** 72:6
72:9,18,21
120:7 121:5,18
**compliance** 25:7
**Complies**
180:20,23
**compound**
14:23 15:4,17
**concerns** 171:14
**concluded**
231:23
**conclusion** 68:1
68:18,25
137:15 167:6
**confer** 231:9
**conference**
13:19
**configuration**
133:10 134:19
**confirm** 17:7
116:3 151:23
160:16 162:3
212:13 230:7
**confirmed**
177:15
**confirming**
206:15
**conflating** 58:2
**confusing** 22:14
27:21 82:1
152:8 198:12
**connect** 13:20
**connected** 13:15
14:2,7
**connection**
89:23 90:7
114:14
**consent** 60:16
60:20 90:5
114:11 162:15

163:18 165:21
**consideration**
233:12
**constitute** 115:1
**consultation**
35:10 89:10
122:20
**consulting** 230:8
**contact** 21:4
88:1,1 90:5,11
114:12,17
122:18
**contacted** 171:4
**contained**
124:19
**contains** 41:14
115:19 181:7
**contemplated**
184:5
**content** 22:20
**context** 28:5,8
46:15 60:6
72:10,19
149:24 186:2
**continuation**
33:5 52:18
**continue** 96:11
96:16,19
120:20 133:22
177:16
**Continued** 4:1
5:1 6:1 7:1 8:1
9:1
**contract** 7:12
8:20 22:8
26:16 27:12
33:15,19,23
34:24 35:6
41:18 42:5,10
52:4 59:21
66:22 70:15
71:15 72:6,9
72:18,21 76:24
76:25 90:19,21
91:2,4 93:4,13

96:13 106:25
107:2,8,13
111:15,25
112:13 114:8
114:25 115:12
115:19,25
116:6 119:13
119:18 121:21
123:22 124:5
124:25 161:24
162:20,24
163:6 164:11
164:21 165:20
168:13,20,24
170:15 178:7
181:20 184:24
**contracted**
17:15,18
**contracting**
184:18
**contractor** 4:20
20:23,25 21:2
50:14 52:2
77:10,20 78:8
78:11,13 86:8
87:4 113:23
**contractor/ro...**
40:20
**contractors**
50:18,24 51:1
51:4,9,11 52:7
52:11 77:24
78:19
**contracts** 26:23
28:10 35:20,24
42:9 58:1
70:18,21 71:22
93:8 106:10,14
106:17,18,19
106:21 107:3
108:8,12,23
122:4 162:18
163:10 165:20
165:24 166:5
173:2,8,18

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley    April 8, 2025

178:13
**control** 190:18
**conversation**
40:2 155:16
205:24
**conversations**
12:6,12 44:25
**conversion**
127:10
**copied** 56:11
63:18 100:8
**copies** 106:14
173:20 208:8
**copies'** 173:3
**copy** 102:22
107:22 119:10
121:23 135:24
172:14 174:3
197:10 231:17
**corner** 103:9
**correct** 11:6,9
22:3 27:5 31:2
32:3,6,14,18
32:19,22 33:25
36:24 37:2,3,5
37:6,8,9,17
41:15,16,20
42:14 47:2,5
52:12,13 56:11
57:15,19 59:14
59:17 60:10
65:2,5,6 66:15
66:18,19 73:9
73:22,23 75:18
78:5,17 81:6,7
81:10,12,13
83:15,22 84:8
84:13,14 94:24
95:6,20 96:1
97:4,10,13
99:15,22 100:1
100:2,11
102:25 106:3
106:20 109:18
110:5,6 111:1

111:9,12,13,25
112:3,15,20
113:4,7,15
114:1,15,20
115:15,20,22
115:23 116:1
117:3,8,12,14
118:13 119:1
119:11,14,20
119:24 120:12
122:4,16,20,21
123:1,2,5,6,12
123:22 124:7
124:16 125:1
130:5,6 131:15
132:25 133:3,7
134:19,24
136:21,22
138:17 140:15
141:4,7,16
142:4,19
143:14 144:1,5
144:8,13,18,20
145:11,16
146:10 152:10
152:20,21
153:24 154:8
160:3,6,9,12
161:22,25
162:1,21
163:19,20,23
163:24 164:1,7
165:4,7,21
166:2 168:4,8
168:9,15,17,18
168:22 169:1,6
169:7,16,17,25
173:5,8,9,19
173:23 174:6
174:10,25
175:3,7,10,13
176:17,19,20
177:2,11 178:4
179:2 180:19
181:11 182:2

183:18 184:9
187:9,24 188:1
188:11 191:12
193:7 196:1,24
196:25 204:1,9
206:17 207:10
208:16 212:24
213:13,21
214:15,16,17
215:4,5 222:3
223:19 224:23
225:18,22,23
226:21 227:9
227:24,25
228:2,14,15,17
228:18,20
229:4,8,9,25
230:1,3,4
233:2
**corrected** 78:14
**correction** 120:2
133:12
**correctly** 151:9
174:2 182:14
**correspondence**
19:12 53:10
54:6,7,10,15
**corresponden...**
13:25 19:25
**corresponding**
228:13
**corresponds**
223:1
**Cory** 62:25
**cost** 34:13 94:6
95:2 97:12
115:22 117:8
158:19 160:5
175:9
**counsel** 12:12
31:6 52:22
105:1 108:25
141:1 144:21
145:7,9,13
183:22 196:10

196:11,11,13
197:6,11,17,21
198:3 199:17
205:25 231:5
235:3,8
**County** 2:14
233:7
**couple** 11:16
19:18 53:21
54:23 60:12
**courier** 106:13
**course** 85:17
99:17 144:4
174:1
**court** 1:1 11:21
12:2 15:8
148:6 234:1
235:19
**courtroom**
11:18
**cover** 7:12
119:14,17,19
142:15
**coverage** 42:8,9
42:12
**covered** 141:11
141:11
**cracks** 132:1
**CRAIG** 8:11
**create** 79:16
171:25 185:18
198:14 199:17
**created** 79:19
80:8 156:25
170:12 171:21
197:19,21
198:5,8,13,17
198:20 221:24
224:1,2
**creating** 153:3
197:6
**creation** 185:11
185:14 199:3
199:11 200:3
**credentials**

133:9 134:18
135:8
**credit** 214:19
215:4
**criteria** 66:3
84:18 87:6
89:12 113:25
175:15,16,17
175:20 176:7
**criterion** 38:16
38:18 43:19
**CS** 8:6,9
**CSR** 1:18
235:18
**curious** 34:5
161:9 197:1
207:12
**currently** 12:10
63:6 177:1
**customer** 8:4
100:19,20,25
101:5 136:2
141:3 146:9
148:11 150:19

**D**

**D** 3:1
**Daddy** 113:9
**damage** 3:21,24
5:7,9,12 6:10
32:8,20 37:13
41:18 59:14,20
59:23 62:13
63:7,22 75:15
81:14 83:22
111:24 112:8
112:13 115:6
120:20 121:21
123:4 124:25
156:16 164:20
175:18
**data** 7:20,23
24:6,13 38:6,6
49:4,6,8,8
64:10 65:18

Worldwide Court Reporters, Inc.
(800) 745-1101

John Moseley   April 8, 2025

126:17,18,19
126:20 127:9
128:4,10 130:7
130:14 131:1
131:21,23
133:6,14
134:14,22
152:17 155:18
174:1 201:17
**database** 18:3,4
38:7
**datasets** 64:10
**date** 23:15 26:16
41:21,22 42:1
44:3 51:19
99:23,25 158:8
160:13 179:6
179:12 180:4
222:14 223:8
235:18
**dated** 3:14,17,20
3:23 4:3,5,8,10
4:13,16,19,22
5:3,5,8,11,13
5:15,18,20,23
6:3,6,9,14,16
6:19,21,23 7:3
7:8,10,13,16
7:19,22 8:3,5,8
8:10,13,19,21
9:3,5,8,11,16
9:18,23 28:23
31:17 32:5
61:16 109:17
141:21 159:6
226:20 227:2
229:3 230:2
**dates** 16:15,22
18:20
**day** 7:18 37:18
67:10 126:13
132:2 134:24
140:17 158:7
160:17 163:5
179:24 190:9

230:15,17,24
230:24 233:9
233:13 235:14
**days** 118:23
**De** 135:24
**deal** 26:25
**debit** 226:15
**debited** 226:6
**Debtor** 1:3
**decade** 51:13
**December** 4:3
6:6,9,14,16,19
80:14 82:15
99:11 100:1
102:6,17 161:6
**Decibel** 177:18
177:21
**decide** 15:23
**decided** 36:19
38:10 231:7
**deed** 106:8
**deeply** 191:25
**DEFENDANT**
1:15 234:6
**deferred** 31:6
**defined** 34:4,4
61:9 78:2
156:17
**definitely** 207:5
**definition**
138:19 171:11
**degree** 129:7
**Delanay** 174:6,8
**Delanay's**
174:15
**delayed** 122:14
122:24
**delegated** 128:2
**deletion** 162:10
**deliver** 26:16,22
27:12 28:10
62:16 106:14
108:11
**delivered** 93:20
106:20 115:15

132:15
**delivering**
106:19 132:1
133:15 134:13
134:23 182:5
**delivery** 61:21
61:25 131:22
**delta** 9:21 25:15
103:11 104:10
178:17 179:3
**denied** 21:3 42:9
122:14,24
**department**
216:8 217:14
**depend** 88:17
**depending** 42:7
88:14
**depends** 92:17
**depict** 147:20
**depicts** 148:13
**depo** 27:16
138:5 149:7
154:5 189:4
**deponent** 231:24
**deposing** 82:2
**deposition** 1:9
1:14 3:11
10:19 11:2
12:8,9 13:8
16:8 46:6
55:20 57:4
58:3 96:22
142:7 144:16
146:1 147:25
148:1,17 150:8
151:3 166:12
166:23 186:6
187:19 189:6
199:9 202:25
213:9,15 214:2
216:10,14
231:23 233:1
234:9,16,18,23
235:1
**depositions**

11:15 78:5
**derived** 172:5
183:2 186:21
**described** 155:6
**description** 3:10
4:2 5:2 6:2 7:2
8:2 9:2 233:10
**deserve** 103:14
202:2
**designate** 26:17
**designated** 11:9
87:17
**desist** 9:24
229:25 230:7
230:23 231:7
**detailed** 229:15
**details** 141:7,16
**determination**
17:25 40:1
129:14
**determine** 17:12
30:7,13 104:11
104:16 128:4
216:14
**determined**
17:23 106:20
**development**
72:12
**dialling** 87:19
**Diesel** 181:23
182:14 183:20
184:4 192:20
193:12,16
194:17
**diet** 105:6
**difference** 83:17
212:6
**different** 17:23
26:25 27:19
35:24 36:2
42:9 57:20
58:18 77:22
85:22 88:18
91:17,23 93:1
99:16 116:8

130:24 146:17
148:23 150:3
154:22 157:5
157:13 200:1
206:11,21
208:10 213:4
216:1 218:21
219:20 230:21
**different-sized**
164:23
**differently**
29:21
**difficult** 34:18
216:19
**digital** 173:12
173:13 197:10
**diligent** 207:21
**dinner** 14:11,13
**direct** 87:18,19
90:7 104:13
114:13 171:11
200:20 205:20
**directed** 51:4,6
51:7 87:24
138:15 142:13
142:17 202:17
204:9 206:2
**directing** 230:22
**directly** 61:20
62:5 170:20
**Director** 99:14
**directs** 230:7
**disasters** 47:8
**discovered**
173:1
**discovers** 178:8
**discovery** 12:21
13:24 17:4
27:2 30:1 57:4
139:14 143:24
144:19 213:16
**discuss** 14:20
15:18,20 52:22
66:21 213:6
**discussed** 48:13

48:21 67:12
75:8 76:16
113:11 193:6
**discussing** 22:10
23:13 26:20
112:3,15,16
134:22 178:6
**discussion** 172:9
181:5 191:18
225:4,15
**discussions**
191:22
**dispersement**
105:4
**DISTGRICT**
1:1 234:1
**distributed**
197:5
**distribution**
53:2,5,7 54:4
**DISTRICT** 1:1
234:1
**DIVISION** 1:2
234:2
**DMAs** 87:18
**doc** 116:8,14
**docs** 24:19
116:13
**document** 10:25
16:21,23 18:22
24:21 25:22
28:18 31:9,14
33:2 40:13
41:8,9,17
42:14,18,19,20
43:1 46:6
49:12 50:10
59:19 60:9
61:15 71:6
84:3,8,9 94:20
95:13 96:7
97:9,15 99:10
101:14 108:6
109:9,13
111:23 113:2

114:16,20
116:12,19,23
117:9,17,21
118:1,4,8
119:8,23 120:3
120:7,23,25
121:4,17
130:18 131:15
139:4 140:14
141:20 144:11
146:3,4,12,19
153:17 157:24
158:3,10,13
159:2,12,24
162:25 163:5
163:16,22
164:5,10,19
167:9 169:15
174:9 175:4,19
176:2,23 177:3
177:7 185:4,12
207:17,19
209:17,17
211:14,18
212:10 214:11
217:20 221:20
221:23,24
222:21 224:1,2
224:7 229:24
233:10
**document's**
222:7
**documents**
12:18,20,22
13:6 16:12,16
19:11 24:20,20
30:7 62:2 97:2
120:14 139:6
144:19 145:7,9
181:4 195:22
195:25 198:22
200:3 207:22
207:24 208:9
209:3,9,11,13
209:15,20

210:13,20
211:4 212:3,16
212:19,24
213:11 221:2
**Doe** 200:15
**doing** 33:21 59:5
85:17 101:16
127:21 182:13
192:3 196:17
197:2
**dollars** 222:10
**Doshi** 152:25
153:6,9
**draft** 7:14 94:20
96:6 117:21
123:16
**drafted** 198:15
**dreaming** 140:9
**Drivers** 6:22
106:5
**drop** 51:15,16
**dual** 8:14 127:17
154:1,12,17,18
154:23,25
155:16,21
156:1,8,23
157:8
**due** 94:8 117:12
158:22 160:8
175:12,18
**duly** 10:5 234:14
**dummy** 62:12
62:15 103:19
**duplicates**
208:21
**duties** 127:25
128:2

_____
**E**
_____
**E** 3:1,6,9 4:1 5:1
6:1 7:1 8:1 9:1
**e-mail** 2:5,10,15
2:19 3:14,17
3:20,23 4:3,5,8
4:10,13,16,19

4:22 5:3,5,8,11
5:13,15,18,20
5:23 6:3,6,9,14
6:16,19,21,23
7:3,8,10,13,16
7:19,22 8:3,5,8
8:10,13,19,21
9:3,5,8,11,16
9:18,23 19:5,7
19:14,14,15
20:4,6 23:2,13
24:20,24 25:18
25:18,19 26:11
27:1 28:5,8,22
29:2 30:15,19
31:16,17,20,20
32:5,11,12,15
33:6,10,17
36:8,11,15
37:14 40:6,17
41:13,13,15
42:15 46:14,17
48:1,21 49:16
50:13,17 52:23
53:2,6,7,9,11
54:4,5,22
56:11 59:10,13
59:19 60:6
61:16,21 62:12
62:15,24 63:3
63:10,13 64:15
64:16,19 70:4
70:9,18 71:7
73:1,21 74:25
74:25 75:7,14
76:10,16 77:14
79:14 80:13,14
80:15,16,19
82:12,14,24
90:8 99:10,18
99:19 100:3,3
100:7,8,11,13
101:25 102:16
102:17 103:12
104:23 106:2

106:18,21
107:21 108:10
109:17,19,25
110:4,11
111:18 112:3
114:15 118:18
118:19,25
119:9 120:14
123:11 124:18
124:20,24
126:24 127:14
130:3,4,11,11
132:23 133:2,6
134:17,21,25
135:22 136:6,6
136:25 137:2,5
139:8 140:15
140:24 141:2,5
141:21 142:3,9
142:13,15,20
142:21,23
143:8,10,14,20
143:22,23,25
143:25 144:8
144:11,17
145:10,11,14
145:15,20
148:23 150:12
153:9,20 154:4
161:20,25
163:21,25
164:6 167:12
168:2,7,11,12
168:17 169:11
169:12,12
172:19,22
177:13 178:15
180:17 181:7
181:10,13,25
189:10 193:6
200:11,15,18
201:10,13,23
229:24 230:2,5
230:6
**e-mail's** 33:8

John Moseley   April 8, 2025

123:15 126:11
**e-mailed** 14:5
  123:16 129:19
  164:10
**e-mailing** 64:3
  71:11
**e-mails** 13:4
  18:25 19:1
  20:2 26:17
  27:1 54:12,16
  54:18 63:18
  79:11 102:20
  130:25 131:9
  135:21 142:23
  143:23 144:4
  200:20,22
  201:8,15 230:6
**EAJF** 216:23
**earlier** 19:24
  20:2 66:3 78:6
  80:19 89:19,22
  106:15 134:21
  149:21 162:17
  165:20 187:7
  196:22 200:17
**earliest** 19:11
**easy** 12:2
**edit** 95:12
  111:20
**editing** 112:3,15
**editorializing**
  170:3
**edits** 42:14
  112:20,21
  119:20
**Efficiencies**
  56:20
**efficiency** 56:22
  57:23 58:9
**efficient** 223:3
**effort** 39:22
  209:11
**efforts** 122:15
**egregious** 231:5
**either** 13:17

44:8 64:22
82:5 83:7 90:6
96:19 114:13
139:23
**eligibility** 86:9
  87:6 90:3
  113:24 114:10
**Eliza** 2:23
**EMAIL** 5:10
  6:15
**employed** 12:11
  17:20 20:14,17
  20:18 65:4
  235:9
**employee** 85:1,2
  85:8,8,23 88:8
**employees** 20:8
  20:10 36:23
  37:1 38:8
  53:12 56:11
  85:11 97:24
  98:9,13,22
  100:10
**employment**
  41:18 59:21
  99:17 111:25
  112:13 121:21
  122:4 124:25
  144:5 156:17
  164:21
**endeavored** 16:7
**ended** 20:12
  49:9 155:7
  156:11
**ends** 71:6 73:2
  75:5,12 149:17
  152:4 201:20
  216:2
**engage** 180:7
  188:4
**engaged** 178:19
  187:15
**engagement**
  173:20
**engaging** 180:8

**ensure** 71:20
**enter** 24:11 86:5
  106:25 107:2
  107:12 114:22
  184:24
**entered** 116:13
  157:5,11
**entering** 91:18
**entire** 18:13,14
  74:14
**entitled** 110:8
  123:4 138:25
  167:13
**ERIN** 9:9
**error** 71:11
  152:17
**especially** 40:18
  64:10
**essentially** 25:19
  47:15
**established** 35:9
  51:13 90:7
  114:14
**ET** 3:15,18,23
  4:6,13,20,23
  5:4,9,12,14,16
  5:18,21,24 6:4
  6:10,17,22 7:4
  7:9,11,14,17
  7:20,23 8:3,6
  8:11,14,19,22
  9:3,8,12,17,24
**ethical** 171:17
**ethically** 86:5
**ethics** 6:20
  102:20,22
  103:1 104:25
  108:25 196:11
  196:13 205:25
**event** 61:21
  163:16
**events** 46:20
  47:8,11
**eventually** 189:8
  230:12

**Everlog** 80:21
**Eversign** 80:21
**everybody** 59:2
**evidence** 14:4
  30:3 35:23
  39:3 60:5
  70:24 73:11
  92:21 95:15
  97:6 108:16
  116:2 132:17
  146:5 147:4,22
  163:8 165:23
  171:7 182:16
  184:11 187:17
  188:24 209:6
**evidences**
  212:23
**evidencing**
  212:19,24
  221:2
**exact** 212:10
**exactly** 34:11
  135:23 194:2
  211:11
**examination**
  10:6 234:20
**example** 56:21
  57:8,9,11,16
  57:22 58:8
  69:4 79:9 93:3
  120:8 121:4,18
  151:22 200:10
  201:2,4
**Excel** 50:14
  75:15 141:25
  144:7 147:18
**exchange** 112:3
  224:25
**exciting** 77:15
**excluded** 44:13
**excuse** 78:10
  220:18
**executed** 92:15
  92:24 233:11
**exhibit** 3:10,11

3:12,14,17,20
3:23 4:3,5,8,10
4:13,16,19,22
5:3,5,8,11,13
5:15,18,20,23
6:3,6,9,12,14
6:16,19,21,23
7:3,6,8,10,13
7:16,19,22 8:3
8:5,8,10,13,16
8:17,19,21 9:3
9:5,8,11,14,16
9:18,20,22,23
9:23 10:19,20
16:19,23 18:18
18:21 19:4
28:15,18 31:10
31:11 32:3,24
32:25 33:2
36:6,8 40:13
40:15 41:7,10
42:18,21 46:3
46:6,11 49:11
49:13 50:6,7
50:10 52:14,16
53:23,24 54:21
59:6,8 61:12
61:13 62:18,19
64:11,13 66:5
66:7,12 69:24
69:25 71:1,3
74:17,18 76:5
76:6 80:9,10
82:8,9 83:24
84:1 97:17,18
99:6,7 101:16
101:17 102:12
102:13 105:14
105:16 107:17
107:18 108:6
109:7,10
112:23,24
118:5,6 119:3
119:4 123:7,8
125:22,24

John Moseley    April 8, 2025

126:5 129:21
129:22 132:20
132:22 135:16
135:17 138:1,3
138:8 141:19
141:23 148:19
148:21 153:16
153:18 157:18
157:19 159:9
159:10 161:15
161:16 164:2,4
167:7,9,23,24
169:8,9,11
172:7,8,10,12
174:16,17
177:4,5 180:13
180:14 181:8
195:19,21
198:23 199:2
207:12,13,15
214:12 220:18
221:16,21
224:14,15,16
224:19,24
225:22 226:3
226:11,15,19
227:1,5,9,20
227:24 228:14
228:20 229:10
229:11,16,18
229:21
**exhibits** 18:25
180:18
**exist** 193:2
198:20 208:19
**existed** 68:13,14
208:17
**existence** 79:22
80:1
**exists** 203:19
212:22 230:18
**expectations**
26:11,19
**expenses** 41:2
**expert** 49:17,21

**expert's** 56:7
**experts** 49:23
103:13 202:1
**Expiration**
235:18
**EXPIRES**
233:16
**explain** 17:17
86:25 128:18
182:8
**explained** 129:4
**explaining**
191:19
**explains** 122:13
122:18,23
**explanation**
191:6
**explicit** 166:6
**expressed**
233:12
**extensive** 39:15
**extent** 200:6
**extra** 19:7
**extract** 24:21
**extraction** 24:12
**eyes** 58:17,24
190:13,14
197:21

**F**

**F** 47:3
**face** 146:4
**fact** 98:7 112:5
143:13 168:10
171:17,17
184:22
**facts** 14:3 30:2
35:23 39:2
60:4 70:23
73:10 92:20
95:14 108:15
132:16 163:7
165:23 171:7
182:15 184:10
187:17 188:23

**fail** 110:23
**failed** 75:16
151:22
**fair** 26:8 43:11
46:17 51:2
85:15 110:21
111:4 128:11
162:4 223:24
**fairly** 222:20
**faith** 122:22,25
124:14
**fall** 131:25
**falloff** 44:10
**falls** 154:5
**FAQ** 122:22
141:15
**FAQs** 120:10
122:10
**Farm** 44:5
**fast** 45:8
**father** 113:11
**Fax** 2:10 235:22
**fear** 131:21
**February** 7:8,10
7:13,16 9:23
113:7 118:20
119:11 123:12
123:17 161:5
230:2,5,11,14
**federal** 1:21
15:7 170:19
**fee** 33:15 34:10
34:19 35:9,19
36:2 52:3,8
86:6,10,15,21
87:7,10 90:6
90:12,16,17,25
91:8,18 92:1,9
92:15,23
113:25 114:12
114:20,21,22
124:10 154:22
**feel** 109:12
**fees** 7:5 34:13,23
35:5,8 93:17

110:5,15,23
112:7 115:12
138:25
**Fernadovich**
171:13 230:25
231:2
**field** 51:20
**fields** 43:5,6
**fifth** 186:24
**figure** 72:5
129:17 143:2
155:22 156:15
157:7 170:9
**file** 26:2 40:10
129:6 155:24
162:15,19
164:12,24
165:21 166:6
166:10,15,18
166:21 167:1
168:14 178:9
184:19 211:16
212:6
**filed** 56:6 60:20
172:3
**files** 128:2 129:4
129:9 168:24
169:2 207:25
208:4,9,13
209:3,20 220:1
221:1
**filing** 60:17
163:18 166:9
**fill** 121:25
**filled** 26:3 41:21
42:1 59:24
183:21
**filled-out** 174:7
174:11
**final** 26:7
197:20 198:2
**finally** 160:8
220:17
**financially**
235:11

**find** 44:7 133:8
134:18 171:1
**finding** 49:17
152:17
**fine** 23:8 45:3,9
46:15 78:6
225:12
**finish** 189:21
190:25 213:14
**finished** 148:4
**fire** 47:5 132:18
**firm** 1:2,20 2:2
2:13 3:11 9:23
10:13 18:13,15
38:3,3 54:17
54:18 63:20
84:17,18 86:4
86:6,8 87:4
89:10,13 90:4
90:8 91:9,15
91:21 92:25
93:18,20,20
113:15,23
114:11,14
115:13,15,15
131:5 136:12
136:12 137:20
154:12 155:2
157:13 178:8,9
180:8 182:7,11
183:6,25
184:17 202:16
221:22 234:2
235:4,19
**firm's** 84:17,18
86:9,10 87:5,6
91:7,8,24 92:1
113:24,25
155:6 202:15
203:4
**firms** 64:7
137:16,25
154:22 155:13
157:9,13 182:9
182:10 184:15

John Moseley   April 8, 2025

| | | | | |
|---|---|---|---|---|
| 193:9 219:20 | **flat** 228:2,17,19 | 108:1 112:1,2 | **four** 25:8,12 | **Garnett** 228:6 |
| **first** 3:19 7:18 | 228:23 | 112:22 114:19 | 36:12 46:7 | **gathered** 25:11 |
| 10:5 11:17 | **flight** 105:23 | 114:23 115:1,6 | 52:15 54:22 | 62:3 90:13 |
| 13:14,22,24 | **flip** 21:25 36:13 | 115:10 121:23 | 80:12 153:16 | 173:25 |
| 14:2 16:3,21 | 74:3 75:12 | 122:5 123:22 | 169:13 206:12 | **gathering** |
| 19:14,20 22:13 | 77:2 113:6 | 124:5 125:1,2 | **fourth** 26:12 | 222:11 |
| 22:15,18 25:18 | 119:22 136:5 | 125:4 150:4 | 86:3 146:18 | **general** 85:7 |
| 26:13 28:23 | 151:17 158:11 | 163:1,4,5 | **Frances** 135:25 | 86:3 113:21 |
| 29:1,4 30:14 | 175:2 201:20 | 164:20,21 | **free** 122:19 | 148:3,10 |
| 31:15,17,20,21 | 204:3 205:8 | 165:9 168:25 | 160:15 | **generally** 82:1 |
| 33:3,7,11 | **flipping** 73:20 | 174:3,7,11 | **front** 85:14 | **geographically** |
| 34:12 36:13,15 | 114:7 120:13 | 176:19 183:16 | 224:14,15 | 103:10 104:9 |
| 40:17 46:19 | 121:17 127:11 | 183:21 184:4 | **frustrate** 58:16 | **getting** 18:20 |
| 52:11,15 62:24 | 131:12 | **format** 70:21 | **frustrating** | 32:21 39:11,13 |
| 64:14,15,16 | **flood** 47:4 | **formed** 91:9,20 | 58:25 | 64:4 86:25 |
| 70:10 71:7 | **flooding** 47:3 | **Former** 20:8 | **full** 10:9 15:8 | 92:24 124:21 |
| 73:21 76:10,11 | **Florida** 98:21 | **formerly** 12:11 | 87:16 | 153:2 165:8 |
| 77:11,12 88:21 | **flowchart** | **forms** 87:11,12 | **fully-signed** | 186:2 |
| 99:18,19 110:8 | 147:20,23 | 106:22 108:7 | 173:8 | **give** 14:22 16:16 |
| 110:11 111:14 | **focused** 16:15 | 114:17 115:3,9 | **functioning** | 21:3 28:7 |
| 112:6 113:2,13 | 58:3 | 165:15 166:2,6 | 77:16 | 56:21 57:9,11 |
| 113:17 114:3 | **follow-up** 54:24 | **formulas** 55:14 | **funds** 103:14 | 69:4 83:8,13 |
| 119:23 120:17 | **following** 64:21 | 55:18 56:1 | 202:2 | 93:3 111:19 |
| 120:19 121:11 | 74:4 76:22 | **forth** 111:2 | **funny** 96:25 | 126:2 166:20 |
| 121:25 122:10 | 153:7 173:2,15 | 123:20 124:18 | **further** 84:15 | 167:1,3 181:3 |
| 123:15 124:20 | 201:25 230:14 | **forward** 21:11 | 124:18 231:24 | 187:9 191:5 |
| 124:20 125:24 | 234:13 235:3 | 59:13 72:24 | 235:8,11 | 192:11 205:13 |
| 126:13,24 | **follows** 10:5 | 143:23 | **future** 24:13 | 212:3 231:9 |
| 128:7 130:11 | 234:23 | **forwarded** | 37:15 66:24 | **given** 78:6 |
| 131:12,15 | **followup** 76:16 | 100:7 143:13 | **FW** 8:9 | 116:13 131:6 |
| 143:1 161:20 | **font** 54:7 164:23 | 144:12 177:23 | | 166:10 180:18 |
| 164:9 168:11 | **food** 125:12 | **forwarding** 6:15 | **G** | 224:10 233:12 |
| 170:17 178:3 | **footer** 124:10 | 100:4,14 | **gain** 162:15 | 234:16 235:1 |
| 181:24 195:22 | **footnote** 61:6,8 | 107:23 | **Galerne** 2:17 | **gives** 164:12 |
| 198:6 214:13 | **foregoing** 233:1 | **found** 26:13 | 180:23 235:7 | 168:13 |
| 218:21 222:14 | 233:11 | 50:4 171:8 | **Galindo** 38:10 | **giving** 26:10 |
| 224:16 227:14 | **forget** 20:5 | 172:4 | 39:21 63:11,15 | 166:15,17 |
| **FISHMAN** 2:8 | 45:16 | **foundation** | 63:19,20,24 | 211:11 |
| **fit** 119:20 | **forgetting** | 23:20 35:7,16 | 64:3 82:5,6 | **Glad** 36:19 |
| **five** 16:24 | 170:21 | 35:22 38:2,4 | 154:14,20 | **gloCOM** 98:5 |
| 224:19 | **forgot** 11:14 | 108:16 132:12 | 168:20 177:14 | **go** 19:13 21:18 |
| **five-second** | 166:24 | 145:17 147:21 | 178:19,25 | 25:17 30:15,23 |
| 105:5 | **form** 4:11 60:2 | 182:16 183:1,8 | 180:8,10 | 33:10 34:12,18 |
| **fixed** 93:19 | 70:18 76:24 | 183:23 187:16 | **galindolaw.com** | 44:19 45:7 |
| 115:13 | 87:19 107:23 | 192:24 194:21 | 63:3 | 71:5 75:4,4 |

John Moseley    April 8, 2025

77:11 87:15
88:6 93:25
99:18,21
103:10,13
104:3 106:10
121:14 123:14
125:13 126:24
127:18 130:10
141:3 144:23
148:8 149:17
150:12 151:4
152:22 154:11
159:4,15
164:16 165:11
171:3 172:15
172:19 180:25
192:13 199:19
202:1 209:10
209:18 210:14
210:18 212:9
214:25 215:25
217:18 218:4,9
221:11 225:20
231:16
**goal** 74:16
**goes** 91:14
110:25 116:25
122:7
**going** 10:18
11:16 13:11
18:24 19:3,17
21:11 23:17
24:4 25:17
26:22 27:8,12
28:9 40:13
41:7 42:3,19
44:14,21 45:17
46:24 47:8
48:11,19 55:19
56:24 65:8
66:5 71:14,19
77:6 96:6,8
108:5 110:11
114:2 115:18
117:6 121:3

126:2 134:2
137:10 144:22
146:14 147:11
147:13 155:25
166:11 175:25
176:18 179:15
186:13 189:13
189:17,20,22
190:9 192:1,10
197:22 213:22
214:20 217:25
218:9 222:1
**good** 10:8 11:25
56:10 66:12
67:21 105:20
105:25 111:9
120:2 125:8
164:16 165:11
191:4
**Goott** 2:2 14:3
14:10,21 15:2
15:6,17 16:9
16:14 21:16
22:11,17,25
23:3,19 27:14
28:11 30:2
31:24 34:6,25
35:7,15,22
36:4 39:2
43:17 44:21
45:2,4,7,16,20
46:1 47:21
48:3,7,15
55:19 56:3,10
56:24 57:25
58:12,16,23
59:5 60:4 64:5
67:25 68:17,24
69:12 70:23
72:1 73:10,16
79:23 83:7
89:7 92:2,4,11
92:20 95:7,14
96:8,14,15,18
96:25 97:5

104:2 105:18
105:22,25
108:15 109:12
109:15 114:2
115:23 116:2
121:6,15
123:25 125:10
127:23 128:14
128:22 132:12
132:16 133:16
133:23 134:4,8
137:14,22
138:19,23
139:6 140:6,17
140:18,20
142:10 143:4
144:22 145:1
145:17 146:5
147:4,21 148:5
148:16 149:11
149:15,25
151:18,24
152:5,8 155:8
156:5,19 162:6
162:22 163:1,7
165:22 166:11
166:22 167:5
171:6 175:25
176:4,8,13,18
179:13,18,21
179:25 180:5
182:15,23
183:1,7,23
184:7,10,14
185:16 186:13
186:20,23
187:4,11,16
188:2,12,23
189:13,17,20
189:22 190:2,6
190:8,13,16,20
191:3,5,12,15
192:3,5,6,10
192:17,23
193:18 194:6,9

194:12,20
195:7 197:3
199:22 200:1,4
201:16 204:22
208:21 209:4,8
209:16 210:3,6
210:9,11,14,18
210:21,23
211:2,5,8,10
211:13,17,21
211:24 212:2
212:14,17,23
213:3,8,10,13
213:17,21
214:3,6,21,24
217:5,25 218:3
221:6,10
224:10 225:2
231:13,19
235:4
**governed** 67:23
68:15,22 69:11
69:18,22
**grab** 105:6
**Grant** 53:17
**granular** 199:13
**great** 74:4
139:19 141:18
214:3
**grossly** 21:3
**GTO** 8:3
**guess** 17:22
23:23 45:1
51:10 66:2,2,4
68:8 129:12,17
156:14 198:17
202:10 230:17
230:21
**guys** 22:9 23:12
37:7,11 49:4
53:1 173:13
210:19

**——— H ———**

**H** 3:9 4:1 5:1 6:1

7:1 8:1 9:1
**hail** 47:4 132:18
132:18,18
**half** 51:13
222:10
**hand** 10:18 19:3
42:19 46:5
83:9 180:17
233:12
**handed** 146:13
180:22 211:6
**handle** 66:21
155:25
**handling** 182:7
**Hanen** 57:4
138:22,24
139:12
**Hanen's** 139:13
**happen** 73:15
86:14 93:5
174:3 187:14
**happened** 14:8
45:17 56:5
67:10 85:16
86:18 87:22
166:7 171:2
192:22
**Happily** 212:14
**happy** 213:6
214:2
**hard** 11:23
45:22 93:4,7
106:14 197:10
**HAYGOOD** 2:8
**he'll** 191:9
**head** 25:2
197:20 215:15
**header** 77:3
**headings** 116:13
**hear** 18:6 21:20
74:6 139:20,22
142:24 180:1
**heard** 171:4
**hearing** 230:25
231:1

John Moseley   April 8, 2025

hearsay 104:2
  166:22
**Hector** 100:8,15
**held** 99:16 181:5
  225:4,15
**help** 16:13,17
  17:15,19,20
  74:6 100:23
**helped** 101:5
  155:17
**helpful** 58:20
**Helping** 161:3
**hereto** 1:23
  215:14
**hey** 75:14 80:20
  100:6 102:21
  107:22 108:23
  111:19 118:21
  124:9 164:15
  177:15
**hide** 139:10
  210:10 211:3,5
**hiding** 210:12
  210:13,20
**high** 72:13
**high-priced**
  42:11
**high-tech** 86:12
**Hilton** 2:22
**HIPAA** 86:10
  90:6 114:13
**hire** 137:16
**hired** 183:22
  184:15
**hires** 183:17
  185:7
**hiring** 184:5
**hit** 25:8,14,16
  35:13,14 37:19
  151:22,23
  152:14,15
**hits** 131:23
**hitting** 152:19
**hold** 14:21 22:11
  96:8 144:22

182:23 186:13
  189:23 210:3,6
  210:6 211:17
  211:17
**home** 175:24
  176:17
**home/damaged**
  176:17
**homeowner**
  21:4
**homes** 106:11
**honestly** 39:16
  39:18,20
**hope** 129:6
**Hopefully** 46:1
**hour** 106:9
**hours** 71:16
**house** 49:2
**Houston** 1:2,21
  2:4,14,18
  10:16 13:19
  98:20 234:2
  235:21
**HR** 99:14
**hub** 64:8
**hundred** 57:12
  85:25 132:1
  134:24
**hundreds** 25:9
  25:10 85:11
  135:4
**Hunter** 1:18
  234:11 235:17
**hurricane** 4:11
  4:14,23 5:4
  9:20 25:14,15
  29:12,13,15
  31:4 37:15,19
  43:15 55:4,5,6
  59:23 61:3,4
  84:24 85:20
  89:15 90:11
  103:7,8 128:24
  129:2 132:4,9
  135:1,5 138:11

138:14 156:7
  161:3 163:11
  175:18 181:16
  216:12
**hurricane-pot...**
  135:2
**hurricane-rel...**
  133:15
**hurricane-reli...**
  5:21,24 51:5,9
  66:25
**hurricane/reli...**
  50:24
**Hurricanehel...**
  206:12
**hurricanes** 25:8
  25:13 37:15
  135:11,12
**Huye** 5:6 7:14
  8:3,6,22 9:6,12
  9:24 59:14
  79:9 111:3,8
  112:14 119:10
  123:15 124:4
  135:23 136:15
  136:16,20
  141:25 142:3
  142:16 144:3
  164:10 168:3
  168:11 172:20
  172:23 173:1
  173:10 178:3
  230:6
**Huye's** 123:21
  144:8 168:16
**hyperlink** 202:8
  203:3,6,8,13
  203:17,18,20
  203:25 204:14
  205:9 206:19
  206:21,25
  207:1
**hyperlinked**
  205:16
**hypothetical**

68:3,5 188:13
  193:2

---

## I

**Ian** 181:16
**Ida** 4:9,14,23
  5:4 37:15,19
  42:4,5,6 55:4,5
  55:6 59:23
  61:3,4 103:7,8
  103:10,11
  104:8 175:18
**idea** 30:5 167:22
  206:25
**identical** 209:9
  209:11,13,14
  209:16,17
  211:18 212:16
  227:8,23
**identify** 225:9
**identity** 233:10
**ignorant** 74:1
**Illinois** 98:21
**immediate**
  76:19
**important** 11:17
  191:17
**imposed** 158:8
**impossible**
  115:4
**impress** 122:15
**in--** 182:11
**in-person**
  106:10
**in-taking** 43:15
**inaudible**
  190:19 210:25
  211:1,12,15,23
  214:8
**inbox** 144:1
  145:11,14,20
**include** 61:9
  87:18 90:16
  178:20,22
**include/group**

141:12
**included** 87:25
  148:24 149:6
  150:8 155:15
  178:8
**includes** 119:7
  235:3
**including** 110:1
  119:17 153:21
  207:22
**incorporate**
  177:18
**incorrectly**
  148:24
**independent**
  86:7 87:4
  113:22 166:15
**indicate** 14:16
  30:9 40:11
  117:7,11
**indicated** 116:25
  185:25
**indicates** 18:10
  110:7 113:13
  113:20 145:15
  169:5
**Indiscernible**
  140:8
**indiscernible)...**
  49:22
**individual**
  104:14
**individually**
  217:16
**individuals**
  77:25 78:16
**information**
  16:6 21:4
  24:14 26:3
  51:18 55:12,13
  55:17,25 62:7
  73:25 79:2
  88:1 90:6,11
  90:13 114:12
  114:17 139:7

153:14 170:17
171:10 173:25
189:5 200:23
200:24 204:19
205:7 222:11
235:1
**initially** 18:25
**Injury** 33:19,23
**inquires** 87:20
87:23
**instance** 1:15
154:23 182:10
**instruct** 179:15
180:6
**instructions**
26:10 84:23
121:24 122:6
**instrument**
233:11
**insurance** 21:2
23:15 24:19
39:9,10,14
43:24 44:2,5
44:12 53:8
54:5,16 61:1
110:21 112:7
122:14 123:1
155:23 157:12
175:21
**insured** 100:23
**insured's** 110:22
**intake** 3:19 4:4
6:17 17:16,19
17:20 18:11,12
27:15 29:4
30:15 38:11,12
38:13 39:25
57:13,14,18
65:23,25 70:8
70:14 81:8,11
84:16 85:18
89:3,11,12,16
90:2,3 95:1
102:1 104:1
113:14 114:8,9

36:23
**invested** 82:7
**investigation**
172:4
**invoice** 6:7,10
9:22 80:21,24
81:23,24 82:4
82:18 83:3,5
83:15,21,23
116:15 214:14
215:6,21 216:2
216:3 217:2,3
218:12,13,15
218:17,21,23
219:5,7,13,24
220:4,4,6,11
220:11,17,19
223:1,2,4,5,12
224:16 225:17
225:24 226:7
226:23 228:5
228:16,23
229:3,7
**invoices** 207:24
208:3,11,17
209:7 215:20
216:15 217:12
219:22 221:1,2
221:4 223:16
223:18 224:8
225:11 229:11
229:13
**involved** 38:9
75:23 80:3
182:17 210:17
210:19
**involvement**
56:14 131:4
**issue** 27:16,18
57:3 61:22
91:3 151:9
171:14,24
172:6
**issued** 215:16
**issues** 58:2,18

**it'll** 59:1
**item** 59:24 60:15
61:5 81:2,8,14
164:22
**items** 76:19

**J**

**James** 7:17
106:3 142:14
**January** 6:21,23
7:3 9:18 106:3
107:21 109:18
110:1 181:11
**Jersey** 98:20
**jjp@walkerand**
2:6
**job** 191:21,21
**John** 1:10,14 3:5
4:4 10:4,11
98:25 99:4
101:7,8,11,13
101:15,20
200:15 233:1,5
233:9 234:9,14
**Johnie** 2:3
**jointly** 128:12
**joke** 113:10
**Jonathan** 2:22
**Jones** 5:21 6:15
73:21 74:9
99:11,14
**Jordan** 135:24
**Judge** 57:3
138:24 139:12
139:13
**July** 8:21 9:3
164:10 165:20
168:16 228:5
**jump** 66:20
**June** 3:14,17
8:19 13:25
14:1 19:15
25:13 28:24
29:3 161:21
162:2,20

163:25 227:12
**jurisdiction**
88:15,17
**justification**
122:25

**K**

**K&K** 64:21
130:14 131:17
**Katherine** 3:14
3:18 4:13 5:24
6:4 20:6,7,13
20:20 21:12,22
22:2 71:8 72:4
73:3 75:7
**Katie** 88:21,23
143:19 145:12
**Katy** 8:8 12:15
53:18
**keep** 18:16 23:8
24:6 166:8
224:14 225:6
225:14
**keeps** 24:12
**Kelly** 6:24 9:3
118:20 167:12
177:24
**kept** 23:4
**Kevin** 228:6
**key** 8:11 43:24
149:19,21
150:3
**kind** 12:1,20
14:15 37:25
65:14 153:11
197:2 204:3
**kinds** 134:12
**Kinsman** 4:22
5:3 6:10 37:5
37:22 38:1,10
47:16,18 52:24
54:3,11,22
55:2 61:9
65:12 127:14
127:15,22,25

John Moseley    April 8, 2025

Page 251

128:7,11,13,21
129:8 131:5,8
132:7,15
152:14,17
154:16 156:13
156:17,20,22
157:4 219:18
219:25
**Kinsman's**
54:17,18
152:20 219:16
**Kinsman--**
128:10
**KK** 6:4 38:22
**KKTL** 9:12
38:21 39:17,20
80:5 82:5,6
91:12
**knew** 218:6
**know** 10:22
11:11,15,15,17
12:6,13 13:23
14:24 16:2,3
17:2 18:23
19:13 20:16
22:3 24:5
28:14,19 29:19
29:24 30:4,5,5
35:3 36:9
40:24 43:25
44:2,3,8,24
46:9 47:12
48:2,6,22 49:2
49:10 51:11,15
52:21 53:7
55:3,17,25
57:4 60:6,8
62:1,21 63:17
64:1,3,25 65:7
65:11,16,17,23
65:24,25 69:1
70:25 72:9,25
73:17 74:1,6
74:10 77:6
78:1,4 79:6,12

81:25 82:23
83:3 90:20
91:13 94:20
96:2,5 98:12
98:13,14,16,18
98:22 99:1,1,5
99:23 100:13
101:2,3 103:9
104:4,8 106:23
107:5,7,10,10
108:3,13,20,21
109:23 114:21
116:6,11
117:23,24
120:25 122:11
125:4,5,6,7
126:9 128:3,5
130:1 131:5
132:5,6 135:19
137:2,16,24
138:4 143:2
144:9 145:19
146:21 148:15
149:22,23
151:8,9,16
153:10 154:11
155:20 159:5
160:20,22
161:11 169:21
179:11 181:18
182:17 183:2
184:23 185:12
185:21 186:1,2
186:15,24
187:2 188:25
189:3,16
192:21,22
193:16 194:14
194:14,14,18
198:16 199:5,7
199:20 200:7
201:5,6,7,9
202:11,18,19
202:21 203:2,5
203:7,13,16,20

203:24 204:8
205:3,5,10,12
205:16,17,19
205:21,22
206:11,16,17
206:18,20,24
207:2,20 208:2
210:12 211:19
211:24 213:1
215:10 216:6
217:13 219:12
219:21,21,21
219:23,23
220:9 222:17
228:7 230:20
**knowledge** 20:3
62:17 104:21
138:13 201:12
201:14
**known** 233:9
**knows** 23:9
155:10 191:8
199:7 218:6
**KORI** 5:11
**Krause** 5:9,14
6:10 8:14 37:4
37:21,25 38:10
47:16,17 61:9
64:16,19 65:8
65:12 127:14
127:22,25
128:7,10,11,13
128:21,21
129:8 131:4,8
132:7,15
150:13 151:7
152:14,17,20
153:20 154:1
154:16 156:12
156:17,20,22
157:4 178:3
219:15,18,25

---
**L**
---
**L.L.P** 2:8

**LA** 110:4,14
115:8 175:24
176:17
**LA-22-13014A**
205:14
**label** 171:15,16
**labeled** 50:10
116:11 118:8
159:12 175:2
**labels** 141:20
**lacking** 213:16
**laid** 131:6
**Lake** 206:10
**Lanay** 1:18
234:11 235:17
**landing** 44:25
50:23 51:8,10
51:14,18 78:23
79:1,16,20,21
80:8 170:13,14
170:15 171:15
171:21 203:25
206:3,7,11
**language** 111:4
111:8 112:17
115:8 162:10
162:17,21
163:17,23
165:3 178:7,21
178:22
**languages** 178:8
**Lanier** 13:16,18
19:21
**large** 64:10
**Late** 105:24
**launched** 69:9
69:21,23 79:15
**launches** 67:11
69:7 118:22
**Laura** 9:21
25:15 104:10
178:17 179:3
**Laura/Delta**
9:17 177:11,16
**law** 1:2,19,20

2:2,13 3:11 7:4
9:23 10:13
63:20 64:7
84:17,17,17,18
86:4,6,8,9,10
87:4,5,6 89:10
89:12 90:4,8
91:6,8,9,15,20
91:24,25 92:25
93:18,20,20
110:5,14
113:15,23,24
113:25 114:11
114:14 115:13
115:15,15
136:11,12
137:16,20,25
154:21 155:2,6
155:12 157:9
157:13 178:8,9
180:8 193:8
221:21 234:2
235:4
**Law's** 63:11
**LAWSON** 2:17
**lawsuit** 60:17,19
60:20
**lawyer** 11:16
42:16 109:2,3
109:4 191:2
**lawyers** 12:7
33:20,24 61:10
179:7 196:12
**lead** 153:3
206:17,19
**leads** 20:20 27:6
41:1 75:15
**leaning** 109:13
**learn** 16:7 45:23
204:5 205:1,18
**learned** 45:21
**learning** 199:10
**lectures** 192:12
**left** 114:3 200:15
201:22

John Moseley    April 8, 2025

Page 252

legal 13:19 15:8
  67:25 68:17,24
  87:17 89:12
  93:11 106:13
  106:18 108:6
  137:14 167:5
  173:14,15,22
  177:1,1
lengthy 26:11
let's 16:12 45:6
  83:24 89:2
  111:15 133:25
  149:13 204:3
  213:2 215:25
  221:11,22
letter 86:12
  119:17,19
  120:18,19
  166:15,17,20
  166:25 167:4
letterhead
  119:24 120:1
letters 7:12
  54:12,19,20
  104:12 119:14
  147:10,12,15
  173:21
letting 179:11
level 199:18
licensed 88:16
lien 40:19 41:2
light 221:3
  226:6,16
limitation 179:4
limited 13:8
  78:13 138:18
  179:8
line 60:15 64:19
  70:9 81:2,8,14
  110:16 113:18
  113:22 133:5
  146:11 147:2,6
  147:11 168:6
  177:10 229:25
  232:2

lines 224:19
  225:20
link 50:20 51:25
  169:16 205:11
  207:8
linked 169:12
  205:4
LinkedIn
  169:12,16
  170:1
list 3:12 11:5
  17:5,14,23
  26:16 29:8
  36:23 41:5
  43:9 46:16
  70:6 73:4 75:8
  76:19,22 146:8
  151:7,12 154:1
  222:13
listed 34:3 52:11
  114:19 142:18
  142:23 144:12
listen 86:1 97:25
  191:3 194:9
  211:21,22,24
listening 85:24
  190:15
listing 106:8
lists 28:1 51:1
  64:21 169:2
  173:5
lit 52:6
litigation 208:12
  208:18,18
little 26:13
  74:22 103:12
  117:1,3 162:13
  164:22 221:7
live 34:18 77:4,7
  77:16
LLC 1:5 2:7,12
  13:9 234:5
  235:5,6
LLP 61:10
loaded 43:25

located 98:15,23
  101:23 103:10
  143:25
locations 98:16
  98:18
logically 112:4
login 79:5 133:9
  134:18 135:8
logins 79:6
logo 120:1,4,18
logos 120:2
long 125:10
longer 70:18
  165:5
look 9:9 10:22
  12:20 16:12,21
  19:17 26:1,12
  28:19 33:7
  49:20 62:24
  65:18 69:1
  83:4,14,24
  89:2 102:5
  118:18 123:24
  126:9 140:23
  146:3 160:15
  164:9 168:10
  170:1 177:13
  183:15 185:6
  214:11 224:14
  226:11 228:22
looked 13:2 33:6
  52:19 66:3
  160:12 162:17
  163:4,17
  214:14 225:21
looking 30:14
  49:22 115:7
  134:16 152:1,3
  162:23 173:22
  173:24 198:22
  200:14 213:11
  214:21,24
  215:1 217:22
looks 21:12
  33:15 106:8

116:7 148:14
  149:4 151:23
  175:14 181:22
  204:4,10 205:5
  205:12 217:4
Loop 1:20 10:15
Lord 191:4
LORs 155:24
loss 23:15 44:3
  51:19 179:6,12
  180:4
lot 13:6 44:10,11
  64:7 88:17
  91:13 123:19
Louisiana 2:9
  7:9 53:16
  63:21 88:19
  104:14 110:21
  112:6 118:12
  124:14 162:11
  166:25 172:4
  175:24 179:5
  197:17 204:11
  205:6,13
love 210:13
Lower 103:11
LSBA 118:23
luck 49:17
Luis 127:3
lump 95:17,19
lunch 105:19
  125:9

—————————————
          M
—————————————

M 3:6
ma'am 10:14,17
  11:1,7,10,13
  11:22 12:4,17
  12:19,24 25:5
  30:22 32:7,10
  34:15 36:18
  42:25 48:10
  54:9 84:5 89:4
  89:6 102:19,23
  103:16,21

110:3 111:22
  112:1,11 113:5
  127:13 130:13
  175:1 183:13
  222:4 224:18
  226:22 227:4
machine 1:19
Magazine 14:18
  15:15
mail 24:20 93:4
  93:8
mailed 217:7
mailers 104:13
main 132:19
  171:14
maintains
  209:21
majority 39:8
  216:19
making 21:17
  43:24 48:15
  56:18 134:6
  141:2 163:22
  191:16 192:1,5
man 98:24
  211:25
managed 101:4
management
  47:15 85:13
  126:22
managers 77:25
manners 89:8
Manual 223:22
manually
  200:25 201:1
manually-crea...
  224:7
map 46:23
mapped 46:24
  48:12
MAPPING 4:11
MAPS/SCHE...
  4:17
March 7:19,22
  130:5,12

John Moseley   April 8, 2025

Page 253

131:14 132:24
133:3 226:16
226:20
**mark** 16:22
18:21 28:18
31:9
**marked** 10:18
10:20 16:19
18:18 28:15
31:11 32:25
36:6 40:15
41:10 42:21
46:3,6 49:13
50:7 52:16
53:24 59:6
61:13 62:19
64:11 66:7
69:25 71:1
74:18 76:6
80:10 82:9
84:1 97:18
99:7 101:17
102:13 105:14
107:18 109:10
112:24 118:6
119:4 123:8
125:22 129:22
132:20 135:17
138:1 141:23
148:19 153:18
157:19 159:10
161:16 164:2
167:7,24 169:9
172:10 174:17
177:5 180:14
195:19 207:15
221:16 224:24
229:21
**market** 116:14
116:16 187:20
**marketing** 6:12
7:6 8:16,17
9:14 17:15,19
17:21 18:12
38:11 39:8,25

82:25 83:1
84:6,12 87:15
87:17,25 90:14
94:14 95:17
113:3,12
118:15 150:19
157:3,4,21
161:13 174:24
177:22 196:17
196:24 197:5
**markets** 197:2
**marking** 221:20
225:7,14
**Mary** 3:14,18
4:13 5:23 6:3
20:6,7,12,19
21:12,22 22:2
71:8 72:4 73:3
75:7 174:6
**mass-action**
38:3
**master** 158:25
**match** 223:16,17
**matches** 96:13
224:7
**matching**
222:24 223:2
**material** 207:22
**math** 96:5
**matt** 139:21
181:2 190:21
190:21,24
191:2,23
210:14 211:13
211:17,21,21
**matter** 177:2
**matters** 173:16
**Matthew** 2:13
231:4 235:6
**matthewprob...**
2:15
**McClenny** 7:17
8:12 106:3
119:23,25
120:3,21

122:19 123:16
136:16 142:14
158:5 159:21
171:16 183:17
183:22 184:5
184:16 185:7
219:17
**mean** 25:4 26:10
39:6,16,21
41:4 42:6 51:6
51:10 55:5
72:18 85:18
86:19 93:1
125:3 128:18
131:3 137:8
157:2 165:10
176:21 183:9
185:6,21
196:19 198:13
201:7 205:24
206:23 208:23
217:4,7,15
223:4
**meaning** 126:25
**means** 17:17
35:14 42:10
53:8 62:2
72:21 105:4
149:23 150:3
157:8,10
175:24 182:8
186:1 198:14
**meant** 48:10
65:24 72:9
203:22
**Media** 8:11
149:18 150:4
**mediation** 55:18
60:21
**mediations** 61:2
**medical** 86:11
**meet** 86:9 87:5
93:12 113:24
171:11
**Meetings** 20:1

**members** 122:16
136:10
**memorized**
217:16,21
218:7
**memory** 62:9
148:3,10
**mentioned**
31:25 106:13
149:21
**mentions** 21:22
**message** 8:11
40:7 71:12
104:18,19
149:18 150:4
170:4,6,14,25
171:2,12,18,19
**messages** 104:15
104:17 147:15
170:22
**messed** 24:11
**met** 13:22 14:5
**method** 137:12
**methods** 138:10
**mgoott@walk...**
2:5
**Michael** 110:17
**middle** 60:15
73:1 75:4,6
102:5 121:3,7
152:3 153:8
**million** 83:18,19
94:8,25 95:17
95:19 117:12
160:9 214:17
214:22,23
215:3,18 222:3
222:10 226:17
226:21 228:2
228:17,23
**mind** 82:20
109:22 149:9
**mine** 83:13
191:15
**minus** 209:17

**minutes** 45:5
113:11
**Miriam** 2:2
58:21 96:21
121:13 134:2
150:2 172:16
176:12 191:25
213:6 225:12
235:4
**mischaracterize**
134:5
**mischaracteri...**
39:3 69:12
97:5 114:3
128:14,22
133:17 156:5
162:22 165:22
187:11 197:4
217:6
**mischaracteri...**
73:17
**misleading**
112:17
**missed** 15:12
178:9
**missing** 27:19
173:18
**Mississippi**
63:21
**mistake** 45:24
**mistaken** 44:8
98:5 101:24
130:23 200:19
**mistakes** 24:13
**MK** 73:24 76:22
**Mma** 1:2,20 2:2
3:11 5:17 6:4
7:9,18 8:6,9,11
9:19,23 10:13
11:8 12:11,23
13:14,20 14:2
15:23 16:4
17:5,6,13,14
17:18,20,24
20:8,14,18

| | | | | |
|---|---|---|---|---|
| 26:22 27:7,13 | 181:20 182:5 | 59:10 61:15 | **MMA-MB000...** | 8:4 |
| 27:20 28:10 | 184:21 186:4,9 | 62:21 64:14 | 4:14 | **MMA-MB000...** |
| 29:20 33:24 | 186:12,19 | 66:5 70:2 71:3 | **MMA-MB000...** | 8:7 |
| 34:3 36:23 | 187:9,23 188:1 | 74:20 76:8 | 9:25 | **MMA-MB000...** |
| 37:7,21 38:10 | 188:4,8,11 | 80:12 82:11 | **MMA-MB000...** | 8:12 |
| 38:21 39:21 | 189:7,10 193:5 | 84:3 99:9 | 9:13 | **MMA-MB000...** |
| 40:3,5,14 | 193:16,17 | 101:19 102:15 | **MMA-MB000...** | 8:20 |
| 47:14,16 48:23 | 194:18,19 | 105:16 107:20 | 9:19 | **MMA-MB000...** |
| 48:24,25 49:9 | 196:1,5,12 | 109:9 113:3 | **MMA-MB000...** | 7:21 |
| 51:12 53:6 | 201:14 202:17 | 118:8 119:7 | 9:17 | **MMA-MB000...** |
| 54:19,21 62:8 | 208:18 209:19 | 123:10 126:5 | **MMA-MB000...** | 6:20 |
| 62:16 63:13,15 | 211:16 215:8 | 127:12 129:24 | 9:7 | **MMA-MB000...** |
| 63:20,24,25 | 215:22 216:4 | 132:22 138:3 | **MMA-MB000...** | 7:18 |
| 66:18,22 67:8 | 216:16,20,24 | 148:21 153:16 | 8:23 | **MMA-MB000...** |
| 69:11 73:22 | 216:25 217:3 | 157:22,23 | **MMA-MB000...** | 6:25 |
| 77:15 79:25 | 217:10 218:13 | 159:12,15 | 9:4 | **MMA-MB000...** |
| 80:5 81:24 | 218:15,23,25 | 161:18,21 | **MMA-MB000...** | 6:22 |
| 82:1,4,20 | 219:3,7,9,11 | 164:4 167:11 | 7:9 | **MMA-MB000...** |
| 84:21 85:1,7 | 220:4,6,8,11 | 167:23 169:13 | **MMA-MB000...** | 4:4 6:18 |
| 85:23 86:1,16 | 220:13,15,19 | 172:12,22 | 3:24 | **MMA-MB000...** |
| 87:10 88:2,8 | 220:21,23 | 174:19 175:3 | **MMA-MB000...** | 5:22 |
| 88:10 90:10,15 | 221:1,4,21 | 177:7 180:16 | 4:7 | **MMA-MB000...** |
| 91:12 92:9 | 222:9 223:15 | 195:22 196:1 | **MMA-MB000...** | 5:19 |
| 93:4,7,12,23 | 223:17 229:14 | 200:10 207:17 | 5:10 | **MMA-MB000...** |
| 97:24,24 98:4 | 230:7,11,16,22 | 214:13 216:9 | **MMA-MB000...** | 5:17 |
| 98:9 99:14 | 234:2 235:4 | 218:12,20 | 5:12 | **MMA-MB000...** |
| 100:22 104:4 | **MMA's** 10:16 | 219:5 220:3,10 | **MMA-MB000...** | 5:7 |
| 104:11,16,20 | 13:11 17:4 | 220:17 225:17 | 5:14 | **MMA-MB000...** |
| 106:25 118:12 | 38:25 86:21 | 225:24 226:16 | **MMA-MB000...** | 4:20 |
| 126:12,15 | 114:23 131:4 | 226:23 227:5 | 5:25 | **MMA-MB000...** |
| 128:4,13,21 | 182:6 188:11 | 227:20 228:9 | **MMA-MB000...** | 4:12 |
| 129:11 130:15 | 192:20 194:24 | 228:16,22 | 6:5 | **MMA-MB001...** |
| 131:24 134:13 | 203:15 209:3,6 | 229:18 | **MMA-MB000...** | 4:9 |
| 136:21 137:6 | 217:11,17 | **MMA-MB000...** | 6:11 | **MMA-MB001...** |
| 137:11 138:24 | 218:17 219:3 | 3:13 | **MMA-MB000...** | 3:22 |
| 138:25 144:5 | 219:11,13,25 | **MMA-MB000...** | 6:15 | **MMA-MB001...** |
| 146:9 148:11 | 220:15,23 | 9:9 | **MMA-MB000...** | 3:19 |
| 151:10,22 | 221:2,5 | **MMA-MB000...** | 7:5 | **MMA-MB001...** |
| 152:15,20 | **MMA-MB** | 8:14 | **MMA-MB000...** | 3:16 |
| 154:24 156:12 | 16:24 18:22 | **MMA-MB000...** | 7:12 | **MMA-MB001...** |
| 156:20,22 | 31:15 32:4 | 6:7 | **MMA-MB000...** | 6:13 |
| 157:3 166:4 | 33:2 36:12 | **MMA-MB000...** | 7:15 | **MMA-MB001...** |
| 170:12,14 | 41:9 46:7 | 5:4 | **MMA-MB000...** | 7:7 |
| 173:18 177:16 | 49:12 50:11 | **MMA-MB000...** | 7:23 | **MMA-MB001...** |
| 179:1 181:19 | 52:15 54:21 | 4:23 | **MMA-MB000...** | 8:16 |

John Moseley    April 8, 2025

| | | | | |
|---|---|---|---|---|
| **MMA-MB001...** 8:18 | **Moseley** 1:10,14 3:5,21 4:4,8,11 | 51:9,11 **MSA** 26:24 27:3 | 2:19 **native** 19:4 26:2 | 41:1 76:25 100:23 106:20 |
| **MMA-MB001...** 9:15 | 4:17,23 5:4,6 5:18 6:6,10,17 | 40:25 41:1,4 67:10,12,19,23 | 41:8 42:20 46:10,10 50:9 | 128:4 129:14 **Needed-Re** |
| **MMA-MB001...** 9:21 | 6:20,22,24 7:8 7:11 8:8,12,14 | 67:23 68:10,12 68:14,16,23 | 59:9,19 80:12 82:11 83:9,10 | 126:12 **needs** 64:20,22 |
| **MMA-MBB0...** 9:22 | 8:19 9:3,4,8,16 9:19 10:4,8,12 | 69:11,19,23 75:22 80:21 | 83:13 102:16 109:8 119:6,8 | 189:25 **Negotiated** |
| **Mma-pllc.com** 202:14 206:8 | 46:5 48:8 63:17 96:24 | 84:7,10,11 89:22,24 97:21 | 123:11 153:17 164:5 172:13 | 197:7 **neither** 140:20 |
| **MMA=MB00...** 4:18 | 122:19 125:25 133:22 134:3 | 118:2 159:4,5 160:11 161:4 | 172:14 180:16 181:7 | 140:20 168:24 191:13,14 |
| **MMAC** 6:7,10 **MMAC.Pdf** | 134:11 136:16 140:23 142:8 | **MSAs** 160:21,24 **multiple** 24:25 | **natively** 141:21 **natural** 47:7 | 235:8 **Network** 13:9 |
| 110:9 **mockups** 206:3 | 143:8 145:15 158:5 159:21 | 96:20 141:11 157:10,12 | **necessarily** 27:1 157:1,2 209:12 | **never** 45:24 50:1 52:9 69:14 |
| 206:4,5 **Modsen** 170:13 | 167:13 171:16 183:17,22 | 186:15 **multiply** 96:11 | **necessary** 105:22 164:25 | 95:9 107:8 133:17 167:10 |
| 170:19,21 171:13 172:3 | 184:5,16 185:8 192:9,16 195:5 | **multiplying** 96:1 | **need** 9:12 14:22 14:25 22:7 | 171:3,8 192:25 199:25 |
| **Modsen's** 170:2 171:3 | 195:14,17 212:21 213:12 | **N** | 32:16 40:19 45:2 46:14 | **new** 2:9 9:19 25:4,7 43:20 |
| **Modsin** 231:4 **moment** 224:6 | 214:8,12 219:17 221:20 | **N** 3:1,6,6 **name** 10:9 13:22 | 58:22,22 63:6 67:5 70:7 72:5 | 43:23 70:8,9 98:20,20,23 |
| **Monday** 67:11 69:7,10,21 | 231:11,15 233:1,5,9 | 13:23 23:14 51:16,19 70:9 | 73:5,25 74:6 78:5 89:5 | 101:7,24 102:3 113:11 123:21 |
| 75:1 109:18 165:12 | 234:9,14 **Moseley's** 58:22 | 70:10 99:5 101:10 110:8 | 96:16,18 102:21 106:10 | 124:5 131:22 132:2 134:24 |
| **money** 216:20 **monitoring** | 221:3 **MOSHENBE...** | 142:18,22 159:20,23 | 110:13 120:22 124:9 126:15 | 135:4 168:19 181:19 182:4 |
| 53:11 **month** 160:11 | 2:17 **Mosley** 10:11 | 171:16 222:18 233:10 | 127:17 130:14 138:6 139:20 | 200:5 225:6 **news** 77:15 |
| 161:13 **months** 161:6,10 | 48:4 119:23,25 120:3,21 | **Name-Retainer** 110:8 | 139:22 141:9 144:23 145:1 | **niche** 38:3 **Nieto** 127:3,6,8 |
| **Morison** 135:25 **morning** 10:8 | 142:14,19 143:16 159:18 | **named** 127:3 131:16 | 155:9 162:14 173:14 186:14 | **no-obligation** 122:20 |
| 76:15 141:3 164:17 165:12 | **mother** 154:13 154:20 | **names** 3:12 98:25 219:19 | 189:23,24 191:5 192:4 | **NO.223** 235:19 **Nods** 25:2 |
| **Morris** 1:5 2:7 2:12 17:6,13 | **Motter** 135:24 **move** 67:15 | 219:21 **naming** 219:22 | 194:6,13 195:7 195:15 209:12 | **nonmarketed** 27:7,7 |
| 29:20 154:23 154:24 183:10 | 195:16 197:22 **moving** 72:24 | **nap** 210:15,16 **narrowly** 78:2 | 213:24 216:7 217:13 231:17 | **nonresponsive** 27:9 44:15 |
| 208:18 234:5 235:5,6 | 93:17 **MPA** 50:24 **MPAs** 50:18 | **Natalie** 2:17 53:17 83:10 180:21 235:7 **natalie.galern...** | 231:19 **needed** 7:18 39:7 40:23 | 67:14 72:16 75:25 195:18 197:23 |

Worldwide Court Reporters, Inc.
(800) 745-1101

**normal** 20:23,25
51:18 103:15
202:3
**North** 1:20
10:15
**NOTARY**
233:15
**note** 37:1,4 54:6
**noted** 192:14
233:2
**notes** 21:14
**notice** 3:11 11:2
12:9 27:15
96:21 138:6
140:1,2,3,4
142:7 144:16
146:1 147:25
149:7 150:8
154:5 186:6
187:19 189:6
189:11 191:18
216:10
**November**
228:24 229:4
**NSA** 173:3
**NUM** 222:15
223:11
**number** 18:22
23:15,15 24:9
24:15,15 33:3
36:12 40:14
41:8,9 44:2,3
46:7 51:19,20
71:15 88:5,5,7
88:15 95:25
96:3 97:3
103:17,18
117:13 122:3
152:2,2,3,4,6
157:22,23
175:17,20,23
176:6,7,16,23
182:1 204:11
204:12,13
205:7 207:17

207:18 208:16
217:1 218:6
222:5,7,7,16
223:12,13
**number's**
117:10
**number/policy**
24:9
**numbered** 1:16
31:14 42:19
49:12 59:10
113:2 119:7
153:8 169:13
177:7
**numbers** 12:23
13:1 16:24
19:3 24:10
32:4 64:22
87:19 88:1,13
103:19,23,24
104:16 117:2,4
152:9 196:1
217:16
**numerous** 35:24

───────────

**O**

**O** 3:6
**o'clock** 45:4
**oath** 11:18 233:9
**object** 15:1 27:8
44:14,21 55:19
56:3,24 96:8
114:2 133:23
134:3 144:22
149:11,25
166:11 175:25
176:18 179:13
186:14 187:4
189:13,20,22
194:12 204:22
**objected** 44:22
**objection** 14:3
14:10,21,23,23
15:3,4,5,8,17
16:9 21:16

23:19 27:14
28:11 30:2
34:6,25 35:7
35:15,22 36:4
39:2 43:17
44:22 47:21
48:3 60:4 64:5
67:25 68:17,24
69:12 70:23
72:1,16 73:10
73:16 75:25
79:23 92:11,20
95:7,14 97:5
104:2 108:15
123:25 127:23
128:14,22
132:12,16
133:16 137:14
137:22 142:10
143:4 145:17
146:5 147:4,21
148:16 149:15
155:8 156:5,19
162:6,22 163:7
165:22 166:22
167:5 171:6
182:15 183:1,7
183:23 184:7
184:10 185:16
186:20 187:11
187:16 188:2
188:12,23
192:23 193:18
194:20 197:3
197:11 199:22
201:16 217:5
217:25
**objections** 14:25
59:4 134:7
191:16 192:2,7
**obtain** 60:16
138:11 163:18
**obtained** 27:17
60:21 62:7
138:25 154:7

154:10
**obtaining** 44:18
92:8
**obvious** 208:24
**obviously** 12:5
116:12
**October** 5:13,15
5:18,20,23 6:3
9:11 64:17
66:14 70:4
71:8 73:1 75:2
75:13 76:12
172:20,23
**offended** 98:24
**office** 67:4,18,22
68:15 113:10
233:12
**officer** 234:15
235:2
**offices** 1:19
10:16
**oftentimes** 24:11
40:4
**oh** 18:23 29:3
54:2 83:8
97:20 98:24
109:21 142:24
146:18 152:5
153:10 155:24
190:6 199:2
224:21
**Ohio** 98:21
**Ohlsson** 8:8
143:14,19,20
144:12 145:12
**okay** 12:5,22
13:20 14:7,13
15:10,23 16:12
17:3,11,17
18:4 19:9,19
19:24 20:4,19
20:25 21:11,25
25:22 26:6
27:24 28:17,18
28:22 29:4,11

29:24 30:7,14
30:19 33:4,5
33:23 34:3,22
35:19 36:8,11
37:21,25 39:13
40:5,13 42:13
43:1 44:14
46:5,13,19
47:14 48:19
49:11 50:13
52:5,10,23
53:11,23 55:11
59:8 60:8 61:2
61:5,12,19,25
62:11 64:13
65:22 66:5,12
67:13 69:6
71:3 72:15
73:20 75:12,24
76:10 77:22
78:3,12,18,22
79:6,9 80:6,13
80:19 81:23
82:4 84:6,11
84:15 86:3
87:3,15 88:4
89:2,3 93:3,7
93:12,17,25
95:25 97:17
98:4,9,18,22
99:1,3,24
100:20 101:25
102:12,16
103:6 104:7,23
105:25 106:23
107:10,17
108:5,21 109:4
109:7,15,17,24
109:25 110:24
111:14 112:5
112:23 113:20
114:7,19,25
115:12,18
116:20 118:5
118:18 120:2,6

John Moseley    April 8, 2025

120:13,17
121:3 122:2,6
123:14,19
124:8,17
125:10 126:11
126:20,24
127:11 128:10
129:2,13,21
130:2,3,10,20
131:3,12
132:22 134:2
134:17,21
135:1,7,20,21
136:5 138:17
140:10 144:3,7
145:14 146:8
146:12,23
147:14 148:21
150:10 151:4
152:9,22
154:15 157:18
158:11 160:1
160:19 163:4
163:15 164:6
165:5,8,15,19
166:4 168:2,6
169:14 170:1
172:19 174:4
174:16,24
175:6 176:4,25
177:10,23
180:13 181:7,8
181:24 182:13
183:14 184:14
186:25 194:11
195:6,24
196:14 197:22
198:19,22
200:17 201:21
203:7 204:3,18
205:8 208:6,15
208:20 209:16
214:12,24
215:6,10,17,19
215:25 217:1

217:10 219:14
220:10 221:10
221:20 222:2
222:13,18
223:7,9,15,23
224:3 226:15
226:23 227:5
227:19 228:9
228:16 229:18
231:10
**old** 126:22
**Olson** 12:15
**onboard** 101:5
**ONBOARDI...**
5:19
**once** 45:22 52:9
70:17 113:13
150:5 170:14
**one-million-d...**
228:19
**one-page** 40:17
49:11
**ones** 11:16 13:2
132:19 159:7
173:14 200:9
**online** 73:5,9
75:9,16,20
76:3,24 87:19
**open** 42:8,12
**opinion** 56:7
191:7,10
**opinions** 192:12
**opposed** 157:8
**opt** 167:1 170:15
171:9
**opt-in** 166:25
**opted** 170:13
171:18
**oral** 1:9,14
234:16
**order** 22:8 63:6
94:1,3 96:24
115:18 116:7
117:5,9,13
118:3 120:20

138:22 139:13
158:12,13
160:1 175:3,4
175:11
**Ordinarily**
105:21
**organic** 27:6
41:1 51:12
72:11,22
**original** 208:11
**originally** 159:5
**originated** 42:8
49:8 55:18
56:2 145:20
156:8
**Orleans** 2:9
98:20,23 101:8
101:24 102:3
**outcome** 235:12
**outgoing** 54:7
54:10
**Outline** 146:9
**outside** 12:12
40:25 41:4
67:7,19 142:6
143:11 144:15
145:25 147:25
154:5 186:5
187:19
**overly** 207:21
**owner** 21:5
158:5 159:21
**owners** 110:22

---

**P**

**P.C** 2:3
**p.m** 1:17 36:16
125:17,18,19
125:21 169:16
221:12,14,15
221:17 231:22
231:24
**P.O** 2:4
**PA** 77:10 78:9
78:11

**packet** 61:21,25
62:1 173:13
**packets** 62:16
82:19,23 83:2
177:19
**page** 3:2,10 4:2
5:2 6:2 7:2 8:2
9:2 11:5,5 19:7
22:1 25:18
28:23 29:1
30:16,17,23
31:15,21 33:7
33:8,11 34:9
34:12,16 36:13
36:14 40:19
50:23 51:8,11
51:14,18 52:15
61:8 64:14,16
71:6 72:25
73:2,21 74:4
75:5,6,12
76:11 77:2,11
77:12 78:23
79:1,16,20,21
80:8 89:2,3
94:1 97:11,14
99:19,20,20
102:6 110:18
110:18 111:7
111:14 113:6
113:13 114:5,7
115:17 116:11
116:25 117:2,3
117:7,11,13
118:3,19
119:23 120:6
120:10,17
121:3,7,9,11
122:2,3,10
123:15,24
124:4,20
126:25,25
127:12,12
130:10 131:13
131:15,16

133:20 136:5,5
140:24,24
146:15,16,17
146:18,18
147:19 148:24
149:2,17 151:5
151:18,19
152:4,6,23
153:8,10
158:11,21
159:15,17
160:1 161:20
164:9 168:11
170:4,14,16
171:15,21
172:5,22 175:2
175:8,16 178:3
200:10 201:20
203:25 204:4
204:19 205:9
206:13 207:19
209:1 214:13
216:1,9 217:1
218:12,20
219:5 220:10
225:17 226:16
227:5,19 228:9
232:2
**pages** 9:12 44:25
111:2 117:4
122:5 170:13
206:3,8,11
**paid** 81:24 82:5
82:6 95:16
96:10,12 112:8
196:23 209:15
209:18 212:7
212:11,24,25
215:6,8,22
217:11,12
218:6,17 219:3
219:11,13,15
219:18 220:8
220:15,23
221:4 222:9

paper 116:3
176:11
paper/mediati...
56:1
papers 55:18
papers/mediat...
55:14
paperwork 74:2
210:8
paragraph
26:13,14 34:13
70:12 86:3
87:16,16 90:1
111:16 113:17
113:21 114:8
164:24
part 13:4 19:4
26:24 39:24
40:1 46:10
50:10 57:19,24
58:10 63:13
75:22 114:3
116:6 118:15
127:25 130:17
139:2 168:12
174:5 181:8
participate
98:10 199:3
participated
199:24 200:6
participating
202:24
particular 83:3
103:19 111:4
174:4 202:9
203:10,16,17
203:18 215:21
222:25 223:1
particularly
221:3
parties 126:23
184:24 235:3,9
partly 56:6,7
partner 36:20
Partners 127:6,8

partnership
37:23
party 3:19 29:4
30:14 234:22
PAs 78:19
pass 38:15,17
Pate 3:15,21,23
4:19 5:16 20:5
20:7,11,17,19
26:7 32:13
Patterson 2:3,3
139:16,20,24
140:2,9 190:21
190:24 191:1,4
202:22,23
208:25 209:22
209:25
Patterson's
140:11
patterson.com
2:6
pay 81:23 82:4
94:23,25 95:5
95:8,12 110:23
112:7
paying 161:12
payment 80:22
94:10,13 209:7
212:20 214:25
221:2 222:25
223:10 224:22
225:21,21,25
226:2,12,12,16
226:19 227:1,8
227:11,20,23
228:1,13,19
229:6
payments
215:15 216:10
216:15,20,24
221:25 223:16
223:18,25
224:7 226:5
227:12 229:15
pdf 124:20

173:12
pdf-- 173:12
pdfs 65:20
pending 22:11
195:4
people 12:14
24:11 27:22
39:9 44:7,11
67:4,7,17 79:6
110:1 200:23
207:3
percent 35:13
35:13,20,21
52:6,6 215:3,4
percentage 52:3
52:7 72:13
percentages
35:5,19
percents 35:12
perfect 131:7
perform 84:16
113:14
performed 41:3
193:11,12,14
194:1,16
performing
131:18
period 25:9
178:16 179:6
179:12 180:4
permissible
137:16,19
person 11:8
79:11,19 88:21
233:10
personal 201:12
201:12
personally 67:5
67:9,18 107:7
107:14 201:9
205:3 233:9
Phil 3:14,18,21
4:3,6,8,11,16
4:19 5:6,16,18
5:20 6:17,19

6:22,24 7:3,8
7:17,20 9:6,16
9:18 19:16
59:16 71:14,19
72:4 73:3
76:15 111:11
111:12 112:15
124:5 130:4
153:23 167:12
168:3,19
173:13 181:10
phone 20:1
44:25 71:15
88:13 97:21
98:10,14
103:23,24
phones 100:24
phonetic 153:22
171:13 230:25
231:2
photograph
170:3
physical 7:11
119:13,18
picture 28:7
207:2,6
pictures 207:4,5
207:8,10
piece 176:11
pile 225:13
pipe 47:4
place 85:15
124:21 125:4
placed 16:3 88:5
158:2
places 216:21
plaintiff 32:17
234:3
Plaintiff's 14:17
plaintiffs 32:21
plan 183:5
played 199:15
please 10:10
14:22 18:17
21:7 50:17

54:14 57:11
61:22 74:22
75:14 83:9
100:6 107:22
119:19 121:4
124:13 125:15
133:8 134:18
137:1 141:12
145:6 150:15
155:10 167:15
167:16 173:7
173:12 177:17
199:15
PLLC 1:2 2:2,17
3:11 10:13
120:21 185:8
234:2 235:4
pllc.com 202:17
plug 150:4
plug-in 49:1,3
plus 181:8 215:3
PNC 23:14 25:3
27:12
PNCs 25:1,9
26:23
POA 4:9 7:14
123:16
point 15:23
39:13 56:10
108:22 125:9
140:11 141:1
185:2 205:22
pointing 27:23
policies 39:9
policy 23:15
24:15 44:2,4
51:19
pop 51:16 207:8
popped 207:4,7
populate 22:6
portal 77:3,6,9
77:10,16,19,25
78:1,2,8,19,22
79:3,7,10,14
79:15 80:7

John Moseley    April 8, 2025

Page 259

portals 77:22
portion 34:10,19
  34:23 75:17,20
  76:2
portions 33:15
position 55:13
  55:18 56:1
  106:9 189:9
  191:20
possession
  229:14
possible 28:7
  112:18 132:11
  141:10 185:5
  207:22 213:19
  228:4,6
possibly 88:9,10
  156:1 182:22
  204:5
post 138:12,16
  149:4 150:6
  159:6 169:12
  169:16 170:1
post-retention
  100:19,20
  153:13 154:4
post-suit 35:21
posted 151:9
  153:3
posting 90:7
  114:13 151:14
  151:14
potential 24:7
  25:4,7 34:19
  42:4 43:15,19
  43:23 69:17,18
  69:22 85:22
  86:8,15,21,22
  87:5,9,23 88:6
  89:17 90:3,4,5
  90:10 91:7,10
  91:25 93:19
  98:2,11 103:25
  107:3,8 113:23
  114:10,11,12

115:14 134:12
  135:4 137:13
  138:14 156:4
  165:16,17
  179:23 180:3,5
  185:4 186:11
  186:18 188:4
  188:10,10
  189:1 193:11
  193:15,17
  194:17,18
  201:10,15
  202:9,12 203:8
  203:14,21
  204:9 206:1
  230:13,16
potentially
  128:20 199:4
practice 85:7
  137:5 161:1,2
pre-lit 52:6
pre-screening
  86:9
pre-suit 35:21
preceding
  151:19 152:23
  158:11 160:1
prefaces 54:23
prep 142:6
  143:11 145:25
  186:5
prepare 12:7
  196:14,21
  199:10
prepared 138:6
  139:11,18,18
  140:11 142:5
  146:13 149:3
  150:7 151:1
  154:3 186:7
  196:5,9 197:12
  197:15 198:15
  218:5
preparing 16:7
  197:1 216:14

prepay 93:18
  115:13
prepped 144:15
  147:24 187:18
Pres 35:13,14
prescreen 96:4
  117:7
prescreened
  91:7,25 93:19
  94:3,6,10,23
  95:2,12 97:2,3
  97:9,12 115:14
  115:20,22
  158:14,19
  160:2,2,5
  175:6 188:21
prescreening
  84:16 87:6
  90:2 95:16
  113:14,24
  114:9 156:3
  194:16
prescriptive
  178:16 179:5
  179:12 180:4
prescrubbing
  193:15
present 2:22
  85:1,23
presented 89:19
preserved 48:1
  48:22,23
presuit 35:14
presumably
  102:4 104:4
presume 85:11
  104:3 151:1
pretty 99:5
  231:4
previous 22:1
  28:13 153:10
  168:7 229:3
previously 48:20
  78:3 161:4
  163:4 180:7

222:6
primarily 53:16
print 105:1
printed 181:2
printing 147:18
prior 23:1 30:23
  63:12 67:12
  128:16,18
  131:4 133:25
  161:7 165:2,19
  166:2 208:12
prioritize
  150:15
probably 42:11
  152:3 158:4
  215:23 223:3
problem 214:6
Probus 2:13,13
  139:22,25
  140:4,7,21
  174:20 189:21
  189:25 190:4,7
  190:11,14,18
  190:22,25
  198:24 210:1,4
  210:7,10,12,16
  210:19,22,25
  211:3,7,9,12
  211:15,19,23
  212:1 231:10
  235:6
Procedure 1:22
proceed 128:5
proceeding
  235:10
process 6:4
  38:25 39:15
  54:25 55:2
  58:25 62:3
  75:16,21,23
  76:3 77:3 80:4
  92:23 120:21
  129:18 130:17
  130:24 131:9
processes 18:1,2

processing 38:6
  55:8
procure 193:8
procured 186:8
  189:7,9 192:19
  193:1,5
procuring 50:3
produce 56:7
  139:3 198:14
  208:20 209:20
  212:9 213:18
  221:1
produced 1:15
  12:21 17:9
  19:11,12 30:8
  30:9 141:21
  167:10 195:25
  197:15 198:5,9
  212:4 216:16
producing 139:6
  207:21 209:11
  210:22
product 198:2
production
  207:23 229:13
project 100:16
  100:18
pronounce
  174:8
proper 122:24
  129:15
properly 110:23
property 21:5
  41:17 59:20,23
  77:24 103:14
  110:22 111:24
  112:8,12 115:6
  120:20 121:21
  124:25 156:16
  164:20 175:18
  202:2
property/home
  175:21
proposed 86:10
  86:15,21 87:7

John Moseley    April 8, 2025

Page 260

87:10,12 111:8
113:25
**prosecutable**
39:14 40:2
**prosecute** 128:5
182:10
**prosecuting**
182:11 183:5
183:25 184:17
187:9,24 188:9
192:21
**prosecution**
74:13,14
**Protect** 120:10
**prove** 143:3
**proved** 233:9
**provide** 61:22
84:21 86:8,15
86:21,22 87:5
87:9 90:18
91:7,25 100:25
107:2,13
113:23 153:1
173:12,23,24
**provided** 19:1,2
28:9 29:25
30:12 55:13,17
56:1 87:11
90:15 97:22
103:24 107:8
144:17,21
145:7 165:16
165:17 173:15
**provides** 82:18
91:4,19 96:24
103:17 121:24
214:8
**providing** 84:12
90:25 92:9
103:3 118:16
**provisions** 1:22
**public** 20:23,25
40:20 77:24
110:25 233:15
**pull** 131:21

207:25
**pulled** 131:23
**pulling** 65:19
131:17 144:19
**purposes** 233:11
**pursuant** 1:21
33:24 216:11
235:1
**pursue** 163:11
**push** 66:25
105:21
**pushed** 49:5,6,8
127:18 174:1
**put** 24:21 52:14
105:1 123:22
124:14 170:16
171:10 197:21
205:6 209:15
224:15 225:6
225:13

**Q**

**qualified** 205:23
**qualify** 43:19,22
**quantity** 81:17
**question** 8:4
14:23 15:4,14
15:17 17:23
21:19,20 22:12
22:20,22,24
23:2,7,23
27:11 28:3,13
34:22 43:25
44:17,19 46:19
48:17 54:2
55:21,23 57:8
57:22 58:4,7,8
59:1 63:10
67:13,17,21
77:23 85:4,5
85:22 87:2
89:20 91:23
92:2,8 95:11
96:9,17,20
97:7,20 101:15

107:25 108:5
109:20 117:6
130:22 133:23
136:3 142:11
142:24 143:11
144:23,25
145:3,5 148:9
150:11 154:6
163:2 176:19
180:1 182:23
185:3 186:6
187:5 189:19
189:21 190:23
190:25 191:7,8
193:23 194:2
194:10 195:4
195:10,11,18
197:25 198:6
198:10,17
199:5,14 200:1
200:4,5 202:20
202:20 204:18
204:20 212:2,8
216:1 218:2
224:3
**questionnaire**
3:15 22:6
23:25 25:23
27:5 57:13,14
57:17,18 66:3
89:18,21
**questions** 19:18
21:18 22:6,7,9
22:12 23:12,18
23:25 24:5,7
26:7 28:6
30:13 33:14
43:10,11,14
46:16,25 47:25
48:3,8,9,12,13
48:19,21 52:19
54:23,24 55:11
57:12,13 58:20
59:3 60:12
64:8 70:14

84:23 85:3,9
89:11,16 97:23
123:19 138:6
146:14 147:24
154:3 155:10
191:21 192:12
195:11 208:10
213:6,12 214:8
231:12
**QUESTIONS/...**
4:6
**quick** 45:2 102:7
221:7 222:10
**Quiet** 191:2
**quite** 188:13
208:24
**quote** 136:12
**quotes** 62:12

**R**

**Radford** 3:18,23
4:6 5:9,11,14
5:23 6:3,9,14
7:3,11,14,22
8:3,6,11,19,22
30:19 33:11
34:8,22 35:4
37:2 56:12
61:17,19 62:11
65:2,4,18 75:1
75:13 77:14
79:15 80:20
82:14,18,24
99:11 109:25
111:11,18,23
112:19 119:9
119:16 120:14
123:12 124:19
132:23 135:22
136:7,9,20
140:25 141:9
142:13 151:21
152:16 153:1
153:24 162:2
162:10 164:15

164:19 165:8
177:23
**radio** 7:9 118:12
118:15 197:10
**Rahul** 152:25
153:9
**raise** 145:2
**raised** 56:10
171:14
**Ramadan** 7:20
7:22 131:16
133:3,8,11
134:17 135:7
**ran** 87:25 157:3
157:4 170:19
182:6 197:17
**Randall** 2:21
**rate** 81:5,11,19
93:19 115:13
175:9
**rates** 197:7
**re-push** 173:7
**reach** 91:14
230:12
**reached** 230:20
**reaches** 21:5,9
178:3
**read** 12:9 22:20
36:12 45:18
74:21 114:5
115:16 140:8
159:2,5,6
185:6 193:25
231:19 233:1
**reading** 10:24
17:1 19:6,19
25:24 26:10
28:21,25 31:12
31:19 33:4
36:10 41:11
42:22 46:8,12
46:18 49:14
50:12 59:12,22
63:2 65:22
70:3 71:4 72:8

John Moseley    April 8, 2025

76:9 82:13
91:6 103:8
109:11,19,24
113:5,19
123:23 126:10
129:25 130:25
133:19 135:20
138:5 142:2
146:11 148:23
157:25 161:19
174:22 176:1
177:9 181:1,9
195:24 222:17
229:22
**ready** 10:23
17:2 18:23
28:20 36:9
42:24 62:22,23
126:9 130:1
135:19 138:4
**real** 57:22 58:8
97:25 98:7
103:23
**realize** 40:18
**really** 33:6 39:4
39:12 45:8
46:13 73:25
74:1 89:5
109:14 123:19
190:6
**reason** 96:10
143:9 218:1
219:1,10 220:7
220:14,16,22
220:24 232:2
**reasons** 41:3
**Rebekka** 2:7
16:14 210:9,9
210:11,14
212:8 235:5
**recall** 19:20
102:10 148:13
160:21
**RECAP** 8:6,9
**recapping** 26:8

**receipt** 63:25
**receive** 143:8
170:13,15
171:9,10
**received** 140:15
142:3,23 143:1
143:3 166:14
166:17,20
170:25 171:18
183:21 212:20
216:3 217:3,8
218:15,25
219:9 220:6,13
220:21
**recipient** 32:15
70:6
**recipients** 32:13
**recollection** 62:6
129:20 134:12
135:3
**recommendati...**
56:22
**recommendati...**
56:18,19
**recommended**
57:23 58:9
**recommends**
62:11
**record** 1:22 6:25
10:3,10 11:25
12:2 14:23
45:11,15,21
96:17 105:9,13
107:23 108:1
125:14,17,21
172:9 181:5
220:25 221:11
221:13,18
225:4,15
229:13 231:17
231:22 234:16
235:3
**record's** 195:2
**recording** 98:1
**records** 86:11

209:21
**recovered** 35:20
35:21
**recovery** 60:20
**red** 54:7
**redacted** 52:20
52:21
**refer** 52:1 84:8
**reference** 4:20
50:15,18,20
51:24 60:19
121:4 165:5
**referenced** 48:1
**references** 90:25
226:5
**referencing**
57:17
**referral** 21:1,14
21:22 22:7
24:1 25:10
29:23 77:10
78:8
**referrals** 20:20
20:21,24 24:19
24:25 51:12
77:20
**referred** 51:21
51:22 78:16
82:23 84:9
154:13
**referring** 48:13
52:2 54:11
55:3 62:1 65:3
65:8 73:14
74:10 82:1
101:7 106:22
108:7 110:14
111:24 121:1
150:18 151:14
152:5 179:21
179:24 184:11
188:22
**refers** 65:2,23
166:25
**reflected** 226:2

227:23
**refresh** 62:6,9
**regarding** 9:20
124:14 140:1
155:16 162:11
**REGISTRAT...**
235:19
**regularly** 85:16
**reiterate** 76:16
**relate** 229:15
**related** 102:2
129:19 130:24
135:9,10
139:14 181:16
228:4 235:9
**relates** 29:8
103:6 149:10
150:11
**relating** 56:23
130:18 134:13
216:12
**relationship**
68:9 91:9,20
128:1 188:5,6
**relationships**
13:12 34:1
**release** 86:11
90:6 114:13
**relevant** 191:8
191:11
**relying** 44:1
222:8
**remember** 16:13
36:11 98:25
101:10,11
108:4 115:8
205:24 206:7
**remotely** 234:15
**removal** 131:18
**remove** 163:23
**rep** 154:17,18,25
155:21 156:8
156:24 157:8
**repeat** 15:13
148:9

**rephrase** 87:2
193:13 198:7
198:10
**replied** 118:25
137:2 169:18
**replies** 124:8
136:15 162:2
**reply** 136:25
162:13
**report** 9:23
221:21 222:25
229:16
**reported** 1:19
**reporter** 11:21
12:2 18:6,14
18:16 21:7
29:15 38:22
39:18 47:17
68:4 74:21
88:23 94:16
95:22 116:21
125:13 126:6
146:23 148:6
167:16 172:8
178:22 188:16
206:4 229:19
231:1 234:12
**Reporter's** 3:4
234:8
**REPORTERS**
235:19
**reports** 56:8
**repped** 154:16
154:24,24
**represent** 21:9
91:10,21
100:22 128:19
184:19,21
193:5 222:20
230:12
**representation**
54:20 128:25
129:3,15 155:2
155:6,7,16
156:24 177:1

John Moseley    April 8, 2025

Page 262

representations 156:12
representative 10:13
represented 17:6 128:12,21 154:14,19,20 154:23 157:9 170:24 180:10 182:21,24,25
representing 33:25 156:23 157:11 183:6
reps 8:14 154:2 154:7,12 156:1
request 91:7,25 117:22 143:24 144:20 189:4 192:14 201:7 201:13 209:24 210:25 212:9 212:12 220:25 221:25
requested 93:14 119:18 131:18 200:23,24 201:6,6,10
requesting 201:15
requests 212:19
required 60:16 89:12 160:21 160:23 165:21 166:9
requirement 166:2
requirements 8:7,9 121:5
requires 112:6
requiring 166:6
RESCANNED 9:12
residence 176:16
residence/dam...

175:23
residential 21:5 74:5
resolution 41:2
respect 80:6
respond 24:24 53:9 108:10 110:20 178:6 189:23
responded 172:2
responds 21:12 22:1 35:12 110:17 111:15 164:15 173:10 174:5,7
response 17:9 41:24 54:15 131:20 153:1,2 164:18 167:3 178:11 214:18 228:25
responses 17:4 30:1,12 213:16
responsible 110:22 178:10 182:12 216:20
responsive 27:2 143:23 144:19 212:3 213:23
rest 164:23
result 88:12 188:5
retained 101:1 150:6,23 178:25
retainer 5:7 34:18 59:14 60:9,13 64:22 64:23 70:8 75:17,20 76:2 87:13 174:5 178:21,23
retainer/intake 65:19
retainers 8:22

9:6,12 64:20 65:7,12,14,15 72:13 81:15 83:22 119:18 164:7 168:7 173:8
retention 138:12 138:16 149:4 149:10 150:7 150:12 153:14
return 234:21
review 12:18 41:8 45:18 90:3,21 114:9 119:19 120:15 133:9 134:18 159:1 231:20
reviewed 93:20 115:14 117:25 118:2 207:23
reviewing 22:5 23:24 106:7
revised 82:20 110:17 162:11
revising 162:20
revisions 41:15 110:24
RF 110:21
ride 111:16
right 10:13 11:3 11:18 12:5 13:5,7 18:20 19:10 21:11 24:16 25:14,17 25:20 26:4 27:4 28:17 31:8,9 32:1,9 32:24 37:16,19 37:20 41:6 43:1 50:6 52:14 54:17,21 60:3,25 61:12 66:9 67:8,19 69:24 71:4,5 72:24 73:20

74:17 75:4 77:11 80:9 82:2 83:24 87:13 88:19 90:1 91:19,21 93:17 95:3 96:4 101:14 103:7,20 105:3 105:16,20 106:5,15 108:19 112:23 117:1,14 119:3 119:22 120:15 121:9,22,25 122:8,11 125:24 129:5 130:8 133:6 135:14,16 138:8 140:15 147:19 149:13 149:13 156:18 156:25 158:25 161:7 164:12 165:3,6 167:1 167:15 168:14 168:14 175:15 176:8 178:17 179:25 180:11 181:4,17 183:6 194:8 195:16 195:21 199:11 200:9 207:12 208:1 213:12 213:17 215:1 215:24 217:24 220:3 226:3,23 227:19 231:14 231:21
right-hand 103:9
rip 148:25
ROBERT 4:22 5:3
rogue 170:14,15
role 63:11,14,15

64:1 80:7 199:10,15
roles 99:16
rolling 58:17,24
roofers 50:18,23 51:9,11
roofing 42:7,11
room 211:25
roughly 63:20 132:1 134:24
round 128:7
routed 88:2
row 223:10
RS221892 112:6
RS221982 115:8
rubber 197:20
Rubion 103:5 109:4 196:11 196:13
rule 3:11 97:6 116:2 146:6 147:5,22
rules 1:21 11:14 15:7 78:4
run 88:3
running 85:19 94:14 113:10
Russian 170:12 170:22 171:2
Russians 171:5 171:22
rveith@fishm... 2:10

**S**

S 3:9 4:1 5:1 6:1 7:1 8:1 9:1
SA 7:17
saith 231:25
salesman 13:22
sample 183:15 184:11
Sanders 53:20
Sanders-- 53:18
Saunders 53:19

John Moseley    April 8, 2025

Page 263

**saw** 13:24 95:2
133:6 137:9
161:4
**saying** 27:1 44:4
81:25 115:2,3
136:15 141:9
171:22 218:4
230:21
**says** 22:5 26:6
26:15 30:25
34:17 41:15
42:15 43:5
46:23 48:11
50:17,23 51:8
55:12 60:15
62:4 65:18
66:24 69:7
70:17 71:14,18
71:19 73:24
75:14 77:3,14
80:20 84:11,15
87:3,16 89:5
90:2 91:6,24
94:3 97:9,12
102:21 103:8
103:13 104:8
106:21 107:22
110:13 112:6
113:8 114:16
114:21 115:13
115:25 116:4,7
117:5 120:19
121:4,25 122:7
122:9,17 123:3
124:9,13,20
127:17 133:20
134:17 136:20
138:22 139:13
140:1 141:2,5
141:8,15,17
143:6 147:2,8
147:17 158:10
158:14,17
160:1,3,4,6
164:15,21,24

165:11 168:19
168:23 175:4,6
175:9,19 176:2
176:10,21,23
176:25 177:3
181:19 182:4
185:7 200:11
201:23 202:5
214:22 217:7
218:14,24
220:5,12,20
223:10 230:6
**Scallan** 4:4
101:8,11,16
102:1,7 135:25
**Scanned** 174:14
**scanning** 173:14
**scheduled** 27:16
**scheduling**
49:17,21,23,25
50:2
**Schery** 7:20,22
131:16
**scope** 55:20 56:4
139:16 140:2,3
140:5 142:6
143:11 144:4
144:15 145:25
147:25 148:16
149:6 151:2
166:12,23
186:5 187:19
189:11
**Scottsdale** 98:20
**screen** 44:11
**screened** 69:17
85:23 86:1
230:13,16,18
**screening** 62:3
82:25 83:1
85:19,24 90:14
91:11,12,13
**script** 22:2
30:20,25 31:4
31:7 102:7,10

136:21 137:10
**scripted** 147:16
**scripting** 141:7
141:12,16
147:12
**scripts** 89:11,16
**scrub** 129:9
182:9 187:20
189:1
**scrubbed** 129:4
129:6 184:18
187:23 188:21
**scrubbing** 94:14
94:17 128:1,7
155:18,18
165:14,15
182:12
**seal** 233:12
**Sean** 6:24 9:3
107:22 118:19
118:21 167:12
**search** 209:20
**second** 11:20
14:22 33:8
34:9,16 36:14
64:16,19 77:2
87:16 90:1
99:20 113:22
114:7,8 122:22
128:8 136:5
170:4 195:11
200:10 231:9
**second-to-the-...**
71:6 140:24
**seconds** 190:10
**section** 175:16
**secure** 90:7
114:14
**see** 19:10 21:15
21:23 24:2
25:1,23 26:17
28:24 29:5
30:21 31:1,16
33:12 34:3,10
34:14,20 36:17

36:21 40:21
41:15,18,23
43:3,5,7 46:20
46:25 47:9
48:11 49:18
50:15,17,21,24
52:24 53:2
54:7,25 55:15
59:11,21,25
60:17,22 61:6
61:10,17,23
62:13,25 63:7
64:17,23 65:20
66:22 67:1,5
70:10,15,19
71:9,12,16,22
72:6 73:6 74:7
75:2,6,9,14,17
76:12,17,20,25
77:4,16 80:22
80:25 81:3,8
81:15,17,19,21
82:15,21 84:4
84:19 86:12
87:7,20 89:13
90:8 92:1
93:21 99:12
100:4,8 102:8
102:18,22
103:15 106:11
110:2,9,25
111:16,21
112:5,9 118:11
118:23 119:20
120:8,11,23
121:5 123:17
124:11,15,22
126:13 127:6
127:19 130:11
130:15 131:18
132:2 133:10
135:25 136:3,7
136:13,18
141:13 146:11
147:6 149:8,14

149:18,19
151:10,24
152:12 154:2
158:12,15,17
158:20,23
159:13,16,17
162:15 164:13
164:17,25
167:13 168:21
168:25 169:3
169:19,24
170:4 172:24
173:3,16,25
177:19,24
178:10 184:19
185:9 200:11
200:16 201:23
202:3,6 204:6
209:2 212:10
212:22 213:2
224:17 225:25
226:7,14,17,24
227:2,6,12,15
227:17,21
228:12 229:1
230:9
**seeking** 128:25
129:3
**seen** 10:25
140:14,16
**sees** 92:4
**select** 51:21
**semicolon**
142:18
**send** 22:8 32:16
32:17 48:24
50:20 51:24
64:20 65:9,20
69:13,16 71:19
73:3 104:12,16
107:22 108:23
114:17,23,25
115:3,3,4,10
166:5 177:17
189:4 196:15

203:3,8,14
207:3 231:7
**sender** 99:23,25
**sending** 50:14
61:19 62:4
76:15,24 93:7
107:15 144:3
167:20 196:18
**sends** 41:14
75:13
**sense** 112:4
136:17
**sent** 22:3 26:25
54:12,18 62:8
63:20 65:11,15
69:14 70:8
71:21 72:14
80:20 82:20
103:25 104:9
104:13 139:9
143:10 145:12
169:15 170:6
178:19 179:1
180:11 184:4
185:5,11
188:25 196:5
196:21 200:18
200:21,22
201:10 202:8
202:12,18
203:14,20,25
218:13,23
219:7,25 220:2
220:4,11,19
228:5
**sentence** 26:13
48:11 60:14
112:6 114:4
**separate** 27:25
57:1,3 58:1,1
146:12
**September** 4:16
4:19,22 5:3,5,8
5:11 9:16
52:24 61:16

63:1 178:15
**service** 6:12 7:6
8:4,16,17 9:14
84:6 87:15
100:19,21
101:1,6 113:3
113:12 116:16
136:2 141:4
146:9 148:11
150:19
**services** 84:13
84:16 86:4
87:25 89:3
90:2 94:15,16
95:1 113:14,21
114:8 116:14
118:16 154:7
157:21 158:25
161:13 174:24
193:15
**set** 31:8 34:17
38:2 62:15
64:4
**sets** 128:4
**setting** 26:11
62:11
**Shame** 211:7,9
211:10
**Shane** 3:18,23
4:6 5:9,11,14
5:23 6:3,9,14
7:3,11,14,22
8:3,6,11,19,22
61:16 64:20,25
65:2,2,8 70:7
75:1 99:10
100:7,14
111:11,11,15
112:14 123:12
124:13 132:23
135:22 142:13
142:17,18,21
143:6,6 152:16
153:23
**Shane/Phil**

111:9
**share** 191:17
**shit** 118:22
**short** 26:14,15
**shorthand** 1:19
84:7 234:11
**shortly** 65:20
178:16
**show** 18:21
28:17 31:9
64:13 71:15
91:4 101:14
138:5
**showed** 89:21
**shows** 162:10
**Shunnarah**
33:19,23
**sic** 85:8 109:9
133:8
**side** 155:19,19
**sidebar** 21:16
34:6 149:11,15
149:25 171:6
187:4 189:14
**sign** 34:19 44:4
66:22 67:5,18
71:20 73:4,8
75:9 80:21
82:20 94:21
120:22 160:24
185:20,21,24
202:19 230:11
**signature** 3:4
9:4,12 21:13
76:24 116:16
122:3,5,7,8
157:24 158:1,2
158:8 167:13
167:20 232:1
233:1 234:20
**signatures** 173:2
173:23,24
**signed** 26:16,23
27:12 28:10
32:17,21 44:9

57:21 65:11,15
67:23 68:10,12
70:15 74:2
90:21 92:9,17
93:13,24 95:3
97:15 106:11
113:6 117:14
117:17 118:1,3
118:4 159:1,18
159:23 166:5
169:5 173:18
174:9
**signing** 63:7
71:24 75:17,20
76:2 185:15,23
**signs** 66:22
154:21 155:12
**signup** 70:8
75:16,20 76:3
177:18
**similar** 89:25
226:2
**simple** 193:4
**simply** 51:10
134:4 192:11
202:5
**simultaneously**
184:16
**single** 86:1
104:13 141:12
204:12
**sir** 18:17 21:8
93:22 100:5
106:12
**sit** 205:21,23
215:23
**site** 71:20
**sitting** 11:3 29:8
205:5,12
206:16,18
215:20 217:2
224:6
**skipped** 121:13
**sleeping** 190:10
190:11,16

**slightly** 17:22
85:21 164:23
216:1 222:5
**slow** 21:7,7
**slower** 74:22
**slowly** 12:1
**small** 147:17
**smallest** 76:23
**smart** 7:18 18:5
18:8,10 40:10
47:13,20 48:23
61:20 62:5
64:4 126:12,16
131:2,9,11
152:25 153:3
192:4 194:24
**Smith** 3:15,15
3:18,21,23
4:13,19 5:16
5:24 6:4 20:6,6
20:11,13 30:25
32:13 35:12
71:8,11 73:14
75:7,8 76:12
76:14 169:2
**smoother** 59:1
**Snap** 226:6,16
**sneak** 218:5
**Snowden** 53:20
53:21 111:3
112:14
**snuck** 217:17,24
**software** 38:7
49:17,20 50:3
98:6 126:22
**SOL** 178:9
**sold** 198:17
**solicitation**
171:12 200:20
**soliciting** 170:20
170:22
**solidify** 54:24
**solo** 198:21
**solution** 49:23
72:5

John Moseley    April 8, 2025

Page 265

solutions 64:9
somebody's
  190:5
sorry 15:12
  16:14 18:6
  39:18 48:17
  55:23 58:12
  65:1,22 77:13
  97:7 99:2,21
  109:19 130:21
  134:15 153:7
  153:10 163:2
  172:17,21
  181:1 207:13
  224:21
sort 33:7 38:4
  40:9 49:1
  62:15 84:21
  126:15,18
  127:21
sorts 41:3 197:9
sound 74:1
sounds 37:20
source 21:14,22
  22:7 24:1
  29:23
sources 24:25
  25:10
south 104:14
SOUTHERN
  1:1 234:1
spaced 161:6
spacious 35:16
speak 11:9 26:7
  88:7,10,19
  98:10 137:12
  191:23 217:14
speaking 14:25
  15:3,4 134:6
  152:2 192:2,7
specialist 38:11
  38:12,13 39:25
specialty 42:5,6
specific 57:17
  84:23 89:11,16

174:3 201:2,4
202:18 203:24
203:25,25
specifically
  37:15 79:8
  80:6 101:2
  138:23 139:11
  159:6 164:11
  168:13 206:1
  224:9
speculate 68:2
  99:3
speculation
  23:20 30:3
  35:1 43:18
  44:22 47:22
  60:5 79:24
  124:1 127:24
  137:23 145:18
  162:7 182:16
  183:8,24
  187:17 188:3
  188:13 192:24
  193:19 194:21
split 50:19 51:24
  52:1,1,3
splits 36:2
  124:10
spoke 88:12
  130:18
spreadsheet
  50:14 71:19
  141:25 144:7
spreadsheets
  147:19
St 2:8
staff 78:20
stamp 197:20
  209:10,15
  212:7,7,11
stamped 208:7,9
  209:2
stand 222:16
stands 222:17
start 11:14

99:21 119:17
  134:15
started 63:7
  202:5
starts 26:14
  33:10 60:14
  71:8 99:19
state 1:18 10:9
  15:8 44:5
  112:9 136:10
  137:20 204:11
  204:15 205:6
  205:13 233:7
  233:16 234:12
stated 1:22
  83:21
statement 87:3
  110:21,24,25
  134:22 153:11
  191:16
states 1:1 114:9
  183:16 234:1
status 141:7,13
  147:3,8,10
statuses 141:10
  141:11
statute 110:18
  124:14 162:11
  179:4
statutes 112:9
step 129:8
steps 5:14
  120:19
Stipulations 3:3
stockholders
  122:15
stop 105:18
  190:1,5,21,21
  190:22,24
  192:1,5
stopped 131:22
storm 3:21,24
  5:6,9,12 6:10
  7:11 8:22 9:6
  25:23 27:5

32:8,20 37:13
  59:13 63:7,22
  75:15 81:14
  82:7 83:21
  84:25 119:13
  133:9,15,20
  134:18 135:8,8
  135:14,15
  164:7 168:7
  179:10
storm-damage...
  62:13
STORM.DOCX
  3:15
storms 27:4
  135:11
strategy 179:8
Street 2:18
strike 67:15
  90:24 195:17
  197:23
string 135:21
Strong 206:10
struggle 148:6
stuff 210:24
subject 29:4
  32:8 37:14
  59:13 70:9
  100:3 102:1,20
  106:5 110:4,16
  119:13 126:11
  130:7 133:5
  136:2 161:24
  164:6 168:6
  177:10 229:25
submission
  87:19
submit 70:14
submits 71:15
submitted
  234:18
subscribed
  233:11
substance 12:14
  30:17 99:20

suggesting
  137:10
suggests 123:17
suit 35:13
  162:15,19
  163:18 164:12
  164:25 165:21
  166:6,9,15,18
  166:21 167:1
  168:14 178:9
Suite 1:20 2:8,14
  10:15 235:20
sum 95:17,19
  229:10
summarize
  123:20 221:25
summary 94:1,3
  96:24 115:19
  116:7 117:5,9
  117:13 118:3
  158:12,13
  160:1 175:3,5
  175:11
summer 16:5
supervise 85:8
supervising 85:1
  107:14
supervision
  84:18,21
surcharge
  214:19 215:4
sure 13:1 15:10
  16:17,18 20:11
  20:17 23:10
  28:8 34:2
  43:24 46:1
  54:14 67:13
  68:14 73:5
  74:23 81:25
  85:21 91:16
  108:2 111:20
  117:6 118:25
  124:3 128:2
  131:25 133:19
  138:8 141:10

John Moseley    April 8, 2025

142:22 144:17
146:21 148:3
148:12 156:9
161:4 170:18
180:19 202:20
205:25 208:8
208:10 215:1
217:22 221:9
223:14 225:1
**surveillance**
85:10,12
**survey** 64:22
65:19,23 89:11
89:16
**surveys** 64:20
65:7,25
**switch** 221:22
225:2
**sworn** 10:5
234:14
**system** 24:22
40:9 42:7,11
47:8,11,14
49:2,5,7,7,9,9
88:14 90:8
92:19 114:14
123:22 124:5
130:15 131:2
131:17,24
151:23 152:15
152:20,20
173:21 194:25
221:25 223:15
223:17
**systems** 88:3
150:4

**————————**
**T**
**T** 2:2 3:6,9 4:1
5:1 6:1 7:1 8:1
9:1 235:4
**T-I-G-H-E**
153:21
**Tab** 83:25
207:13

**take** 10:22 12:2
28:19 38:3
45:6 105:5
109:21 125:9
126:9 162:20
179:3 183:15
221:7 224:14
**taken** 1:16 45:12
73:5 105:10
125:18 139:14
221:14 235:2
235:11
**takes** 184:23
**talk** 11:24 12:1
12:10 13:11
14:13 57:2
126:1 138:21
142:5 148:5
149:3 155:23
211:25 213:15
213:24 214:1
**talked** 114:22
**talking** 13:3
20:22 22:2
23:4 25:10
27:15 29:9
58:1,18 67:8
76:15 91:16
97:21 106:15
128:11 131:10
132:5 153:6
163:21 188:15
188:18 190:1,2
190:4 191:19
**team** 31:6 37:8
37:10 39:22,24
53:17,18 72:12
131:17 136:10
141:4 167:15
167:17 177:22
215:11,12
**team's** 65:19
**tech** 49:4
**technology** 64:8
79:19 127:6,8

155:19
**Tel** 2:5,9,15,19
235:21
**telephone** 40:6
**tell** 13:14 20:21
22:9 39:12
46:15 69:8
105:19 123:20
142:8 146:3
155:9 173:13
180:3 192:10
194:24 199:15
205:14 215:21
217:2,23
221:23 222:24
**telling** 144:9,14
186:19 187:3
194:25 195:10
**temporal** 68:9
**ten** 57:13
**tender** 231:12
**Tennessee** 98:21
**term** 26:14,15
**terminated**
155:2
**terms** 38:12
**testified** 10:5
69:8 156:3
192:21 196:22
198:1 200:17
203:5
**testify** 150:7
151:2 187:7
**testifying** 134:3
140:19
**testimony** 39:3
58:22 69:13
126:1 128:15
128:23 133:13
133:17,25
134:5 155:9
156:6 165:23
172:1 187:12
197:4 216:17
217:6 221:3

234:16 235:2
**Texas** 1:1,19,21
2:4,14,18
60:24 61:1,4
63:21 89:7
234:1,12
235:18,21
**text** 33:16 34:16
40:6 103:18
104:15,17,18
104:19 105:2
120:7 141:12
147:12,15
161:25 164:22
170:3,6,13,16
170:22,24
171:2,10,11,12
171:18,19
201:25
**texter** 170:12
**thank** 17:11
20:4 28:2,17
41:6 45:18
48:15 58:21
61:12 66:4
73:24 82:21
96:14 120:19
121:15 133:12
141:2,18
192:17 204:18
231:11,14
**thanks** 14:24
76:14 136:20
163:15 176:12
**theoretically**
74:5
**thing** 104:23
205:8,16
208:22 212:5
215:1 219:19
**things** 27:21
34:8 45:24
71:18 88:18
91:17 146:4
149:8 196:23

207:4
**think** 15:3 19:23
20:15 22:2,16
22:17,23 25:3
25:6 26:25
27:18 31:6
33:21 35:8,14
37:14 42:5
51:15 53:19
54:13,18 57:20
64:7 78:4,23
79:5 80:8
83:10 89:6
91:2 98:5,16
98:16,18,25
99:4 101:3,20
101:23,23
104:3 106:13
106:21 108:7
112:21 116:18
116:21 117:18
118:21 124:9
125:8 130:21
130:25 132:9
136:15 138:12
144:21 145:19
147:17 148:24
150:11 159:4,5
160:18,22
163:1 167:10
177:22 179:8
181:20 183:10
191:6,23 193:1
204:15 206:9
206:15 207:21
216:18 217:23
219:15 223:2
224:3 231:10
**thinking** 150:20
**third** 60:15
113:18 126:22
146:15,18
**third-party** 93:9
**thou--** 25:3
**thought** 22:18

Worldwide Court Reporters, Inc.
(800) 745-1101

24:24 43:25
137:19,24
154:18 179:7
200:17
**Thoughts** 74:7
**thousand** 85:25
93:1 96:1,12
**thousands** 24:25
25:6,9,11
**thread** 52:18
**three** 33:3 40:14
49:12 50:11
59:10 60:15
61:15 62:21
64:14 66:5
71:3 74:20
76:8 82:11
83:23 99:9
101:19 102:15
105:16 107:20
109:9 118:8
119:7 123:4,10
126:5 127:12
129:24 132:22
135:23 138:3
140:17 148:21
159:12 160:18
161:6,18,21
164:4 167:11
167:23 172:12
172:22 173:2,5
173:15,18,20
175:23 176:16
176:23 177:7
180:16 184:15
206:12 225:20
229:18
**three-page**
119:17,19
**Thursday** 28:23
**Tie** 153:22
**tiered** 88:14
**Tighe** 9:8,24
153:23 169:18
230:6

**time** 10:2 15:23
20:5,12 23:9
25:16 45:10,14
72:24 97:25
98:7 105:8,12
108:22 109:21
125:16,20
131:6,22
137:24,25
141:3 160:21
160:25 165:19
166:4 172:21
186:24 205:22
221:12,17
231:11,21
234:22 235:2
**times** 96:12,20
123:4 186:15
**title** 113:9
117:18 118:12
158:7
**titled** 50:14
66:17 109:9
159:16 221:21
**titles** 116:13
**TL** 38:23
**today** 10:1 11:3
13:8 20:5
27:16 28:13
29:9 58:4
149:21 196:22
205:21,23
206:16,18
215:20,23
217:2 223:23
**today's** 12:7
**told** 56:25 72:20
89:21 96:10,12
109:2 138:23
139:8 155:17
179:19 180:7
186:14,23
187:3 196:20
199:12 218:5,6
222:6

**tomorrow**
124:22 125:4
150:16
**top** 30:16 32:12
33:8 41:13
46:14,17 52:23
54:13 65:21
74:25 80:14
99:10,19 103:8
109:17,25
110:7 111:7,18
120:18 121:20
122:3 123:11
124:18 130:3
131:20 135:21
143:13 145:15
147:2,9 168:3
190:1 200:13
200:15 201:22
209:2
**topic** 139:10
216:10
**topics** 11:6,9,12
16:16 57:5
139:2 142:5
191:7,10 199:8
**Tort** 13:8
**toss** 109:12
**total** 94:3,8 96:4
97:2,3,9
115:19 117:11
158:14,22
160:2,8 175:6
175:12 215:15
215:17 222:2
224:17 225:18
227:6,20
229:10
**totally** 58:18
225:12
**Town** 2:14
**Toyloria** 1:18
234:11 235:17
**track** 40:19,24
41:2 51:22

166:8
**tracking** 40:9
**tracks** 18:12
**train** 137:24
**training** 38:8
85:13 97:22
**transaction** 9:23
221:21 222:14
222:15,25
229:15
**transcript**
231:18 234:15
234:18
**transfer** 7:20,23
63:24 64:10
130:7,14 133:6
133:14 134:14
134:22 152:18
**transferred**
174:2
**transferring**
64:1 131:10
**transmit** 90:4,10
114:10
**transmitted**
90:17
**Trial** 13:16,18
19:21 61:9
**tricky** 197:19
**tried** 44:10
71:20 73:4
75:9 88:16
107:23
**trouble** 72:13,22
109:14 147:18
**true** 120:16
186:10 233:2
234:16
**truth** 144:10,14
**truthful** 145:24
**try** 105:21 124:3
148:5
**trying** 11:25
28:6 58:16,24
73:8 129:17

143:2 156:15
157:7 169:24
197:18 216:18
225:8
**Tuesday** 10:1
29:3 119:10
**turn** 146:15
157:23 200:10
**TV** 197:10
**TWIA** 60:21,24
61:2 162:14
165:6
**twice** 45:25
156:25 161:13
**two** 4:6 18:22
22:12,13,15
27:21,25 37:1
37:4 41:9 45:5
57:1 58:1,1,18
71:21 77:22
84:3 113:3
116:12 150:3
154:21,22
155:12,24
157:5,15
159:13,15
160:20,24
161:6,7,9
168:23 169:2
174:19 175:3
175:20 177:15
179:6,8,12
180:4,18
183:15 184:23
195:11,22
200:10 208:10
214:13 218:12
218:20 220:3
220:10,17
225:17,24
226:23 227:11
227:20 228:9
228:16,22
**two-million-d...**
229:6

John Moseley    April 8, 2025

**two-year** 179:10
**Tyeisha** 71:21
**type** 42:7 46:20
  46:20 84:8
  222:15
**types** 132:6,8,14
  135:11

**U**

**UCC** 2:16 235:7
**Uh-huh** 17:22
  24:3 89:4
  181:14
**ultimately** 31:3
  49:9 111:7
  112:20 124:17
  174:4 182:20
  182:25
**unclear** 176:22
**underneath**
  117:14 141:6
  226:11
**underpaid** 21:3
  122:14,24
**undersigned**
  185:7
**understand** 12:3
  13:7 17:4
  23:23 35:4
  41:6 44:19
  54:10 79:18
  91:17 125:3
  129:3 146:13
  181:16,21
  182:14 188:14
  198:1 209:8
  214:19 224:5
  224:12,12
**understand--**
  209:5
**understandable**
  67:3
**understanding**
  17:8 22:19,24
  23:7,22 38:14

68:11,16 75:19
107:1 128:6
133:24 192:25
212:4
**understands**
  86:4
**Understood**
  24:14 131:12
  150:10 184:2
**UNITED** 1:1
  234:1
**universe** 224:5
  230:18
**unrelated** 27:20
**untimely** 112:9
**updated** 7:14
  8:22 9:6
  111:20 123:16
  124:21 164:7
  164:11,16
  165:9,12,20
  166:5 168:7,13
  168:24
**updates** 146:9
  150:24
**updating** 165:13
**upfront** 95:17
**upload** 70:14
  77:15,19 78:19
  79:14
**uploaded** 79:3
  79:10
**use** 8:20 38:11
  47:20 63:11
  64:7 77:25
  89:10,15 111:4
  112:17 161:24
  168:20 219:20
**usually** 24:9
  155:23
**utilize** 14:9
  15:24
**utilized** 30:20
  36:3 47:14
  63:23

**V**

**vague** 14:10
  16:9 27:14
  28:11 36:4
  48:16 72:1
  156:19 175:25
  176:9 201:16
**validation**
  169:24
**values** 34:10,17
**Van** 135:24
**variables** 93:2
**various** 51:1
  195:22
**Veith** 2:7 3:7
  10:7,21 14:6
  14:12,24 15:5
  15:10,11,19
  16:11,18,20
  18:9,19 21:10
  21:19,21 22:15
  22:23 23:1,10
  23:11,21 27:8
  27:10,24 28:2
  28:4,16 29:18
  30:6 31:13
  32:1,2 33:1
  34:7 35:2,11
  35:18 36:1,7
  38:24 39:5,23
  40:16 41:12
  42:23 43:21
  44:14,16,23
  45:3,6,9,19,23
  46:4 47:19,24
  48:5,10,18
  49:15 50:8
  52:17 54:1
  55:21,24 56:9
  57:7 58:5,13
  58:21 59:3,7
  60:7 61:14
  62:20 64:12
  66:8 67:14,16
  68:6,20 69:3

69:15 70:1
71:2 72:3,16
72:17 73:13,19
74:19,23,24
75:25 76:1,7
80:2,11 82:10
83:8,12 84:2
89:1,9 92:5,7
92:14,22 94:18
95:10,18,24
96:14,16,21,23
97:1,8,19 99:8
101:18 102:14
104:6 105:7,15
105:20,24
106:1 107:19
108:18 109:14
109:16 113:1
114:6 115:25
116:5,9,24
118:7 119:5
121:7,9,13,16
123:9 124:2
125:8,12,15,23
126:7,8 128:9
128:17 129:1
129:23 132:13
132:21 133:19
133:21 134:2,6
134:10 135:18
137:18 138:2
138:21 139:3
139:13,19
140:10,13,18
140:22 141:24
142:12 143:7
144:25 145:4
145:22 146:7
147:1,7 148:2
148:7,20
149:12,16
150:9 151:19
151:20 152:1,7
152:10,11
153:19 155:14

156:10,21
157:20 159:11
161:17 162:8
162:25 163:3,9
164:3 166:1,16
167:2,8,17,19
168:1 169:10
171:20 172:11
172:16,18
174:18,21,23
176:3,6,12,15
176:24 177:6
178:24 179:16
179:20,23
180:2,9,15,21
180:24 181:6
182:19,25
183:4,11 184:1
184:8,13 185:1
185:19 186:17
186:21,25
187:1,6,13,22
188:7,20 189:2
189:15,18
191:10,13,25
192:5,7,8,11
192:14,15,18
193:3,22 194:8
194:15,23
195:4,12,16,20
197:8,22,24
198:25 199:1
199:23 200:2,8
201:19 202:23
203:1 204:23
206:6 207:16
208:23 209:1,6
209:12,19,23
212:12,15,18
213:1,5,9,11
213:14,19
214:1,4,7,10
214:23 215:2
217:9 218:2,9
218:11 220:25

221:9,11,19
224:12,13
225:1,5,10,12
225:16 229:12
229:17,20,23
231:9,14
234:24 235:5
**Velawcity** 13:8
13:12,15,20
14:2,8,15
15:24 16:3
17:7,13,15,19
17:20,24 19:12
19:16,21 25:20
26:22 27:7,12
27:19 28:9
31:3 32:12,21
33:12,21 37:1
38:9,11,13
39:1,17,21,24
40:23 42:13
43:14 44:17
46:25 47:20,25
48:8,12,20,24
49:2,7,9,20,24
56:4,11,22
57:15,23,23
58:9,9 59:16
60:2 61:17
62:7,16 63:13
63:18,23 64:7
64:9 65:4,11
65:25 67:24
69:11,14 70:13
70:21 71:25
75:22 76:3
79:15,21 80:3
80:5 84:11,15
84:22 85:2,8
85:11,17,23
86:1,5,7,14,20
86:22 87:3,9
87:20,24,25
88:2,4,8 89:6
89:15 90:4,10

90:25 91:6,11
91:17,24 92:8
92:18 93:18
95:8 98:1,14
98:22 100:10
100:25 101:2,8
103:25 104:19
106:20 109:5
111:12 112:15
113:13,18,22
114:10,16
115:10,13
118:16 127:18
127:21 128:6
129:4 132:15
132:24 133:14
133:18 134:13
134:23 137:7,9
137:12 138:10
138:22 139:1,7
139:14 153:24
155:15 156:3,8
166:4,13
167:21 168:20
169:18 170:6
171:25 173:1,7
173:11,22
177:24 182:13
186:8 189:7,9
192:19,25
193:8,10,11,14
193:20 194:1,3
194:4,16 196:4
196:9,14,15,17
196:23 197:13
197:15 198:4,8
198:15,20
199:2,10,15
207:18 208:3,6
208:8,16,18,24
209:10,15
212:6,7 215:16
216:4,11,12
219:20 222:1
222:10 223:24

224:9,23
225:22 226:13
226:20 229:14
230:13,15,22
231:7
**Velawcity's**
75:20 80:7
90:2 101:5
114:9 138:13
148:11 152:19
154:7 156:2
207:23 211:16
**Velawcity-rel...**
104:5
**Velawcity-SA**
126:12
**Velawcity-sto...**
62:12
**Velocity's** 18:11
63:16
**verbally** 11:20
**verbatim** 198:18
231:8
**verify** 39:7
215:11
**Verifying** 43:24
**Vernado** 169:3
**version** 19:4
80:13 82:12
103:20 119:8
123:11 124:21
164:5
**versus** 166:9
**victim** 156:7,11
**victims** 84:24,25
85:20 103:10
128:24 129:2
161:3
**video** 14:18
15:15 231:17
**VIDEOGRAP...**
2:20 10:1
45:10,14 105:8
105:12 125:16
125:20 221:12

221:17 231:16
231:21
**VIDEOTAPED**
1:9,14
**view** 184:19
**viewed** 13:6
**violation** 112:9
171:17
**voice** 18:16 74:6
145:2
**Volume** 1:12
**voluminous**
20:20
**Vottiero** 3:14,18
3:21 4:3,6,8,11
4:16,19 5:6,16
5:18,20 6:17
6:19,22,24 7:4
7:9,17,20 9:6
9:17,18 20:5
22:1 23:17,24
24:4 25:19
26:6,20 32:11
37:2 40:18
41:14 42:13,16
43:2 49:16
50:13 51:8,23
56:12 59:16
60:8 62:25
63:5 66:14,20
69:7 70:5,7,12
82:15 99:25
100:6 102:20
102:25 106:2,7
106:19,24
107:7,15,21,22
108:7,11,23
111:12,14
112:19 118:19
124:8 130:4,12
132:4 134:23
153:23 164:11
167:12 168:3
177:24 178:2
181:10 185:14

185:23,25
**Vottiero's**
131:20
**VS** 1:4 234:4

---

**W**
**W/ATTACH...**
6:11,20 8:9
9:10
**W/ATTACH...**
7:5,12,15 9:13
9:20
**W/VOLUMI...**
8:15
**waiting** 118:23
**waiver** 177:17
178:7
**waivers** 177:18
178:12
**walk-ins** 78:20
**WALKER** 2:3
**want** 12:5,13
16:21 17:7
19:17 21:25
23:5,7 33:7
36:13 45:18
46:23 54:5
58:2 60:12
66:2,4,13,24
74:5 96:22
105:18 109:13
116:3 118:22
160:16,20
181:3 184:19
184:22 188:4
190:18 191:17
197:18 208:22
209:10,18
210:23 211:3,5
211:25 212:3,9
212:10 213:24
214:25 216:13
217:18 221:6,6
224:4 225:2
**wanted** 36:20

John Moseley    April 8, 2025

Page 270

102:8 128:5 176:13
**wanting** 162:3
**wants** 162:7 184:23
**wasn't** 57:16 75:23 101:4 107:15 131:1 143:10 148:4 149:6 151:1 153:5 156:23 156:24 172:2,4 172:5 181:20 182:5,6 186:4 190:11 196:18 204:18 219:2 220:7,14,16,22 220:24
**waste** 118:23
**Watkins** 181:22 182:14 183:20 184:4 187:8,15 188:22 192:20 193:1,12,16 194:17
**way** 2:14 45:22 45:23 51:21 62:7 78:4 85:6 94:19 95:25 117:25 137:3 166:8 170:23 194:24 201:9 222:23,24 223:3,15,17,21
**ways** 201:7
**we'll** 16:22 18:21 31:9 136:21 213:14 214:1 220:25 225:5,6
**we're** 10:2 11:3 13:11 18:24 23:4 28:12 29:8 37:7 41:4 45:11,15 58:3

58:18 61:19 62:4 67:8 89:7 105:25 121:10 125:17 136:21 138:20,21 173:24 216:18 218:9 221:13 225:13 231:22
**we've** 36:19 179:24 184:21 190:9 214:14
**web** 172:5
**webpage** 207:10
**website** 70:13 71:25 72:6 88:6,7,13 103:18 170:22 202:9,11,15,19 203:2,4,8,13 205:3,10,16 206:1
**websites** 103:19 103:24,25
**Wednesday** 19:15
**weed** 38:15 39:1
**week** 66:21 106:9,11
**weeks** 160:18 177:16
**welcome** 96:15 176:13
**went** 14:11 64:9 75:15 88:7 103:23 117:20 205:17 215:19
**weren't** 27:1 95:5,11 107:14 179:16 182:11 197:1,13
**Weslayan** 235:20
**West** 1:20 10:15
**Westbrook** 5:12 62:25 177:14

**WH** 146:9
**what'd** 14:13
**When's** 105:23
**white** 171:15
**why'd** 139:3 160:24
**wife** 20:13 171:3
**Wilhelmy** 9:8,24 153:23 169:18 169:21 230:6
**William** 5:6 7:14 8:3,6,22 9:6,11,24 53:17 59:14 76:14 119:16 124:9 136:16 168:3
**wind** 132:18
**wind/hurricane** 47:4,4
**Windstorm** 60:24 61:1
**Wings** 93:11 106:13,18 108:6 173:14 173:15,22
**withdrawing** 22:13
**witness** 1:15 18:8,15 27:22 27:25 29:16 38:23 39:20 47:18 68:5 88:24 92:3 94:17 95:23 105:5 116:23 121:11 139:5 143:12 144:16 146:1,24 178:23 188:18 191:19 194:11 195:2,6,9 206:5 225:3,8 225:11 231:2 231:12 234:14

234:17,19,20
**woke** 210:21,23
**word** 34:4 61:6 63:12 73:17 190:15 198:14
**words** 83:23 95:2 97:11,14 114:5 115:16 115:19 117:7 117:11,19 141:8 158:21 175:8,11 199:19
**work** 14:17 15:7 21:1 27:19 33:21 36:20 37:22,25 41:3 58:12 91:14 103:13 107:24 136:12,17 137:25 150:17 193:20,21 194:4,5 202:1 209:22,22,25 210:1,5,10 213:22 224:2
**WORKBOOK** 8:6,9
**worked** 73:22 199:17
**workflow** 54:24 55:2,8 56:15 56:23 57:19,20 57:21,24,25 58:10,11 63:12 63:16 74:11,12 131:7 141:4 147:23 148:11 148:14
**working** 37:7,11 100:17 136:11 136:21 137:11 137:20 224:5
**WORLDWIDE** 235:19

**wouldn't** 68:13 82:20 208:15
**wrapped** 26:8
**write** 36:19 49:16 111:9
**writes** 40:18 61:19 63:5 64:20 66:20 70:7,12 72:4 73:3 74:4 76:14,19 82:18 100:6 102:7 106:7 111:19 118:21 119:16 124:4 130:14 131:17 133:8 136:9 151:8,8 151:21 173:1 177:15
**writing** 135:8 212:13
**written** 84:18 115:24 116:18 116:23
**wrong** 22:4 44:9 86:25 152:2 181:3
**wrote** 51:23 60:8 167:15 198:15

| X |
|---|
| **X** 3:1,6,9 4:1 5:1 6:1 7:1 8:1 9:1 |

| Y |
|---|
| **y'all** 110:24 111:9 231:17 |

**yeah** 16:16 25:15 26:21 35:24 39:4 45:20 55:25 69:14 72:11 79:25 84:9 92:3,13 93:24

John Moseley    April 8, 2025

95:8,16 99:2
101:13,20
109:3 115:25
117:9 118:4
121:23 126:7
128:24 137:25
138:9,16,18
140:7 142:22
152:1 154:3
155:12 156:7
158:13 163:13
169:25 172:2
175:11 176:3
182:3 185:10
190:4,7,14
191:15 195:9
197:5 199:2
205:24 207:9
207:11 210:16
217:15 224:24
225:3,5,8
228:8
**years** 53:22
135:23 140:17
179:6,9,12
180:4 206:12
**Yep** 100:12
169:20 226:10
227:7,18
228:11
**yes/no** 43:11
**yesterday**
143:14 144:18
**you-all** 63:5
67:4,18 70:13
112:2
**younger** 89:6

**Z**

**Zach** 3:21 4:3,8
4:11,16,22 5:3
5:6,18 6:6,9,17
6:19,22,24 7:8
7:11 8:8,14,19
9:3,4,8,16,18

80:20 82:18
102:21 107:22
118:21 119:16
142:8,13,19
143:16 145:15
159:18 167:13
177:15 185:23
194:9
**Zach/William**
136:9
**Zachary** 10:11
**Zantac** 132:19
135:13,14,15
**Zeda** 103:11
**Zepeda** 174:5
**zero** 81:5,11
104:18
**Zoom** 2:22,23

**0**

**0's** 127:12
**000962** 70:2
**001014** 32:4
**001057** 157:23
**00464** 31:15
**04:50:24** 234:24
**09/30/2026**
235:18
**0s** 16:25 18:22
33:3 36:12
40:14 41:9
46:7 49:12
50:11 52:15
54:22 59:10
61:15 62:21
64:14 66:6
71:3 74:20
76:8 80:12
82:11 84:3
99:9 101:19
102:15 105:16
107:20 109:9
113:3 118:8
119:7 123:10
126:5 129:24

132:22 138:3
148:21 153:16
159:12,13,15
161:18,21
164:4 167:11
167:23 169:13
172:12,23
174:19 175:3
177:8 180:16
195:22 200:10
214:13 218:12
218:20 220:3
220:10,17
225:17,24
226:23 227:20
228:9,16,22
229:18

**1**

**1** 1:12 3:3,11
10:19,20 16:25
61:5 72:25
121:9 138:8
228:17,23
**1,000** 82:19
83:19 94:4,10
96:4 97:2,3,10
106:9 115:20
160:3
**1.5** 226:17,21
**1.9** 215:4
**1:04** 125:19
**1:16** 169:16
**10** 3:7,11,20
4:10 24:10
42:18,21 52:6
104:14 106:10
**10/30** 52:3
**10:00** 45:4
**10:08** 45:13,15
**1002** 41:9
**101** 6:16
**102** 6:19
**1026** 18:23
**1030** 42:10

50:19 51:24
52:1
**1039** 84:3
**1045** 113:3
**10497** 2:14
**105** 6:21
**1050** 174:20
**1051** 157:22
**1058** 159:13
**1064** 159:16
**1066** 174:19,21
**107** 6:23
**1074** 175:3
**1075** 195:23
**1076** 200:10
**1080** 201:20
**1081** 204:4
**1082** 204:21,24
**1085** 205:8
**1086** 205:15
**1087** 205:18
206:13
**1088** 206:13,15
**1089** 206:14
**109** 7:3
**1091** 214:13
**1092** 216:2
225:17
**1093** 216:9
217:1 225:24
226:16
**1094** 218:12
226:24
**1095** 218:20
227:6
**1096** 219:5
227:20
**1097** 220:3
228:9
**1098** 220:10
228:16
**1099** 220:17
228:22
**10th** 31:22,24
32:1,5,12

**11** 4:13 9:5 46:3
46:6,11
**11:29** 105:8,10
**11:42** 105:11,13
**112** 7:6
**118** 7:8
**119** 7:10
**11th** 71:8 168:2
168:17
**12** 4:16 49:11,13
**12-digit** 24:10
**12-month** 25:8
**12:04** 125:21
**12:09** 125:16,18
**123** 7:13
**1235** 1:20 10:15
**125** 7:16
**129** 7:19
**13** 4:19 5:20
6:23 9:3 50:6,7
**132** 7:22
**135** 8:3
**137** 99:21,22
**138** 8:5 99:21
**13th** 73:1 107:21
**14** 4:22 5:3
52:15,16 54:3
**141** 8:8
**148** 8:10
**14th** 75:13
150:13 161:21
164:10 229:4
235:14
**15** 4:3 5:3 6:16
53:23,24 54:21
**153** 8:13
**157** 8:16
**1572** 6:7 9:22
80:24 83:5,15
214:14 218:22
**159** 8:17
**15th** 102:6
130:12 151:8
151:21,25
**16** 3:12 5:5,5

John Moseley    April 8, 2025

7:19 8:19,21
9:8 59:6,8
226:20
**161** 8:19
**1634** 216:2
**164** 8:21
**167** 9:3,5
**169** 9:8
**16th** 130:5
131:14 162:2
169:15 227:12
**17** 5:8 6:19
61:12,13
**1709** 217:2
**172** 9:11
**174** 9:14
**1747** 218:13
**1752** 218:21,22
**177** 9:16
**1781** 219:5,13
**17th** 102:17
**18** 3:14 5:11,23
7:22 8:10
62:18,19
226:17
**18-** 106:8
**180** 9:18
**1806** 220:4
**1824** 223:11
**1830** 220:11
**1831** 220:18
**18th** 75:2 132:24
133:3 228:5,24
**19** 5:13 64:11,13
**195** 9:20
**196,954.02**
227:17
**19th** 33:9

**2**

**2** 3:3,12 16:19
16:23 59:24
83:18 111:3,8
216:10 229:19
**2,001,000** 80:25

81:21
**2,036,698**
225:18
**2/23/22** 226:12
**2/25/2022** 226:9
**20** 3:23 5:15
66:5,7,12
106:10 169:13
**200** 21:15,23
**201** 2:8
**2020** 13:17
**2021** 3:14,17,20
3:23 4:3,5,8,10
4:13,16,19,22
5:3,5,8,11,13
5:15,18,20,23
6:3,6,9,14,16
6:19 13:17,25
14:1 16:5
19:15 25:13
28:24 31:18
32:5 36:16
37:18 43:2
52:24 61:16
63:1 64:17
66:15 70:4
71:8 73:1 75:2
76:12 80:14
82:15 99:11
100:1 102:6,17
**2022** 6:21,23 7:3
7:8,10,13,16
7:19,22 8:3,5
8:10,13,19,21
9:3,5,8,11,16
106:3 107:21
109:18 110:2
113:7 118:20
119:11 123:12
123:17 130:5
132:24 133:3
135:23 141:22
150:13 151:8
158:9 159:19
160:14,15

161:21 162:20
163:25 168:2
168:17 172:20
172:23 178:16
223:10 226:17
226:20 227:2
228:24 229:4,8
230:5
**2023** 9:18,23
181:11 230:2
230:11,14
**2025** 1:11,17 8:8
10:2 233:13
234:9 235:14
**207** 9:22
**20th** 31:18,23
33:9 63:1
**21** 5:8,18 6:3
7:13 69:24,25
**21st** 61:16 76:12
123:12
**22** 5:11,20 8:13
71:1,3 109:18
**220** 175:7
**221** 9:23
**221892** 110:21
162:11
**229** 9:23
**23** 5:23 74:17,18
**2301** 2:18
**232** 3:4
**234** 3:4 229:18
**235** 235:20
**23rd** 19:15
159:19 160:14
**24** 6:3 7:3 71:16
76:5,6 85:10
**24th** 110:7
110:1,12
**25** 3:14 6:6 80:9
80:10 106:8
**25th** 223:10
**26** 6:9 82:8,9
**268** 158:17
**269** 172:12

**27** 6:12 9:11
83:25 84:1
**271** 172:23
**27th** 172:20,23
**28** 3:17 6:14
7:16 83:24,25
97:17,18 99:6
99:7
**28.95** 222:3
**289** 180:16
**29** 3:17 6:16
101:16,17
**290** 182:1
**296** 172:22
**29th** 28:24 29:3
36:16 37:18
**2nd** 158:9
160:15,18
227:2 228:1

**3**

**3** 3:14 18:18,21
19:4 55:12
60:14 76:22
83:18 94:8,25
95:17,19 111:3
111:16 112:5
117:12 122:3
123:24 124:4
164:22 214:17
214:22,23
215:3,3 228:2
**3,000** 81:19
93:19 94:6,23
95:3,19,25
96:1,11 97:12
115:14,22
117:8
**3,058,103.98**
224:17
**3,114,224.14**
227:21
**3,395,000**
227:14
**3,500** 158:20

160:6
**3,591,954.02**
227:6
**3.5** 160:9
**3:07** 221:12,14
**3:23** 221:15,17
**3:36** 231:22
**3:37** 1:17 231:24
**30** 6:19 52:6
53:12 102:12
102:13
**30(b)(6)** 3:11
10:12 139:17
143:12 144:16
146:1 149:7
**3000** 235:20
**31** 3:20 4:5,8,10
4:13 6:21 9:18
105:14,16
108:6
**315** 154:15
**31st** 43:2 181:11
**32** 3:23 6:23
107:17,18
**324** 177:8
**33** 7:3 35:13,20
109:7,10
167:23 222:9
**33.5** 215:18
**33/40s** 36:5
**339** 164:4
**34** 7:6 112:23,24
229:20
**343** 167:11
**35** 7:8 118:5,6
**3500** 175:9
**36** 4:3 7:10
119:3,4
**37** 7:13 123:7,8
**38** 7:16 125:22
125:24 126:5
**39** 7:19 129:21
129:22
**39,756** 225:25
**3rd** 70:4

John Moseley    April 8, 2025

| 4 |
| --- |

**4** 3:17 28:15,18
110:18 138:10
176:25
**4.6.22.xlss**
146:10
**4:24-cv-4446** 1:5
234:5
**4:30** 36:16
**40** 4:5 7:22
35:13,21 53:12
54:21 80:12
132:20,22
**404** 71:11
**41** 4:8 8:3
135:16,17
**417** 118:9
**42** 4:10 8:5
54:22 138:1,3
**428** 64:14
**43** 8:8 52:15
141:19,23
**44** 8:10 148:19
148:21
**45** 8:13 153:16
153:18
**46** 4:13 8:16
157:18,19
**4600** 2:8
**464** 33:3
**47** 8:17 159:9,10
**474** 40:14
**479** 61:15
**48** 8:19 161:15
161:16
**480** 62:21
**49** 4:16 8:21
164:2,4

| 5 |
| --- |

**5** 3:20 9:23
31:10,11 32:3
117:1 138:13
**5,000** 63:20
**50** 4:19 9:3

53:12 167:7,9
**500** 74:20 131:6
**500,000** 226:9
226:12
**502** 75:13
**503** 75:5
**504-586-2520**
2:10
**504-586-5252**
2:9
**506** 76:8
**51** 9:5 167:23,24
**519** 82:11
**52** 4:22 9:8
169:8,9,11
172:7
**525** 99:9
**53** 5:3 9:11
172:8,10,12
**533** 109:9
**54** 9:14 174:16
174:17
**540** 119:7
**549** 123:10
**55** 9:16 177:4,5
**56** 9:18 180:13
180:14 181:8
**57** 9:20 195:19
195:21 198:24
198:25 199:2
**58** 9:22 207:13
207:14,15
214:12 224:15
224:16 226:15
227:5 229:11
**59** 5:5 9:23
221:16,21
224:14,19
225:6,22 226:3
226:11,19
227:1,9,20,24
228:14,20
229:16
**5th** 113:7 230:2
230:5,11,14

| 6 |
| --- |

**6** 3:23 4:16 5:13
6:21 9:16 11:5
32:24,25 33:2
64:17 106:3
116:11 117:3
178:15
**6:00** 105:24
**60** 9:23 190:10
198:23 229:18
229:21
**607** 132:22
**61** 5:8 207:12,13
**61301** 2:4
**616** 30:16
**62** 5:11
**63** 127:12
**64** 5:13 127:1
**65** 127:1
**66** 5:15
**667** 81:17 82:19
**69** 5:18

| 7 |
| --- |

**7** 4:3,19,22 5:15
6:6 8:8 36:6,8
66:14
**700** 131:6
**70170** 2:9
**71** 5:20
**713-258-2700**
2:15
**713-337-5580**
2:19
**713-956-5577**
2:5
**713.572.2009**
235:22
**717** 138:3
**720** 106:9
**74** 5:23
**756** 152:7
**757** 148:22
**758** 152:22
153:9

**759** 151:19,24
152:4,9
**76** 6:3
**760** 151:5
**763** 149:17
**770,000** 175:12
**77002** 2:18
**77008** 1:21
**77024** 2:14
**77027** 235:21
**77208-1301** 2:4
**787** 161:18
**790** 161:21
**7978** 235:18
**7th** 52:24 80:14
141:22

| 8 |
| --- |

**8** 1:11,17 4:5 6:9
7:8,10 8:3,5
10:2 40:13,15
234:9
**8/29/21** 41:22
**8/5/2022** 169:6
**80** 6:6
**800.745.1101**
235:21
**806** 129:24
**810** 1:20 10:15
**82** 6:9 36:12
126:6
**827** 126:5,7
**831** 127:12
**832** 127:1
**833** 127:1
**84** 6:12
**848,212.77**
228:10
**865** 107:20
**867** 105:17
**882** 102:15
**886** 101:19
**8th** 82:15 100:1
118:20 119:11
123:17 135:22

| 9 |
| --- |

**9** 4:8 5:18 6:14
41:7,10
**9:10** 10:2
**9:11** 1:17
**9:58** 45:10,12
**930** 2:14
**938,000** 158:22
**945** 71:3
**946** 73:2
**947** 71:7
**962** 66:6,10
**963** 66:6,9,10,11
**97** 6:14
**975** 59:10
**980** 50:11
**982** 49:12
**99** 46:7
**998,059** 226:24
227:2
**9th** 99:11